ACCEPTED
07-15-00083-CV
SEVENTH COURT OF APPEALS
AMARILLO, TEXAS
9/9/2015 5:05:30 PM
Vivian Long, Clerk

## No. 07-15-00083-CV

**IN THE SEVENTH COURT OF APPEALS**
**AMARILLO, TEXAS**

FILED IN
7th COURT OF APPEALS
AMARILLO, TEXAS
9/9/2015 5:05:30 PM
VIVIAN LONG
CLERK

**MARK P. HARDWICK, INDIVIDUALLY AND D/B/A**
**MARK P. HARDWICK OIL AND GAS PROPERTIES AND**
**MARK P. HARDWICK, LLC,**
*Appellants,*

**v.**

**SMITH ENERGY COMPANY, ON ITS OWN BEHALF**
**AND ON BEHALF OF SMITH ENERGY RESOURCE OIL, LTD.,**
**A TEXAS LIMITED PARTNERSHIP, AND ON BEHALF OF SMITH**
**ENERGY PARTNERS I, LTD., A TEXAS LIMITED PARTNERSHIP,**
*Appellees.*

**On Appeal from the 121st District Court, Terry County, Texas**
**Trial Court Cause No. 19,490; The Honorable Rick Morris, Presiding**

## BRIEF OF APPELLANTS

BECK REDDEN LLP
  David M. Gunn
  State Bar No. 08621600
  dgunn@beckredden.com
  Chad Flores
  State Bar No. 24059759
  cflores@beckredden.com
  Erin H. Huber
  State Bar No. 24046118
  ehuber@beckredden.com
1221 McKinney, Suite 4500
Houston, TX  77010-2010
(713) 951-3700
(713) 951-3720 (Fax)

**COUNSEL FOR APPELLANTS**

*Oral Argument Requested*

## IDENTITY OF PARTIES AND COUNSEL

**Appellants:**                 Mark P. Hardwick, Individually and d/b/a
                                Mark P. Hardwick Oil and Gas Properties, and
                                Mark P. Hardwick, LLC


**Counsel for Appellants:**     David M. Gunn
                                State Bar No. 08621600
                                dgunn@beckredden.com
                                Chad Flores
                                State Bar No. 24059759
                                cflores@beckredden.com
                                Erin H. Huber
                                State Bar No. 24046118
                                ehuber@beckredden.com
                                BECK REDDEN LLP
                                1221 McKinney, Suite 4500
                                Houston, TX  77010
                                (713) 951-3700
                                (713) 951-3720 (Fax)

1890.001/55701

| | |
|---|---|
| **Appellees:** | Smith Energy Company, on Its Own Behalf and on Behalf of Smith Energy Resource Oil, Ltd., a Texas Limited Partnership, and on Behalf of Smith Energy Partners I, Ltd., a Texas Limited Partnership |
| **Counsel for Appellees:** | Rusty Hardin<br>State Bar No. 08972800<br>rustyhardin@rustyhardin.com<br>Ryan K. Higgins<br>State Bar No. 24007362<br>rhiggins@rustyhardin.com<br>Jeremy Monthy<br>State Bar No. 24073240<br>jmonthy@rustyhardin.com<br>Lara Hollingsworth<br>State Bar 00796790<br>lhollingsworth@rustyhardin.com<br>Carolyn P. Courville<br>State Bar No. 24007042<br>ccourville@rustyhardin.com<br>RUSTY HARDIN & ASSOCIATES, LLP<br>1401 McKinney Street, Suite 2250<br>Houston, Texas 77010<br>(713) 652-9000<br>(713) 652-9800 (Fax) |
| **Trial Court:** | Hon. Rick Morris<br>Judge, 121st District |

# TABLE OF CONTENTS

**Page**

IDENTITY OF PARTIES AND COUNSEL ............................................................... i

TABLE OF CONTENTS ....................................................................................... iii

INDEX OF AUTHORITIES................................................................................... vii

STATEMENT OF THE CASE ................................................................................xv

STATEMENT REGARDING ORAL ARGUMENT ............................................... xvi

ISSUES PRESENTED ......................................................................................... xvii

INTRODUCTION....................................................................................................1

STATEMENT OF FACTS ........................................................................................2

STANDARD OF REVIEW.....................................................................................11

SUMMARY OF THE ARGUMENT .......................................................................12

ARGUMENT ........................................................................................................13

    I.    THE CONTRACT AND THEFT THEORIES SHOULD BE REVERSED. ..........13

        A.    The Fusselman contract recovery should be reversed. .............13

            1.    The Fusselman part of the contract recovery should be reversed and rendered, because Hardwick did not breach any of the Fusselman contracts, let alone all of them. ......................................14

            2.    The Fusselman part of the contract recovery should be reversed and rendered, because no overcharge damages resulted from any breach. .............17

            3.    Alternatively, the Fusselman contract recovery should be reversed and remanded because of charge error. ..................................................................18

B. The Bad Billy contract recovery should be reversed................22

  1. The contract (PX-85) is not ambiguous.........................22

  2. The statute of frauds applies to the Bad Billy claim.................................................................................23

C. There is no theft, and even if there were, the statute of limitations would still bar almost all of the theft recovery........26

  1. The statute of limitations bars recovery. .......................27

  2. Breach of a contract should not be theft.........................29

II. THE TORT THEORIES SHOULD BE REVERSED. ......................................30

A. There is no breach of fiduciary duty. .......................................30

  1. There is no joint venture, as the parties carefully disclaimed any joint venture in writing. .........................31

  2. There is no agency, because the parties disclaimed it. ............................................................................33

  3. The contracts have legal effect. .....................................34

B. There is no fraud. ....................................................................37

  1. The fraudulent inducement aspect of the claim fails because it lacks legally and factually sufficient evidence. ........................................................38

  2. The rest of the fraud claim is flawed. .............................40

III. THE ADDITIONAL REMEDIES—$5 MILLION IN FORFEITURE, $3.5 MILLION IN FEES, $750,000 IN INTEREST ON THE FORFEITURE, AND PARTIAL RESCISSION—ARE IMPROPER. ......................................42

A. The $5 million forfeiture award is improper. .........................42

  1. There is no underlying tort to support forfeiture...........42

2. Even if forfeiture were available—so that Hardwick had to "return" his "compensation"—the working interests never came from Smith and were not compensation. ...........................................43

3. The forfeiture award rests on inaccurate factual findings. .............................................................44

4. The forfeiture amount is too large. ................................45

5. The forfeiture cannot be saved as restitution and rescission for fraud. ....................................................46

B. The attorney's fees should be reduced or eliminated. .............48

1. A reversal of the underlying damages will require either a rendition or remand on attorney's fees.............48

2. Smith failed to segregate fees between recoverable and non-recoverable claims. ...........................................49

3. There is no evidence that the hours worked by Smith's lawyers were necessary. ....................................53

C. The judgment wrongly stacks remedies: Smith cannot have both the $5 million in disgorgement and the $3.5 million in fees...............................................................................56

D. The rescission remedy is improper. ..........................................58

E. Interest on forfeiture. .................................................................58

IV. LLC Should Recover Fees Because It Prevailed on the Theft Claim. .................................................................................................59

A. The Theft Liability Act alters the American Rule by making fees mandatory for a person who "prevails."...............59

B. Under this Court's reasoning in Dean Foods, the prevailing party on Smith's theft claim against LLC is not Smith, but LLC. ...............................................................59

C. LLC should recover fees........................................................61

PRAYER FOR RELIEF ..................................................................................63

CERTIFICATE OF SERVICE ...........................................................................65

CERTIFICATE OF COMPLIANCE ....................................................................66

APPENDIX

    Jury Verdict (2 CR 2948-92) ................................................... TAB A

    Judgment (2 CR 3600-11) ....................................................... TAB B

    North Mound Lake Participation Agreement (DX 1346) ...................... TAB C

    North Mound Lake Operating Agreement (DX 1347) ........................... TAB D

    North Mound Lake letter (DX 1345) (incorrectly dated as
    January 17, 2008 instead of July) .........................................TAB E

    Big Bump Participation Agreement & Operating
    Agreement (DX 1354) ..........................................................TAB F

    On Point GEA (DX 1351) ....................................................... TAB G

    Muy Caliente GEA (DX 1356)................................................. TAB H

    Amended North On Point Extension & O'Donnell GEA
    (DX 1350).........................................................................TAB I

    Bad Billy Agreement (Amended) (PX 85)............................... TAB J

# INDEX OF AUTHORITIES

**CASES**                                                                   **Page(s)**

*A.G. Edwards & Sons Inc. v. Beyer*,
   235 S.W.3d 704 (Tex. 2007) ...........................................................................52

*Air Routing Int'l Corp. (Canada)*
   *v. Britannia Airways, Ltd.*,
   150 S.W.3d 682 (Tex. App.—Houston
   [14th Dist.] 2004, no pet.)..........................................................................59

*In re Bank One, N.A.*,
   216 S.W.3d 825 (Tex. 2007) ........................................................................37

*Bank One, Tex., N.A. v. Stewart*,
   967 S.W.2d 419 (Tex. App.—Houston
   [14th Dist.] 1998, pet. denied) ...................................................................39

*Barker v. Eckman*,
   213 S.W.3d 306 (Tex. 2006) ........................................................................49

*Bay Colony, Ltd. v. Trendmaker, Inc.*,
   121 F.3d 998 (5th Cir. 1997) .......................................................................39

*Bed, Bath & Beyond, Inc. v. Urista*,
   211 S.W.3d 753 (Tex. 2006) ........................................................................20

*Bokor v. State*,
   114 S.W.3d 558 (Tex. App.—
   Fort Worth 2002, no pet.) ...........................................................................29

*Bowden v. Phillips Petroleum Co.*,
   247 S.W.3d 690 (Tex. 2008) ........................................................................11

*Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*,
   747 S.W.2d 785 (Tex. 1988) ...................................................................56, 57

*Bradford v. Vento*,
   48 S.W.3d 749 (Tex. 2001)...........................................................................41

*Brainard v. Trinity Universal Ins. Co.*,
216 S.W.3d 809 (Tex. 2006) ...............................................................58

*Bryant v. Vaughn*,
33 S.W.2d 729 (Tex. 1930)..................................................................48

*Burns v. Bishop*,
48 S.W.3d 459 (Tex. App.—Houston
[14th Dist.] 2001, no pet.)....................................................................28

*Burrow v. Arce*,
997 S.W.2d 229 (Tex. 1999) ................................................11, 45, 54

*Cadle Co. v. Henderson*,
982 S.W.2d 543 (Tex. App.—San Antonio
1998, no pet.) .......................................................................................28

*City of Amarillo v. Glick*,
991 S.W.2d 14 (Tex. App.—Amarillo
1997, pet. denied)................................................................................60

*City of Keller v. Wilson*,
168 S.W.3d 802 (Tex. 2005) ...............................................................11

*City of Laredo v. Montano*,
414 S.W.3d 731 (Tex. 2013) (per curiam) .........................................54

*Columbia Rio Grande Healthcare, L.P. v. Hawley*,
284 S.W.3d 851 (Tex. 2009) ...............................................................21

*Cooper v. Green Tree Servicing LLC*,
2015 WL 799255 (N.D. Tex. Feb. 25, 2015) .....................................27

*Costley v. State Farm Fire & Cas. Co.*,
894 S.W.2d 380 (Tex. App.—Amarillo
1994, writ denied) ...................................................................47, 48, 58

*Crown Life Ins. Co. v. Casteel*,
22 S.W.3d 378 (Tex. 2000)............................................................18, 20

*Dean Foods Co. v. Anderson*,
178 S.W.3d 449 (Tex. App.—Amarillo
2005, pet. denied)................................................................................60

*Dryzer v. Bundren*,
2014 WL 1856849 (Tex. App.—Amarillo
June 16, 2014, pet. denied) ................................................................48

*El Apple I, Ltd. v. Olivas*,
370 S.W.3d 757 (Tex. 2012) ..............................................................53

*Ensil Int'l Corp. v. Lear Siegler Servs., Inc*.,
2011 WL 2473067 (Tex. App.—San Antonio
June 22, 2011, no pet.)........................................................................39

*Fairfield Ins. Co. v. Stephens Martin Paving, LP*,
246 S.W.3d 653 (Tex. 2008) ..............................................................35

*Figueroa v. Davis*,
318 S.W.3d 53 (Tex. App.—Houston
[1st Dist.] 2010, no pet.) .....................................................................11

*Foreca, S.A. v. GRD Dev. Co., Inc*.,
758 S.W.2d 744 (Tex. 1988) ..............................................................35

*Gates v. Asher*,
154 Tex. 538, 280 S.W.2d 247 (1955) ...............................................24

*Goose Creek Consol. I.S.D.*
*v. Jarrar's Plumbing, Inc*.,
74 S.W.3d 486 (Tex. App.—Texarkana
2002, pet. denied)................................................................................28

*Grant Thornton LLP v. Suntrust Bank*,
133 S.W.3d 342 (Tex. App.—Dallas
2004, pet. denied)................................................................................41

*Greer v. Greer*,
144 Tex. 528, 191 S.W.2d 848 (1946) ...............................................24

1890.001/55701

*Gregory v. Porter & Hedges, LLP*,
　398 S.W.3d 881 (Tex. App.—Houston
　[14th Dist.] 2013, pet. denied) ...............................................................42

*Guenther v. Amer-Tex Const. Co.*,
　534 S.W.2d 396 (Tex. Civ. App.—Austin
　1976, no writ)....................................................................................25

*Gulf States Utils. Co. v. Low*,
　79 S.W.3d 561 (Tex. 2002)................................................................48

*Gym-N-I Playgrounds, Inc. v. Snider*,
　220 S.W.3d 905 (Tex. 2007) .............................................................35

*Haase v. Glazner*,
　62 S.W.3d 795 (Tex. 2001).................................................................34

*Hann v. State*,
　771 S.W.2d 731 (Tex. App.—Fort Worth
　1989, no pet.) ...................................................................................29

*In re Hardwick*,
　426 S.W.3d 151 (Tex. App.—Houston
　[1st Dist.] 2012, orig. proceeding)................................................xiv, 8

*Harris County v. Smith*,
　96 S.W.3d 230 (Tex. 2002)............................................................20, 21

*Heir of Barrow v. Champion Paper & Fibre Co.*,
　327 S.W.2d 338 (Tex. Civ. App.—
　Beaumont 1959, writ ref'd n.r.e.) ....................................................25

*Hoffart v. Wiggins*,
　2010 WL 816915 (E.D. Tex. Jan. 30, 2010),
　*adopted & rejected in part*, 2010 WL 816863
　(E.D. Tex. Mar. 3, 2010), *rev'd in part on other*
　*grounds*, 406 Fed. Appx. 834 (5th Cir. 2010) ................................27

*Houchins v. Scheltz*,
　590 S.W.2d 745 (Tex. Civ. App.—Houston
　[14th Dist.] 1979, no writ) ................................................................28

1890.001/55701

*Howard v. Sony BMG Music Entm't*,
   2007 WL 2537865 (S.D. Tex. Aug. 31, 2007),
   *aff'd*, 293 Fed. Appx. 350 (5th Cir. 2008) ......................................................27

*IKON Office Solutions, Inc. v. Eifert*,
   125 S.W.3d 113 (Tex. App.—Houston
   [14th Dist.] 2003, pet. denied) ......................................................39

*Ingram v. Deere*,
   288 S.W.3d 886 (Tex. 2009) ......................................................35

*Ins. Co. of N. Am. v. Morris*,
   981 S.W.2d 667 (Tex. 1998) ......................................................41

*J&J Sports Prods., Inc. v. JWJ Mgmt., Inc.*,
   324 S.W.3d 823 (Tex. App.—Fort Worth
   2010, no pet.) ......................................................27

*Jacobs v. State*,
   230 S.W.3d 225 (Tex. App.—Houston
   [14th Dist.] 2006, no pet.) ......................................................29

*Jeanbaptiste v. Wells Fargo Bank, N.A.*,
   No. 14-10671, at *4 (5th Cir. Nov. 7, 2014) ......................................................27

*Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*,
   962 S.W.2d 507 (Tex. 1998) ......................................................58

*Larson v. Cook Consultants, Inc.*,
   690 S.W.2d 567 (Tex. 1985) ......................................................45

*Long Trusts v. Griffin*,
   222 S.W.3d 412 (Tex. 2006) ......................................................24, 26

*Long v. Griffin*,
   442 S.W.3d 253 (Tex. 2014) (per curiam) ......................................................53, 54

*Malik v. ConocoPhillips Co.*,
   2014 WL 3420775 (E.D. Tex. June 23, 2014) ......................................................27

*Matney v. Odom*,
   147 Tex. 26, 210 S.W.2d 980 (1948) ......................................................24

1890.001/55701

*MBM Fin. Corp. v. Woodlands Operating Co., L.P.*,
  292 S.W.3d 660 (Tex. 2009) ...............................................................50

*Morrow v. Shotwell*,
  477 S.W.2d 538 (Tex. 1972) ...............................................................24

*In re Nalle Plastics Family Ltd. P'ship*,
  406 S.W.3d 168 (Tex. 2013) ...............................................................49

*Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*,
  235 S.W.3d 695 (Tex. 2007) ...............................................................35

*Nat'l Prop. Holdings, L.P. v. Westergren*,
  453 S.W.3d 419 (Tex. 2015) ...............................................................11

*Osterberg v. Peca*,
  12 S.W.3d 31 (Tex. 2000) ...................................................................45

*Peltier Enters., Inc. v. Hilton*,
  51 S.W.3d 616 (Tex. App.—Tyler
  2000, pet. denied) ................................................................................41

*In re Prudential Ins. Co. of Am.*,
  148 S.W.3d 124 (Tex. 2004) ...............................................................37

*Quigley v. Bennett*,
  227 S.W.3d 51 (Tex. 2007) ..................................................................23

*Reyna v. First Nat'l Bank*,
  55 S.W.3d 58 (Tex. App.—Corpus Christi
  2001, no pet.) ......................................................................................39

*Robbins v. Capozzi*,
  100 S.W.3d 18 (Tex. App.—Tyler
  2002, no pet.) ......................................................................................18

*Rogers v. Ricane Enters., Inc.*,
  772 S.W.2d 76 (Tex. 1989) ..................................................................43

*Roper v. State*,
  917 S.W.2d 128 (Tex. App.—Fort Worth
  1996, pet. ref'd) ..................................................................................29

*Sabine Inv. Co. of Tex., Inc. v. Stratton*,
    549 S.W.2d 247 (Tex. Civ. App.—
    Beaumont 1977, no writ) ......................................................................25

*Saden v. Smith*,
    415 S.W.3d 450 (Tex. App.—Houston
    [1st Dist.] 2013, pet. denied)................................................................57

*Scott v. Ingle Bros. Pac., Inc.*,
    489 S.W.2d 554 (Tex. 1972) ................................................................35

*Sullivan v. Abraham*,
    2014 WL 5140289 (Tex. App.—Amarillo
    Oct. 13, 2014, pet. filed) ......................................................................55

*Sw. Bell Tel. Co. v. Marketing on Hold Inc.*,
    308 S.W.3d 909 (Tex. 2010) ................................................................28

*T.O. Stanley Boot Co., Inc. v. Bank of El Paso*,
    847 S.W.2d 218 (Tex. 1992) ...........................................................22, 39

*Thota v. Young*,
    366 S.W.3d 678 (Tex. 2012) ................................................................11

*Tony Gullo Motors I, L.P. v. Chapa*,
    212 S.W.3d 299 (Tex. 2006) ...............................................49, 50, 51, 53, 57

*Travel Music of San Antonio, Inc. v. Douglas*,
    04-00-757-CV, 2002 WL 1058527 (Tex. App.—
    San Antonio May 29, 2002, pet. denied)................................................1

*U.S. Enters., Inc. v. Dauley*,
    535 S.W.2d 623 (Tex. 1976) ................................................................25

*Varner v. Cardenas*,
    218 S.W.3d 68 (Tex. 2007)...................................................................50

*Wilson v. Fisher*,
    144 Tex. 53, 188 S.W.2d 150 (1945) ...................................................24

1890.001/55701

**STATUTES**

TEX. BUS. ORGS. CODE
§ 152.002(a) ..................................................................................33
§ 152.052(b)(4) .............................................................................32

TEX. CIV. PRAC. & REM. CODE
§ 16.068.........................................................................................27
§§ 38.001(8), 134.005(b) ........................................................49, 53
§ 134.003.......................................................................................27
§ 134.005(b)..................................................................................59

**RULES**

TEX. R. CIV. P. 277.............................................................................20

**OTHER AUTHORITIES**

Calvert, *"No Evidence" & "Insufficient Evidence"*
*Points of Error*, 38 TEX. L. REV. 361 (1960).......................................36

RESTATEMENT (THIRD) OF RESTITUTION &
UNJUST ENRICHMENT, Introductory Note (2011).................................47

## STATEMENT OF THE CASE

*Nature of the case*   This dispute arises out of several oil and gas projects. The projects made millions of dollars, but a dispute arose about the contractual obligations between the parties.

The five participants consist of four West Texans and an investor from Houston. The West Texans are (1) an engineer, (2) a geologist, (3) a geophysicist, and (4) a landman. The Houstonian is Lester Smith, who invested in the projects through his company, Smith Energy.

This suit is between Smith and the landman (Hardwick).

*Trial court*   Hon. Rick Morris, senior judge from 146th Jud. Dist. Ct. of Bell Cty., sitting in 121st Jud. Dist. Ct. of Terry Cty.

*Course of proceedings*   Smith sued the landman in Harris County. After a venue mandamus, the case was transferred to West Texas. *In re Hardwick*, 426 S.W.3d 151 (Tex. App.—Houston [1st Dist.] 2012, orig. proceeding).

A jury trial took place in Terry County.

*Trial court disposition*   A jury awarded Smith actual damages of $104,000.

The court increased Smith's recovery by adding the following awards:

- $5,004,231 in disgorgement

- about $3,500,000 in attorney's fees

- about $750,000 in interest on the disgorgement

- Partial rescission of the multi-party contracts, *i.e.*, "as to" Smith and Hardwick.

*See* **Tab A** (verdict); **Tab B** (judgment).

1890.001/55701

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is appropriate for several reasons:

- The legal issues are numerous.

- The monetary stakes are substantial.

- The reporter's record is about 31,000 pages long.

- The case involves many distinct contracts and legal documents.

The issues are not routine, and the Court would benefit from an opportunity to discuss them in person with both sides.

1890.001/55701

# ISSUES PRESENTED

1.  *Breach of Fusselman contracts*: (a) Does the evidence support the findings of breach and resulting damages? (b) Is there charge error in the definition of "Smith Energy"? (c) Is there charge error in the definition of "Fusselman Prospect Agreements"?

2.  *Breach of Bad Billy contract*: (a) Is the contract ambiguous? (b) Does the property description satisfy the statute of frauds?

3.  *Theft*: (a) Is there charge error in the definition of "Smith Energy," such that it includes claims that are untimely under the statute of limitations? (b) Is this a case of bona fide contract dispute and thus not theft?

4.  *Fiduciary duty*: (a) Does the evidence support the finding of breach of fiduciary duty as to the Fusselman projects? (b) Does it support the finding of breach of fiduciary duty as to Bad Billy? (c) Is there charge error?

5.  *Fraud*: (a) Does the evidence support the finding of fraud? (b) Is there charge error in the definition of "Smith Energy? (c) Is there charge error in the inclusion of a duty to disclose?

6.  *The $5 million forfeiture award*: (a) Should the forfeiture be reversed for lack of an underlying tort? (b) Is it the return of compensation? (c) Is there proof of the amounts in Questions 15a and 15b? (d) Is the forfeiture amount too large? (e) Is forfeiture available here as a remedy for fraudulent inducement?

7.  *Attorney's Fees*: Does the evidence support the award of fees?

8.  *Election of remedies*: May Smith recover forfeiture on top of fees?

9.  *Partial rescission*: May Smith have rescission of the Fusselman contracts "as between" only two of the parties?

10.  *Fees for Hardwick LLC*: Should Hardwick LLC recover fees?

1890.001/55701

## INTRODUCTION

Smith Energy accused landman Mark Hardwick of charging too much and not working enough. The jury agreed in part, disagreed in part, and found damages of only $104,000.

But Smith had spent $3.5 million on lawyers and wanted a bigger recovery. Smith asked the trial court to add another $5 million in "forfeiture," which effectively stripped Hardwick of his working interests in the oil and gas projects.

To justify that "forfeiture," Smith argued that Hardwick's working interests were basically his salary as a landman. According to Smith, if Hardwick did not want to keep laboring on the projects, he could not keep collecting his working interest earnings as a paycheck. 4 RR 18-19, 21.

This appeal challenges that portrayal of the working interests as dead wrong. Hardwick's working interests in the oil and gas projects were not a salary, and he did not get them from Smith. If some of Hardwick's invoices to Smith for landman services contained errors or overcharges, so be it; Hardwick will pay any of the $104,000 in damages that Smith legitimately established. But those modest damages cannot justify clawing away $5 million in real-property interests, and it cannot justify stacking that $5 million in tort-based forfeiture on top of $3.5 million more in fees for prosecuting the contract case.

## STATEMENT OF FACTS

This appeal revolves around a handful of written contracts and related documents that were executed in 2008, 2009, and 2010. **Tabs C-J**. This statement of facts will address the circumstances that preceded the contracts, their language, and the 2011 disagreement about compliance with them.

### *Background:  Chasing the Fusselman Pinchout*

The Permian Basin is home to the Fusselman formation, a Silurian Age dolomite at roughly 11,000 feet.  5 RR 260-62.  The Fusselman "pinchout" runs for hundreds of miles (6 RR 111) and offers good potential as an oil trap.  5 RR 264.

The trick was finding it.  People had chased the Fusselman for years.  6 RR 21; 7 RR 241; *see* 6 RR 136 ("Forever").  Locating the Fusselman pinchout proved devilishly hard, and many efforts ended in failure.  7 RR 241.  But failures have educational value.  Just as Edison made many unsuccessful light bulbs before inventing one that functioned, the data from each bad Fusselman well helped provide a body of knowledge that eventually paid off.  Hence the old euphemism about a bad well—"scientific success and economic failure."  *See* 6 RR 12.

Appellant Mark Hardwick knew about the Fusselman because of his father.  4 RR 58; 5 RR 122-23; 6 RR 21.  Hardwick is a landman.  He was working in West Texas, along with his friends Steve Blaylock (a geophysicist) and Jerry Elger (a geologist).  4 RR 58-61.  Blaylock said that after a number of bad wells, they

thought that they had learned enough to pursue the Fusselman with some accuracy: "Working with Jerry Elger and Mark [Hardwick], we put together some seismic data in an area … where I had pretty good 3D seismic." 5 RR 265. "I just started going through, studying all the wells that I had. And I got through with a given area where I remember I had 22 wells in that given area and I went back through and finally worked out a method that I could apply and I think I would have been right in predicting the presence of or the absence of Fusselman on 20 of the wells. I convinced myself that I could, anyway, and so I kind of got excited." 5 RR 266.

They kept honing their methods. The three of them persuaded a client in Wichita Falls to invest in more drilling, but the client's engineer insisted on changing their preferred drill site, and the well was a dry hole. 5 RR 267. Again, however, they learned from the experience.

Mark had previously met Lester Smith, a Houston investor in the oil and gas business. 4 RR 73. Perhaps Mr. Smith might be interested in investing? Mark Hardwick, Blaylock, and Elger decided to approach Mr. Smith. 6 RR 108-09, 134-36. But they also included their friend Joey Hardin, who had a prior relationship with Mr. Smith. 4 RR 91.

They offered Mr. Smith a standard "third for a quarter" arrangement, in which an investor agrees to pay one-third of acquisition, seismic, and drilling costs in exchange for a quarter of the working interest. 5 RR 126-27; 6 RR 10, 18; *see* 6

RR 200 ("It's very common"); 9 RR 13 ("a third for a quarter is a very basic and historic oil and gas transaction"). Mr. Smith invested to the max. 7 RR 242. Instead of a third, he took three thirds, agreeing to pay all of those costs for 75% of the working interest. *Id*. He did so through his company, Smith Energy.

***The Fusselman Contracts***

The four West Texans—Joey Hardin, Steve Blaylock, Jerry Elger, and Mark Hardwick—and Mr. Smith did several Fusselman projects. Although litigation often erupts after deals gone bad, these were "deals gone good" in the sense that everybody made money. *See* 4 RR 21 ("hugely successful"). Each Fusselman project has a name:

| PROSPECT NAME | CONTRACT |
|---|---|
| **North Mound Lake** | Participation Agreement **Tab C** (DX-1346)(May 1, 2008) |
| **Big Bump** | Participation Agreement **Tab F** (DX-1354)(Oct. 19, 2009) |
| **On Point** | Geophysical Exploration Agreement **Tab G** (DX-1351)(Jan. 2, 2010) |
| **Muy Caliente** | Geophysical Exploration Agreement **Tab H** (DX-1356)(Jan. 15, 2010) |
| **North On Point Extension** | Geophysical Exploration Agreement (DX-1298)(Dec. 1, 2010) <br><br> An amended version is at **Tab I** (DX-1350)(June 15, 2011) |

The basic idea was this. The five parties would split the working interest, 75% for Smith and 25% for the four West Texans. Smith would "carry" the others on the first few wells (but not all wells) by paying certain costs (but not all costs) – specifically, lease acquisition costs, seismic costs, and drilling costs – until the casing point. The details are unnecessary to develop here.

The first contract is a 2008 agreement (DX-1346) between Smith Energy and Joey Hardin's company RAW Oil & Gas, with RAW then writing a side letter to each of the three other West Texans to address each man's 6.25% share. *See* DX-1345. RAW would buy the leases and parcel out working interest shares to Smith, Hardwick, and the others. The later Fusselman contracts are all multilateral deals between Smith and all the West Texans. DX-1298, 1351, 1354, 1356.

These contracts have two significant features:

1. They do not classify anybody's share of the working interest as salary or compensation for services;

2. They do not create a joint venture.

In fact, they flatly repudiate joint venture: "It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals." DX-1347 art. VII. Several even underline the phrase "**No Partnership**." DX-1298, 1351, 1356 (§ 6.3).

### *The Bad Billy Contract*

In addition to the Fusselman contracts, there is a very different contract called the Bad Billy agreement (**Tab J**, PX-85). It involves Smith and Hardwick but not the other three West Texans, who thought the Bad Billy play unattractive. 6 RR 112-13; 7 RR 277-78. They were right. The wells were awful, and Bad Billy might as well have been named "Horrible Billy." 4 RR 192, 235; 5 RR 231.

The Bad Billy agreement is a 3-party deal among Smith, Mark Hardwick, and Mark's brother Paul. PX-85. Unlike the Fusselman contracts, it involves overriding royalty interests, not working interests. *Id*. Unlike the Fusselman contracts, it refers to the overrides as compensation. *Id.*

It says that Smith wants leases in the Bad Billy area and that Smith will compensate Paul for geology work with a 1.5% override in any leases acquired. *Id*. Smith will assign Mark a 1% override "in consideration" of Mark overseeing the lease acquisition. *Id*. Smith will pay Mark all his expenses and—somewhat more controversially—"a day-work brokerage fee." *Id*. The contract has a 3-year term, starting Dec. 17, 2010. *Id.*

What about a land description? Where is the "Bad Billy Area"? The area exists somewhere in "Terry, Yoakum, Hockley, Lubbock & Lynn Counties." PX-85. But the contract does not give a metes and bounds description. It says only that the "Bad Billy Area" is depicted on an Exhibit A:



The AMI's black boundary line wanders randomly through the five counties, with no details about location, so the statute of frauds is an issue.

### *Smith and Hardwick fall out in August 2011*

The Fusselman wells made money. 5 RR 295; 8 RR 12, 55. Acquisition, seismic, and (some) drilling costs were paid by Smith on the few carried wells. The other costs – *e.g.*, operating expenses, ad valorem taxes, and royalties – were undisputedly paid on all the wells by Hardwick and the other working interest owners from day one, in accordance with their percentages as working interest owners. 5 RR 203; DX-488, 489, 1357; *see also* CR 3122 ("from the beginning").

This success had two side effects. First, the work approached the town of O'Donnell. 5 RR 165. So the last Fusselman contract is called "North On Point Extension / O'Donnell." Given the proximity to a populated area, Hardwick formed a business entity, just as Joey Hardin had formed RAW Oil and Gas and Jerry Elger had formed Elger Exploration, Inc. 5 RR 205. He formed Mark P. Hardwick LLC. *Id*. It holds a number of his working interests. 5 RR 205-06.

Second, the land work grew exponentially. Hardwick had his hands full. 10 RR 98-103. He and Lester Smith found themselves at odds over what the contracts mean and over how intense the land work actually was. PX-39.

The conflict boiled over in August 2011. Hardwick and Smith parted ways as to Hardwick doing further land work. PX-33, 36. They differed sharply over whether Hardwick quit or was fired (5 RR 5, 86; 8 RR 34-43), but that disagreement does not matter to the appeal. What matters is that their relationship soured to the point that Smith sued Hardwick and his LLC.

### *This litigation*

Smith filed this suit in Harris County. CR 6. The case soon moved because venue was held mandatory in West Texas. *In re Hardwick*, 426 S.W.3d 151 (Tex. App.—Houston [1st Dist.] 2012, orig. proceeding). By the time of the verdict in Terry County, Smith was on its eighth amended petition (CR 2895) and had spent $3.5 million in attorney's fees. *See* Question 24.

The live petition seeks actual damages, exemplary damages, attorney's fees, and interest. CR 2926-28. It also asks for "forfeiture of all compensation paid," including "all assigned mineral interests and overriding royalty interests." CR 2927. The forfeiture claim may deserve mention because it underpins the trial court's award of $5 million.

The forfeiture claim grows out of Smith's position that the parties created joint ventures, which involved fiduciary duties. CR 2902. Based on those alleged fiduciary duties, Smith sought forfeiture of Hardwick's Fusselman working interests. CR 2919. In essence, Smith approaches the case as though Hardwick were an attorney and Smith a client, with Hardwick's Fusselman working interests being a "fee" that came from the client and thus can be returned to the client in the event of a clear and serious breach of fiduciary duty. CR 3162-65.

Hardwick disputed all this. He noted that the working interests never came from Smith in the first place, that they were not a fee to be forfeited, and that there was no joint venture or fiduciary duties in any event. CR 3007-50, 3088-102.

The contract claims are straightforward. Smith alleged breach of the Fusselman contracts and the Bad Billy contract. CR 2919-21. For damages, Smith alleged two distinct classes of damages: (1) overcharges, and (2) the cost of hiring replacement landmen to finish Hardwick's purported responsibilities.

The overcharge damage allegations are just what they sound like; they accuse Hardwick of inflating his invoices with time that he did not work and with expenses that he should not have included.

The replacement landman allegations accuse Hardwick of quitting too soon. Smith argued that the Fusselman contracts required him to do Fusselman land work and to keep doing it for as many years or decades that there is still Fusselman activity going on. Smith further asserted that Hardwick breached the Bad Billy contract by quitting before the end of the 3-year term, resulting in excess cost when Smith had to hire new landmen.

The court ruled several of the Fusselman contracts ambiguous with regard to whether Hardwick promised to keep doing land work as long as the Fusselman projects are alive. 11 RR 276. The court ruled the Bad Billy contract ambiguous as to whether Hardwick promised to cap his daily rate at $500. 11 RR 283.

### *The verdict*

The jury found for Smith on all four theories: (1) contract, (2) fraud, (3) fiduciary duty, and (4) theft. It found damages of $104,000, which consisted of about $79,000 in overcharges, plus $25,000 in replacement landman costs for Bad Billy work. The jury found about $3.5 million in fees for Smith's trial fees, and another $250,000 in fees for any appeal. *See* Question 24.

The jury charge also asked about Hardwick's working interests. The jury found that Hardwick received $795,056 in working interest earnings after he stopped the landman services and that his working interests had a market value of $4,209,175 in the middle of 2013. *See* Question 15.

Smith obtained findings on four theories but did not elect a remedy. Instead, Smith sought a judgment for all of them stacked on top of each other—actual damages, rescission (despite damages), fees (under the contract and theft theories), and forfeiture (under the tort theories). Specifically, Smith wanted forfeiture of the $795,056 plus the $4,209,175 associated with the Fusselman working interests. The trial court awarded all of the above.

## STANDARD OF REVIEW

Jury findings are reviewed under the normal sufficiency standards. *See City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005). Abuse of discretion review applies to rulings on the charge and equitable relief. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012); *Burrow v. Arce*, 997 S.W.2d 229, 245 (Tex. 1999). De novo review applies to the other issues. *See Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 426 (Tex. 2015) (applicability of statute of frauds); *Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 705 (Tex. 2008) (ambiguity); *Figueroa v. Davis*, 318 S.W.3d 53, 66 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (availability of prejudgment interest).

## SUMMARY OF THE ARGUMENT

The trial court failed to impose meaningful discipline on the plaintiffs' case. Smith sued on written contracts, but the court failed to enforce them as written. Smith requested a charge that blurs all the Fusselman contracts together as one and defines "Smith" too broadly, but the court submitted it nonetheless.

**1. Contract & theft.** The contract and theft theories are unsound. The Fusselman contracts do not require Hardwick to do what Smith alleges, and the remaining contract ("Bad Billy") violates the statute of frauds. The theft theory is either unproven or contaminated by inclusion of time-barred claims.

**2. Tort.** The tort theories have similar flaws. Smith alleged a fiduciary duty from a joint venture, but the contracts repeatedly disavow joint venture and fiduciary duties. The fraud theory contains layers of charge error.

**3. Remedies.** The trial court wrongly inflated the recovery by awarding (a) $5 million in "forfeiture", (b) $3.5 million in unproven attorney's fees, (c) fees stacked on top of forfeiture, (d) partial rescission of the agreements, and (e) prejudgment interest on the non-compensatory "forfeiture."

**4. LLC.** Mark P. Hardwick LLC has its own appeal on the issue of attorney's fees. The theft statute makes fees mandatory for a prevailing party. Smith sued the LLC for theft but did not prevail against it. As a result, the statute requires an award of fees to LLC.

Smith won a verdict for $104,000 in damages. If the trial court had rendered judgment for only that amount, this appeal might never have arisen. The court, however, awarded Smith a judgment for about 90 times that amount. The judgment stacks an oversized forfeiture award on top of an oversized fee award.

## I. THE CONTRACT AND THEFT THEORIES SHOULD BE REVERSED.

Start with contract and theft. Those theories closely resemble each other, except that contract damages were $104,000, whereas the theft damages were only $79,428 because the jury charge restricted the theft damages to overcharge claims.

The jury charge combined all five Fusselman contracts into a single bundle, even though the contracts vary in wording. This inappropriate fusion of the agreements enabled Smith to gloss over weaknesses in his case, with the result that the jury found Hardwick guilty of breaking promises that he kept—and of breaking promises that he never even made.

### A. The Fusselman contract recovery should be reversed.

There is legally and factually insufficient evidence that Hardwick breached any of the Fusselman contracts, let alone all of them. Further, the contract damage findings are unsupported. The jury found damages of $36,003 in overcharges. *See* Question 5(1)(a). It found that those damages "resulted from" a failure to comply. But there is legally and factually insufficient evidence of that.

At a minimum, there is charge error. The charge collected several different documents and defined them all as the "Fusselman Prospect Agreements." The first is the North Mound Lake agreement. Hardwick is not even a party to that one, yet the jury found him in breach of the "Fusselman Prospect Agreements." *See* Question 3a. The definition is tainted by inclusion of North Mound Lake.

> **1. The Fusselman part of the contract recovery should be reversed and rendered, because Hardwick did not breach any of the Fusselman contracts, let alone all of them.**

Hardwick did not breach the Fusselman contracts at all:

- He is not a party to the first contract (the North Mound Lake Participation Agreement);

- He is a party to the second contract (Big Bump) but made no promise to anybody about land work or its cost.

- He is a party to the other contracts, but the only relevant promise is to participate "*as may be requested from RAW*," and all agree that he did everything RAW requested.

There is zero evidence that the Fusselman contracts were breached.

The first contract in the definition of Fusselman Prospect Agreements is the North Mound Lake Participation Agreement (DX-1346). It runs between Smith, RAW Oil & Gas, and RAW Energy. Hardwick cannot have breached a contract to which he was not a party. That is especially true given that the contract requires RAW—not Hardwick—to negotiate with landowners and to "conduct all title investigations." *Id.* § 6.

The definition's next items are the North Mound Lake Letter Agreements. They consist of three letters from RAW to Blaylock, to Elger, and to Hardwick. *See* PX-1, DX-86, DX-1345. Hardwick is not a party to the letter to Blaylock or Elger, so he cannot have breached either of those.

Hardwick was the recipient of the third RAW letter (PX-1), but there is no evidence that he breached any promise there. The only promise that he arguably made there was to pay his share of certain costs: "Hardwick will pay his way on the completion cost of the first well and all subsequent operations including any additional acreage purchases within the AMI area ...." PX-1. Nothing suggests that Hardwick broke that promise. All agree that Hardwick paid his share of the costs for all the various wells. 6 RR 270.

The next Fusselman agreement is Big Bump (DX-1354). This contract has the virtue of including Hardwick as a party. However, it contains no promise for Hardwick to do land work at any given rate or on any given terms. Nothing in the contract obligates Hardwick to do any land work, let alone do it for a certain price. Again, there is no evidence of breach.

Finally, there are the remaining Fusselman contracts: On Point, Muy Caliente, North On Point, and Amended North On Point. DX-1351, 1356, 1298, 1350. These contracts include Hardwick as a party. But they do not require him to perform land work. In fact, they provide for the opposite by assigning that job to

RAW. Section 1.5(b) of each says that "RAW will provide or supervise the land work." Once again, there is no evidence that Hardwick breached any of these Fusselman contracts.

Smith argued that Hardwick had a duty to do land work because the final Fusselman contracts (On Point, Muy Caliente, and the North On Point) contain this sentence in section 1.5: "All Parties will participate with RAW in accomplishing the Geophysical Program as may be requested from RAW from time to time."

That clause does not commit Hardwick to do land work. But even if it did, the most that it might require would be to do what RAW "requested." Yet there is no evidence that he breached any such obligation. It is undisputed that Hardwick did everything RAW asked him to do. Hardwick's defense lawyer, the Hon. Rick Strange, asked this simple question to RAW's principal, Joey Hardin:

Q. Have you asked Mark to do any land services that he didn't do?

A. No.

6 RR 247. This Court will find no evidence whatsoever of Hardwick refusing to do any land work "requested" by RAW.

The question for all the Fusselman contracts thus boils down to this: *Where's the breach?* The evidence shows no breach of those contracts at all. The Court should reverse the recovery of the $36,003.

**2.    The Fusselman part of the contract recovery should be reversed and rendered, because no overcharge damages resulted from any breach.**

Even if the Fusselman contracts had been breached, those contracts have no connection to the overcharge damages found in Question 5(1)(a).  The contracts simply do not cap landman charges at $500 a day or at any particular price.  Although Smith's damage expert assumed that the contracts impose such a ceiling (7 RR 10-11), they do not.  They never mention the subject.  The jury had no basis for finding that the $36,003 in overcharges "resulted from" any failure to comply with the "Fusselman Prospect Agreements."

Hardwick objected to these questions and assailed the findings in post-verdict motions.  CR 3012-32; CR 3530-32.  He noted that Smith had **evidence** (but not findings) about oral contracts, and **findings** (but not evidence) about written contracts.  *See* CR 3012.  The disconnect between the written contracts and the supposed oral deals is stark.  *See* 6 RR 239 ("but that was not our gentleman agreement"); 8 RR 82 ("We had an oral agreement").

Hardwick's JNOV motion made this point in a way that nobody could miss: "The jury's answer to Question 5.1(a) should also be disregarded because there is no evidence to support this finding."  CR 3028.  He went on to point out that there was no evidence "that Mark Hardwick agreed in the written contracts to limit his day rate or to charge no overtime."  *Id.*

In his response to the lengthy JNOV motion, Smith could only write three sentences to defend the indefensible finding of Fusselman overcharge damages:

> The evidence clearly supports the jury's finding that Hardwick's breach caused Smith Energy damage. The evidence showed that Hardwick charged for days of work that he could not and did not work. *See* Plaintiff Exhibit 182A. There was abundant evidence that his billing constituted double billing or overbilling. *See* Shaw, August 27 at 122-23.

CR 3118. That is it. That is all that Smith could say about the evidence supporting the answer to Question 5.

As shown earlier, however, no evidence supports the award of $36,003 for overcharge damages that "resulted from" any breach of the Fusselman contracts. Those contracts say nothing about charging or overcharging. The Court should reverse and render the $36,003 recovery, and the Court should award Hardwick his fees (or at least remand to let him pursue them) as prevailing party under the Fusselman contracts. *See, e.g.*, DX-1298, 1351 (§ 6.5); *Robbins v. Capozzi*, 100 S.W.3d 18, 27 (Tex. App.—Tyler 2002, no pet.).

### 3. Alternatively, the Fusselman contract recovery should be reversed and remanded because of charge error.

The jury charge defines "Smith Energy" and "the Fusselman Agreements." However, it defines those terms so broadly as to include items that do not belong. This problem infects all four liability theories and constitutes reversible error, per the progeny of *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000).

First, the term "Fusselman Prospect Agreements" covers several contracts. But the contracts differ significantly. The earliest Fusselman contract runs only between RAW and Smith. DX-1346. Yet the jury found Hardwick liable for breaching the "Fusselman Prospect Agreements." *See* Questions 3a & 5. Hardwick cannot have breached a contract to which he was not a party. Nor can he have breached Big Bump, because it has no promise to do land work.

Second, the charge defines "Smith Energy Company" as including Smith Energy Company **and** over two dozen other parties, such as the friends and family members of Mr. Smith who took pieces of Smith's interest by assignment.

The inclusion of extra parties creates severe problems. Trial focused on the Hardwick's dealings with Mr. Smith, but not with Mr. Smith's friends and family. Even if the contract was assignable (giving the extra parties a right to sue), there must be evidence on every element of their claims. Take fraud. Fraud requires reliance, but there is insufficient evidence of reliance by those parties.

Likewise, theft has a short statute of limitations. If the theft claims by the extra parties were time-barred when assigned over to Smith (which they were), they remain just as untimely when Smith sues on them. The definition of "Smith" built error into the theft claim by including assigned claims from the extra entities. While the other theories will come up later in this brief, the point here is that the

jury charge was marred by *Casteel* error because of the way it defined "Smith" and "the Fusselman Prospect Agreements."

The law in this area is familiar to the Court. Broad-form submission is the reigning model for charge practice. TEX. R. CIV. P. 277. But the model has limits: "Rule 277 is not absolute." *Casteel*, 22 S.W.3d at 390. Thus, "when the trial court is unsure whether it should submit a particular theory of liability, separating liability theories best serves the policy of judicial economy underlying Rule 277 by avoiding the need for a new trial when the basis for liability cannot be determined." *Id.*

A trial court can combine different items into a single question as long as each item genuinely belongs. But if an item does not belong, it may infect the whole question. Thus, one "rotten apple" can spoil the whole barrel.

This doctrine comes from *Casteel* and its progeny, such as *Harris County v. Smith*, 96 S.W.3d 230 (Tex. 2002), which extended the rotten apple concept to situations where part of a submission is unsupported by sufficient evidence. *See Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 756 (Tex. 2006) ("Under *Casteel* and *Harris County*, we presume that the error was harmful and reversible and a new trial required when we cannot determine whether the jury based its verdict solely on the improperly submitted invalid theory or damage element.").

"Submission of an invalid theory involves '[a] trial court's error in instructing a jury to consider erroneous matters.'" *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 865 (Tex. 2009) (quoting *Harris County*, 96 S.W.3d at 233). Here such "erroneous matters" appear in two key definitions: Smith Energy Company and the Fusselman Prospect Agreements. Page 3 of the charge defines "Smith Energy Company" as referring to the company "and on behalf of the interests of" more than two dozen other entities.

Smith's argument for including the extra entities in the definition was that the company distributed slices of its oil and gas interests to all the recipients, while later taking back litigation assignments of the right to sue Hardwick in this lawsuit. For lack of a better term, this brief will refer to "tag-along" parties. The tag-along parties did not sue in the lawsuit as plaintiffs, but they assigned their rights to sue Hardwick to Smith, who prosecuted those claims as plaintiff.

Hardwick objected to defining Smith this way. 11 RR 398-99; *see also* 8 RR 231-33, 246-49. He argued that the assigned claims suffered from evidentiary insufficiency as to their elements. The trial court should have sustained his objections. The verdict treats him as breaching all the Fusselman agreements, but he plainly did not breach North Mound Lake or Big Bump. At a minimum, the contract recovery suffers from *Casteel* error because of the inclusion of the extra parties and because of the combination of all the Fusselman contracts.

## B. The Bad Billy contract recovery should be reversed.

The trial court held the Bad Billy agreement ambiguous and asked the jury to construe it. *See* Question 2; *see also* 11 RR 283 (trial court ruling of ambiguity). The jury construed it in Smith's favor and found Hardwick liable. *See* Question 3. Damages were about $68,000 – *i.e.*, $43,425 in overcharges and $25,448 for the cost of hiring the replacement landmen. *See* Question 5.

### 1. The contract (PX-85) is not ambiguous.

Question 2 asked whether Hardwick agreed "[i]n the Bad Billy Agreement" that he would "perform landman services for a day work rate of $500." It told the jury to construe the statement "that Smith shall pay all expenses incurred by Mark in connection with such lease acquisition, plus a day-work brokerage fee." But that statement says nothing about fixing the fee at $500, and it says nothing about the way such a fee would be computed.

The court rewrote the contract. There simply is no $500 rate "[i]n the Bad Billy Agreement." The agreement says nothing about a $500 rate, any more than it says something about a rate of $1 or $15 million. The writing just does not set the dollar amount. Courts should not supply missing terms in this fashion. The classic example is *Stanley Boot*, where a loan contract failed to state the interest rate, and the court refused to insert that missing term. *See T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992).

Sometimes a court can imply a reasonable price, such as in a UCC contract for the sale of goods. But that is not the factual issue that these parties litigated, and it is not what the charge told the jury to find. If the jury had been asked simply about the reasonableness of Hardwick's rates, it likely would have found for him, because so many people saw his invoices and approved them. Regardless, that is not what Question 2 asks. The overcharge recovery should be reversed.

## 2. The statute of frauds applies to the Bad Billy claim.

The statute of frauds bars the claim for $25,000 as the cost of hiring replacement landmen. Those expenditures occurred after Smith and Hardwick separated in August 2011. But enforcing that part of the bargain is impermissible, because Bad Billy is an agreement to convey real estate, without an adequate land description. Although it attaches a map with a crude drawing, the drawing is too fuzzy to satisfy the statute. The description fails as a matter of law, or at least as a matter of the great weight of the evidence. Hardwick preserved this point by raising it repeatedly. CR 3029-30, 3055, 3532, 3538; *see also* 11 RR 403.

Smith agreed to convey overrides to Hardwick, who agreed to do land work. An overriding royalty interest is real property subject to the statute of frauds. *Quigley v. Bennett*, 227 S.W.3d 51, 54 (Tex. 2007). Hence, the agreement triggers the statute of frauds, as it refers to a "Lease Acquisition Program" and states that Smith is desirous of "acquiring oil and gas leases." PX-85.

The contract "must furnish within itself, or by reference to some other existing writing, the means or data by which the [property] to be conveyed may be identified with reasonable certainty." *Long Trusts v. Griffin*, 222 S.W.3d 412, 416 (Tex. 2006). "The essential elements may never be supplied by parol." *Wilson v. Fisher*, 144 Tex. 53, 57, 188 S.W.2d 150, 152 (1945). If enough description exists so that a person familiar with the area can locate the premises with reasonable certainty, it can satisfy the statute. *Gates v. Asher*, 154 Tex. 538, 541, 280 S.W.2d 247, 248-49 (1955). But even if the contracting parties knew and understood what property was intended to be conveyed, their knowledge and intent will not make the contract valid. *Morrow v. Shotwell*, 477 S.W.2d 538, 540 (Tex. 1972).

The text has no description at all. PX-85. It references five counties, an area called the "Bad Billy Area" or "AMI Outline" in "portions" of those counties, and an area that is excluded. There is nothing about tracts, sections, surveys, or acreage size. There is no description of the location, distance, or direction of the lines comprising the irregular boundary lines. There is no recording information. The text itself is plainly inadequate.[1]

---

[1] *See., e.g.*, *Long Trusts*, 222 S.W.3d at 416 (description of lessors' names and each lease's survey name, term, and net acreage insufficient); *Morrow*, 477 S.W.2d at 540-41 (description of tract, survey, and county insufficient); *Matney v. Odom*, 147 Tex. 26, 28-29, 210 S.W.2d 980, 982 (1948) (description of acreage amount, survey, city, county, and relation to nearby courthouse and highway insufficient); *Greer v. Greer*, 144 Tex. 528, 530-31, 191 S.W.2d 848, 849-50 (1946) (description of acreage amount, survey, county, patent, volume, and abstract numbers insufficient).

Nor does the attached map suffice. It is true that an "attached map becomes a part of the written contract and can aid a defective written description if the map contains enough necessary descriptive information." *U.S. Enters., Inc. v. Dauley*, 535 S.W.2d 623, 628 (Tex. 1976). But not this map. The area depicted on the map cannot be located with reasonable certainty.

The location of the irregularly-shaped boundaries is uncertain. The boundary lines cut through portions of several counties, but there is no data to fix the precise spots. There is no information about the width of the boundary lines. There is no information regarding the courses and distances of the boundary lines. There is no scale to determine the length of the lines. There is no identifiable survey or recording information. An equally indeterminate "excluded" area falls in and out of the boundary lines. These problems doom the map.[2]

The testimony reinforces this conclusion, inasmuch as the only surveyor who testified indicated that the description is inadequate. 10 RR 57; 13 RR (Piper excerpt). The surveyor flatly could not locate the "AMI Outline." 13 RR at deposition p. 25-27, 66, 80-81. For these reasons, Bad Billy fails the statute.

---

[2] *See, e.g.*, *U.S. Enters.*, 535 S.W.2d at 628-29 (tract location uncertain on map); *Sabine Inv. Co. of Tex., Inc. v. Stratton*, 549 S.W.2d 247, 249-50 (Tex. Civ. App.—Beaumont 1977, no writ) (courses and distances not provided); *Guenther v. Amer-Tex Const. Co.*, 534 S.W.2d 396, 398 (Tex. Civ. App.—Austin 1976, no writ) (map not drawn to scale did not show size, acreage, recording information, or width, length, and position of boundary lines); *Heir of Barrow v. Champion Paper & Fibre Co.*, 327 S.W.2d 338, 347 (Tex. Civ. App.—Beaumont 1959, writ ref'd n.r.e.) (width of boundary line uncertain).

This does not undo the parties' past performance. But it makes the contract unenforceable as to future performance after Smith and Hardwick separated. *See Long Trusts*, 222 S.W.3d at 417 ("Respondents' acquisition of interests in the past were completely separate from future transactions and did not insulate the agreements from the Statute of Frauds for wells not drilled"). The Court should reverse the $25,000 in damages found in Question 5 for services after Smith and Hardwick separated.

## C. There is no theft, and even if there were, the statute of limitations would still bar almost all of the theft recovery.

The jury found statutory theft and assessed damages of about $79,000. Those damages do not include the costs of hiring other landmen; they include only overcharges. *See* Question 18. The question does not have separate blanks for Fusselman and Bad Billy, but the answer of $79,428 matches the earlier findings about overcharges for Fusselman ($36,003) and Bad Billy work ($43,425).

The theft recovery has two flaws. First, it has a titanic problem with the statute of limitations. Almost all the damages come from assigned claims, but those claims are untimely. Second, the theft recovery treats a bona fide contract dispute as a crime. When a trial court cannot even tell what a contract means—and a jury has to pick between two reasonable readings—there might be a breach of contract but not statutory theft.

## 1.     The statute of limitations bars recovery.

The Texas Theft Liability Act creates a cause of action for theft.  *See* TEX. CIV. PRAC. & REM. CODE § 134.003.  The 2-year statute of limitations applies to theft claims.  *J&J Sports Prods., Inc. v. JWJ Mgmt., Inc.*, 324 S.W.3d 823, 832 (Tex. App.—Fort Worth 2010, no pet.); *see Jeanbaptiste v. Wells Fargo Bank, N.A.*, No. 14-10671, at *4 (5th Cir. Nov. 7, 2014) ("A two-year limitations period applies to conversion and TTLA claims.").  Courts widely agree on this.[3]

Because the assigned claims were not sued on in this case until February 2014 (CR 1286, 1319), Hardwick asserted limitations.  CR 3054, 3538; 11 RR 399, 405.  Smith responded with the relation-back rule of TEX. CIV. PRAC. & REM. CODE § 16.068.  CR 3135.  Smith argued that the original petition was filed in November 2011, and that all new claims added in later pleadings count as timely as long as they relate to the same transaction.  *Id.*

Relation-back does not let a plaintiff resurrect somebody **else's** dead claims via assignment.  If P sues timely, P can amend to add his or her **own** claims.  But P cannot collect stale claims belonging to another and turn them from stale to timely.

---

[3] *See Cooper v. Green Tree Servicing LLC*, 2015 WL 799255, at *3 (N.D. Tex. Feb. 25, 2015); *Malik v. ConocoPhillips Co.*, 2014 WL 3420775, at *5 (E.D. Tex. June 23, 2014); *Hoffart v. Wiggins*, 2010 WL 816915, at *12 (E.D. Tex. Jan. 30, 2010), *adopted & rejected in part*, 2010 WL 816863, at *4 (E.D. Tex. Mar. 3, 2010), *rev'd in part on other grounds*, 406 Fed. Appx. 834 (5th Cir. 2010); *Howard v. Sony BMG Music Entm't*, 2007 WL 2537865, at *3 (S.D. Tex. Aug. 31, 2007), *aff'd*, 293 Fed. Appx. 350 (5th Cir. 2008).

*Goose Creek Consol. I.S.D. v. Jarrar's Plumbing, Inc.*, 74 S.W.3d 486, 493 (Tex. App.—Texarkana 2002, pet. denied). A dead claim cannot be resurrected after D's limitations defense has vested. *See Cadle Co. v. Henderson*, 982 S.W.2d 543, 546 (Tex. App.—San Antonio 1998, no pet.) ("When the limitations period has run, rights have become 'vested and perfect,' and even the Legislature cannot remedy or lengthen the limitations period.").

When TP assigns a claim to P, courts say that P has stepped into TP's shoes. *See Sw. Bell Tel. Co. v. Marketing on Hold Inc.*, 308 S.W.3d 909, 920 (Tex. 2010) ("stands in the shoes of his assignor"). A defense that was good against TP is good against P: "an assignee or subrogee walks in the shoes of his assignor and takes the assigned rights **subject to all defenses** which the opposing party might be able to assert against his assignor." *Burns v. Bishop*, 48 S.W.3d 459, 466 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (emphasis added); *see Houchins v. Scheltz*, 590 S.W.2d 745, 751 (Tex. Civ. App.—Houston [14th Dist.] 1979, no writ) (assignee has no greater right to recover on contract than assignor).

Where, as here, the claim was time-barred before it was assigned, assigning the claim will not bring it back to life. *See Goose Creek*, 74 S.W.3d at 493 ("Because an assignee stands in the shoes of the assignor, [P] was subject to the statute of limitations as it applied to [D]'s independent actions for breach and negligence, and was thus barred").

The assigned claims were dead when Smith obtained them. Most of the $79,000 in overcharges preceded the blowup of August 2011, and any remaining charges would have been incurred by the end of 2011. The statute would expire on all charges by the end of 2013. In fact, it would have expired on most of them before that, because they were paid earlier. *See* PX-40, 162, 174; DX-7, 8, 79, 80, 186-90. The theft recovery is time-barred as to assigned claims, and their inclusion contaminates the remainder, per *Casteel* and *Harris County*.

## 2. Breach of a contract should not be theft.

The trial court found the language ambiguous, making it impossible for the litigants to know what their contract meant until a jury verdict informed them. Being on the wrong side of a contract dispute is not theft:

> If a bona fide dispute exists as to the ownership of the property, then the evidence is legally insufficient to sustain a theft conviction. *See Hann v. State*, 771 S.W.2d 731, 733 (Tex. App.—Fort Worth 1989, no pet.); *see also Roper v. State*, 917 S.W.2d 128, 132-33 (Tex. App.— Fort Worth 1996, pet. ref'd) (ordering acquittal in a theft case that was based on "a simple case of a civil contract dispute").

*Bokor v. State*, 114 S.W.3d 558, 560 (Tex. App.—Fort Worth 2002, no pet.); *see Jacobs v. State*, 230 S.W.3d 225 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (similar). Even if Hardwick is wrong about the contract's meaning, the fact that it had to go to a jury shows that this case is "a simple case of a civil contract dispute." *Roper*, 917 S.W.2d at 132. It is not theft. *Id.*

## II.   THE TORT THEORIES SHOULD BE REVERSED.

The fraud and fiduciary duty theories have similar problems:  the evidence does not support them, and they have the same *Casteel* issues just discussed.

### A.   There is no breach of fiduciary duty.

The parties to the Fusselman projects disclaimed fiduciary duties.  *See* DX-1347, art. VII.A ("the parties shall not be considered fiduciaries"); DX-1354 (disclaiming "partnership," "joint venture," and "agency").  They did it repeatedly:

- "**No Partnership.**" (DX-1351, § 6.3)

- "**No Partnership.**" (DX-1356, § 6.3)

- "**No Partnership.**" (DX-1298, § 6.3)

Thus, Hardwick strenuously objected to the fiduciary duty issue (Question 13). *See* 11 RR 411 ("there is no evidence of fiduciary duty.  There's no basis at all to ask the jury if Mark owed a fiduciary duty because as a matter of law, he didn't."). He did the same with the issues about joint venture (Question 11) and agency (Question 12).  11 RR 408-11.[4]  The trial court erred in failing to heed.

---

[4] Hardwick reiterated the no-evidence complaints in his JNOV motion.  *See* CR 3047 ("The Jury's Finding That Mark Hardwick Breached His Fiduciary Duty Should Be Disregarded Because He Owed No Such Duty."); CR 3048 ("Hardwick was not a member of a joint venture with Smith Energy Company, individually or as defined by the court, and he was not Smith Energy Company's agent."); *see also* CR 3036 ("Hardwick was not a member of a joint venture with Smith Energy"); CR 3037 ("There was no joint venture"); CR 3042 ("The evidence establishes that there was no joint venture as a matter of law"); CR 3044 ("The evidence conclusively establishes that Mark Hardwick was not Smith Energy Company's (individually) agent, let alone the vast majority of the individuals and entities included within the Court's definition of Smith Energy Company."). His motion for new trial is similar.  CR 3535-36.

### 1. There is no joint venture, as the parties carefully disclaimed any joint venture in writing.

Smith alleged a joint venture between Hardwick and Smith because of the Fusselman contracts. *See* CR 2918 (alleging a joint venture "as a result of the fact that Hardwick and Smith are joint working interest owners"); CR 2902 ("The GEAs each created a joint venture").

But the contracts say the opposite. Start with the North Mound Lake Participation Agreement between Smith and RAW (DX-1346), and the three side letters that brought Blaylock, Elger, and Hardwick into the project (DX-86). The participation agreement says nothing about a joint venture. *See* DX-1346.

Paragraph 11 requires them to sign an operating agreement (DX-1347), which they all did. That agreement disclaims any joint venture. It does so in Article VII's very first paragraph: "It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals." DX-1347. Article VII goes on to say that "the parties shall not be considered fiduciaries." *Id.* Lester Smith signed the operating agreement, as did everyone else involved in the deal: Hardin, Blaylock, Elger, and Hardwick. *See id.*

If they had not signed this agreement, the parties might debate the effect of the statutory rule that "ownership of mineral property under a joint operating agreement" is a fact that, "by itself, does not indicate that a person is a partner in the business." TEX. BUS. ORGS. CODE § 152.052(b)(4). But the operating agreement removes all room for debate. There was no joint venture.

The Big Bump contract contains similar terms. DX-1354. The contract has an attached operating agreement, which again states in Article VII that there is no joint venture or partnership, and that the parties "shall not be considered fiduciaries." *Id.*

The remaining agreements—On Point, Muy Caliente, and North On Point Extension—loudly reject any possibility of a joint venture. Paragraph 6.3 of each one is entitled "**No Partnership**." There, the parties renounced any joint venture: "The liabilities of the Parties hereunder shall be several, not joint or collective …. It is not the intention of the Parties to create, nor shall this Agreement be deemed as creating a mining or other partnership or association or to render the Parties liable as partners." DX-1351; *accord* DX-1356, DX-1298.

The operating agreements go further by rejecting any fiduciary duty between the parties: "the parties shall not be considered fiduciaries or to have established a confidential relationship." DX-1354, art. VII.A; *accord* DX-1356, DX-1298.

So while Smith certainly **alleged** that the contracts "created a joint venture" (CR 2902), those allegations wither in the face of the contracts. There was no joint venture, and even if there had been, the parties disclaimed any fiduciary duties. Joint venturers have a right to agree that they will not owe fiduciary duties, as the State's policy of freedom of contract supports almost any bargain made by a joint venture's members. *See* TEX. BUS. ORGS. CODE § 152.002(a).

### 2. There is no agency, because the parties disclaimed it.

A similar analysis applies to agency. The Fusselman operating agreements state in Article VII that it is not the intention of the parties to create "a mining or other partnership, joint venture, agency relationship or association." DX-1347; *accord* DX-1354, DX-1351, DX-1356, DX-1298. Further, they likewise provide that the "parties shall not be considered fiduciaries." *Id.*

Smith says that agency existed for Bad Billy, but not Fusselman. CR 3129. If so, agency cannot support the $5 million forfeiture award, because that money (Question 15) relates to Fusselman, not Bad Billy. The most that agency might support would be Bad Billy tort damages (Question 14) of $43,425 in overcharges plus $25,448 in replacement costs, with no fees and no forfeiture of Fusselman working interest money. CR 3092. So the most Smith could recover is $68,873.

But even that award has problems. First, there is no proof of any breach of a fiduciary duty related to any Bad Billy agency. What did Hardwick do wrong on

Bad Billy? According to Smith, he charged too much and stopped too soon. Those acts may be contract breaches but not fiduciary duty breaches.

Second, the statute of frauds bars the recovery of the $25,448 in replacement landman costs, because a plaintiff cannot have benefit-of-the bargain damages in tort when the statute of frauds makes the bargain unenforceable, as is true of the Bad Billy contract. *Haase v. Glazner*, 62 S.W.3d 795, 797-99 (Tex. 2001).

Finally, the definition of "Smith" injects *Casteel* error into the agency claim. As noted earlier, the definition includes all the tag-along parties as "Smith," but there is no evidence of agency between Hardwick and those parties.

### 3. The contracts have legal effect.

When Hardwick pressed these arguments in his JNOV motion, Smith replied that the contracts do not count. First, Smith claimed that there was testimony about the five partnership factors. CR 3120-24; *see* CR 3124 ("regardless of the language used in the Fusselman Prospect Agreements or the JOAs, the agreements are not conclusive proof that a joint venture does not exist.").

But that argument fails because it pretends that the contracts are ineffective. Parties cannot end-run their written agreements by taking the stand and asserting, "Oh yes, despite disclaiming a joint venture in writing, we actually had a joint venture because we shared control and all those other things."

The whole point of the contractual disclaimers was to define the relations between the parties and to prevent one party from ambushing another party with phony allegations of partnership. Texas does not favor "surprise or accidental partnerships." *Ingram v. Deere*, 288 S.W.3d 886, 898 (Tex. 2009).

Texas recognizes "the right of persons to define the terms of their business relationships." *Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 702 (Tex. 2007); *see Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex. 2007) (Texas "strongly favors" freedom of contract); *Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 664 (Tex. 2008) ("utmost liberty of contracting"). Part of this is the freedom to determine when to be bound. *See Foreca, S.A. v. GRD Dev. Co., Inc.*, 758 S.W.2d 744, 745-46 (Tex. 1988); *Scott v. Ingle Bros. Pac., Inc.*, 489 S.W.2d 554, 555 (Tex. 1972).

Imagine the consequences of Smith's position. If parties could not define their relationships in written contracts, how will they ever know what duties they owe each other? They can hire a lawyer and ask, "Am I in a partnership?," but the lawyer will not be able to say, because any decent lawyer would tell them that if the two sides disagree, it must go to trial. The only way to know how to behave toward another party would be to go ask a jury: "*Were we in a joint venture?*" What a depressing and unpredictable world it would be if nobody could rely on written contracts such as these. The Court should enforce the contracts as written.

Smith says that witnesses such as Lester Smith and Steve Blaylock testified to certain factors under the five-factor test for a joint venture. CR 3123. Yes, they said that—despite signing contracts saying the opposite, and despite paying no attention to the writings. *See* 5 RR 280 (Blaylock: "beat me with a wet rope if I had to read one of those ... I don't read them"); 6 RR 24 (Blaylock: "I haven't read through any of them even today."); 6 RR 30 (Blaylock: "I didn't read the agreements we signed."); 7 RR 249 (Smith: "I'm a handshake guy .... I don't even know if I read the contract."). But it makes no difference.

Such parol evidence about what they felt and thought is legally immaterial. If the contracts are enforceable, the effect is to trump the force of such testimony. In the words of Chief Justice Calvert's article, such testimony is classified as no evidence because a rule of law bars its consideration. *See* Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 361-62 (1960).

Second, Smith argued that there was no signature on the operating agreements attached to the contracts for On Point, Muy Caliente, and North On Point Extension. CR 3124. That is an odd position to take, given that those three contracts each positively scream "**No Partnership**" in section 6.3. Further, Smith signed the operating agreement for North Mound Lake, which disclaims joint venture and fiduciary duty.

That leaves only the Big Bump participation agreement.  In section 11, Smith agreed that upon its execution, the parties would sign the attached operating agreement.  *See* DX-1354.  That bound Smith to the terms of the attachment.  *See In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 & n.41 (Tex. 2004) ("[A]n unsigned paper may be incorporated by reference in the paper signed by the person sought to be charged.  The language used is not important provided the document signed ... plainly refers to another writing."); *In re Bank One, N.A.*, 216 S.W.3d 825, 826 (Tex. 2007) (arbitration clause in Bank's Account Rules and Regulations was incorporated by reference into signature card where customer agreed to be bound by the account rules and regulations).  In short, the contracts count.

## B.    There is no fraud.

Question 9 asked the jury whether Hardwick committed fraud against Smith Energy either by a misrepresentation or by a nondisclosure.  The jury said Yes. The jury found the same damages that it had found on the contract claim:  $36,003 in Fusselman overcharges, $43,425 in Bad Billy overcharges, and $25,448 in Bad Billy replacement landman costs.  *See* Question 10.

Hardwick repeatedly assailed Question 9.  First, he objected to the question as being insufficiently specific.  *See* 11 RR 406 (Mr. Strange:  "it's not limited in scope in any way, shape, form or fashion.  Did Mark Hardwick commit fraud against Smith Energy in connection with what?").  Second, he objected to

including the tag-along parties in the definition of "Smith" (11 RR 406), because there is no evidence of any representation to, or reliance by, the tag-along parties. 11 RR 406-07. Third, he objected to the nondisclosure part of the question, because a duty to disclose would exist only if there were a fiduciary relationship, which there was not. 11 RR 407. Fourth, he assailed its intent element with a no-evidence point in writing after the verdict. CR 3101.

Smith's counsel argued that Hardwick committed fraud by not disclosing that he and Lester Smith read the contracts differently. *See* 11 RR 323 ("The testimony is certainly unequivocally from Mr. Smith that if he had known that this man's position was he didn't have to do anything in order to collect 6 percent, he would have never entered in the contract.").

That is a peculiar notion of fraud, but Smith's counsel committed himself to it and stressed it in closing argument: "Lester Smith testified, 'If I had known that I thought that he thought that he didn't have to do anything in return for this really, really rich deal I was giving him, I'd have never entered into the contract.' That is the fraud." 12 RR 62.

### 1. The fraudulent inducement aspect of the claim fails because it lacks legally and factually sufficient evidence.

The fraudulent inducement complaint is untenable. Take the intent element. To prove that Hardwick fraudulently induced the contracts, Smith had to prove that

Hardwick had a bad intent at the time the parties entered into the contract. *See T.O. Stanley Boot Co.*, 847 S.W.2d at 222. But that lacks the support of legally and factually sufficient evidence.

All agreed that Hardwick was an excellent landman and did good work. *E.g.*, 6 RR 50. Lester Smith said so himself. 7 RR 267 ("Mark's an excellent landman. Very, very good at his job."); 8 RR 9 ("Mr. Hardwick was an excellent landman and did great work"). Although Smith criticizes him for running out of gas before finishing the race, that is a far cry from starting as a fraud.

To the contrary, Hardwick performed extensively under the agreements. Hardwick put in long hours and worked on the projects during 2008, 2009, 2010, and much of 2011. 9 RR 234-35; 10 RR 18, 98, 100-03, 129. He worked himself nearly to the point of exhaustion, because the wells came in so successfully. Performing a contract for years refutes fraudulent inducement. *See IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113, 124 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *Bank One, Tex., N.A. v. Stewart*, 967 S.W.2d 419, 445-46 (Tex. App.—Houston [14th Dist.] 1998, pet. denied); *Ensil Int'l Corp. v. Lear Siegler Servs., Inc.*, 2011 WL 2473067, at *3 (Tex. App.—San Antonio June 22, 2011, no pet.); *Reyna v. First Nat'l Bank*, 55 S.W.3d 58, 66-68 (Tex. App.—Corpus Christi 2001, no pet.); *Bay Colony, Ltd. v. Trendmaker, Inc.*, 121 F.3d 998, 1006 (5th Cir. 1997). The intent element is unproven.

Further, there is legally and factually insufficient evidence of a failure to disclose a "material fact." Question 9 recognizes fraud by non-disclosure. As noted earlier, Smith insisted that Hardwick's failure to disclose that he read the contracts a certain way was an actionable non-disclosure of a material fact. But that is not a material fact. The Court should render on this theory.

Alternatively, the non-disclosure aspect of Question 9 injected *Casteel* error into the charge. Hardwick owed no duty to disclose, for the reasons given earlier. Thus, at a minimum, the fraud theory should be reversed and remanded because of error in the charge.

## 2. The rest of the fraud claim is flawed.

Smith's only other argument for fraud relates to overbilling. Smith asserted that overbilling for the Fusselman and Bad Billy work constituted fraud. 12 RR 63-66; CR 3119. At most, the overbilling would justify damages of about $79,000. It would not constitute fraudulent inducement, and it would not justify rescission of the contracts.

But the problems with the fraud claim go deeper than that. The jury charge contains more layers of *Casteel* error. First, the trial court erred in including the tag-along parties in the definition of "Smith." Those parties have no evidence of fraud whatsoever. CR 2964-65. They conspicuously failed to prove material misrepresentation or reliance.

This is unsurprising, given that they had no contact with Hardwick. A misstatement, its materiality, and reliance all "require individualized proof." *Peltier Enters., Inc. v. Hilton*, 51 S.W.3d 616, 623 (Tex. App.—Tyler 2000, pet. denied); *see Grant Thornton LLP v. Suntrust Bank*, 133 S.W.3d 342, 355 (Tex. App.—Dallas 2004, pet. denied) ("Proof of reliance or lack of reliance necessarily requires an individualized determination"). There was no effort to prove these individualized aspects of fraud claims as to the tag-along parties. There is simply no evidence that any of them have supportable fraud claims.

Second, the tag-along plaintiffs also failed to prove that Hardwick had a duty to disclose information to them. Failure to disclose does not constitute fraud unless there is a duty to disclose. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998). "Generally, no duty of disclosure arises without evidence of a confidential or fiduciary relationship." *Id*. Duty is a matter of law for the court. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001).

There is no evidence that Hardwick had any type of relationship with the tag-along parties, so no duty to speak could arise. Thus, any claim for fraud by nondisclosure to the tag-alongs cannot stand. At a minimum, the Court should reverse and remand the fraud recovery because of error in the charge.

## III. THE ADDITIONAL REMEDIES—$5 MILLION IN FORFEITURE, $3.5 MILLION IN FEES, $750,000 IN INTEREST ON THE FORFEITURE, AND PARTIAL RESCISSION—ARE IMPROPER.

The largest dollar amounts in this appeal involve remedies.

### A. The $5 million forfeiture award is improper.

After obtaining only $104,000 in damages from the jury, Smith asked the court to make the recovery nearly 50 times larger. Smith requested a "forfeiture" award for $5,004,231, which is the sum of the dollar figures found in Questions 15a and 15b. *See* CR 3153-65.

Smith got its wish. The judgment awards the amount requested and recites that "forfeiture" of this amount is "necessary to satisfy the public's interest in protecting fiduciary relationships." CR 3604. That was error. There should be no forfeiture at all, and certainly not one this large.

#### 1. There is no underlying tort to support forfeiture.

No forfeiture is proper. There was no fiduciary duty and no breach, let alone a clear and serious one, for the reasons discussed earlier in section II.A. The Fusselman contracts repeatedly disclaim fiduciary duty. *E.g.*, DX-1298, 1351, 1356. Although Smith says that a fiduciary duty flowed from an agency relationship created by the Bad Billy contract, that is irrelevant; a breach on one project will not support forfeiture as to another. *Gregory v. Porter & Hedges, LLP*, 398 S.W.3d 881, 887 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).

Smith may seek to salvage the forfeiture award as a restitutionary remedy for fraudulent inducement. That will not do. There was no fraudulent inducement, for all the reasons discussed in section II.B. Accordingly, the forfeiture award lacks the support of a proper legal predicate.

## 2. Even if forfeiture were available—so that Hardwick had to "return" his "compensation"—the working interests never came from Smith and were not compensation.

Even if there had been a breach to support forfeiture of something, it would not justify turning over the working interest earnings. Smith analogized to a refund that a disloyal lawyer might have to make to a client in an *Arce* situation. *See* CR 2919 (pleading for "compensation" to be "forfeited"); 11 RR 288 ("I'm trying to get the value of the compensation that we paid him.") Smith said that it "simply wants back the compensation that Hardwick did not earn." CR 3165.

The record refutes this myth of "compensation" going "back" to Smith. First, the working interests never came from Smith. They came from RAW. *See* DX-1298, 1346, 1354, 1351, 1356. Hardwick and friends took the deal to Smith, not vice versa. 6 RR 108-09, 134-36. Second, the working interests were not compensation and they are not conditioned on personal services. Conditions are disfavored in law and would require very clear language. *See Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 79 (Tex. 1989). All a working interest owner must do is pay his bills (6 RR 244), which Hardwick undisputedly did.

To see the absurdity of Smith's position, take a hypothetical that shows why Hardwick's share of the working interest cannot have been salary for land work. What if Hardwick died in a wreck before all the work was done? Smith concedes that forfeiture of the working interests would be improper for that. 11 RR 293-96. Hardwick's heirs would inherit the working interests and keep getting paid. *Id*. But that concession proves the point. If the working interest earnings were truly a paycheck for finishing a multi-year job, as Smith claims, they would need to stop if Hardwick was run over by a train. The forfeiture claim is a baseless land grab.

### 3. The forfeiture award rests on inaccurate factual findings.

In Question 15, the jury found that "Hardwick" received $795,056 in working interest earnings after stopping work. It also found that "Hardwick's" working interests had a market value of $4,209,175 in the middle of 2013. These findings address Hardwick individually—as opposed to the LLC. But the findings are excessive. Hardwick assigned the working interests to LLC in 2011. *See* DX-848; DX-1371; 5 RR 205-06. This is undisputed. *See id*. Thus, most of the $795,056 (Question 15a) was "received" by LLC, not Mark Hardwick. Similarly, the value of "Mark Hardwick's" working interests (Question 15b) on the relevant date was not $4.2 million, because $2.8 million of that amount belonged to LLC by then. Hardwick laid out the numbers in his new trial motion (CR 3537), and Smith's response neither quoted nor cited any evidence to contradict them.

In response to the motion for new trial, Smith claimed that Hardwick was "legally entitled to receive" the various working interests and associated earnings. CR 3643. That may or may not be true, but it makes no difference. The charge did not ask what Hardwick was "legally entitled to receive." It asked what he "received." Sufficiency review takes place in light of the charge as submitted, not some hypothetical charge. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000); *Larson v. Cook Consultants, Inc.*, 690 S.W.2d 567, 568 (Tex. 1985). Smith also called LLC a "shell" company (CR 3643) but has no alter ego finding to support that belated claim. The answers to Question 15 are simply unsupportable, and the response to the new trial motion tends to suggest that Smith realizes it.

### 4.     The forfeiture amount is too large.

If the Court gets this far, it should reduce the award's size. While trial courts have discretion over forfeiture amounts, *see Burrow v. Arce*, 997 S.W.2d 229, 246 (Tex.1999), if an award can ever be excessive, this one is.

First, the $5 million forfeiture of Fusselman working interest monies dwarfs the damages associated with those projects. Second, the contracts disavow joint ventures and fiduciary duties, so Hardwick had a good reason for any failure to comply. *See, e.g.*, DX-1298, 1347. Third, all agreed that Hardwick did excellent work. 7 RR 267; 8 RR 9. Under these circumstances, such a disproportionately large forfeiture is improper.

### 5. The forfeiture cannot be saved as restitution and rescission for fraud.

As an alternative, Smith treated the forfeiture as equitable relief to go with rescission as a remedy for fraudulent inducement. CR 3150-69. Smith spoke of restitution. *See* CR 3156-60. But that argument fails for multiple reasons.

To begin with, the law disfavors awarding equitable relief when money damages are available. Money damages are generally an adequate remedy at law. Smith sued for damages on the Fusselman contracts, and although the verdict was less than Smith wanted, the jury awarded something. So if Hardwick breached the Fusselman contracts, the damages make Smith whole. Nothing justifies piling on with "equitable" relief.

Smith says that a fraudulent inducement plaintiff can seek "rescission and restitution of the consideration paid." CR 3156. But Smith does not want that. The remedy Smith got is nothing like "rescission and restitution." Smith positively loves the Fusselman contracts because they turned out so profitably. Smith wants to keep them in place, not rescind them. The twist is that Smith wants to rewrite the contracts—partway—by readjusting the percentages, so that Hardwick's share goes down, Smith's goes up, and there is no change in the percentage for Blaylock, Elger, and RAW. That hardly sounds like rescission.

Nor does Smith really want restitution of "consideration paid," because the $5 million in working interest earnings were not "consideration" for the contracts, were not "paid" by Smith, and do not count as restitution in any sense of the word. In substance, the $5 million borders on punitive damages.

Smith cites section 54 of a Restatement to shore up the remedy (CR 3465), but that part of the Restatement deals with the return of "specific property in the hands of a defendant, as opposed to a money judgment in the amount of the defendant's unjust enrichment." RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT, Introductory Note at 260 (2011). It imposes an "all-important 'tracing requirement.'" *Id.* at 262. Thus, section 54 speaks of a person who has "transferred money or other property" being entitled to recover "it." *Id*. § 54.

Smith does not want to rescind the Fusselman contracts. Smith wants to pick and choose—keeping some parts and rejecting others. The Court should refuse to let Smith go halfway across the canyon. Texas law strongly disfavors partial rescission: "It is the longstanding general rule in Texas that a rescission of a contract must be in toto." *Costley v. State Farm Fire & Cas. Co.*, 894 S.W.2d 380, 387 (Tex. App.—Amarillo 1994, writ denied). That rule applies here and condemns the trial court's decree of rescission "as between" two parties to the five-way set of Fusselman contracts.

Although the rule against partial rescission has two narrow exceptions, neither applies. The exceptions are for divisible contracts and "extreme" cases. *Id.* The Fusselman contracts are not plainly divisible. Nor is this case extreme—after all, the fraudulent inducement caused **zero** damages. Smith alleged that Hardwick would work in perpetuity, but the jury brought back all zeros on that claim. *See* Questions 10(3)(a)(i), (b)(i), (c)(i). That does not qualify as extreme. *See Bryant v. Vaughn*, 33 S.W.2d 729, 730 (Tex. 1930) (rescission is improper for fraudulent inducement that causes no damage).

In short, the only "consideration" worthy of the name is the money Smith paid in so that RAW could acquire leases in the names of all five participants. That money never went to Hardwick, so he cannot "return" it. Nor is that money the same as the working interests or associated earnings he was ordered to forfeit. The forfeiture award is not supportable as restitution of consideration paid.

### B. The attorney's fees should be reduced or eliminated.

The $3.5 million fees should be reduced or eliminated.

#### 1. A reversal of the underlying damages will require either a rendition or remand on attorney's fees.

If the Court deletes the damages, it should delete the fees. *Dryzer v. Bundren*, 2014 WL 1856849, at *5 (Tex. App.—Amarillo June 16, 2014, pet. denied); *see Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 567 (Tex. 2002)

("Without an actual-damages recovery, a party is not entitled to an attorney's fees recovery."). Likewise, if Smith's damages are disturbed but not eliminated, the fee award would necessarily require reconsideration by the fact finder. The jury was asked to find fees based on the "amount involved and the results obtained." CR 2985. When the damages are reduced, that changes "the results," so a retrial on fees is required. *Barker v. Eckman*, 213 S.W.3d 306, 313-15 (Tex. 2006).

### 2. Smith failed to segregate fees between recoverable and non-recoverable claims.

But the fee award should be reversed no matter how the Court rules on the actual damages. Smith did not prove fees properly. Attempting to inflate the fee award, Smith openly refused to segregate recoverable from unrecoverable fees. In fact, Smith redacted the invoices to hide virtually all signs of what the lawyers were doing. Hardwick preserved these arguments. CR 3055-57, 3459, 3539.

Fees cannot be recovered unless authorized by contract or statute. *In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d 168, 172 (Tex. 2013). Thus, "if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006). Here, Smith can recover fees for only the contract and statutory-theft claims. *See* TEX. CIV. PRAC. & REM. CODE §§ 38.001(8), 134.005(b). Smith cannot recover fees for tort claims.

Nevertheless, Smith failed to segregate. Hardwick asked Smith's main fee expert whether he segregated the fees. The expert, Mr. Moore, said No:

> Q. You have not attempted to allocate any fees to any particular claim or cause of action?
>
> A. I guess the answer is no because I don't know how you could particularly allocate a fee to a particular cause of action when they've got about 10 or 12 and you've got about 12 or 15. So I guess the answer is no.

7 RR 202; *see* 7 RR 203 ("I did not attempt to segregate a fee to a particular cause of action"). Moore said that the case involved "interrelated causes of action," so he did not "know how you break it out." 7 RR 215. Smith's lead trial attorney, Rusty Hardin, echoed this in some short follow-up testimony, contending that fees were unsegregated because the causes of action "were all so interrelated" and "impossible to divide." 7 RR 219-20.

Smith seeks to revive the old intertwining exception to segregation, which *Tony Gullo* explicitly rejected: "To the extent *Sterling* suggested that a common set of underlying facts necessarily made all claims arising therefrom 'inseparable' and all legal fees recoverable, it went too far." 212 S.W.3d at 313; *see also MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 667 (Tex. 2009) (similar). *Tony Gullo* "reestablished the rule that attorney's fees are recoverable only if necessary to recover on a contract or statutory claim allowing them." *Varner v. Cardenas*, 218 S.W.3d 68, 69 (Tex. 2007).

The only time that segregation is not required is "when **discrete legal services** advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Tony Gullo*, 212 S.W.3d at 313-14 (emphasis added). The focus of the exception now is on the work performed, not the facts or claims. *Id*. "Intertwined facts do not make tort fees recoverable" or any other fees not related to a contract or statute. *See id*. at 313.

Here, any work that Smith's lawyers performed solely to advance issues not related to the contract or statutory-theft claims cannot lead to fee recovery. Thus, any work done on the following issues must be segregated and excluded from Smith's fee calculation:

- Breach of fiduciary duty

- Joint venture

- Agency

- Fraud

- Forfeiture (which includes the working-interest earnings that Hardwick received after he stopped his services, and the value of his working interests)

- Exemplary damages

- Claims on which Smith did not prevail, such as fraud claims relating to the North On Point Extension GEA amendment (8 RR 235, 238, 252)

- Smith's non-suited claims, such as the fraudulent-transfer claim (8 RR 236-38, 252)

This partial list shows how many significant issues involved work related only to tort claims.

In fact, segregation on this record was impossible. As Hardwick noted in his JNOV motion, the invoices from Smith's lawyers "are so heavily redacted as to be essentially meaningless." CR 3056. *E.g.*:

- "1/26/2012 RKH Telephone calls to [redacted]; review [redacted] draft [redacted]"

- "12/19/2012 CPC Conduct legal research regarding [redacted] and conduct factual research regarding [redacted]"

- "10/25/2013 LH Meeting with Carolyn Courville and Ryan Higgins regarding [redacted] research regarding [redacted]"

- "6/19/2014 RH Meeting with Ryan Higgins and Carolyn Courville to [redacted] conference with Carolyn Courville"

PX-166. These general descriptions of the work go on for page after page. *Id.* Were the lawyers working on Smith's tort claims? Contract claims? Nobody can tell from the invoices, because the subject matter is marked out. The redactions make it impossible to tell what work the plaintiffs' lawyers did on claims for which fees are recoverable and on claims for which they are not. The failure to segregate warrants at least a reversal and remand. *See A.G. Edwards & Sons Inc. v. Beyer*, 235 S.W.3d 704, 710 (Tex. 2007).

### 3. There is no evidence that the hours worked by Smith's lawyers were necessary.

But the problems go deeper than failure to segregate. Smith had the burden to prove that the fees awarded for the fee-recoverable contract and statutory-theft claims were not only reasonable, but necessary. TEX. CIV. PRAC. & REM. CODE §§ 38.001(8), 134.005(b). Any fees expended solely on non-recoverable claims, by definition, are not necessary. *See Tony Gullo*, 212 S.W.3d at 311-14. Here, Smith supplied no specific evidence—none—that the hours worked by the attorneys were necessary. *See* CR 3055-57, 3459, 3539 (Hardwick's objections).

Smith's fee expert, Bradford Moore, used the lodestar method to calculate trial fees by relating the hours worked for each person who worked on the case multiplied by their hourly rates for a total fee. PX-166, 276-80. A "party choosing the lodestar method of proving attorney's fees must provide evidence of the time expended on specific tasks to enable the fact finder to meaningfully review the fee application." *Long v. Griffin*, 442 S.W.3d 253, 253 (Tex. 2014) (per curiam). "[G]eneralities about tasks performed provide insufficient information for the fact finder to meaningfully review whether the tasks and hours were reasonable and necessary under the lodestar method." *Id.* (citing *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 763 (Tex. 2012)). But Smith offered only generalities, not specifics, about the tasks performed by the attorneys.

As discussed above, the contemporaneous billing records are heavily redacted. PX-166. They speak only in general terms about the work; such generalities are not evidence of "time spent on specific tasks" for recoverable claims. *Long*, 442 S.W.3d at 255; *see City of Laredo v. Montano*, 414 S.W.3d 731, 736 (Tex. 2013) (per curiam) ("lodestar calculation requires certain basic proof, including itemizing specific tasks").

The expert, Moore, concluded that the total amount of fees was "reasonable and necessary" (7 RR 197), but he did not explain how the hours worked satisfied that standard. He conceded that he could not explain the substance of the tasks performed because the invoices were redacted. 7 RR 207-11. This is understandable, since he apparently reviewed only the redacted bills. 7 RR 207, 209. That leaves Smith with the expert's mere say-so, which is not enough. *See Burrow*, 997 S.W.2d at 235 ("a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness.").

Likewise, Moore made no effort to determine whether the billings for the legal support staff included only substantive legal work (possibly recoverable), as opposed to clerical work (not recoverable). 7 RR 204-13. He made that assumption based on his experience with other law firms and the Hardin firm's reputation. *Id*. Mr. Hardin did testify that all the staff's work encompassed legal

matters (7 RR 220-21), and his testimony can be taken as true, but this testimony says nothing about whether their hours worked were necessary.

In sum, under the method that Smith chose to use, no evidence supports the amount of attorney's fees awarded. No evidence indicates the hours expended on the specific tasks working on claims for which fees may be recovered. Smith offered only generalities, and "[o]ne does not satisfy that obligation by simply proffering evidence of generalities." *Sullivan v. Abraham*, 2014 WL 5140289, at *3 (Tex. App.—Amarillo Oct. 13, 2014, pet. filed). The Court should reverse and render as to fees. Alternatively, the Court should reverse and remand.

This complaint about evidentiary insufficiency is not some technicality. Smith wants a $3.5 million fee award for recovering a mere $104,000. Such a disproportionate fee award ought to rest on solid proof. If the Court were to approve of Smith's evidence, the law would have no way of stopping an award at $3.5 million. Why not $10 million next time? Why not $100 million? If all a plaintiff needs to do is what Smith did, reviewing courts will have no way to know when a fee award crosses the line. Smith's fee award rests on legally and factually insufficient evidence.

**C.    The judgment wrongly stacks remedies:  Smith cannot have both the $5 million in disgorgement and the $3.5 million in fees.**

The trial court erred in stacking inconsistent remedies.  The most obvious example of this error comes in the stacking of the $5 million disgorgement award on top of the $3.5 million fee award.  Smith sought disgorgement on the basis of the tort theories—fiduciary duty and fraud—while seeking fees on the basis of the contract and statutory theft theories.

Hardwick asked the court to require an election.  *See* CR 3035 ("At a minimum Plaintiffs must elect a damage theory"); CR 3455 ("election of remedies doctrine and the one-judgment rule"); CR 3456 (similar); CR 3458 (objecting to "multiple recoveries"); CR 3459 (objecting to the fee award under the "election of remedies and one-satisfaction doctrines").  The court erred in failing to do so.

A plaintiff is entitled to elect the greatest recovery when the verdict supports relief under multiple theories.  *See Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988) ("When a party tries a case on alternative theories of recovery and a jury returns favorable findings on two or more theories, the party has a right to a judgment on the theory entitling him to the greatest or most favorable relief.").  But the plaintiff cannot stack them all on top of each other.

The rule came up in *Tony Gullo*, which involved three theories, namely contract, fraud, and DTPA:

> For breach of contract, Chapa could recover economic damages and attorney's fees, but not mental anguish or exemplary damages. For fraud, she could recover economic damages, mental anguish, and exemplary damages, but not attorney's fees. For a DTPA violation, she could recover economic damages, mental anguish, and attorney's fees, but not additional damages beyond $21,639 (three times her economic damages). The court of appeals erred by simply awarding them all.

*Tony Gullo*, 212 S.W.3d at 304.

Smith won on four theories. The fraud and fiduciary duty theories sound in tort and arguably support disgorgement, but they will not support an award of fees. The contract and theft theories support an award of fees, but not disgorgement. The trial court "erred by simply awarding them all." *Id.*

Smith cannot mix and match theories. Smith needs to elect "the theory entitling him to the greatest or most favorable relief." *Boyce*, 747 S.W.2d at 787. If the rule were otherwise, the plaintiff in *Tony Gullo* would have been able to cherry-pick by stacking economic losses <u>plus</u> mental anguish <u>plus</u> fees <u>plus</u> exemplary damages. *See id.*

This is not a case where the jury found different damages for each theory. Every overcharge finding is the same from theory to theory—to the last dollar. Every finding of damages for "cover" is also the same from theory to theory. Accordingly, Smith must elect. *Id.*; *see Saden v. Smith*, 415 S.W.3d 450, 469 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).

## D. The rescission remedy is improper.

The judgment rescinded seven contracts "as between" Smith and Hardwick. Those seven are the first five Fusselman contracts, the amended version of the last Fusselman contract (North On Point Extension / O'Donnell), and Bad Billy. Hardwick objected to rescission (CR 3088-101) because, as noted earlier, the law strongly disfavors partial rescission. *See Costley v. State Farm Fire & Cas. Co.*, 894 S.W.2d 380, 387 (Tex. App.—Amarillo 1994, writ denied). The Court should follow *Costley* and reverse.

## E. Interest on forfeiture.

Over Hardwick's objection (CR 3459), the trial court awarded prejudgment interest on forfeiture. Prejudgment interest accrues on actual damages because the plaintiff's money has been detained: "Prejudgment interest is 'compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment.'" *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998). But forfeiture does not compensate. Forfeiture has a more punitive aspect and is available even absent actual damages. Because prejudgment interest's purpose is to "fully compensate the injured party, not to punish the defendant," *Brainard v. Trinity Universal Ins. Co.*, 216 S.W.3d 809, 812 (Tex. 2006), the award of prejudgment interest on forfeiture is improper.

## IV. LLC Should Recover Fees Because It Prevailed on the Theft Claim.

Smith alleged theft against two defendants—Hardwick individually and Hardwick LLC—not one:

- "Defendants have intentionally and unlawfully appropriated property"

- "Defendants are liable for the damages resulting from such theft."

- "Plaintiffs bring this claim against Defendants pursuant to Chapter 134 of the TEX. CIV. PRAC. & REM. CODE"

CR 2923-24.  Smith did not prevail on the theft claim against the LLC.

### A. The Theft Liability Act alters the American Rule by making fees mandatory for a person who "prevails."

The Act has a loser-pays rule:  "Each person who prevails in a suit under this chapter shall be awarded court costs and reasonable and necessary attorney's fees." § 134.005(b).  "The Theft Act is unusual in Texas law in that it requires the court to award attorney's fees to a party who successfully defends a Theft Act claim, without any prerequisite that the claim is found to be groundless, frivolous, or brought in bad faith."  *Air Routing Int'l Corp. (Canada) v. Britannia Airways, Ltd.*, 150 S.W.3d 682, 686 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

### B. Under this Court's reasoning in *Dean Foods*, the prevailing party on Smith's theft claim against LLC is not Smith, but LLC.

Section 134.005(b) uses the word "prevails" but does not define that word. This Court has shown how to analyze language in comparable enactments.

1890.001/55701

In *Dean Foods Co. v. Anderson*, 178 S.W.3d 449 (Tex. App.—Amarillo 2005, pet. denied), the dispute involved a statutory phrase, "prevailing party." The Court held that Ms. Anderson prevailed when her late husband's employer nonsuited its effort to overturn a compensability determination. *Id.* at 454. The employer argued that its nonsuit kept her from prevailing, but the Court disagreed. *Id.*

Chief Justice Quinn amplified on the analysis in a concurrence. He noted that defendants who win by non-suit routinely recover court costs under Rule 131: "it consistently has been held that the beneficiary of a non-suit, *e.g.*, the defendant when a plaintiff files a non-suit, is the prevailing or successful party for purposes of Rule 131." *Dean*, 178 S.W.3d at 456 (Quinn, C.J., concurring). "If we are to retain the uniformity spoken of above, then we cannot but conclude that Anderson was the successful or prevailing party here when Dean Foods filed its non-suit." *Id*. As the Chief Justice noted, the Court previously construed the term "prevailing party" in a different statute so as to harmonize with the cases under Rule 131. *See City of Amarillo v. Glick*, 991 S.W.2d 14 (Tex. App.—Amarillo 1997, pet. denied).

Just as in *Dean Foods*, the statute does not define what it means to prevail. Just as in *Dean Foods*, the Court should promote consistency in the law by reading the term "prevails" in the Theft Liability Act to include a defendant who is sued for theft but is not found liable for theft.

### C. LLC should recover fees.

For these reasons, LLC prevailed and should have recovered fees. Smith sued LLC for theft but did not prevail. Smith neither obtained jury findings nor a judgment for theft against LLC.

When LLC raised this point after trial (CR 3079), Smith responded with three contentions. First, Smith said that it did not really sue LLC for theft. CR 3107. But the pleadings say otherwise. CR 2923-24 ¶ 94. The theft count always refers to the "Defendants" in the plural. *Id.* The petition even asks for damages to be awarded against the two defendants "jointly and severally." CR 2927. Smith plainly sued LLC for theft.

Second, Smith said that a theft defendant does not "prevail" unless there is an affirmative finding of outright innocence. CR 3107. In other words, Smith argued that a defendant does not prevail by merely winning a take-nothing. *Id.* But *Dean Foods* proves otherwise. Where a plaintiff sues for $50 million, as Smith did, a defendant who walks away with a take-nothing has prevailed.

The only case cited on this point in Smith's response was a memorandum opinion from San Antonio. *See* CR 3107 (citing *Travel Music of San Antonio, Inc. v. Douglas*, 04-00-757-CV, 2002 WL 1058527, at *3 (Tex. App.—San Antonio May 29, 2002, pet. denied)). That decision is unpersuasive. Insisting on a finding of affirmative innocence would complicate trials by making juries answer liability

questions twice: (1) Is D guilty of theft?, and (2) Is D innocent of theft? The better view is the one in *Dean Foods* and the Chief Justice's concurrence.

Finally, Smith argued that LLC waived its fee claim by not getting a jury finding on the dollar amount. CR 3108. But Smith told the trial court otherwise. When the trial court was going through draft charge language about fees, the court asked Smith about the "concept" of submitting questions for both defendants.

This discussion came up while the court was discussing fees. 11 RR 316-18. The court suggested trying fees to the bench, if both sides consented. *Id.* at 316. The court was looking for ways to shorten the trial. *Id.* at 318. In the very next breath, the court raised the issue of whether to have duplicate questions for Hardwick and LLC. *Id.* Smith told the court that there was no need for findings on behalf of LLC:

| The Court | Well, let's – let me talk about this concept for just a minute. I noticed that Mr. Strange has, on behalf of the defendant, several questions for Mark Hardwick and Mark Hardwick, LLC. And we don't need to do LLC, do we? |
| Ms. Hollingsworth | No. |
| The Court | I mean, we can eliminate that and just go with Mark Hardwick, can't we? |
| Ms. Hollingsworth | Yes, sir. |

11 RR 318-19. Smith cannot undo that representation now.

This Court should reverse that part of the judgment that denies fees to LLC. As a remedy, the Court should either award LLC half the total amount found by the jury or remand the fee issue for trial. If the Court chooses to remand for a trial, the resulting proceedings would be speedy, because a fee dispute such as this can be resolved in less than a day of trial time.

## PRAYER FOR RELIEF

The judgment should be reversed.

As to Hardwick individually, the Court should reverse the judgment and render judgment that Smith take nothing or, alternatively, reverse and remand. The Court should reverse the decree of rescission, the award of fees, and the forfeiture. The Court should forbid stacking of forfeiture and fees, and it should require an election of remedies. Any excessive recovery should be reduced or remitted.

As to Hardwick LLC, the Court should award LLC its fees in the amount of half of what the jury found in answer to Question 25. Alternatively, the Court should remand LLC's fee claim for a trial on the proper amount.

Respectfully submitted,

BECK REDDEN LLP


By: */s/ David M. Gunn*
    David M. Gunn
    State Bar No. 08621600
    dgunn@beckredden.com
    Chad Flores
    State Bar No. 24059759
    cflores@beckredden.com
    Erin H. Huber
    State Bar No. 24046118
    ehuber@beckredden.com
1221 McKinney, Suite 4500
Houston, TX 77010-2010
(713) 951-3700
(713) 951-3720 (Fax)

**COUNSEL FOR APPELLANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2015, a true and correct copy of the above and foregoing Brief of Appellants was forwarded to all counsel by the Electronic Service Provider, if registered, otherwise by email, as follows:

Rusty Hardin
rustyhardin@rustyhardin.com
Ryan K. Higgins
rhiggins@rustyhardin.com
Jeremy Monthy
jmonthy@rustyhardin.com
Lara Hollingsworth
lhollingsworth@rustyhardin.com
Carolyn P. Courville
ccourville@rustyhardin.com
RUSTY HARDIN & ASSOCIATES, LLP
1401 McKinney Street, Suite 2250
Houston, TX 77010
***Counsel for Appellees***

*/s/ David M. Gunn*
David M. Gunn

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Tex. R. App. P. 9.4 because it contains 14,973 words, excluding the parts of the brief exempted by Tex. R. App. P. 9.4(i)(2)(B).

2.      This brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14 point Times New Roman font.

Dated: <u>September 9, 2015</u>.

<u>*/s/ David M. Gunn*</u>
David M. Gunn
*Counsel for Appellant*

## No. 07-15-00083-CV

### IN THE SEVENTH COURT OF APPEALS
### AMARILLO, TEXAS

### MARK P. HARDWICK, INDIVIDUALLY AND D/B/A MARK P. HARDWICK OIL AND GAS PROPERTIES AND MARK P. HARDWICK, LLC
*Appellants,*

**v.**

### SMITH ENERGY COMPANY, ON ITS OWN BEHALF AND ON BEHALF OF SMITH ENERGY RESOURCE OIL, LTD., A TEXAS LIMITED PARTNERSHIP, AND ON BEHALF OF SMITH ENERGY PARTNERS I, LTD., A TEXAS LIMITED PARTNERSHIP,
*Appellees.*

**On Appeal from the 121st District Court, Terry County, Texas
Trial Court Cause No. 19,490; The Honorable Rick Morris, Presiding**

### APPENDIX TO
### BRIEF OF APPELLANTS

## Tab

A  Jury Verdict (2 CR 2948-92)

B  Judgment (2 CR 3600-11)

C  North Mound Lake Participation Agreement (DX 1346)

D  North Mound Lake Operating Agreement (DX 1347)

E  North Mound Lake letter (DX 1345) (incorrectly dated as January 17, 2008 instead of July)

F  Big Bump Participation Agreement & Operating Agreement (DX 1354)

G  On Point GEA (DX 1351)

H  Muy Caliente GEA (DX 1356)

I  Amended North On Point Extension & O'Donnell GEA (DX 1350)

J  Bad Billy Agreement (Amended) (PX 85)

## No. 07-15-00083-CV

**IN THE SEVENTH COURT OF APPEALS**
**AMARILLO, TEXAS**

**MARK P. HARDWICK, INDIVIDUALLY AND D/B/A**
**MARK P. HARDWICK OIL AND GAS PROPERTIES AND**
**MARK P. HARDWICK, LLC**
*Appellants,*

**v.**

**SMITH ENERGY COMPANY, ON ITS OWN BEHALF**
**AND ON BEHALF OF SMITH ENERGY RESOURCE OIL, LTD.,**
**A TEXAS LIMITED PARTNERSHIP, AND ON BEHALF OF SMITH**
**ENERGY PARTNERS I, LTD., A TEXAS LIMITED PARTNERSHIP,**
*Appellees.*

**On Appeal from the 121st District Court, Terry County, Texas**
**Trial Court Cause No. 19,490; The Honorable Rick Morris, Presiding**

## APPENDIX TO
## BRIEF OF APPELLANTS

**Tab**

A   Jury Verdict (2 CR 2948-92)

B   Judgment (2 CR 3600-11)

C   North Mound Lake Participation Agreement (DX 1346)

D   North Mound Lake Operating Agreement (DX 1347)

E   North Mound Lake letter (DX 1345) (incorrectly dated as January 17, 2008 instead of July)

F   Big Bump Participation Agreement & Operating Agreement (DX 1354)

G   On Point GEA (DX 1351)

H   Muy Caliente GEA (DX 1356)

I   Amended North On Point Extension & O'Donnell GEA (DX 1350)

J   Bad Billy Agreement (Amended) (PX 85)

# TAB A
## Jury Verdict
## (2 CR 2948-92)

CAUSE NO. 19,490

| | | |
|---|---|---|
| SMITH ENERGY COMPANY, ON<br>ITS OWN BEHALF AND ON BEHALF<br>OF SMITH ENERGY RESOURCE<br>OIL, LTD., A TEXAS LIMITED<br>PARTNERSHIP, AND ON BEHALF OF<br>SMITH ENERGY PARTNERS I, LTD.,<br>A TEXAS LIMITED PARTNERSHIP | § § § § § § § § | IN THE DISTRICT COURT |
| **Plaintiffs,** | § § | |
| vs. | § § | TERRY COUNTY, TEXAS |
| MARK P. HARDWICK, INDIVIDUALLY<br>AND D/B/A MARK P. HARDWICK OIL &<br>GAS PROPERTIES, AND<br>MARK P. HARDWICK, LLC | § § § § § | |
| **Defendants.** | § | 121st JUDICIAL DISTRICT |

## COURT'S CHARGE

MEMBERS OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

After you complete your deliberations, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

1

2948

Here are the instructions for answering the questions.

1. Do not let bias, prejudice, or sympathy play any part in your decision.

2. Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

3. You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4. If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5. All the questions and answers are important. No one should say that any question or answer is not important.

6. Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence unless you are told otherwise. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise.

The term "**preponderance of the evidence**" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7. Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8. Do not answer questions by drawing straws or by any method of chance.

9. Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

2

2949

10.     Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11.     Unless otherwise instructed the answers to the questions must be based on the decision of at least ten of the twelve jurors. The same ten jurors must agree on every answer. Do not agree to be bound by a vote of anything less than ten jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

The terms set forth below are defined in this charge as follows:

1.  "Smith Energy Company" refers to itself, and on behalf of the interests of the following persons and/or entities:

    a. Alec Smith
    b. A.M. Greene Trust
    c. Brian Hendry
    d. Bronze Creek Holdings, Ltd.
    e. David Garcia
    f. Elger Exploration
    g. Janice Holloway
    h. JDH RAW Energy, L.C.
    i. Jeff Kimble
    j. Jennifer Huber
    k. Julie Rouse
    l. JZM Oil and Gas,, LLC
    m. Karen Collier
    n. Karla Neal
    o. KB Oil and Gas, LP
    p. Lawrence E. Glenn
    q. Lester H. Smith 1999 Revocable Trust
    r. Lester H. Smith 2004 Family Legacy Trust
    s. Limor Smith
    t. Margaret Farmer
    u. PAH Energy

3

2950

v. Patricia Morille
w. Paul Hardwick
x. RAW Oil & Gas, Inc.
y. Shari Motal
z. Smith Energy Partners I, Ltd.
aa. Smith Energy Resource Oil Ltd.
bb. Steve Blaylock
cc. Stuart Smith & Michelle Hendry 2004 Family Legacy Trust
dd. Sue Ashcraft Smith
ee. Triple S Energy
ff. Vika Belova Irrevocable Trust
gg. Wanda Ripple
hh. Wanda Tollett

2. "Fusselman Prospect Agreements" refers to the following agreements:

   a. North Mound Lake Participation Agreement.
   b. North Mound Lake Letter Agreements.
   c. Big Bump Geophysical Exploration Agreement.
   d. On Point Geophysical Exploration Agreement.
   e. Muy Caliente Geophysical Exploration Agreement.
   f. North On Point Extension/O'Donnell Geophysical Exploration Agreement.
   g. Amended North On Point Extension/O'Donnell Geophysical Exploration Agreement.

3. "Working interests" refers to the working interests Mark Hardwick received pursuant to the Fusselman Prospect Agreements.

"Landman services" refers to the acquisition or supervision of the acquisition of oil and gas leases, performance of curative title work, and maintenance and management of acquired leases.

4

2951

# QUESTION 1

Was Mark Hardwick obligated to provide landman services for the Fusselman prospects until the prospects were completed?

It is your duty to interpret the following language:

> "All Parties will participate with RAW in accomplishing
> the Geophysical Program as may be requested from RAW
> from time to time."

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

You must decide its meaning by determining the intent of the parties at the time of the agreement. Consider all the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties.

Answer "Yes" or "No."

Answer: ___Yes___

5

2952

## QUESTION 2

In the Bad Billy Agreement of December 17, 2010, did Mark Hardwick agree to perform landman services for a day work rate of $500.00?

It is your duty to interpret the following language of the agreement:

> Smith shall pay all expenses incurred by Mark in connection with such lease acquisition, plus a day-work brokerage fee.

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

You must decide its meaning by determining the intent of the parties at the time of the agreement. Consider all the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties.

Answer "Yes" or "No."

Answer: __Yes__

2953

## QUESTION 3

Did Mark Hardwick fail to comply with the Agreements?

Answer "Yes" or "No" for each of the following:

a. Fusselman Prospect Agreements     <u>Yes</u>

b. Bad Billy Agreement     <u>Yes</u>

2954

If you answered "Yes" to any part of Question 3, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 4

Was Mark Hardwick's failure to comply excused?

Failure to comply by Mark Hardwick is excused if compliance is waived by Smith Energy Company.

Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.

Failure to comply with an agreement is excused if a different performance was accepted as full satisfaction of performance of the original obligations of the agreement.

Failure to comply by Mark Hardwick is excused by Smith Energy Company's prior repudiation of the same agreement.

A party repudiates an agreement when he indicates, by his words or actions, that he is not going to perform his obligations under the agreement in the future, showing a fixed intention to abandon, renounce, and refuse to perform the agreement.

Answer "Yes" or "No" for each of the following:

a. Fusselman Prospect Agreements      _NO_

b. Bad Billy Agreement      _no_

8

2955

If you answered "Yes" to any part of Question 3 and "No" to any part of Question 4, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 5

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Smith Energy Company for its damages, if any, that resulted from such failure to comply?

Consider the following elements of damages, if any, and none other.

1.  The landman charges that Mark Hardwick overcharged Smith Energy Company, if any.

2.  The reasonable and necessary expenses incurred in hiring others to perform the landman services that Mark Hardwick stopped performing, if any:

    a.  The amount of Maner Shaw's increased rate.

    b.  The amount of Ron King's increased rate.

    c.  Maner Shaw's bonus payment.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any.

1.  The landman charges that Mark Hardwick overcharged Smith Energy Company, if any.

    a.  Fusselman Prospect Agreements

    Answer: _$ 36,003_____

9

2956

b. Bad Billy Agreement

Answer: _____ $ 43,425 _____

2. The reasonable and necessary expenses incurred in hiring others to perform the landman services that Mark Hardwick stopped performing, if any:

    a. The amount of Maner Shaw's increased rate.

        i. Fusselman Prospect Agreements

        Answer: _____ 0 _____

        ii. Bad Billy Agreement

        Answer: _____ $ 12,110 _____

    b. The amount of Ron King's increased rate.

        i. Fusselman Prospect Agreements

        Answer: _____ 0 _____

        ii. Bad Billy Agreement

        Answer: _____ $ 13,338 _____

    c. Maner Shaw's bonus payment.

        i. Fusselman Prospect Agreements

        Answer: _____ 0 _____

10

2957

ii. Bad Billy Agreement

Answer: _____ O _____

2958

# QUESTION 6

Did Smith Energy Company fail to comply with one or more of the following agreements, if any?

Please Answer "Yes" or "No" for each of the following:

A.     The Muy Caliente GEA.

Answer: _____ no _____

B.     The Mitchel County sale to Firewheel Energy, LLC?

Answer: _____ no _____

C.     The Fischer County sale to Gunn Oil Company?

Answer: _____ no _____

D.     The Bad Billy Agreement.

Answer: _____ no _____

E.     Payment of invoices submitted by Mark Hardwick for:

      1. The Muy Caliente Prospect Area.

Answer: _____ no _____

      2. The On Point Prospect Area.

Answer: _____ no _____

      3. The North On Point Extension Prospect Area.

Answer: _____ no _____

      4. O'Donnell Prospect Area.

Answer: _____ no _____

      5. The Bad Billy Area.

Answer: _____ no _____

12

2959

If you answered "Yes" to any part of Question 6, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 7

Was Smith Energy Company's failure to comply excused?

Failure to comply by Smith Energy Company, individually, is excused by Mark Hardwick's previous failure to comply with a material obligation of the same agreement.

Failure to comply by Smith Energy Company, individually, is excused by Mark Hardwick's prior repudiation of the same agreement.

A party repudiates an agreement when he indicates, by his words or actions, that he is not going to perform his obligations under the agreement in the future, showing a fixed intention to abandon, renounce, and refuse to perform the agreement.

Failure to comply by Smith Energy Company, individually, is excused if the following circumstances occurred:

1. Mark Hardwick

    a. by words or conduct made a false representation or concealed material facts, and

    b. with knowledge of the facts or with knowledge or information that would lead a reasonable person to discover the facts, and

    c. with the intention that Smith Energy Company would rely on the false representation or concealment in acting or deciding not to act; and

2. Smith Energy Company, individually

    a. did not know and had no means of knowing the real facts and

    b. relied to his detriment on the false representation or concealment of material facts.

13

2960

Please Answer "Yes" or "No" for each of the following:

A. The Muy Caliente GEA.

Answer: _____

B. The Mitchel County sale to Firewheel Energy, LLC?

Answer: _____

C. The Fischer County sale to Gunn Oil Company?

Answer: _____

D. The Bad Billy Agreement.

Answer: _____

E. Payment of invoices submitted by Mark Hardwick for:

   1. The Muy Caliente Prospect Area.

Answer: _____

   2. The On Point Prospect Area.

Answer: _____

   3. The North On Point Extension Prospect Area.

Answer: _____

   4. O'Donnell Prospect Area.

Answer: _____

   5. The Bad Billy Area.

Answer: _____

14

If you answered "Yes" to any subpart to Question No. 6 and "No" to the same subpart of Question 7, then answer the following question as to the subpart(s) to which you answered "Yes" in Question 6. Otherwise, do not answer the following question or subpart.

## QUESTION 8

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Mark P. Hardwick for his damages, if any, that resulted from Smith Energy Company's failure to comply with the agreement(s), if any, listed in Question No. 6?

Consider the elements of damages listed below and none other.

The fair market value of Mark P. Hardwick's 6% working interest in the leases acquired by Smith Energy Company within the Muy Caliente Area of Mutual Interest that Smith Energy Company failed to convey as of August 2011.

The amount of the commission or fee to which Mark P. Hardwick was entitled to receive from the sale of leases in Mitchel County to Firewheel Energy, LLC?

The amount of the commission or fee to which Mark P. Hardwick was entitled to receive from the sale of leases in Fischer County to Gunn Oil Company.

Four percent of the sales price of the 999.1989 acres within the Bad Billy Area of Mutual Interest identified as "LHS 100%".

The amount of Mark P. Hardwick's unpaid fees and expenses for land services provided on the Muy Caliente Prospect Area.

The amount of Mark P. Hardwick's unpaid fees and expenses for land services provided on the On Point Prospect Area.

The amount of Mark P. Hardwick's unpaid fees and expenses for land services provided on the North On Point Extension Prospect Area.

The amount of Mark P. Hardwick's unpaid fees and expenses for land services provided on the O'Donnell Prospect Area

The amount of Mark P. Hardwick's unpaid fees and expenses for land services provided on the Bad Billy Prospect Area.

Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not

15

2962

Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find. Do not include in your answer any amount that you find the person or entity listed below could have avoided by the exercise of reasonable care.

Answer IN DOLLARS AND CENTS for damages, if any, that were sustained.

A.    The Muy Caliente GEA.

      Answer: _____

B.    The Mitchel County sale to Firewheel Energy, LLC?

      Answer: _____

C.    The Fischer County sale to Gunn Oil Company?

      Answer: _____

D.    The Bad Billy Agreement.

      Answer: _____

E.    Fees, expenses and services rendered for:

            1. The Muy Caliente Prospect Area.

      Answer: _____

            2. The On Point Prospect Area.

      Answer: _____

            3. The North On Point Extension Prospect Area.

      Answer: _____

            4. O'Donnell Prospect.

      Answer: _____

            5. The Bad Billy Area.

      Answer: _____

16

# QUESTION 9

Did Mark Hardwick commit fraud against Smith Energy Company?

Fraud occurs when—

    1. a party makes a material misrepresentation, and

    2. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and

    3. the misrepresentation is made with the intention that it should be acted on by the other party, and

    4. the other party relies on the misrepresentation and thereby suffers injury.

"Misrepresentation" means—

1. A false statement of fact, or

2. A promise of future performance made with an intent, at the time the promise was made, not to perform as promised, or

3. A statement of opinion that the maker knows to be false.

## OR

Fraud occurs when—

    1.     a party fails to disclose a material fact within the knowledge of that party, and

    2.     the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth, and

    3.     the party intends to induce the other party to take some action by failing to disclose the fact, and

    4.     the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

17

2964

Answer "Yes" or "No" for each of the following:

a.  Fusselman Prospect Agreements

Answer: ___yes___

b.  Bad Billy Agreement

Answer: ___yes___

18

If you answered "Yes" to any part of Question 9, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 10

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Smith Energy Company for its damages, if any, that resulted from such fraud?

Consider the following elements of damages, if any, and none other.

1. The landman charges that Mark Hardwick overcharged Smith Energy Company, if any.

2. Expenses Smith Energy Company paid Mark Hardwick for which he was not entitled to reimbursement, if any.

3. The reasonable and necessary expenses incurred in hiring others to perform the landman services that Mark Hardwick stopped performing, if any:

    a. The amount of Maner Shaw's increased rate.

    b. The amount of Ron King's increased rate.

    c. Maner Shaw's bonus payment.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any.

1. The landman charges that Mark Hardwick overcharged Smith Energy Company, if any.

    a. Fusselman Prospect Agreements

    Answer: ___$36,003___

19

2966

b. Bad Billy Agreement

Answer: $43,425

3. The reasonable and necessary expenses incurred in hiring others to perform the landman services that Mark Hardwick stopped performing, if any:

a. The amount of Maner Shaw's increased rate.

i. Fusselman Prospect Agreements

Answer: 0

ii. Bad Billy Agreement

Answer: $12,110

b. The amount of Ron King's increased rate.

i. Fusselman Prospect Agreements

Answer: 0

ii. Bad Billy Agreement

Answer: $13,338

a. Maner Shaw's bonus payment.

a. Fusselman Prospect Agreements

Answer: 0

20

b. Bad Billy Agreement

Answer: _____*0*_____

21

# QUESTION 11

Were Mark Hardwick and Smith Energy Company engaged in a joint venture?

Consider the following factors in deciding whether Mark Hardwick and Smith Energy Company were engaged in a joint venture:

1. the receipt or right to receive a share of profits of the business;

2. an expression of an intent to be partners or joint venturers in the business;

3. the participation or the right to participate in control of the business;

4. sharing or agreeing to share:

   i. losses of the business, or

   ii. liability for claims of third parties against the business; and

5. an agreement to contribute or contributing money or property to the business.

Answer "Yes" or "No."

Answer: _____Yes_____

2969

## QUESTION 12

Was Mark Hardwick acting as Smith Energy Company's agent when performing landman services?

> An agent is one authorized by another to transact some business for the principal; the relationship is a consensual one between two parties, by which one party acts on behalf of the other, subject to the principal's control, including the right to control the means and details of the process by which the agent will complete his tasks.

Answer "Yes" or "No."

Answer: ___yes___

23

2970

If you answered "Yes" to Question 11 or 12, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 13

Did Mark Hardwick comply with his fiduciary duty to Smith Energy Company?

Mark Hardwick owed Smith Energy Company a fiduciary duty. To prove he complied with his duty, Mark Hardwick must show—

1.    the transactions in question were fair and equitable to Smith Energy Company; and

2.    Mark Hardwick made reasonable use of the confidence that Smith Energy Company placed in him; and

3.    Mark Hardwick acted in the utmost good faith and exercised the most scrupulous honesty toward Smith Energy Company; and

4.    Mark Hardwick placed the interests of Smith Energy Company before his own, did not use the advantage of his position to gain any benefit for himself at the expense of Smith Energy Company, and did not place himself in any position where his self-interest might conflict with his obligations as a fiduciary; and

5.    Mark Hardwick fully and fairly disclosed all important information to Smith Energy Company concerning the transactions.

Answer "Yes" or "No."


Answer: _____ n o _____

If you answered "No" to Question 13, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 14

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Smith Energy Company for its damages, if any, that were proximately caused by such conduct?

Consider the following elements of damages, if any, and none other.

1. The landman charges that Mark Hardwick overcharged Smith Energy Company, if any.

2. The reasonable and necessary expenses incurred in hiring others to perform the landman services that Mark Hardwick stopped performing, if any:

   a. The amount of Maner Shaw's increased rate.

   b. The amount of Ron King's increased rate.

   c. Maner Shaw's bonus payment.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any.

1. The landman charges that Mark Hardwick overcharged Smith Energy Company, if any.

   i. A Fusselman Prospect Agreements

      Answer: $ 26,003

   ii. Bad Billy Agreement

      Answer: $ 43,425

25

2972

2. The reasonable and necessary expenses incurred in hiring others to perform the landman services that Mark Hardwick stopped performing, if any:

   a. The amount of Maner Shaw's increased rate.

      i. Fusselman Prospect Agreements

         Answer: _____O_____

      ii. Bad Billy Agreement

         Answer: _$ 12, 110_____

   b. The amount of Ron King's increased rate.

      i. Fusselman Prospect Agreements

         Answer: _____O_____

      ii. Bad Billy Agreement

         Answer: _$ 13, 338_____

   c. Maner Shaw's bonus payment.

      i. Fusselman Prospect Agreements

         Answer: _____O_____

      ii. Bad Billy Agreement

         Answer: _____O_____

# QUESTION 15

What sum of money did Mark Hardwick receive after he stopped performing landman services?

Consider the following element, if any, and none other.

a. The working interest earnings Mark Hardwick received after he stopped providing landman services on August 12, 2011.

b. The market value of Mark Hardwick's working interests as of June 30, 2013.

"Market value" means the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling.

In answering the following questions, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Answer separately in dollars and cents, if any.

a. The working interest earnings Mark Hardwick received after he stopped providing landman services on August 12, 2011.

Answer: $ 795,056

b. The market value of Mark Hardwick's working interests as of June 30, 2013.

Answer: $ 4,209,135

If you answered "Yes" to Question 9, or if you answered "No" to Question 13, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 16

What was the amount of the compensation Mark Hardwick received for performing landman services?

Answer in dollar and cents, if any:

Answer: _____ $ 6,125,068 _____

# QUESTION 17

Did Mark Hardwick commit theft?

"Theft" means that a person unlawfully appropriates property with the intent to deprive the owner of property. Appropriating property is unlawful if it is without the owner's effective consent.

A person acts with intent with respect to the nature of his conduct or to a result of his conduct when it is the conscious objective or desire to engage in the conduct or cause the result.

"Deprive" means to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner.

"Owner" means a person who has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than Mark Hardwick.

"Property" means: (a) real property; (b) tangible or intangible personal property, including anything severed from land; or (c) a document, including money, that represents or embodies anything of value.

"Consent" means assent in fact, whether express or implied.

"Effective consent" includes consent by a person legally authorized to act for the owner. Consent is not effective if induced by deception or coercion.

"Deception" means:

(a)     creating or confirming by works or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believer to be true; or

(b)     failing to correct a false impression of law or fact that is likely to affect the judgment of another in the transaction, that the actor previously created or confirmed by works or conduct, and that the actor does not now believe to be true.

Answer "Yes" or "No."

Answer: _____yes_____

29

2976

If you answered "Yes" to Question 17, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 18

What sum of money, if paid now in cash, would fairly and reasonable compensate Smith Energy Company for its damages, if any, that resulted from Mark Hardwick's theft?

Consider the following elements of damages, if any, and none other.

1. The landman charges that Mark Hardwick overcharged Smith Energy Company, if any.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Answer separately in dollars and cents for damages, if any:

Answer: _____ $ 79,428 _____

Answer the following question only if you unanimously answered "Yes" to Question 9, or Question 17 OR, if you unanimously answered "No" to Question 13, then answer the following question only as to that question. Otherwise, do not answer the following question.

To answer "Yes" to any part of the following question, your answer must be unanimous. You may answer "No" to any part of the following question only upon a vote of ten or more jurors. Otherwise, you must not answer that part of the following question.

## QUESTION 19

Do you find by clear and convincing evidence that the harm to Smith Energy Company resulted from malice or fraud?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means a specific intent by Mark Hardwick to cause substantial injury or harm to Smith Energy Company.

Fraud occurs when—

    1.    a party makes a material misrepresentation, and

    2.    the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and

    3.    the misrepresentation is made with the intention that it should be acted on by the other party, and

    4.    the other party relies on the misrepresentation and thereby suffers injury.

"Misrepresentation" means—

    a.  A false statement of fact, or

    b.  A promise of future performance made with an intent, at the time the promise was made, not to perform as promised, or

    c.  A statement of opinion that the maker knows to be false.

31

OR

Fraud occurs when—

1.    a party fails to disclose a material fact within the knowledge of that party, and

2.    the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth, and

3.    the party intends to induce the other party to take some action by failing to disclose the fact, and

4.    the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

OR

Fraud occurs when—

1.    there is a false representation of a past or existing material fact, and

2.    the false representation is made to a person for the purpose of inducing that person to enter into a contract, and

3.    the false representation is relied on by that person in entering into that contract.

OR

Fraud occurs when—

1.    a party makes a false promise to do an act, and

2.    the promise is material, and

3.    the promise is made with the intention of not fulfilling it, and

4.    the promise is made to a person for the purpose of inducing that person to enter into a contract, and

5.    that person relies on the promise in entering into that contract.

32

2979

Answer "Yes" or "No" as to each of the following questions:

a.  Question 9:

      Answer: _____

b.  Question 13:

      Answer: _____

c.  Question 17:

      Answer: _____

33

2980

Answer the following question only if you unanimously answered "Yes" to Question 9 , and to the same subpart of Question 19a. Otherwise, do not answer the following question.

You must unanimously agree on the amount of any award of exemplary damages.

## QUESTION 20

What sum of money, if any, if paid now in cash, should be assessed against Mark Hardwick and awarded to Smith Energy Company as exemplary damages, if any, for the conduct found in response to Question 9 and 19a.?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to consider in awarding exemplary damages, if any, are—

1.     The nature of the wrong.

2.     The character of the conduct involved.

3.     The degree of culpability of Mark Hardwick.

4.     The situation and sensibilities of the parties concerned.

5.     The extent to which such conduct offends a public sense of justice and propriety.

6.     The net worth of Mark Hardwick.

Answer in dollars and cents, if any.

Answer: _____

34

2981

Answer the following question only if you unanimously answered "Yes" to Question 13 , and "Yes" as to the same subpart of Question 19b. Otherwise, do not answer the following question.

You must unanimously agree on the amount of any award of exemplary damages.

## QUESTION 21

What sum of money, if any, if paid now in cash, should be assessed against Mark Hardwick and awarded to Smith Energy Company as exemplary damages, if any, for the conduct found in response to Question 13 and Question 19b.?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to consider in awarding exemplary damages, if any, are—

      1.     The nature of the wrong.

      2.     The character of the conduct involved.

      3.     The degree of culpability of Mark Hardwick.

      4.     The situation and sensibilities of the parties concerned.

      5.     The extent to which such conduct offends a public sense of justice and propriety.

      6.     The net worth of Mark Hardwick.

Answer in dollars and cents, if any.

Answer: _____

35

2982

Answer the following question only if you unanimously answered "Yes" to Question 17 and "Yes" to the same subpart of Question 19c. Otherwise, do not answer the following question.

You must unanimously agree on the amount of any award of exemplary damages.

## QUESTION 22

What sum of money, if any, if paid now in cash, should be assessed against Mark Hardwick and awarded to Smith Energy Company as exemplary damages, if any, for the conduct found in response to Question 17 and 19c.?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to consider in awarding exemplary damages, if any, are—

1. The nature of the wrong.

2. The character of the conduct involved.

3. The degree of culpability of Mark Hardwick.

4. The situation and sensibilities of the parties concerned.

5. The extent to which such conduct offends a public sense of justice and propriety.

6. The net worth of Mark Hardwick.

Answer in dollars and cents, if any.

Answer: _____

2983

# QUESTION 23

Do you find that the Bad Billy Agreement fails to furnish either within itself, or by reference to some other existing writing, the means or data by which the property to be conveyed may be identified with reasonable certainty?

Answer "Yes" or "No."

Answer: ___No___

2984

## QUESTION 24

What is a reasonable fee for the necessary services of Smith Energy Company's attorneys, stated in dollars and cents?

Factors to consider in determining a reasonable fee include—

1. The time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly.

2. The likelihood that the acceptance of the particular employment will preclude other employment by the lawyer.

3. The fee customarily charged in the locality for similar legal services.

4. The amount involved and the results obtained.

5. The time limitations imposed by the client or by the circumstances.

6. The nature and length of the professional relationship with the client.

7. The experience, reputation, and ability of the lawyer or lawyers performing the services.

8. Whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

Answer with an amount for each of the following:

1. For representation in the trial court.

   Answer: ___ $3,465,764 ___

2. For representation through appeal to the court of appeals.

   Answer: ___ $75,000 ___

3. For representation at the petition for review stage in the Supreme Court of Texas.

   Answer: ___ $50,000 ___

4. For representation at the merits briefing stage in the Supreme Court of Texas.

   Answer: ___ $50,000 ___

38

2985

5. For representation through oral argument and the completion of proceedings in the Supreme Court of Texas.

Answer: _____

# QUESTION 25

What is a reasonable fee for the necessary services of Mark Hardwick's attorneys, stated in dollars and cents?

Factors to consider in determining a reasonable fee include—

1. The time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly.

2. The likelihood that the acceptance of the particular employment will preclude other employment by the lawyer.

3. The fee customarily charged in the locality for similar legal services.

4. The amount involved and the results obtained.

5. The time limitations imposed by the client or by the circumstances.

6. The nature and length of the professional relationship with the client.

7. The experience, reputation, and ability of the lawyer or lawyers performing the services.

8. Whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

Answer with an amount for each of the following:

1. For representation in the trial court.

   Answer: _____ $2,418,000 _____

2. For representation through appeal to the court of appeals.

   Answer: _____ $75,000 _____

3. For representation at the petition for review stage in the Supreme Court of Texas.

   Answer: _____ $50,000 _____

4. For representation at the merits briefing stage in the Supreme Court of Texas.

   Answer: _____

40

2987

5. For representation through oral argument and the completion of proceedings in the Supreme Court of Texas.

       Answer: _____

2988

## Presiding Juror:

1.      When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

2.      The presiding juror has these duties:

        a.      have the complete charge read aloud if it will be helpful to your deliberations;

        b.      preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;

        c.      give written questions or comments to the bailiff who will give them to the judge;

        d.      write down the answers you agree on;

        e.      get the signatures for the verdict certificate; and

        f.      notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

## Instructions for Signing the Verdict Certificate:

1.      Unless otherwise instructed you may answer the questions on a vote of ten jurors. The same ten jurors must agree on every answer in the charge. This means you may not have one group of ten jurors agree on one answer and a different group of ten jurors agree on another answer.

2.      If ten jurors agree on every answer, those ten jurors sign the verdict.

If eleven jurors agree on every answer, those eleven jurors sign the verdict.

If all twelve of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3.      All jurors should deliberate on every question. You may end up with all twelve of you agreeing on some answers, while only ten or eleven of you agree on other answers. But when you sign the verdict, only those ten who agree on every answer will sign the verdict.

4.      There are some special instructions before Questions 20, 21 and 22 explaining how to answer those questions. Please follow the instructions. If all

42

2989

twelve of you answer those questions, you will need to complete a second verdict certificate for those questions.

Do you understand these instructions? If you do not, please tell me now.

_____
**RICK MORRIS**
JUDGE PRESIDING

43

**Verdict Certificate**

Check one:

_____ Our verdict is unanimous. All twelve of us have agreed to each and every answer. The presiding juror has signed the certificate for all twelve of us.

_____          _____
Signature of Presiding Juror                      Printed Name of Presiding Juror

_____ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

__✓__ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

Signature                                    Name Printed

1.  _Barry L. Sims_                          _BARRY Sims_

2.  _Austin King_                            _Austin King_

3.  _Vickie L. Fulton_                       _Vickie L. Fulton_

4.  _Gary Stephens_                          _Gary Stephens_

5.  _Erik Iniguez_                           _ERIK Iniguez_

6.  _Julio Caballero_                        _Julio Caballero_

7.  _Admirable Garcia_                       _Admirable Garcia_

8.  _Michael Perez_                          _Michael Perez_

9.  _Adam Cain_                              _ADAM CAIN_

10. _Roxanne D Barr_                         _ROXANNE D. BARR_

11. _____         _____

44

2991

If you have answered Question No. 20, 21 and 22, then you must sign this certificate also.

## Additional Certificate

I certify that the jury was unanimous in answering the following questions. All twelve of us agreed to each of the answers. The presiding juror has signed the certificate for all twelve of us.

Questions: _____

_____
Signature of Presiding Juror                    Printed Name of Presiding Juror

45

# TAB B

# Judgment
# (2 CR 3600-11)

**CAUSE NO. 19,490**

| | | |
|---|---|---|
| Smith Energy COMPANY, ON ITS OWN BEHALF AND ON BEHALF OF Smith Energy RESOURCE OIL, LTD., A TEXAS LIMITED PARTNERSHIP, AND ON BEHALF OF Smith Energy PARTNERS I, LTD. A TEXAS LIMITED PARTNERSHIP | § § § § § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| vs. | § § |  |
| MARK P. HARDWICK, INDIVIDUALLY AND D/B/A MARK P. HARDWICK OIL & GAS PROPERTIES, AND MARK P. HARDWICK, LLC | § § § § § | TERRY COUNTY, TEXAS |
| Defendants. | § | 121st JUDICIAL DISTRICT |

## JUDGMENT

On August 18, 2014, this cause came to be heard and Plaintiff Smith Energy Company, on its own behalf and as the General Partner of Smith Energy Resource Oil, Ltd., a Texas Limited Partnership, ("SERO") and as General Partner of Smith Energy Partners I, Ltd., a Texas Limited Partnership, ("SEP I") and as the party authorized through legal assignment to bring suit on behalf of parties who have been damaged by Defendants' acts and omissions (collectively "Plaintiff" or "Smith Energy Company") appeared in person and by attorney of record and announced ready for trial, and Defendants Mark P. Hardwick ("Hardwick"), Mark P. Hardwick Oil and Gas Properties, and Mark P. Hardwick, LLC (collectively "Defendants") appeared in person and by attorney of record and announced ready for trial. Having been previously demanded, a jury consisting of 14 qualified jurors was duly impaneled and sworn, and the case

3600

proceeded to trial. After closing arguments, one qualified juror was dismissed, one alternate was released, and the remaining 12 qualified jurors deliberated the case.

The jury heard evidence concerning (1) Plaintiff Smith Energy Company's claims against Hardwick, including claims for breach of contract, fraud, breach of fiduciary duties, and theft in violation of Texas Civil Practice and Remedies Code § 134.003; (2) Hardwick's affirmative defenses; and (3) Hardwick's counterclaim.

At the close of the Plaintiff's case, the Court heard Defendants' Motion for Partial Directed Verdict. In response, Plaintiff dismissed without prejudice its claims against Mark P. Hardwick LLC, and claims against Mark Hardwick based on the acquisition of specific acreage known as the White Acreage, and the Court denied the remainder of Defendants' Motion.

At the close of the evidence, on August 28, 2014, the Court heard Plaintiff's Motion for Directed Verdict, and the Court denied Plaintiff's Motion.

The Court thereafter submitted the questions of fact in the case to the jury. The charge of the Court and the verdict of the jury are incorporated herein for all purposes by reference.

In its verdict, the jury determined, *inter alia*, that:

(1)    Hardwick breached his contracts with Smith Energy Company;

(2)    Hardwick committed fraud;

(3)    Hardwick breached his fiduciary duties to Smith Energy Company; and

(4)    Hardwick committed theft in violation of Texas Civil Practice and Remedies Code § 134.003.

In addition, the jury found that Hardwick was obligated to provide landman services for the Fusselman prospects until the prospects were completed and that in the

2

3601

Bad Billy Agreement of December 17, 2010, Hardwick agreed to perform landman services for a day work rate of $500.00.

The jury further found that Hardwick received, after he stopped performing landman services, $795,056.00 in working interest earnings and working interests with a market value of $4,209,175.00 as of July 1, 2013. The jury then found that Hardwick received compensation totaling $6,125,068 for performing landman services.

Finally, the jury found that the reasonable and necessary services of Smith Energy Company's attorneys was $3,465,764.00 for representation in the trial court, $75,000 for representation through appeal to the court of appeals, $50,000 for representation at the petition for review stage in the Supreme Court of Texas, and $50,000 for representation at the merits briefing state in the Supreme Court of Texas.

On December 2, 2014 Mark P. Hardwick moved for judgment notwithstanding the verdict and further moved to disregard the jury's findings to certain special issues. On December 10, 2014, Smith Energy Company moved for judgment on the verdict and also sought equitable relief. On December 10, 2014, Defendants moved for judgment holding no equitable forfeiture, Mark P. Hardwick, LLC moved for judgment seeking attorneys' fees, and Mark P. Hardwick moved for judgment seeking attorneys' fees. The Court heard argument on the motions on December 15, 2014. After considering the motions and responses, the applicable law, the arguments of counsel, the evidence presented at trial, and the jury's verdict, the Court is of the opinion that Smith Energy Company's Motion for Judgment should be granted and judgment entered in favor of Smith Energy Company and against Defendant Mark P. Hardwick as set forth herein.

3

It further appears to the Court that Defendants should take nothing against Smith Energy Company on Defendants' counterclaim.

It further appears that Defendant Mark P. Hardwick's Motion for Judgment Notwithstanding the Verdict and To Disregard Jury's Findings should be denied.

It further appears that Defendants' Brief and Motion For Judgment Holding No Equitable Forfeiture should be denied.

It further appears that Mark P. Hardwick, LLC's Motion for Entry of Judgment should be denied.

It further appears that Mark P. Hardwick's Motion for Entry of Judgment should be denied.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that Plaintiff Smith Energy Company's Motion for Judgment is granted.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the following agreements as between Plaintiff Smith Energy Company and Defendant Mark P. Hardwick are rescinded and null and void, *ab initio*, as between these entities:

    a. North Mound Lake Letter Agreement, dated May 1, 2008;

    b. Big Bump Geophysical Exploration Agreement, dated October 10, 2009;

    c. On Point Geophysical Exploration Agreement, dated January 2, 2010;

    d. Muy Caliente Geophysical Exploration Agreement, dated January 15, 2010;

    e. North On Point Extension/O'Donnell Geophysical Exploration Agreement, dated December 1, 2010;

4

3603

f. Amended North On Point Extension/O'Donnell Geophysicial Exploration Agreement, dated June 15, 2011; and

g. Bad Billy Letter Agrement, dated December 17, 2010.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the rescission of the above listed agreements as between Smith Energy and Mark P. Hardwick is fully and independently supported by the jury's findings of fraud, the evidence presented at trial, and equity.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff, Smith Energy Company have and recover from Defendnt Mark P. Hardwick monies in the sum of $5,004,231.00.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the award of $5,004,231.00 to Smith Energy Company is fully and independently supported by the jury's findings of fraud, the evidence presented at trial, and equity.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Mark P. Hardwick's breach of fiduciary duty, which included fraudulent inducement and theft, was a clear and serious breach of duty to Smith Energy as a matter of law and that forfeiture of $5,004,231 is necessary to satisfy the public's interest in protecting fiduciary relationships.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the award of $5,004,231.00 to Smith Energy Company is fully and independently supported by the jury's findings of breach of fiduciary duty, the evidence presented at trial, and equity.

5

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the jury's finding that Mark P. Hardwick received, $5,004,231.00 after he stopped performing landman services is fully supported by the evidence.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the jury's finding that Mark P. Hardwick received compensation totaling $6,125,068 for performing landman services is fully supported by the evidence.

It IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff Smith Energy Company have and recover from Defendant Mark P. Hardwick monies in the sum of $104,876.00, which is in addition to $5,004,231.00 awarded above.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff Smith Energy Company's recovery of $104,876.00 is fully and independently supported by the jury's findings of breach of contract and damages resulting therefrom and the evidence presented at trial.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff Smith Energy Company's recovery of $104,876.00 is fully and independently supported by the jury's findings of fraud and damages resulting therefrom and the evidence presented at trial.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff Smith Energy Company's recovery of $104,876.00 is fully and independently supported by the jury's findings of breach of fiduciary duty and damages resulting therefrom and the evidence presented at trial.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff Smith Energy Company's recovery of $79,428.00 (which is a portion of the $104,876.00

6

awarded) is fully and independently supported by the jury's findings of theft and damages resulting therefrom and the evidence presented at trial.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff Smith Energy Company have and recover from Defendant, Mark P. Hardwick, reasonable and necessary attorneys' fees:

    a. in the sum of $3,465,764.00 for representation in the trial court;

    b. in the event of an appeal to the court of appeals, the sum of $75,000.00, conditioned upon Plaintiff prevailing in the court of appeals; and

    c. in the event of an appeal to the Supreme Court of Texas, in the sum of $100,000.00, conditioned upon Plaintiff prevailing in the Supreme Court of Texas.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the jury's finding that the amount for reasonable and necessary services of Plaintiff Smith Energy Company's attorneys was $3,465,764.00 for representation in the trial court, $75,000.00 for representation in the event of an appeal to the court of appeals, $50,000.00 for representation at the petition for review stage in the Supreme Court of Texas, and $50,000.00 for representation at the merits briefing state in the Supreme Court of Texas in the event of an appeal is fully supported by the evidence presented at trial.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that an award of attorneys' fees in the sum of $3,465,764.00 for representation in the trial court, $75,000.00, for representation in the event of an appeal to the court of appeals; and $100,0000.00 the event of an appeal to the Supreme Court of Texas, is equitable and just.

7

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the award of attorneys' fees in the sum of $3,465,764.00 for representation in the trial court, $75,000.00, for representation in the event of an appeal to the court of appeals; and $100,0000.00 for representation in the event of an appeal to the Supreme Court of Texas, is fully and independently supported by the jury's finding that Mark P. Hardwick failed to comply with the North Mound Lake Letter Agreement, dated May 1, 2008; the Big Bump Geophysical Exploration Agreement, dated October 19, 2009; the On Point Geophysical Exploration Agreement, dated January 2, 2010; the Muy Caliente Geophysical Exploration Agreement, dated January 15, 2010; the North On Point Extension/O'Donnell Geophysical Exploration Agreement, dated December 1, 2010; the Amended North On Point Extension/O'Donnell Geophysicial Exploration Agreement, dated June 15, 2011; and the Bad Billy Letter Agrement, dated December 17, 2010, the jury's award of damages for the failure to comply, and Texas Civil Practice and Remedies Code section 38.001.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the award of attorneys' fees in the sum of $3,465,764.00 for representation in the trial court, $75,000.00, for representation in the event of an appeal to the court of appeals; and $100,0000.00 for representation in the event of an appeal to the Supreme Court of Texas, is fully and independently supported by the jury's finding that Mark P. Hardwick failed to comply with the On Point Geophysical Exploration Agreement, dated January 2, 2010; the Muy Caliente Geophysical Exploration Agreement, dated January 15, 2010; the North On Point Extension/O'Donnell Geophysical Exploration Agreement, dated December 1, 2010; and the Amended North On Point Extension/O'Donnell Geophysicial

8

3607

Exploration Agreement, dated June 15, 2011, the jury's award of damages for the failure to comply, and the contractual provision in each of these agreements that states that:

> Should any Party hereto be forced to resort to legal action to enforce the provisions hereof, the prevailing Party shall be entitled to reasonable attorneys' fees and all court costs incurred in such legal action.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the award of attorneys' fees in the sum of $3,465,764.00 for representation in the trial court, $75,000.00, for representation in the event of an appeal to the court of appeals; and $100,0000.00 for representation in the event of an appeal to the Supreme Court of Texas, is fully and independently supported by the jury's finding that Mark P. Hardwick committed theft, the jury's award of damages for the theft, and Texas Civil Practice and Remedies Code section 134.005.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff Smith Energy Company recover from Defendant Mark P. Hardwick all costs of court spent in this cause to be calculated by the clerk of court and set forth in a bill of costs forwarded to the parties after the signing of the Judgment.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff Smith Energy Company have and recover from Defendant Mark P. Hardwick prejudgment interest in the $792,264.16, calculated on the award of $5,109,107.00 at a rate of 5% per annum from the date suit was filed, November 9, 2011, to date of judgment.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff Smith Energy Company shall have and recover post-judgment interest on all sums awarded to

9

3608

the Plaintiff under this judgment at the rate of five percent (5%) per annum, compounded annually, from the date hereof until paid in full.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendants and Counter-Plaintiffs, Mark P. Hardwick, Mark P. Hardwick Oil and Gas Properities, and Mark P. Hardwick, LLC, take nothing under their counterclaim in this suit against Plaintiff and Counter-Defendant, Smith Energy Company, on its own and on behalf of Smith Energy Resource Oil, Ltd., A Texas Limited Partnership, and on behalf of Smith Energy Partners I Ltd., a Texas Limited Partnership.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendant Mark P. Hardwick, LLC's Motion for Entry of Judgment is denied.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendants' Brief and Motion For Judgment Holding No Equitable Forfeiture is denied.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendant Mark P. Hardwick's Motion for Entry of Judgment is denied.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendant Mark P. Hardwick's Motion For Judgment Not Withstanding The Verdict and to Disregard Jury Findings is denied.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff Smith Energy Company shall have all appropriate and necessary writs, execution and process, as many and as often as are necessary for the enforcement and collection of this judgment.

10

3609

All relief not expressly granted is this judgment is denied. This judgment is final, disposes of all claims and all parties and is appealable.

SIGNED on _____January 26_____, ~~2014.~~ 2015

_____
Judge Presiding

11

3610

APPROVED AS TO FORM:

RUSTY HARDIN & ASSOCIATES, LLP

_____
Rusty Hardin
State Bar No.: 08972800
Ryan K. Higgins
State Bar No. 24007362
Jeremy Monthy
State Bar No. 24073240
Lara Hollingsworth
State Bar. 00796790
Carolyn P. Courville
State Bar No. 24007042
1401 McKinney Street, Suite 2250
Houston, Texas 77010
Telephone: (713) 652-9000
Facsimile: (713) 652-9800

ATTORNEYS FOR PLAINTIFF SMITH
ENERGY COMPANY, ON ITS OWN AND
ON BEHALF OF SMITH ENERGY RESOURCE
OIL, LTD., A TEXAS LIMITED PARTNERSHIP,
AND ON BEHALF OF SMITH ENERGY
PARTNERS I LTD., A TEXAS LIMITED PARTNERSHIP

APPROVED AS TO FORM:

_____
Susan R. Richardson
Chris Aycock
Rick G. Strange
Stephanie D. Lee
Cotton, Bledsoe, Tighe & Dawson, P.C.
P.O. Box 2776
Midland, Texas 79702-2776

ATTORNEYS FOR DEFENDANT
MARK P. HARDWICK, MARK P.
HARDWICK OIL AND GAS PROPERTIES,
AND MARK P. HARDWICK, LLC

12

3611

# TAB C

# North Mound Lake Participation Agreement (DX 1346)

# N. MOUND LAKE PROSPECT
# LYNN AND TERRY COUNTIES, TEXAS
# PARTICIPATION AGREEMENT

This Participation Agreement (the "Agreement") dated and effective as of the 1[th] day of May, 2008 (the "Effective Date"), is entered into by and between **RAW Oil & Gas, Inc.** ("RAW"), **RAW Energy, L.C.** ("RAW LC") and **Smith Energy Company** ("Smith").

WHEREAS, RAW LC is purchasing Leases covering the lands set out on Exhibit "A", attached hereto ("Prospect Area").

WHEREAS, the parties have agreed to participate in a program to explore for and develop oil and gas within the Prospect area; and,

WHEREAS, the parties intend that Smith shall own an undivided 75.0% interest in the Leases acquired covering the lands defined in Exhibit "A", Smith shall pay 100.0% of the Acreage, Geological and Land Costs associated with the Prospects. (Acreage Cost should average between $200.00 to $250.00 per acre and the land Cost will consist of leasing cost and Title Opinion cost). A one time Geological cost is $50,000.00 will be payable upon the execution of this agreement. Smith shall pay 100.0% of all expenses incurred in connection with the drilling expenses (through the casing point election), on the first well drilled on the prospect. Smith shall pay 75.0% of all expenses incurred in connection with the equipping, completion and lease operating. Smith shall become a party to the Joint Operating Agreement ("Operating Agreement"), dated May 1, 2008, naming RAW as Operator and covering operations with respect to the Lease. *(If RAW is unable to secure leases and or Assignments or Farmouts on 100% of the mineral/leasehold interest in the initial drillsite tract, Smith's obligations above will be proportionally reduced as to the amount of interest RAW has acquired. This includes, but is not limited to, land cost, acreage cost, geological cost, drilling and completion cost. )*

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants, agreements and obligations set forth herein and to be performed, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties hereto, the parties agree as follows:

1. Definitions.

(a) "Affiliate" means, with respect to any party, a person or entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the party in question. As used in the definition of "Affiliate", the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a party, whether through ownership of voting securities, by contract or otherwise.

(b) "Prospect" shall mean the areas defined on Exhibit "A"..

(c) "Casing Point Election" means the well has been drilled to the objective depth, at which time the owners of the majority of the interest will decide whether to commit additional dollars to "setting pipe" and attempt a completion or to plug and abandon as non-commercial.

2. Representations and Warranties of RAW. RAW represents and warrants to Smith the following:

1

DEFENDANT'S
TRIAL EXHIBIT

1346

SEC 189120

(a) Without making any warranty or representation of any kind relating to the title of any lessor to the minerals covered by the Lease (any such warranty being expressly disclaimed), RAW represents and warrants that it is the owner of such of the rights of lessee under the Lease as are to be assigned to Smith pursuant to the provisions hereof; that it has good and sufficient title to such interest and rights; and that it has the right, power and authority to sell and transfer said interests and rights to Smith.

(b) There are no proceedings, judgments or liens now pending or, to the knowledge of RAW threatened against RAW which would affect the Lease or the Prospect Area except those as have been previously disclosed to Smith in writing.

(c) The interest in the Lease to be assigned to Smith will be assigned free and clear of any liens, claims or encumbrances upon said Lease created by, through or under RAW.

3. Covenants of RAW. RAW as Operator under the Operating Agreement, covenants and agrees to perform the terms of, and provide the documents, information and data required by, Schedule A attached hereto.

4. Acknowledgments by the Parties. The parties acknowledge and agree to the following:

(a) The parties shall execute and record in Lynn County, Texas a memorandum of this agreement.

(b) RAW and Smith represent and warrant to each other that the interests in the Leases acquired by them hereunder are being acquired for investment only and not with a view to any "distribution" (as such term is used in the Securities Act of 1993, as amended) thereof, and neither of them shall offer to sell or otherwise dispose of the Lease so acquired by it in violation of any of the registration requirements of the Securities Act of 1993, as amended, or any applicable state securities laws, and that each of the parties qualifies as an "accredited investor" as defined in Regulation D under the Securities Act of 1993, as amended.

(c) RAW and Smith represent and warrant to each other that each has received information regarding the interest in the Lease being acquired by it pursuant to this Agreement, each has been provided access to any and all written information, documents and materials that it has requested, has obtained to the satisfaction of itself and its counsel answers to all inquiries made by it and has been given an opportunity to obtain all answers and information that it believes necessary or appropriate to evaluate the suitability of an investment in the interests in the Lease being acquired by it; and, in evaluating the suitability of an investment therein, neither it nor its counsel has relied upon any representations or other information (whether oral or written) other than as set forth herein.

(d) RAW and Smith represent and warrant to each other that (i) each can bear the economic risk of losing its entire investment in the interests in the Lease, and (ii) each has adequate means for providing for its current financial needs and contingencies, does not have as an investment objective the immediate receipt of income and has no need for liquidity in an investment in such interests.

5. Interests Assigned to the Parties.

RAW hereby agrees to assign to Smith 75.0% of 8/8ths of the rights and interests existing under the Leases. The lease will be assigned to Smith bearing a net revenue interest which the lease

2

SEC 189121

originally have with RAW not burdening the leases with any additional ORRI. The interests to be assigned to Smith will be assigned on a well by well or proration unit by proration unit basis as the wells are drilled. The assignment of interest to Smith will be delivered to Smith upon receipt of payment of the drilling cost of each well but prior to the drilling of the well.

The interests assigned to Smith pursuant to this agreement are hereby expressly assigned subject to their proportionate part of all of the terms, covenants, overriding royalty interests, reversionary interests and other production burdens referenced in the following:

(i) The Lease.
(ii) The Operating Agreement.

6. <u>Duties and Role of RAW</u>. RAW has been designated the Operator in accordance with the Operating Agreement. As such, RAW, in addition to any other duties assigned to it pursuant to the Operating Agreement, shall have the overall responsibility to conduct all negotiations with landowners in the Prospect Area, conduct all title investigations required by this Agreement, conduct drilling operations, select acreage to lease, and carry out production operations.

7. <u>Participation of the Parties in the Prospect Area, Prospect A and Subsequent Wells</u>.

(a) <u>Prospect Area</u>. Smith agrees to pay to RAW, a total of 100.0% of the acreage, Seismic/Geological and land costs associated with Prospect.

(b) It is understood and agreed that RAW, as Operator, will commence operations for the drilling of a well on or before December 1, 2008. Enclosed herewith is RAW's Authorization For Expenditure ("<u>AFE</u>") which shows the total estimated costs to drill, complete and equip such well.

(c) RAW shall be entitled to a 25% working interest carried to the casing point on the first well drilled in the prospect, all subsequent wells will be on a heads-up basis.

(d) As to all wells drilled within the Prospect Area, each will be subject to a casing point election at which, if any party elects not to participate in such drilling or completion, such party will relinquish and assign to the participating parties all of its leasehold interest in and to the well and the prospect area as defined in Exhibit "A".

In the event that any party elects not to participate in a completion attempt, the non-consenting party will be subject to the provisions in the governing JOA.

(e) No party shall have the right to reinstatement of an interest in a well or acreage relinquished in accordance with this Section 7, whether by payment of a cash penalty, production penalty, or otherwise.

8. <u>AMI</u>.

(a) <u>General Requirements</u>. No party, either directly or through an Affiliate, may acquire any lease or petroleum exploration or seismic license or participate in the acquisition of any lease or petroleum exploration or seismic license from a third party holding a lease or petroleum exploration or seismic license, which lease or petroleum exploration or seismic license is located partially or entirely within the Prospect Area, other than in accordance with the provisions of this Paragraph.

3

SEC 189122

(b)     The parties to this Participation Agreement hereby create an Area of Mutual Interest, which will consist of all of the lands included within the Contract Area described in Exhibit "A" to the Joint Operating Agreement dated May 1, 2008.

(c) Procedures. Any party, whether directly or through an Affiliate, wishing to acquire a lease or petroleum exploration or seismic license within the AMI shall first serve written notice on the other parties, such notice to specify the terms which such party is prepared to offer for such lease or petroleum exploration or seismic license. The recipient parties shall have thirty (30) days from receipt of such notice to elect to participate in the acquisition (including attendant costs) of such lease or petroleum exploration or seismic license to the extent of the pro rata share of the interests of those joining in such acquisition, as shown on Exhibit "B" to the Operating Agreement. Failure by a party to affirmatively elect to participate in the acquisition within thirty (30) days shall cause the land covered by the lease or petroleum exploration or seismic license to be automatically deleted from the AMI as to such party without further action by the parties. If fewer than all the recipient parties elect to participate, then the parties which do wish to participate may acquire the lease or petroleum exploration or seismic license on terms not less onerous than those set out in the written notice. In the event that more than one party serves a notice of intent to acquire a certain lease or petroleum exploration or seismic license and the terms which such parties are willing to offer are different, then the notice or notices specifying the financial terms least favorable to the parties shall be disregarded and the other parties shall elect whether to participate with the party offering the most favorable financial terms.

9. Financing. Any party shall have the right to arrange its own financing for any wells or other projects to be conducted on the Prospect Area without any obligation to provide, or assist the other in obtaining, similar financing. No party shall encumber the rights and interests of any other party in the Prospect Area.

10. Indemnification. Each party shall indemnify, defend and save harmless each other party and its officers, directors, employees, agents and attorneys, and each of them (the "Indemnified Parties"), from and against any and all commenced or threatened claims, actions, suits, litigation, administrative or enforcement proceedings or investigations (including any proceeding or action under any federal or state law) and other legal proceedings, and all damages, costs, interest charges, counsel fees and other expenses and penalties related thereto (collectively "Claims" or individually a "Claim") which any of the Indemnified Parties may sustain or incur by reason of or arising from or related to (i) any breach by the indemnifying party of any representation, warranty, covenant or agreement or (ii) the transfer by or through the indemnifying party of any interests herein or in the Lease. The indemnification set forth in this Section 10 shall not cover any Claim arising from or related to any gross negligence or willful misconduct of an Indemnified Party.

11. Operating Agreement. Upon execution of this Agreement, Smith agrees to execute the Operating Agreement. In the event of conflict between the provisions of this Agreement and the Operating Agreement, the provisions of this Agreement shall be controlling. In any assignment executed by any party conveying part or all of the interests acquired by it pursuant hereto, such party agrees to include the following provision:

> The interests conveyed hereby are subject to the terms and provisions of that certain Operating Agreement dated May 1, 2008, between RAW Oil & Gas as Operator, and Smith Energy Company, etal as Non-Operators.

4

SEC 189123

12. **Survival of Representations and Warranties.** All representations and warranties contained herein or made in writing in connection herewith shall survive the execution hereof for a period of one (1) year after the date hereof except for those set forth in Section 2(a) and Section 2(c) which shall survive without limitation as to time. All covenants contained herein shall survive without limitation as to time.

13. **Additional Acts.** Each party will execute and deliver all such other and additional instruments and will do such other acts and things as may be necessary to assure more fully to the other that all respective rights intended to be conveyed and granted are conveyed and granted.

14. **Notices.** All notices or other communications given pursuant hereto shall be deemed given when delivered, if delivered in person; one day after deposit with an overnight carrier such as Federal Express for delivery on the next calendar day; the day of transmission by telecopy (if confirmed by notice sent by Federal Express or a similar overnight carrier for receipt the next day); or five days after mailing if sent certified mail, return receipt requested. All notices shall be given at the following addresses, unless any party changing its notice address shall notify all other parties in writing of such change:

> RAW Oil & Gas, Inc.
> 12312 Slide Road
> Lubbock, TX 79424
> Attn: Joe D. Hardin
> Fax: (806) 771-7766

15. **Governing Law.** The interpretation, validity and enforceability of this Agreement shall be governed by the laws of the State of Texas other than its conflict of law principles.

16. **Counterparts.** This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.

**RAW OIL & GAS, INC.**

By: _____
Joe D. Hardin, President

**RAW ENERGY, L.C.**

By: _____
Joe D. Hardin, Manager

**SMITH ENERGY COMPANY**

By: _____
Lester Smith, President

5

SEC 189124

## SCHEDULE A

1. Prior to commencing operations on a well, RAW shall furnish or cause to be furnished to Smith a location plat, an AFE detailing estimated dry hole and completion costs, the date of commencement of operations, the proposed spud date and a drilling title opinion covering the drillsite tract along with copies of any curative documents obtained in connection therewith.

2. RAW shall provide to Smith, upon request, a seismic and/or subsurface map depicting the structure(s) to be encountered and, on request, make available the data used to make such map.

3. RAW shall furnish or cause to be furnished to Smith the date drilling is commenced, daily drilling reports by fax and in writing containing customary information; and advance notice of coring, testing and running surveys so that a representative can be present and have access to all well information.

4. With respect to all wells, RAW shall test or cause to be tested all prospective hydrocarbon bearing horizons, run appropriate electric logs and furnish to Smith a field print, copy of such log(s) and other well data.

5. After well completion, RAW shall furnish or cause to be furnished to Smith a final print of log(s) and notices to all governmental authorities.

SEC 189125

## EXHIBIT "A"

Attached to and made a part of Participation Agreement
dated May 1, 2008, by and between
RAW Oil & Gas, Inc., Raw Energy, L.C. and Smith Energy Company.

## Prospect Area

Section 39, Block E, EL&RR Ry. Co. Survey, Lynn and Terry Counties, Texas (640.00 ac.)
AND

Section 0, A-1181, No Block, No Survey, Lynn County, Texas (this Section is located just to the East of Section 39 described above)

7

SEC 189126

# TAB D

# North Mound Lake Operating Agreement (DX 1347)

A.A.P.L. FORM 610 - 1989

# MODEL FORM OPERATING AGREEMENT

## NORTH MOUND LAKE PROSPECT

OPERATING AGREEMENT

DATED

_____ **May 1** _____ , __**2008**__
<sub>year</sub>

OPERATOR   **RAW Oil & Gas, Inc.** _____

CONTRACT AREA   **See Exhibit "A"** _____

_____

_____

_____

_____

COUNTY OR PARISH OF   **LYNN AND TERRY** _____ , STATE OF   **TEXAS** _____

COPYRIGHT 1989 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS, 76137, APPROVED FORM.

A.A.P.L. NO. 610 – 1989

DEFENDANT'S
TRIAL EXHIBIT
__1347__

SEC 189020

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS: | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION: | 2 |
| | C. SUBSEQUENTLY CREATED INTERESTS: | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION: | 2 |
| | B. LOSS OR FAILURE OF TITLE: | 3 |
| |    1. Failure of Title | 3 |
| |    2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| |    3. Other Losses | 3 |
| |    4. Curing Title | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR: | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR: | 4 |
| |    1. Resignation or Removal of Operator | 4 |
| |    2. Selection of Successor Operator | 4 |
| |    3. Effect of Bankruptcy | 4 |
| | C. EMPLOYEES AND CONTRACTORS: | 4 |
| | D. RIGHTS AND DUTIES OF OPERATOR: | 4 |
| |    1. Competitive Rates and Use of Affiliates | 4 |
| |    2. Discharge of Joint Account Obligations | 4 |
| |    3. Protection from Liens | 4 |
| |    4. Custody of Funds | 5 |
| |    5. Access to Contract Area and Records | 5 |
| |    6. Filing and Furnishing Governmental Reports | 5 |
| |    7. Drilling and Testing Operations | 5 |
| |    8. Cost Estimates | 5 |
| |    9. Insurance | 5 |
| VI. | DRILLING AND DEVELOPMENT | 5 |
| | A. INITIAL WELL: | 5 |
| | B. SUBSEQUENT OPERATIONS: | 5 |
| |    1. Proposed Operations | 5 |
| |    2. Operations by Less Than All Parties | 6 |
| |    3. Stand-By Costs | 7 |
| |    4. Deepening | 8 |
| |    5. Sidetracking | 8 |
| |    6. Order of Preference of Operations | 8 |
| |    7. Conformity to Spacing Pattern | 9 |
| |    8. Paying Wells | 9 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK: | 9 |
| |    1. Completion | 9 |
| |    2. Rework, Recomplete or Plug Back | 9 |
| | D. OTHER OPERATIONS: | 9 |
| | E. ABANDONMENT OF WELLS: | 9 |
| |    1. Abandonment of Dry Holes | 9 |
| |    2. Abandonment of Wells That Have Produced | 10 |
| |    3. Abandonment of Non-Consent Operations | 10 |
| | F. TERMINATION OF OPERATIONS: | 10 |
| | G. TAKING PRODUCTION IN KIND: | 10 |
| |    (Option 1) Gas Balancing Agreement | 10 |
| |    (Option 2) No Gas Balancing Agreement | 11 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 11 |
| | A. LIABILITY OF PARTIES: | 11 |
| | B. LIENS AND SECURITY INTERESTS: | 12 |
| | C. ADVANCES: | 12 |
| | D. DEFAULTS AND REMEDIES: | 12 |
| |    1. Suspension of Rights | 13 |
| |    2. Suit for Damages | 13 |
| |    3. Deemed Non-Consent | 13 |
| |    4. Advance Payment | 13 |
| |    5. Costs and Attorneys' Fees | 13 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES: | 13 |
| | F. TAXES: | 13 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 14 |
| | A. SURRENDER OF LEASES: | 14 |
| | B. RENEWAL OR EXTENSION OF LEASES: | 14 |
| | C. ACREAGE OR CASH CONTRIBUTIONS: | 14 |

i

SEC 189021

## TABLE OF CONTENTS

   D. ASSIGNMENT; MAINTENANCE OF UNIFORM INTEREST: .................................................. 15
   E. WAIVER OF RIGHTS TO PARTITION: ........................................................................ 15
   F. PREFERENTIAL RIGHT TO PURCHASE: .................................................................... 15
 IX. **INTERNAL REVENUE CODE ELECTION** ........................................................................ 15
  X. **CLAIMS AND LAWSUITS** ............................................................................................ 15
 XI. **FORCE MAJEURE** ........................................................................................................ 16
 XII. **NOTICES** ...................................................................................................................... 16
XIII. **TERM OF AGREEMENT** ................................................................................................ 16
XIV. **COMPLIANCE WITH LAWS AND REGULATIONS** ........................................................ 16
   A. LAWS, REGULATIONS AND ORDERS: ...................................................................... 16
   B. GOVERNING LAW: .................................................................................................. 16
   C. REGULATORY AGENCIES: ...................................................................................... 16
 XV. **MISCELLANEOUS** ........................................................................................................ 17
   A. EXECUTION: ............................................................................................................ 17
   B. SUCCESSORS AND ASSIGNS: .................................................................................. 17
   C. COUNTERPARTS: ...................................................................................................... 17
   D. SEVERABILITY ........................................................................................................ 17
XVI. **OTHER PROVISIONS** .................................................................................................... 17

SEC 189022

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between __RAW Oil & Gas, Inc._____,
hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes
hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land
identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil
and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of estimating the costs to be incurred in conducting an operation hereunder.

B. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production testing conducted in such operation.

C. The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be developed and operated for Oil and Gas purposes under this agreement. Such lands, Oil and Gas Leases and Oil and Gas Interests are described in Exhibit "A."

D. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the lesser.

E. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

F. The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.

G. The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be located.

H. The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.

I. The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as provided in Article VI.B.2.

J. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

K. The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

L. The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts of land lying within the Contract Area which are owned by parties to this agreement.

M. The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

N. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone.

O. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned in order to attempt a Completion in a different Zone within the existing wellbore.

P. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or improve production in a Zone which is currently open to production in the wellbore. Such operations include, but are not limited to, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Recompleting, or Plugging Back of a well.

Q. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties.

R. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

### ARTICLE II.
### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

__X__ A. Exhibit "A," shall include the following information:
　　　(1) Description of lands subject to this agreement,
　　　(2) Restrictions, if any, as to depths, formations, or substances,
　　　(3) Parties to agreement with addresses and telephone numbers for notice purposes,
　　　(4) Percentages or fractional interests of parties to this agreement,
　　　(5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement,
　　　(6) Burdens on production.
__X__ B. Exhibit "B," Form of Lease.
__X__ C. Exhibit "C," Accounting Procedure.
__X__ D. Exhibit "D," Insurance.
__X__ E. Exhibit "E," Gas Balancing Agreement.
_____ F. ~~Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.~~
__X__ G. ~~Exhibit "G," Tax Partnership.~~
_____ H. Other: _____

- 1 -

SEC 189023

If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

### ARTICLE III.
### INTERESTS OF PARTIES

**A. Oil and Gas Interests:**

If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B," and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.

**B. Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area up to, but not in excess of, existing lease burdens _____ and shall indemnify, defend and hold the other parties free from any liability therefor. Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s) which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any liability therefor.

No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby, and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

**C. Subsequently Created Interests:**

If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production payment, net profits interest, assignment of production or other burden payable out of production attributable to its working interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interests, or other burden payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's Lease or Interest to exceed the amount stipulated in Article III.B. above.

The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

### ARTICLE IV.
### TITLES

**A. Title Examination:**

Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and, if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in procuring abstracts, fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in royalty opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection with Leases or Oil and Gas Interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings. Costs incurred by Operator, including fees paid to outside attorneys, which are associated with hearings before governmental agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C."

SEC 189024

Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the Drilling Parties in such well.

**B. Loss or Failure of Title:**

1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas Leases and Interests; and,

(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;

(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed Lease or Interest;

(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;

(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received production for which such accounting is required based on the amount of such production received, and each such party shall severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;

(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and

(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest is reflected on Exhibit "A."

2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas Lease or interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A" shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest, calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest, it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or Interest, on an acreage basis, up to the amount of unrecovered costs;

(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination, would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties in proportion to their respective interests reflected on Exhibit "A"; and,

(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.

3. Other Losses: All losses of Leases or Interests committed to this agreement, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

4. Curing Title: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B. shall not apply to such acquisition.

SEC 189025

## ARTICLE V.
## OPERATOR

A. Designation and Responsibilities of Operator:

    RAW Oil & Gas, Inc. shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

B. Resignation or Removal of Operator and Selection of Successor:

    1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. ~~Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.~~

    Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

    2. Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

    3. Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

C. Employees and Contractors:

    The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined Operator, and all such employees or contractors shall be the employees or contractors of Operator.

D. Rights and Duties of Operator:

    1. Competitive Rates and Use of Affiliates: All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

    2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

    3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from

- 4 -

SEC 189026

liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.

5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each Non-Operator or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C."

6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder, including but not limited to the Initial Well:

(a) Operator will promptly advise Non-Operators of the date on which the well is spudded, or the date on which drilling operations are commenced.

(b) Operator will send to Non-Operators such reports, test results and notices regarding the progress of operations on the well as the Non-Operators shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.

(c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

8. Cost Estimates: Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

**ARTICLE VI.**

**DRILLING AND DEVELOPMENT**

**A. Initial Well:**

On or before the __31st__ day of __December__, __2008__, Operator shall commence the drilling of the Initial Well at the following location:

Mutually agreed upon location within the Contract Area to be determined at a later date by all the parties to this Agreement

and shall thereafter continue the drilling of the well with due diligence to penetrate the Fusselman Formation.

The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation in Completion operations and Article VI.F. as to termination of operations and Article XI as to occurrence of force majeure.

**B. Subsequent Operations:**

1. Proposed Operations: If any party hereto should desire to drill any well on the Contract Area other than the Initial Well, or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone

SEC 189027

under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be performed, the location, proposed depth, objective Zone and the estimated cost of the operation. The parties to whom such a notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties within the time and in the manner provided in Article VI.B.6.

If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation, reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance with Article VI.B.5. in the event of a Sidetracking operation.

2. Operations by Less Than All Parties:

(a) Determination of Participation. If any party to whom such notice is delivered as provided in Article VI.B.1. or VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties' interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10) days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period. If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the period provided in Article VI.B.1., subject to the same extension right as provided therein.

(b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense; provided, however, that those Non-Consenting Parties that participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened, Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking, Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking,

- 6 -

SEC 189028

Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non-Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes, royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

(i) _____ % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and

(ii) _____ % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening, Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C., and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions of this Article VI.B.2. (b) shall apply to such party's interest.

(c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties _____ % of that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

(d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem, production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.C.

In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back, Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing, Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of Oil and Gas produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking, Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and Exhibit "C" attached hereto.

3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise terminated pursuant to Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking,

- 7 -

SEC 189029

Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.

4. Deepening: If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone of which the parties were given notice under Article VI.B.1. ("Initial Objective"). Such well shall not be Deepened beyond the Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate in the Deepening operation.

In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective, such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation, such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses.

(a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the sole account of Consenting Parties.

(b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the well for Deepening

The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article VI.F.

5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore to be utilized as follows:

(a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

(b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking operation is initiated shall be determined in accordance with the provisions of Exhibit "C."

6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required shall be deemed not to have voted. The proposal receiving the vote of parties owning the largest aggregate percentage interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the

SEC 189030

initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty-four (24) hours if a rig is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within such period shall be deemed an election not to participate in the prevailing proposal.

7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone.

8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except with the consent of all parties that have not relinquished interests in the well at the time of such operation.

**C. Completion of Wells; Reworking and Plugging Back:**

1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling, Deepening or Sidetracking shall include:

☐ Option No. 1: All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completing and equipping of the well, including necessary tankage and/or surface facilities.

☐ Option No. 2: All necessary expenditures for the drilling, Deepening or Sidetracking and testing of the well. When such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to participate in a Completion attempt whether or not Operator recommends attempting to Complete the well, together with Operator's AFE for Completion costs if not previously provided. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an accompanying AFE. Operator shall deliver any such Completion proposal, or any Completion proposal conflicting with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the procedures specified in Article VI.B.6. Election to participate in a Completion attempt shall include consent to all necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface facilities but excluding any stimulation operation not contained on the Completion AFE. Failure of any party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of conflicting Completion proposals. If one or more, but less than all of the parties, elect to attempt a Completion, the provision of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations thereafter conducted by less than all parties; provided, however, that Article VI.B.2. shall apply separately to each separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier Completions or Recompletion have recouped their costs pursuant to Article VI.B.2.; provided further, that any recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in which the Completion attempt is made. Election by a previous Non-Consenting party to participate in a subsequent Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt, insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a Completion attempt.

2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked, Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the Reworking, Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and Completing and equipping of said well, including necessary tankage and/or surface facilities.

**D. Other Operations:**

Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of _____ Twenty-five thousand _____ Dollars ($ 25,000.00 ) except in connection with the drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so requesting an information copy thereof for any single project costing in excess of Twenty-five thousand _____ Dollars ($ 25,000.00 ). Any party who has not relinquished its interest in a well shall have the right to propose that Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively be those Articles). Operator shall deliver such proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent of any party or parties owning at least 50 % of the interests of the parties entitled to participate in such operation, each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms of the proposal.

**E. Abandonment of Wells:**

1. Abandonment of Dry Holes: Except for any well drilled or Deepened pursuant to Article VI.B.2., any well which has been drilled or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be

- 9 -

SEC 189031

plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and restoring the surface, for which the abandoning parties shall remain proportionately liable.

2. Abandonment of Wells That Have Produced: Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well within the required period or thereafter to conduct operations on such well shall entitle operator to retain or take possession of such well and plug and abandon the well.

Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the interest of the abandoning party is or includes an Oil and Gas Interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest in a portion of the well shall pay their proportionate shares of abandonment and surface restoration cost for such well as provided in Article VI.B.2.(b).

F. Termination of Operations:

Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing, Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without consent of parties bearing 50.0% of the costs of such operation; provided, however, that in the event granite or other practically impenetrable substance or condition in the hole is encountered which renders further operations impractical, Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1, and the provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.

G. Taking Production in Kind:

☐ Option No. 1: Gas Balancing Agreement Attached

Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment

- 10 -

SEC 189032

directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing basis to be used.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

☐ Option No. 2: No Gas Balancing Agreement:

Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditures incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase contract having a term extending beyond such ten (10) day period. Any purchase or sale by Operator of any other party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation fee equal to that received under any existing market or transportation arrangement. The sale or delivery by Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase of Oil and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written notice of such intended purchase or sale and the price to be paid or the pricing basis to be used. Operator shall give notice to all parties of the first sale of Gas from any well under this Agreement.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

## ARTICLE VII.
### EXPENDITURES AND LIABILITY OF PARTIES

**A. Liability of Parties:**

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

- 11 -

SEC 189033

**B. Liens and Security Interests:**

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

**C. Advances:**

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

**D. Defaults and Remedies:**

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered

- 12 -

SEC 189034

only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator, and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator. Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified below or otherwise available to a non-defaulting party.

1. <u>Suspension of Rights:</u> Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement.

2. <u>Suit for Damages:</u> Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

3. <u>Deemed Non-Consent:</u> The non-defaulting party may deliver a written Notice of Non-Consent Election to the defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party, notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

4. <u>Advance Payment:</u> If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided in the Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

5. <u>Costs and Attorneys' Fees:</u> In the event any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

**E. Rentals, Shut-in Well Payments and Minimum Royalties:**

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to production of a producing well, at least five (5) days (excluding Saturday, Sunday, and legal holidays) prior to taking such action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

**F. Taxes:**

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

- 13 -

SEC 189035

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C."

Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

**ARTICLE VIII.**

**ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**

**A. Surrender of Leases:**

The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B." Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made varies according to depth, then the interest assigned shall similarly reflect such variances.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

**B. Renewal or Extension of Leases:**

If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease, promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an assignment of its proportionate interest therein by the acquiring party.

If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating Agreement in the form of this agreement.

If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.

The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.

**C. Acreage or Cash Contributions:**

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled inside Contract Area. Contributions under the paragraph do not include proceeds from the actual sale of working interest in a well or lease

- 14 -

SEC 189036

hereunder.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

**D. Assignment; Maintenance of Uniform Interest:**

~~For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells, equipment and production unless such disposition covers either:~~

~~1. the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or~~

~~2. an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production in the Contract Area.~~

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

**E. Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

**F. Preferential Right to Purchase:**

~~☐ (Optional; Check if applicable.)~~

~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after the notice is delivered, to purchase for the stated consideration on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to transfer title to its interests to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests, or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock.~~

**ARTICLE IX.**

**INTERNAL REVENUE CODE ELECTION**

If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulation §1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.

**ARTICLE X.**

**CLAIMS AND LAWSUITS**

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed ___five thousand___ Dollars ($ _5,000.00_ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling settling, or otherwise discharging such claim or suit shall be a the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

- 15 -

SEC 189037

## ARTICLE XI.
### FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

## ARTICLE XII.
### NOTICES

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex, telecopier or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the telecopy, facsimile or telex machine of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, telecopy or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.

## ARTICLE XIII.
### TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☐ Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

☐ ~~Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this agreement shall continue in force so long as any such well is capable of production, and for an additional period of \_\_\_\_\_ days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re-completing, Plugging Back or Reworking operations are commenced within \_\_\_\_\_ days from the date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of 180 days from the conduct of any operations on the well, whichever first occurs.~~

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

## ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

A. Laws, Regulations and Orders:

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

B. Governing Law:

This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of __Texas__ shall govern.

C. Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or

- 16 -

SEC 189038

orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not constitute gross negligence. Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

**ARTICLE XV.**

**MISCELLANEOUS**

**A. Execution:**

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest. In the event Operator proceeds with drilling operations for the Initial Well without the execution hereof by all persons listed on Exhibit "A" as having a current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the Initial Well which would have been charged to such person under this agreement if such person had executed the same and Operator shall receive all revenues which would have been received by such person under this agreement if such person had executed the same.

**B. Successors and Assigns:**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Contract Area.

**C. Counterparts:**

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

**D. Severability:**

For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

**ARTICLE XVI.**

**OTHER PROVISIONS**

This Joint Operating Agreement is subject to the additional terms and provisions which are contained in Article XVI attached hereto.

SEC 189039

IN WITNESS WHEREOF, this agreement shall be effective as of the 1st day of May, 2008.

**OPERATOR**

RAW OIL & GAS, INC.

By _____

Joe D. Hardin
Type or print name

Title President

Date 6/12/2008

Tax ID or S.S. No. _____

**NON-OPERATORS**

RAW ENERGY, LC

By _____

Joe D. Hardin
Type or print name

Title Manager

Date 6/12/2008

Tax ID or S.S. No. _____

SMITH ENERGY COMPANY

By _____

Lester Smith
Type or print name

Title President

Date 6/26/2008

Tax ID or S.S. No. ██████████████

**MARK P. HARDWICK**

By _____

Date _____

Tax ID or S.S. No. _____

**STEVE BLAYLOCK**

By _____

Date _____

Tax ID or S.S. No. _____

**ELGER EXPLORATION INC.**

By _____

Jerry Elger
Type or print name

Title President

Date _____

Tax ID or S.S. No. _____

- 18 -

SEC 189040

**ACKNOWLEDGMENTS**

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts.

The validity and effect of these forms in any state will depend upon the statutes of that state.

Acknowledgment in representative capacity:

State of Texas     )
              ) ss.
County of Lubbock    )

This instrument was acknowledged before me on this 12 day of _____June_____, 2008, by Joe D. Hardin as President of **RAW OIL & GAS, INC.**

(Seal, if any)

> **SANDRA VALDEZ**
> Notary Public, State of Texas
> My Commission Expires
> March 23, 2011

_Sandra Valdez_

Title (and Rank) _____

My commission expires: 3/23/2011

State of Texas     )
              ) ss.
County of Lubbock    )

This instrument was acknowledged before me on this 12 day of _____June_____, 2008, by Joe D. Hardin as Manager of **RAW ENERGY, LC.**

(Seal, if any)

> **SANDRA VALDEZ**
> Notary Public, State of Texas
> My Commission Expires
> March 23, 2011

_Sandra Valdez_

Title (and Rank) _____

My commission expires: 3/23/2011

State of Texas     )
              ) ss.
County of _Harris_   )

This instrument was acknowledged before me on this 26 day of _____June_____, 2008, by Lester Smith as President of **SMITH ENERGY COMPANY.**

(Seal, if any)

> **JUDITH MILLS**
> **NOTARY PUBLIC**
> State of Texas
> Comm. Exp. 04-09-2011

_____

Title (and Rank) _____

My commission expires: 4-09-2011

Individual acknowledgment:

State of Texas     )
              ) ss.
County of Midland    )

This instrument was acknowledged before me on this _____ day of _____, 2008, by **MARK P. HARDWICK.**

(Seal, if any)

_____

Title (and Rank) _____

My commission expires: _____

- 19 -

SEC 189041

IN WITNESS WHEREOF, this agreement shall be effective as of the 1st day of May, 2008.

**OPERATOR**

RAW OIL & GAS, INC.

By _____

Joe D. Hardin
Type or print name

Title President

Date 6/12/08

Tax ID or S.S. No. _____

**NON-OPERATORS**

RAW ENERGY, LC

By _____

Joe D. Hardin
Type or print name

Title Manager

Date 6/17/2008

Tax ID or S.S. No. _____

SMITH ENERGY COMPANY

By _____

Lester Smith
Type or print name

Title President

Date 6/26/08

Tax ID or S.S. No. ████████████

**MARK P. HARDWICK**

By _____

Date _____

Tax ID or S.S. No. _____

**STEVE BLAYLOCK**

By _____

Date _____

Tax ID or S.S. No. _____

**ELGER EXPLORATION INC.**

By _____

Jerry Elger
Type or print name

Title President

Date _____

Tax ID or S.S. No. _____

- 18 -

SEC 189042

ACKNOWLEDGMENTS

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts.

The validity and effect of these forms in any state will depend upon the statutes of that state.

Acknowledgment in representative capacity:

State of Texas )
) ss.
County of Lubbock )

This instrument was acknowledged before me on this 12 day of _____June_____, 2008, by Joe D. Hardin as President of **RAW OIL & GAS, INC.**

(Seal, if any)

_Sandra Valdez_

Title (and Rank) _____

My commission expires: 3/23/2011

---

State of Texas )
) ss.
County of Lubbock )

This instrument was acknowledged before me on this 12 day of _____June_____, 2008, by Joe D. Hardin as Manager of **RAW ENERGY, LC.**

(Seal, if any)

_Sandra Valdez_

Title (and Rank) _____

My commission expires: 3/23/2011

---

State of Texas )
) ss.
County of _Harris_ )

This instrument was acknowledged before me on this 26 day of _____June_____, 2008, by Lester Smith as President of **SMITH ENERGY COMPANY.**

(Seal, if any)

Title (and Rank) _____

My commission expires: 4-09-2011

---

Individual acknowledgment:

State of Texas )
) ss
County of Midland )

This instrument was acknowledged before me on this _____ day of _____, 2008, by **MARK P. HARDWICK.**

(Seal, if any)

_____

Title (and Rank) _____

My commission expires: _____

- 19 -

SEC 189043

IN WITNESS WHEREOF, this agreement shall be effective as of the 1st day of May, 2008.

**OPERATOR**

RAW OIL & GAS, INC.

By _____

Joe D. Hardin
Type or print name

Title President _____

Date 7/14/08

Tax ID or S.S. No. _____

**NON-OPERATORS**

RAW ENERGY, LC

By _____

Joe D. Hardin
Type or print name

Title Manager _____

Date _____

Tax ID or S.S. No. _____

SMITH ENERGY COMPANY

By _____

Lester Smith
Type or print name

Title President _____

Date _____

Tax ID or S.S. No. _____

MARK P. HARDWICK

By _____

Date _____

Tax ID or S.S. No. _____

STEVE BLAYLOCK

By _____

Date 7/3/08

Tax ID or S.S. No. ▉▉▉▉▉▉▉▉▉

ELGER EXPLORATION INC.

By _____

Jerry Elger
Type or print name

Title President _____

Date _____

Tax ID or S.S. No. _____

- 18 -

SEC 189044

ACKNOWLEDGMENTS

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts.

The validity and effect of these forms in any state will depend upon the statutes of that state.

Acknowledgment in representative capacity:

State of Texas )
) ss.
County of Lubbock )

This instrument was acknowledged before me on this 15th day of July , 2008, by Joe D. Hardin as President of RAW OIL & GAS, INC.

(Seal, if any)

        SANDRA VALDEZ
        Notary Public, State of Texas
        My Commission Expires
        March 23, 2011

_Sandra Valdez_

Title (and Rank) _____

My commission expires: 3|23|2011

State of Texas )
) ss.
County of Lubbock )

This instrument was acknowledged before me on this 15th day of July , 2008, by Joe D. Hardin as Manager of RAW ENERGY, LC.

(Seal, if any)

        SANDRA VALDEZ
        Notary Public, State of Texas
        My Commission Expires
        March 23, 2011

_Sandra Valdez_

Title (and Rank) _____

My commission expires: _____

State of Texas )
) ss.
County of _____ )

This instrument was acknowledged before me on this _____ day of _____, 2008, by Lester Smith as President of SMITH ENERGY COMPANY.

(Seal, if any)

_____

Title (and Rank) _____

My commission expires: _____

Individual acknowledgment:

State of Texas )
) ss.
County of Midland )

This instrument was acknowledged before me on this _____ day of _____, 2008, by MARK P. HARDWICK.

(Seal, if any)

_____

Title (and Rank) _____

My commission expires: _____

- 19 -

SEC 189045

Individual acknowledgment:

State of Texas     )
           ) ss.
County of Midland    )

    This instrument was acknowledged before me on this 3rd day of ____July____, 2008, by STEVE BLAYLOCK.

(Seal, if any)

                      Rebecca A. Waldrop

REBECCA A. WALDROP
MY COMMISSION EXPIRES
June 12, 2009

                  Notary Public State of Texas
Title (and Rank) _____

My commission expires: ____6/12/09____

State of Texas     )
           ) ss.
County of _____ )

This instrument was acknowledged before me on this _____ day of _____, 2008, by Jerry Elger as President of ELGER EXPLORATION INC.

(Seal, if any)

                _____

                Title (and Rank) _____

                My commission expires: _____

- 20 -

SEC 189046

IN WITNESS WHEREOF, this agreement shall be effective as of the 1st day of May, 2008.

OPERATOR

RAW OIL & GAS, INC.

By _____

Joe D. Hardin
Type or print name

Title President_____

Date 7/14/08

Tax ID or S.S. No. _____

NON-OPERATORS

RAW ENERGY, LC

By _____

Joe D. Hardin
Type or print name

Title Manager_____

Date _____

Tax ID or S.S. No. _____

SMITH ENERGY COMPANY

By _____

Lester Smith
Type or print name

Title President_____

Date _____

Tax ID or S.S. No. _____

MARK F. HARDWICK

By _____

Date 7/8/08

Tax ID or S.S. No. _____

STEVE BLAYLOCK

By _____

Date _____

Tax ID or S.S. No. _____

ELGER EXPLORATION INC.

By _____

Jerry Elger
Type or print name

Title President_____

Date 7/8/08

Tax ID or S.S. No. ██████████

- 18 -

14

SEC 189047

ACKNOWLEDGMENTS

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.

Acknowledgment in representative capacity:

State of Texas )
) ss.
County of Lubbock )

This instrument was acknowledged before me on this 15th day of July, 2008, by Joe D. Hardin as President of RAW OIL & GAS, INC.

(Seal, if any)

Sandra Valdez

SANDRA VALDEZ
Notary Public, State of Texas
My Commission Expires
March 23, 2011

Title (and Rank) _____

My commission expires 3/23/2011

State of Texas )
) ss.
County of Lubbock )

This instrument was acknowledged before me on this 15th day of July, 2008, by Joe D. Hardin as Manager of RAW ENERGY, LC.

(Seal, if any)

Sandra Valdez

SANDRA VALDEZ
Notary Public, State of Texas
My Commission Expires
March 23, 2011

Title (and Rank) _____

My commission expires: 3/23/2011

State of Texas )
) ss.
County of_____ )

This instrument was acknowledged before me on this _____ day of _____, 2008, by Lester Smith as President of SMITH ENERGY COMPANY.

(Seal, if any)

_____

Title (and Rank) _____

My commission expires: _____

Individual acknowledgment:

State of Texas )
) ss.
County of Midland )

This instrument was acknowledged before me on this 8th day of July, 2008, by MARK P. HARDWICK.

(Seal, if any)

Lindsay Davis

Title (and Rank) _____

My commission expires: 3/11/12

LINDSAY RYAN DAVIS
Notary Public, State of Texas
My Commission Expires
March 11, 2012

- 19 -

14

SEC 189048

Individual acknowledgment:

State of Texas          )
                        ) ss.
County of Midland      )

This instrument was acknowledged before me on this _____ day of _____, 2008, by STEVE BLAYLOCK

(Seal, if any)

                                          _____

                                          Title (and Rank) _____

                                          My commission expires: _____

State of Texas          )
                        ) ss.
County of Midland      )

This instrument was acknowledged before me on this 8th day of July _____, 2008, by Jerry Elger as President of ELGER EXPLORATION INC.

(Seal, if any)

LINDSAY RYAN DAVIS
Notary Public, State of Texas
My Commission Expires
March 11, 2012

                                          _____

                                          Title (and Rank) _____

                                          My commission expires: 3/11/12

14

SEC 189049

Individual acknowledgment:

State of Texas )
                    ) ss.
County of Midland )

This instrument was acknowledged before me on this _____ day of _____, 2008, by **STEVE BLAYLOCK.**

(Seal, if any)                                        _____

                                                     Title (and Rank) _____

                                                     My commission expires: _____


State of Texas )
                    ) ss.
County of _____ )

This instrument was acknowledged before me on this _____ day of _____, 2008, by Jerry Elger as President of **ELGER EXPLORATION INC.**

(Seal, if any)                                        _____

                                                     Title (and Rank) _____

                                                     My commission expires: _____

SEC 189050

## JOINT OPERATING PROVISIONS

## ARTICLE XVI

To be attached to and made a part of that certain Joint
Operating Agreement dated May 1, 2008, between
Raw Oil & Gas, Inc. as Operator
and Smith Energy Company, etal, as Non-Operator

A. Royalties, Overriding Royalties and Other Payments:

1. As used herein, the term "Existing Burdens" shall apply separately to each Lease and means all royalties and overriding royalties and other payments carved out of the Leasehold estate with which each Lease covered by this Operating Agreement is burdened as of the effective date hereof.

2. Each party shall pay or deliver, or cause to be paid or delivered, its proportionate part of all Existing Burdens and shall hold the other parties free from any liability therefor.

B. Rentals, Shut-in Well Payments and Minimum Royalties:

1. All rentals, shut-in well payments and minimum royalties which may be required under the terms of any Lease shall be administered and paid by Operator and charged to the Joint Account except where otherwise expressly provided to the contrary in this Operating Agreement. Any party may request and shall be entitled to receive proper evidence of all such payments.

2. Operator shall diligently attempt to make or cause to be made proper payment of any rentals and/or shut-in well payments and/or minimum royalties under the foregoing provisions, but Operator shall not be held liable to the other parties in damages for the loss of any Lease or interest therein if, through mistake or oversight, any rental and/or shut-in well payment and/or minimum royalty is not paid or is erroneously paid. The loss of any Lease or interest therein which results from Operator's failure to pay or an erroneous payment of rental and/or a shut-in well payment and/or a minimum royalty shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

3. Each party hereto shall be obligated to bear its proportionate part of any and all rentals necessary to continue in force and effect the Oil and Gas Leases covered by this Agreement unless and until it timely gives the notice provided for in the next sentence hereof. If any party does not wish to bear its proportionate part of any rental necessary to continue in force any Lease covered by this Agreement, such party may give Operator and all other parties hereto written notice of such election, and the party giving such written notice shall be released of obligation to bear its proportionate part of any rentals which accrue under the terms of the Leases specified in such written notice at any time after thirty (30) days after the date Operator receives such party's aforesaid written notice. Unless mutually agreed, otherwise, the proportionate part of the rental attributable to any such Lease which would have been borne by the party giving the aforesaid written notice shall be borne by the parties hereto who do not exercise the aforesaid election, in the proportion that the interest of each bears to the total of their Interests, and the party giving the aforesaid written notice of election not to pay its part of such rental shall assign, without express or implied warranty of title, all of its interest in the Lease or Leases specified in said written notice to the aforesaid parties in the respective proportions that they bear the rental on any such Lease or Leases.

C. Removal of Operator-Vote of all Parties.

Operator may at any time be removed with or without cause by the affirmative vote of the owners of the majority interest in the Contract Area based upon ownership as shown in Exhibit "A".

D. Transition.

Upon the selection of the successor operator, the Operator who has been removed or has resigned shall promptly deliver to the successor operator all original records relating to operations on the Contract Area, including current accounting information with regard to the status of the joint account, information concerning all invoices not yet paid by the operator who has resigned or been removed, all logs, maps and all other information concerning operations. Duplicating expenses required by virtue of the change of operators shall be charged to the joint account.

E. Financing Statement.

The security interest granted to each Operator and Non-Operator under Paragraph VII.B. of this agreement which secures payment of each party's share of costs and expenses of operations shall extend to each such party's share of all Oil and Gas, equipment, fixtures, personal property, accounts, inventory and general intangibles and proceeds or products thereof relating or pertaining to the Leases and lands included in the Contract Area as described in Exhibit "A" attached hereto. For purposes of compliance with TEXAS BUSINESS AND COMMERCE CODE, Sec. 9.302, each party agrees that this instrument shall serve and may be filed as a financing statement to perfect the security interest mutually granted herein. In that regard, each party hereto agrees that its signature below shall be its signature as debtor of an appropriate financing statement, and that for purposes of compliance with the requirements of Sec. 9.402 of the TEXAS BUSINESS AND COMMERCE CODE each secured party and debtor's names and addresses are as follows:

SEC 189051

The names and addresses
of secured parties are:

The names and address
of debtors are:

SEE EXHIBIT "A"

SEE EXHIBIT "A"

The collateral to which the security Interests apply are all of each debtor's interest in Oil and Gas, equipment, fixtures, personal property, accounts, inventory and general intangibles and proceeds or products thereof relating or pertaining to the Oil and Gas Leases covered by this agreement and included in the Contract Area as described in Exhibit "A".

F. Deemed Non-Consent for Defaulting Payment.

If the lien conferred in Article VII.B has been enforced, or if any party to this agreement shall fail to pay its share of costs and expenses incurred in operations of the Contract Area for a period of 90 days from the date of Operator's invoice therefor, Operator may notify the affected party of its default by certified mail, return receipt requested, and if such party fails to cure the default within 10 days from the date of receipt of Operator's notice, by payment in full of all invoices for operating costs which have been due for more than 30 days, the affected party shall be deemed in non-consent status and for so long as the affected party remains in default it shall have no further access to the Contract Area or information obtained in connection with operations hereunder and shall not be entitled to vote on any matter hereunder. As to any proposed operation in which it otherwise would have the right to participate, such party shall have the right to be a Consenting Party therein only if it pays the amount it is in default before the operation is commenced; otherwise it automatically shall be deemed a Non-Consenting Party to that operation. Nothing herein shall affect each party's right to protest any item charged to the joint account by Operator under the provisions of Article I.5. of Exhibit "C" attached hereto.

G. Trustee's Sale for Defaulting Payment.

If Operator should elect to proceed to foreclose the lien of Operator as against the interest of a Non-Operator having an interest in the Contract Area, this operating agreement does hereby include provisions for non-judicial sale under the laws of the State of Texas and David Cotton is hereby appointed as Trustee for such purpose. Upon such default, said Trustee or Operator shall at least 21 days preceding the date of nonjudicial sale serve written notice of the proposed sale by certified mail to Non-Operator according to records of Operator. Service of such notice shall be deemed completed upon deposit of a notice enclosed in a post-paid wrapper properly addressed to the Non-Operator and each other party obligated to pay such obligations at the most recent address or addresses as shown on the records of Operator in a post office or other official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service. After such notice, said Trustee shall proceed to sell all of the Interests of Non-Operator in the Contract Area at public auction to the highest bidder for cash after having given notice of the time and place of sale and in the manner and after the advertisement of such sale as now required by the statutes of the State of Texas in making sales of real estate under deeds of trust. Sale of a part of the realty would not exhaust the power of sale and sales may be made from time to time until all of the property is sold or the obligations paid in full. Said Trustee shall have authority to appoint an attorney in fact to act as Trustee in conducting the foreclosure sale and executing a deed to the purchasers; and it is further agreed that said Trustee or his successor may sell said property together or in lots and/or parcels as to him shall deem expedient and after such sale as aforesaid shall make, execute and deliver to the purchaser or purchasers thereof good and sufficient deeds, assignments or other lawful conveyances to vest in said purchaser or purchasers title to the Non-Operator's interest in the Contract Area in fee simple together with all personal property used or obtained in connection therewith and together with all of the proceeds of production attributable thereto including proceeds of production held by any party for the payment to Non-Operator. From the proceeds of said sale said Trustee shall first pay all charges, costs and expenses in executing these provisions and secondly pay any sums due by the Trustee for taxes in the preservation of the security and thereafter pay all of the remaining sums to Operator for the satisfaction of the debts of Non-Operator hereunder and the balance, if any, shall be paid to Non-Operator.

It is agreed that such sale shall be a perpetual bar against Non-Operator and its heirs, successors and assigns and legal representatives and all other persons claiming under him, them or any of them. It is further agreed that said Trustee or any holder or holders of said obligation of Operator shall have the right to become the purchaser or purchasers at such sale if they are the highest bidder or bidders in which event the bid or bids may be credited upon said indebtedness of Non-Operator. It is stipulated and agreed that in case of any sale hereunder by Trustee or his successor all prerequisites of said sale shall be presumed to have been performed and any conveyance given hereunder, all statements of fact or recitals therein made as to the non-payment of money secured or as to any default under the terms hereof or as to the request of the Trustee to enforce this trust or as to the proper and due appointment of any successor or substitute Trustee or as to the advertisement of sale or the time, place and terms of sale or as to any other preliminary act or thing shall be taken in all courts of law and equity as prima facie evidence that the facts so stated are true. Operator may appoint a substitute or successor Trustee in the event the Trustee above named is unable for any reason to serve.

H. Drill or Out

Notwithstanding any provisions to the contrary contained in Article VI.B, should any party hereto, after receiving notice from Operator of a proposal to drill a well on the Contract Area, other than the well provided for in Article VI.A fail to timely notify Operator of its election to participate in such proposal or should a party elect not to participate in the drilling proposal, it is hereby agreed that such party shall relinquish and assign to the participating parties all of its Leasehold interest in and to the well and the proration unit allocated to such well. Additionally, in such event, such non-participating party shall release, relinquish and surrender and forever forfeit proportionately to the participating parties, all of the non-participating party's interest in and to all proration units which are adjoining and/or

SEC 189052

contiguous to the proration unit allocated to such proposed well except for any thereof on which a well is situated and in which well the nonparticipating party participated in the drilling.

By way of illustration, in the event a 40 acre proration unit in the form of a square is allocated to a proposed well, then a non-participating party shall forfeit, release and relinquish all interest in such 40 acre proration unit together with the eight immediately surrounding and adjoining 40 acre proration units with the exception indicated.

Notwithstanding any provision to the contrary contained in Article VI., Non-Operator upon receiving Operator's recommendation with respect to an attempted Completion shall within the time period set forth herein, notify Operator of its election to participate in a proposed Completion attempt. Failure to so notify Operator shall be deemed an election by Non-Operator not to participate. In the event that any Non-Operator elects not to participate in the Completion attempt, the Non-Consenting Party shall relinquish and assign to the participating parties all of its Leasehold interest in and to the well and the proration unit allocated to such well, only insofar as to the interval or formation which is subject to the Completion attempt. Additionally, in such event, such non-participating party shall relinquish and surrender and forever forfeit proportionately to the participating parties, all of the non-participating party's interest in and to all proration units which are adjoining and/or contiguous to the proration unit allocated to such well, only insofar as to the interval or formation which is subject to the Completion attempt.

With regard to Deepening operations, any Non-Consenting Party shall forfeit proportionately to the participating parties all of the non-participating party's interest in depths greater than the depth drilled in an operation for which such non-participating party had previously consented. The interest of any party in such relinquished and forfeited Leasehold rights shall be assigned proportionately to the participating parties by the non-participating party without warranty of title except as to claims, by, through or under Assignor, and shall be free of burdens except those created prior to the time the non-participating party acquired his interest in the Leasehold estate so forfeited.

I. Sales Necessitating Separate Measurements.

In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area which necessitates separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

J. Internal Revenue Code Election.

This Operating Agreement shall not create any mining partnership, commercial partnership or other partnership relation or joint venture, and the liabilities of each of the parties hereto shall be several and not joint. However, solely for Federal and State income tax purposes, the parties elect to be taxed as a partnership in accordance with the Tax Partnership Agreement attached as Exhibit "G" hereto, but such relationship shall not be a partnership to any other extent or for any other purpose. Notwithstanding anything to the contrary herein, the parties hereto agree that, with respect to all operations conducted hereunder, each party hereto agrees to elect to be excluded from the application of Subchapter K of Chapter I of Subtitle A of the Code, and each party agrees to join in the execution of such additional documents and elections as may be required by the Internal Revenue Service in order to effectuate the foregoing. In addition, if the income tax laws of any state in which the parties conduct operations pursuant to the terms of this Agreement contain provisions similar to those contained in Subchapter K of Chapter I of Subtitle A of the Code, the parties hereby agree to elect to be excluded from the application of such provisions.

K. Memorandum of Operating Agreement.

Within ten (10) days from the execution of this operating Agreement, each party agrees to execute a "Memorandum of Joint Operating Agreement" to be filed of record in Lynn and Terry Counties, Texas, imparting constructive notice that the Contract Area is subject to all of the terms, conditions and provisions contained in this agreement.

L. Power of Attorney.

Each Non-Operator designates Operator as its respective attorney-in-fact for the purpose of executing on behalf of such Non-Operator all instruments of release; all oil purchase agreements, gas purchase agreements and amendments thereto; all amendments to existing Leases in the Contract Area deemed necessary by Operator and all filings required by regulatory agencies relating to operations on the Contract Area including without limitation all NGPA filings, filings required by the Federal Energy Regulatory Commission and the Railroad Commission of the State of Texas. This Power-of-Attorney may be revoked only by revocation signed and acknowledged by the revoking non-operator, and filed for record in Lynn and Terry Counties, Texas, a copy of which shall be forwarded to operator.

M. Area of Mutual Interest.

(1) The parties hereto hereby create an Area of Mutual Interest (the "AMI") comprising all of the Contract Area covered by this Operating Agreement.

(2) During the term of the AMI, if any party hereto ("the Acquiring Party") acquires any Oil and Gas Lease, or any interest therein, any unleased mineral interest or any farmout, sublease or other contract with respect thereto which covers or affects any lands or minerals lying within the AMI ("the offered Mineral Interest"), the Acquiring Party shall promptly notify each of the other parties hereto ("Offeree") of such acquisition. In such event, such Offeree shall have the right to acquire his or its proportionate interest in the offered Mineral Interest in accordance with the other provisions of this Article XVI I.

SEC 189053

(3) Promptly upon acquiring the offered Mineral Interest, the Acquiring Party shall, in writing, advise each Offeree of such acquisition. The notice shall include complete xerox copies of the instruments of acquisition including, by way of example but not of limitation, such copies of the Leases, assignments, subleases, farmouts or other contracts acquired by the Acquiring Party creating or affecting the offered Mineral Interest, together with such copies of paid drafts, plats depicting the exact location of the acreage covered or affected thereby, Lease brokers' reports and any other title data relating thereto. The Acquiring Party shall also enclose an itemized statement of the actual costs and expenses incurred by the Acquiring party in acquiring the offered Mineral Interest ("Acquiring Costs"). Each Offeree shall have a period of fifteen (15) days after receipt of the notice within which to furnish the Acquiring party written notice of his or its election to acquire his or its proportionate interest in the offered Mineral Interest. If, however, a well in search of oil or gas is being drilled on lands situated within the AMI or on lands situated outside the AMI of which the result could be expected to materially affect the value of the offered Mineral Interest, each Offeree shall have a period of forty-eight (48) hours after receipt of the notice (exclusive of Saturdays, Sundays and legal holidays) within which to elect to acquire his or its proportionate interest in the offered Mineral Interest. It is provided, however, that the forty-eight (48) hour election period shall not apply unless the Acquiring Party shall give written notice to each Offeree within two (2) days after the date on which the Acquiring party acquired the offered Mineral Interest exclusive of Saturdays, Sundays and legal holidays. In addition thereto, the Acquiring Party shall also:

(i)     furnish each Offeree with the approximate location of the well then being drilled and the name of the operator or drilling contractor drilling the well; and

(ii)    specifically advise each Offeree that each Offeree shall have a period of forty-eight (48) hours (inclusive of Saturdays, Sundays and legal holidays) within which to elect to acquire his or its proportionate interest in the offered Mineral Interest.

The above information shall be in addition to the information and copies of instruments to be furnished in connection with the acquisition of the offered Mineral Interest as provided hereinabove. If the Acquiring Party does not receive written notice of election from any Offeree to acquire his or its proportionate interest within the fifteen (15) day or forty-eight (48) hour period, as the case may be, such failure shall constitute an election by such Offeree not to acquire his or its interest in the offered Mineral Interest. Written notice from the Acquiring Party to each Offeree and written notice of election from each Offeree to the Acquiring Party shall be deemed given when delivered if delivered in person, one day after deposit with an overnight carrier such as Federal Express for delivery on the next calendar day and the day of transmission by telecopy (if confirmed by notice sent by Federal Express or a similar overnight carrier for receipt the next day). Each Offeree accepting the offered Mineral Interest shall be entitled to participate in the offered Mineral Interest in the proportion to which his or its ownership interest as set forth in Exhibit "A" bears to the total ownership Interests as set forth in Exhibit "A" of the Acquiring Party and all other Offerees who have elected to acquire their proportionate interest in the offered Mineral Interest. Promptly after the period for the election has expired, the Acquiring Party shall invoice each Offeree electing to acquire his or its Interests in the offered Mineral Interest for his or its proportionate part of the Acquisition Costs. In the event an Offeree elects not to acquire his or its proportionate interest therein, then the Acquiring Party and each of the other Offerees who elect to participate in the offered Mineral Interest shall bear the Acquisition Costs attributable to such non-acquiring Offeree's interest in the proportion to which such participating party's expense bearing interest in the AMI at such time bears to the aggregate expense-bearing interest in the AMI at such time of the Acquiring Party and such other Offerees who so elect to participate. Each Offeree shall immediately reimburse the Acquiring Party for his or its share of the Acquisition Costs as reflected by the invoice. Upon receipt of such reimbursement or, in the case of a farmout or similar agreement at the time the acquiring party receives its assignment or other instrument, the Acquiring Party shall execute and deliver an appropriate, recordable assignment to each participating Offeree. If the Acquiring Party does not receive the amount due from a participating Offeree within five (5) days after receipt by such Offeree of the invoice for its share of the Acquisition Costs, the Acquiring Party may, at his or its election and without prejudice to other existing remedies, give written notice to such delinquent party that the failure of the Acquiring Party to receive the amount due within forty-eight (48) hours (exclusive of Saturdays, Sundays and legal holidays) after receipt of such notice by the delinquent Offeree shall constitute a withdrawal by the delinquent Offeree of its former election to acquire the interest and such Offeree shall no longer have the right to acquire an interest in the offered Mineral Interest. In the event the Acquiring Party does not receive the amount due within such forty-eight (48) hour period, the delinquent Offeree shall be deemed to have elected not to participate and the Acquiring Party shall succeed to and own the entirety of the interest in the offered Mineral Interest which the delinquent Offeree would have owned and the Acquiring party shall bear the delinquent Offeree's proportionate share of the Acquisition Costs.

(4) In the event less than all of the Offerees elect to acquire their proportionate interest in the offered Mineral Interest, then the portion of the lands covered by the offered Mineral Interest shall be automatically deleted from the AMl and the Contract Area covered hereby without the necessity of Operator or any Non-Operator executing a document amending the AMI and this Operating Agreement to reduce the AMI and the Contract Area to exclude such lands therefrom. The Acquiring Party and the Offerees electing to acquire the Interests in the offered Mineral Interest shall be deemed to have agreed to operate the offered Mineral Interest in accordance with the terms and provisions of this Operating Agreement, except that the offered Mineral Interest shall constitute the Contract Area covered thereby. Exhibit "A" shall list the names and addresses of the parties owning the offered Mineral Interest and the Interests in which they own the same, and Operator shall be named Operator therein unless Operator did not participate in acquiring his interest in the offered Mineral Interest, in which event the parties agreeing to participate in the offered Mineral Interest shall select an Operator from among themselves, which Operator shall be elected by the affirmative vote of two or more such parties owning a majority interest based on their ownership of the offered Mineral Interest, and not on the number of parties electing to participate. The Acquiring Party and the Offerees electing to acquire their Interests in the offered Mineral Interest shall enter into an Operating Agreement reflecting the same immediately after agreeing to own jointly the offered Mineral Interest, but the failure to enter immediately into such an Operating Agreement shall not

SEC 189054

prevent the owners of the offered Mineral Interest from operating, developing and maintaining the same in accordance with the terms hereof, unless Operator elects not to participate and such parties are unable to agree on the election of an operator.

(5) Any assignment made by the Acquiring Party shall be made free and clear of any burdens placed thereon by the Acquiring Party but otherwise without warranty of title, except as to acts by, through and under the Acquiring Party, but not otherwise. The assignment shall be expressly made subject to and each assignee shall expressly assume his or its portion of all of the obligations imposed by the instrument creating or affecting the offered Mineral Interest.

(6) If the interest of any party hereto in the AMI should vest in three or more parties, those parties shall designate one of them to whom all notices provided for in this AMI are to be given and shall promptly furnish the other parties hereto the name and address of the designated party. If the Acquiring Party has not received the name and address of the designated party, the notice of the acquisition shall be directed to all of the parties having an interest in the AMI according to the Exhibit "A" which is then a part of this Operating Agreement.

(7) If the instrument creating or affecting the offered Mineral Interest covers lands situated both within and outside the AMI, the Acquiring Party may, at his or its option, offer either all of the offered Mineral Interest or only that portion of the offered Mineral Interest covering lands situated within the AMI. If less than the entirety is offered, the Acquisition Costs shall be prorated between the acreage covered by the offered Mineral Interest situated within the AMI and the acreage situated outside the AMI and the Acquiring Party shall bear all of the Acquisition Costs attributable to such outside acreage and the Acquiring Party and the Offerees who elect to participate shall bear their proportionate share of the Acquisition Costs attributable to the acreage within the AMI. If the entirety of the premises covered by the Mineral Interest is offered and each party hereto acquires it proportionate interest therein, the lands lying outside the AMI shall become a part of the Contract Area covered hereby and the AMI shall thereby be automatically enlarged without the necessity of operator or any Non-Operator executing a document amending the AMI and this Operating Agreement to enlarge the AMI to include such lands lying outside the AMI.

(8) If two or more of the offered Mineral Interests are included in the same notice, each Offeree shall have the separate right of election as to each offered Mineral Interest.

(9) The provisions of the AMI shall not apply to acquisitions resulting from a merger, consolidation, reorganization or an acquisition from a parent, subsidiary or affiliated corporation, or, as to individuals, from ascendants or descendants or trusts of which such parties are beneficiaries. The provisions hereof shall also not apply to sales and acquisitions between partners in a partnership which is a party hereto, or ventures in a joint venture which is a party hereto, nor to the acquisition by any party hereto of all or any part of the interest of another party hereto.

(10) Each party hereto stipulates and represents to the other parties hereto that he or it is not now and shall not become hereafter a party to any other area of mutual interest agreement involving all or any portion of the land comprising the AMI.

SEC 189055

**EXHIBIT "A"**

Attached to and made a part of
Operating Agreement dated May 1, 2008, between RAW Oil & Gas Inc. as Operator and
Smith Energy Company, etal, as Non-Operators

**PART I:**     CONTRACT & AMI AREA

Section 39, Block E, EL&RR Ry. Co. Survey, Lynn and Terry Counties, Texas (640.00 ac.), and

Section 0, A-1181, No Block, No Survey, Lynn County, Texas (this Section is located just to the East of Section 39 described above)

**PART II:**     PARTIES, INTEREST AND ADDRESSES FOR NOTICE PURPOSES

| Names and Addresses | Percentage of Working Interest Owned |
|---|---|
| Raw Oil & Gas, Inc.<br>12312 Slide Road<br>Lubbock, Texas 79424 | 1.00 |
| Raw Energy, L.C.<br>12312 Slide Road<br>Lubbock, Texas 79424 | 5.25 |
| Smith Energy Company<br>Lester Smith, President<br>P.O. Box 52890<br>Houston, Texas 77052<br>Attention: Judy Mills | 75.00 |
| Mark P. Hardwick<br>P.O. Box 213<br>Midland, Texas 79702 | 6.25 |
| Steve Blaylock<br>214 W. Texas, Suite 306<br>Midland Texas 79701 | 6.25 |
| Elger Exploration Inc.<br>P.O. Box 2623<br>Midland, Texas 79702 | 6.25 |

SEC 189056

This is an Amended Exhibit "A" which is dated September 15th 2009 for the purpose of the addition of
additional owners and their interest.

EXHIBIT "A"

Attached to and made a part of
Operating Agreement dated May 1, 2008, between RAW Oil & Gas Inc. as Operator and
Smith Energy Company, etal, as Non-Operators

PART I:   ~ CONTRACT & AMI AREA

Section 39, Block E, EL&RR Ry. Co. Survey, Lynn and Terry Counties, Texas (640.00
ac.), and

Section 0, A-1181, No Block, No Survey, Lynn County, Texas (this Section is located just to the
East of Section 39 described above)

PART II:   -   PARTIES, INTEREST AND ADDRESSES FOR NOTICE PURPOSES

| Names and Addresses | Before Casing Point of the First Well | After Casing Point of the First Well And all Subsequent Operations |
|---|---|---|
| Raw Oil & Gas, Inc. 12312 Slide Road Lubbock, Texas 79424 | -1.3334%- | 1.00% |
| Raw Energy, L.C. 12312 Slide Road Lubbock, Texas 79424 | -0%- | 6.25% |
| Smith Energy Company Lester Smith, President P.O. Box 52890 Houston, Texas 77052 | 93.3331% | 10.00% |
| Mark P. Hardwick P.O. Box 213 Midland, Texas 79702 | -0%- | 6.25% |
| Steve Blaylock 214 W. Texas, Suite 306 Midland Texas 79701 | -0%- | 6.25% |
| Elger Exploration Inc. P.O. Box 2623 Midland, Texas 79702 | -0%- | 6.25% |
| A.M. Greene Trust P.O. Box 94364 Lubbock, Texas 79493 | 2.6667% | 2.0% |
| P.A.H. Energy Company 1025 Martin Houston, Texas 77018 | 1.3334% | 1.0% |
| B Shale Investments Ltd. 100 Congress Ave, Suite 1600 Austin Texas 78701 | 1.3334% | 1.0% |
| Smith Energy Partners I P.O. Box 52890 Houston, Texas 77052 | -0%- | 60.00% |

SEC 189057

Attached to and made a part of
Operating Agreement dated May 1, 2008, between RAW Oil & Gas Inc., as Operator and
Smith Energy Company, etal, as Non-Operators.

Producers 88 (7-69) Paid Up
with 640 Acres Pooling Provision

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this _____, between _____, Lessor (whether one or more), whose address is
_____, and _____, Lessee, **WITNESSETH:**

1. Lessor, in consideration of Ten Dollars and other valuable consideration ($10.00 and OVC), receipt of which is hereby acknowledged, and of the covenants and agreements of lessee hereinafter contained, does hereby grant, lease and let unto lessee the land covered hereby for the purposes and with the exclusive right of exploring, drilling, mining and operating for, producing and owning oil, gas, sulphur and all other minerals (whether or not similar to those mentioned), together with the right to make surveys on said land, lay pipe lines, establish and utilize facilities for surface or subsurface disposal of salt water, construct roads and bridges, dig canals, build tanks, power stations, telephone lines, employee houses and other structures on said land, necessary or useful in lessee's operations in exploring, drilling for, producing, treating, storing and transporting minerals produced from the land covered hereby or any land adjacent thereto. The land covered hereby, herein called "said land", is located in the Counties of _____, State of **Texas**, and is described as follows:

This lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by lessor by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by lessee for a more complete or accurate description of said land. For the purpose of determining the amount of any bonus or other payment hereunder, said land shall be deemed to contain _____acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof. Lessor accepts the bonus as lump sum consideration for this lease and all rights and options hereunder.

2. Unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of _____years from the date hereof, hereinafter called "primary term", and as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days.

3. As royalty, lessee covenants and agrees: (a) To deliver to the credit of lessor, in the pipe line to which lessee may connect its wells, the equal _____
of all oil produced and saved by lessee from said land, or from time to time, at the option of lessee, to pay lessor the average posted market price of such _____ part of such oil at the wells as of the day it is run to the pipe line or storage tanks, lessor's interest, in either case, to bear _____ of the cost of treating oil to render it marketable pipe line oil; (b) To pay lessor on gas and casinghead gas produced from said land (1) when sold by lessee, _____ )of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well, of _____ of such gas and casinghead gas; (c) To pay lessor on all other minerals mined and marketed or utilized by lessee from said land, one tenth either in kind or value at the well or mine at lessee's election, except that on sulphur mined and marketed the royalty shall be one dollar ($1.00) per long ton. If, at the expiration of the primary term or any time or times thereafter, there is any well on said land or on lands with which said lands or any portion thereof has been pooled, capable of producing oil or gas, and all such wells are shut-in, this lease shall, nevertheless, continue in force as though operations were being conducted on said land for so long as said wells are shut-in, and thereafter this lease may be continued in force as if no shut-in had occurred. Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the minerals capable of being produced from said wells, but in the exercise of such diligence, lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities of flow lines, separator, and lease tank, and shall not be required to settle labor trouble or to market gas upon terms unacceptable to lessee. If, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety consecutive days, and during such time there are no operations on said land, then at or before the expiration of said ninety day period, lessee shall pay or tender, by check or draft of lessee, as royalty, a sum equal to one dollar ($1.00) for each acre of land then covered hereby. Lessee shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety day period if upon such anniversary this lease is being continued in force solely by reason of the provisions of this paragraph. Each such payment or tender shall be made to the parties who at the time of payment would be entitled to receive the royalties which would be paid under this lease if the wells were producing, and may be deposited in the _____ Bank at _____
_____, or its successors, which shall continue as the depositories, regardless of changes in the ownership of shut-in royalty. If at any time that lessee pays or tenders shut-in royalty, two or more parties are, or claim to be, entitled to receive same, lessee may, in lieu of any other method of payment herein provided, pay or tender such shut-in royalty, in the manner above specified, either jointly to such parties or separately to each in accordance with their respective ownership thereof, as lessee may elect. Any payment hereunder may be made by check or draft of lessee deposited in the mail or delivered to the party entitled to receive payment or to a depository bank provided for above on or before the last date for payment. Nothing herein shall impair lessee's right to release as provided in paragraph 5 hereof. In the event of assignment of this lease in whole or in part, liability for payment hereunder shall rest exclusively on the then owner or owners of this lease, severally as to acreage owned by each.

4. Lessee is hereby granted the right, at its option, to pool or unitize any land covered by this lease with any other land covered by this lease, and/or with any other land, lease, or leases, as to any or all minerals or horizons, so as to establish units containing not more than 80 surface acres, plus 10% acreage tolerance; led, however, units may be established as to any one or more horizons, or existing units may be enlarged as to any one or more horizons, so as to contain not than 640 surface acres plus 10% acreage tolerance, if limited to one or more of the following: (1) gas, other than casinghead gas, (2) liquid hydrocarbons (condensate) which are not liquids in the subsurface reservoir, (3) minerals produced from wells classified as gas wells by the conservation agency having jurisdiction. If larger units than any of those herein permitted, either at the time established, or after enlargement, are required under any governmental rule or order, for the drilling or operation of a well at a regular location, or for obtaining maximum allowable from any well to be drilled, drilling, or already drilled, any such unit may be established or enlarged to conform to the size required by such governmental order or rule. Lessee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded. Each of the said options may be exercised by the lessee at any time and from time to time while this lease is in force, and whether before or after production has been established either on said land, or on the portion of said land included in the unit, or on other land unitized therewith. A unit established hereunder shall be valid and effective for all purposes of this lease even though there may be mineral, royalty, or leasehold interests in lands within the unit which are not effectively pooled or unitized. Any operations conducted on any part of such unitized land shall be considered, for all purposes, except the payment of royalty, operations conducted upon said land under this lease. There shall be allocated to the land covered by this lease within each such unit (or to each separate tract within the unit if the lease covers separate tracts within the unit) that proportion of the total production of unitized minerals from the unit, after deducting any used in lease or unit operations, which the number of surface acres in such land (or in each such separate tract) covered by this lease within the unit bears to the total number of surface acres in the unit, and the production so allocated shall be considered for all purposes, including payment or delivery of royalty, overriding royalty and any other payments out of production, to be the entire production of unitized minerals from the land to which allocated in the same manner as though produced therefrom under the terms of this lease. The owner of the reversionary estate of any term royalty or mineral estate agrees that the accrual of royalties pursuant to this paragraph or of shut-in royalties from a well on the unit shall satisfy any limitation of term requiring production of oil or gas. The formation of any unit hereunder which includes land not covered by this lease shall not have the effect of exchanging or transferring any interest under this lease (including, without limitation any shut-in royalty which may become payable under this lease) between parties.owning interests in land covered by this lease and parties owning interests in land not covered by this lease. Neither shall it impair the right of the lessee to release as provided in paragraph 5 hereof, except that lessee may not so release as to lands within a unit while there are operations thereon for unitized minerals unless all pooled leases are released as to lands within the unit. At any time while this lease is in force lessee may dissolve any unit established hereunder by filing for record in the public office where this lease is recorded a declaration to that effect, if at that time no operations are being conducted thereon for unitized minerals. Subject to the provisions of this paragraph 4, a unit once established hereunder shall remain in force so long as any lease subject thereto shall remain in force. If this lease now or hereafter covers separate tracts, no pooling or unitization of royalty interests as between any such separate tracts is intended or shall be implied or result merely from the inclusion of such separate tracts within this lease but lessee nevertheless shall have the right to pool or unitize as provided in this paragraph 4 with consequent allocation of production as herein provided. As used in this paragraph 4, the words "separate tract" mean any tract with royalty ownership differing, now or hereafter, either as to parties or amounts, from that as to any other part of the leased premises.

5. Lessee may at any time and from time to time execute and deliver to lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations, as to the released acreage or interest.

SEC 189058

6. Whenever used in this lease the word "operations" shall mean operations for and any of the following: drilling, testing, completing, reworking, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals, excavating a mine, production of oil, gas, sulphur or other mineral, whether or not in paying quantities.

7. Lessee shall have the use, free from royalty, of water, other than from lessor's water wells, and of oil and gas produced from said land in all operations hereunder. Lessee shall have the right at any time to remove all machinery and fixtures placed on said land, including the right to draw and remove casing. No well shall be drilled nearer than 200 feet to the house or barn now on said land without the consent of the lessor. Lessee shall pay for damages caused by its operations to growing crops and timber on said land.

8. The rights and estate of any party hereto may be assigned from time to time in whole or in part as to any mineral or horizon. All of the covenants, obligations, and considerations of this lease shall extend to and be binding upon the parties hereto, their heirs, successors, assigns, and successive assigns. No change or division in the ownership of said land, royalties, or other moneys, or any part thereof, howsoever effected, shall increase the obligations or diminish the rights of lessee, including, but not limited to, the location and drilling of wells and the measurement of production. Notwithstanding any other actual or constructive knowledge or notice thereof of or to lessee, its successors or assigns, no change or division in the ownership of said land or of the royalties, or other moneys, or the right to receive the same, howsoever effected, shall be binding upon the then record owner of this lease until thirty (30) days after there has been furnished to such record owner at his or its principal place of business by lessor or lessor's heirs, successors, or assigns, notice of such change or division, supported by either originals or duly certified copies of the instruments which have been properly filed for record and which evidence such change or division, and of such court records and proceedings, transcripts, or other documents as shall be necessary in the opinion of such record owner to establish the validity of such change or division. If any such change in ownership occurs by reason of the death of the owner, lessee may, nevertheless pay or tender such royalties, or other moneys, or part thereof, to the credit of the decedent in a depository bank provided for above.

9. In the event lessor considers that lessee has not complied with all its obligations hereunder, both express and implied, lessor shall notify lessee in writing, setting out specifically in what respects lessee has breached this contract. Lessee shall then have sixty (60) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by lessor. The service of said notice shall be precedent to the bringing of any action by lessor on said lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after service of such notice on lessee. Neither the service of said notice nor the doing of any acts by lessee aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that lessee has failed to perform all its obligations hereunder. If this lease is canceled for any cause, it shall nevertheless remain in force and effect as to (1) sufficient acreage around each well as to which there are operations to constitute a drilling or maximum allowable unit under applicable governmental regulations, (but in no event less than forty acres), such acreage to be designated by lessee as nearly as practicable in the form of a square centered at the well, or in such shape as then existing spacing rules require; and (2) any part of said land included in a pooled unit on which there are operations. Lessee shall also have such easements on said land as are necessary to operations on the acreage so retained.

10. Lessor hereby warrants and agrees to defend title to said land against the claims of all persons whomsoever. Lessor's rights and interests hereunder shall be charged primarily with any mortgages, taxes or other liens, or interest and other charges on said land, but lessor agrees that lessee shall have the right at any time to pay or reduce same for lessor, either before or after maturity, and be subrogated to the rights of the holder thereof and to deduct amounts so paid from royalties or other payments payable or which may become payable to lessor and/or assigns under this lease. If this lease covers a less interest in the oil, gas, sulphur, or other minerals in all or any part of said land than the entire and undivided fee simple estate (whether lessor's interest is herein specified or not), or no interest therein, then royalties and other moneys accruing from any part as to which this lease covers less than such full interest, shall be paid only in the proportion which the interest if any, covered by this lease, bears to the whole and undivided fee simple estate therein. All royalty interest covered by this lease (whether or not owned by lessor) shall be paid out of the royalty herein provided. This lease shall be binding upon each party who executes it without regard to whether it is executed by all those named herein as lessor.

11. If while this lease is in force, at, or after the expiration of the primary term hereof, it is not being continued in force by reason of the shut-in well provisions of paragraph 3 hereof, and lessee is not conducting operations on said land by reason of (1) any law, order, rule or regulation, (whether or not subsequently determined to be invalid) or (2) any other cause, whether similar or dissimilar, (except financial) beyond the reasonable control of lessee, the primary term hereof shall be extended until the first anniversary date hereof occurring ninety (90) or more days following the removal of such delaying cause, and this lease may be extended thereafter by operations as if such delayed had not occurred.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.


LESSOR:

_____

By: _____
Printed Name: _____
Title: _____

ID No.: _____


## ACKNOWLEDGEMENT


STATE OF _____ §
                                                      CORPORATE
COUNTY OF _____ §


Before me, the undersigned Notary Public, personally appeared _____
known to me to be the person whose name is subscribed to the foregoing instrument and known to me to be _____ of
_____ a corporation, and acknowledged to me that he or she executed the same as the act of said corporation for the purposes therein set forth.

Given under my hand and seal of office this _____ day of _____, 2008.

_____
Notary Public in and for the State of _____

My commission expires: _____

SEC 189059

## EXHIBIT "C"

Attached to and made a part of ___Joint Operating Agreement dated May 1, 2008, by and between RAW Oil & Gas, Inc., as Operator and Smith Energy Company, etal, as Non-Operators.___

# ACCOUNTING PROCEDURE

# JOINT OPERATIONS

## I. GENERAL PROVISIONS

**1. Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council or Petroleum Accountants Societies.

**2. Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

**3. Advances and Payments by Non-Operators**

A. Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B. Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at Peoples Bank, Lubbock ___ on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

**4. Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

**COPYRIGHT © 1985 by the Council of Petroleum Accountants Societies.**

SEC 189060

5. **Audits**

A. A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B. The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6. **Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. **Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2. **Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

3. **Labor**

A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

   (2) Salaries of First level Supervisors in the field.

   (3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

   (4) Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation or the Joint Property if such charges are excluded from the overhead rates.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

4. **Employee Benefits**

Operator's current costs or established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

SEC 189061

5. **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6. **Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C. In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

7. **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account.if directly engaged in the operation (not administration) of the joint property.

8. **Equipment and Facilities Furnished By Operator**

A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed _eighteen_ percent (____18____%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. ¯ For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9. **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10. **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

11. **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

SEC 189062

12.   Insurance

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

13.   **Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

14.   **Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

15.   **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

1.   **Overhead - Drilling and Producing Operations**

i.   As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

( X ) Fixed Rate Basis, Paragraph 1A, or
(    ) Percentage Basis, Paragraph 1B

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii.   The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

(    ) shall be covered by the overhead rates, or
( X ) shall not be covered by the overhead rates.

iii.   The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

(    ) shall be covered by the overhead rates, or
( X ) shall not be covered by the overhead rates.

A.   Overhead - Fixed Rate Basis

(1)   Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate $_____7,500.00_____
    (Prorated for less than a full month)

Producing Well Rate $___750.00_____

(2)   Application of Overhead - Fixed Rate Basis shall be as follows:

(a)   Drilling Well Rate

(1)   Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever

- 4 -

SEC 189063

is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

    (b) Producing Well Rates

       (1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

       (2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

       (3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

       (4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

       (5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B.   Overhead - Percentage Basis

    (1) Operator shall charge the Joint Account at the following rates:

       (a) Development

          _____Percent (_____%) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.

       (b) Operating

          _____ Percent (_____%) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

    (2) Application of Overhead - Percentage Basis shall be as follows:

    For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.

2.   **Overhead - Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint

SEC 189064

Account for overhead based on the following rates for any Major Construction project in excess of $_____:

A.    _5_ % of first $100,000 or total cost if less, plus

B.    _3_ % of costs in excess of $100,000 but less than $1,000,000, plus

C.    _2_ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3.    **Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A.    _5_ % of total costs through $100,000; plus

B.    _3_ % of total costs in excess of $100,000 but less than $1,000,000; plus

C.    _2_ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4.    **Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

IV.    **PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS**

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1.    **Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2.    **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A.    New Material (Condition A)

   (1)    Tubular Goods Other than Line Pipe

      (a)    Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at current new price available from area vendors effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

      (b)    For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000

- 6 -

SEC 189065

pound Oil Field Haulers Association interstate truck rate shall be used.

(c) Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

(d) Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

(2) Line Pipe

(a) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(l)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(b) Line Pipe movements (except size 24 inch OD) and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(c) Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

(d) Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

(3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

(4) Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(l) and (2).

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

At seventy-five percent (75%) of current new price, as determined by Paragraph A.

(2) Material used on and moved from the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

(b) At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material

(3) Material not used on and moved from the Joint Property

At seventy-five percent (75%) of current new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

SEC 189066



(2)  Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a)  Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight.  Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b)  Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3)  Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D.  Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E.  Pricing Conditions

(1)  Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2)  Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3.  **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies. strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material.  Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4.  **Warranty of Material Furnished By Operator**

Operator does not warrant the Material furnished.  In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1.  **Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2.  **Reconciliation and Adjustment of Inventories**

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for

- 8 -

SEC 189067


overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4. **Expense of Conducting Inventories**

A. The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B. The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

SEC 189068

**EXHIBIT "D"**

Attached to and made a part of
Operating Agreement dated May 1, 2008, between RAW Oil & Gas Inc., as Operator and
Smith Energy Company, etal, as Non-Operators.

## INSURANCE

Operator shall carry and maintain at all times the following insurance with respect to all operations under this Agreement:

a) Insurance which shall comply with the Workmen's Compensation Laws of the State in which operations hereunder are conducted.

b) Employers' Liability Insurance with limits of not less than $1,000,000 for each occurrence.

c) Comprehensive General Liability Insurance with limits of not less than (i) $1,000,000 for each occurrence for bodily injury, and (ii) $1,000,000 for each occurrence for property damage. Operator shall provide an AFE insurance program with coverage as follows: Premises and operations, sudden and accidental pollution, underground resources, products and completed operations, and blowout, cratering and explosion coverage.

d) Automobile Liability Insurance, including owned, hired and non-hired vehicles, with combined single limits of $500,000.

e) Coverages in subparagraphs (c) and (d) above shall include Non-Operators as Additional Insured.

f) Excess Liability Coverage in excess of the coverage in subparagraphs (a), (b), (c), (d) and (e) above with a combined single limit for Bodily Injury and Property Damage of not less than $1,000,000 for each occurrence.

g) All premiums on the above provided for insurance shall be charged to the Joint Account. Except as may be otherwise expressly provided in the Operating Agreement to which this Exhibit is attached, the Joint Account shall be charged with all liabilities and expenditures resulting from any claims, damages, or losses against which Operator is not required to carry insurance.

h) Operator shall not be liable to Non-Operators for loss, suffered on account of the insufficiency of insurance carried, or of the insurer with whom carried, nor shall Operator be liable to Non-Operators for any loss accruing by reason of Operator's inability to provide or maintain the insurance specified above, provided, however, that if at any time Operator is unable to obtain or maintain such insurance, Operator shall promptly notify Non-Operators in writing of such fact and Non-Operators may obtain and maintain such insurance at their expense.

SEC 189069

Attached to and made a part of
Operating Agreement dated May 1, 2008, between RAW Oil & Gas Inc., as Operator and
Smith Energy Company, etal, as Non-Operators.

## GAS BALANCING AGREEMENT

The parties to the Operating Agreement to which this agreement is attached own the working interest in the gas rights underlying the Contract Area covered by such agreement in accordance with the percentages of participation as set forth in Exhibit "A" to the Operating Agreement.

Each party has made (or will make) arrangements to sell or utilize its share of the gas well gas produced from the Contract Area. However, the respective gas markets of the parties may be limited from time to time; therefore, to permit the parties as much flexibility as possible in meeting the demands of their respective markets, the parties hereto agree to the following storage arrangement:

### Section 1.

From and after the date of initial delivery of gas well gas from any proration unit within the Contract Area, during any period when the market of a party is not sufficient to take that party's full share of the gas well gas produced, the other parties shall be entitled to produce each month, in addition to their own share of production, that portion of any other party's share of production which said party is unable to market, or its purchaser does not take, of the allowable gas production assigned to such proration unit by the appropriate regulatory authority having jurisdiction in the premises or at the maximum efficient rate, if no such allowable gas production is so assigned, except, however, that no party shall be entitled to take or deliver to a purchaser gas production in excess of three hundred percent (300%) of its share of allowable gas production or maximum efficient rate unless that party has gas in storage. The parties hereto shall share in and own the lease condensate (liquid hydrocarbons recovered from such gas by lease equipment) in accordance with their respective above specified interests, upon and subject to the terms of the Operating Agreement.

### Section 2.

A party taking less than its full share of the gas well gas produced shall be credited with gas in storage on a BTU basis equal to its full share of the total gas well gas produced, less such party's share of such gas used in lease operations or vented or lost, and less that portion of such gas such party took or delivered to the purchaser. Operator will maintain a running account of the gas balance as between the parties hereto and will furnish each party monthly statements showing the total quantity of gas well gas produced, the portion thereof used in lease operations, vented or lost, the total quantity of gas well gas delivered to market, and the monthly and cumulative total over and under delivery of each party on an MCF and on a BTU basis.

### Section 3.

After notice, any party may at any time begin taking or delivering to a purchaser its full share of the gas well gas produced (less such party's share of such gas used in the lease operations, vented or lost). To allow the recovery of gas in storage and to balance the gas account of the parties in accordance with their respective interests, a party with gas well gas in storage shall be entitled to take or deliver to a purchaser its full share of the gas well gas produced (less such party's share of such gas used in lease operations, vented or lost), plus a share of gas not exceeding its gas in storage determined by multiplying (1) twenty-five percent (25%), by (2) the interest in the proration unit's current production (less such party's share of such gas used in lease operations, vented or lost) of the party or parties without gas in storage, by (3) a fraction, the numerator of which is the interest in the proration unit of such party with gas in storage and the denominator of which is the total percentage interest in the proration unit of all parties with gas in storage.

### Section 4.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to its purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser. Each party shall at all times use its best efforts to regulate its takes and deliveries from the Contract Area so that wells will not be shut in for over producing the allowable, if any, assigned thereto by the regulatory authority having jurisdiction.

### Section 5.

Each party producing or taking or delivering gas well gas to its purchaser shall pay any and all royalties and production taxes due on such gas.

### Section 6.

Should production of gas well gas from a proration unit be permanently discontinued before the gas account is balanced, settlement will be made between the parties for gas which has not been recovered by any party from storage. In making

such settlement, if there is any party whose gas has not been recovered from storage, or a party who has sold more than its share of gas well gas, then the amount owed (as hereinafter defined) by each of the latter shall be forwarded to the operator who shall allocate the sum of such amounts and pay the former in proration to the respective ownerships in gas not recovered from storage. The amount owed by each party who has sold more than its share of gas well gas shall be the weighted average of the amounts received by such party upon sale of such gas during the period or periods overproduction is accrued by such party, less base lease royalty and taxes paid thereon; provided, however, that as to gas sold in interstate commerce by such party, such amounts shall be based upon that portion of the rate or rates not subject to refund applicable to and collected for the volumes sold during such period or periods by such party under orders of the regulatory body having jurisdiction which are final at the time of such settlement, plus any additional collected amounts which are not ultimately required by said body to be refunded, such additional collected amounts to be accounted for at such time as final determination is made with respect thereto. For the purpose of the preceding sentence, the weighted average of the amounts received by such party shall be determined by weighting the respective amounts received for such gas on the basis of volumes of overproduction that accrue hereunder to the account of such party during the period for which such amount was received. As to any gas which any party hereto may take for its own use or sell to a third party purchaser affiliated with such selling party such sum or amount of money for the amount of such gas thereof shall be based upon the rate which would have been received by the under produced party as if such gas had been taken during the period or periods of underproduction under its contract with a nonaffiliated third party purchaser, but, if the underproduced party has no such contract, such sum or amount of money shall be based on the average rate received by other parties hereto for their share of gas during the affected period.

Section 7.

This agreement shall constitute a separate agreement as to each proration unit within the Contract Area and shall become effective in accordance with its terms and shall remain in force and effect as long as the Operating Agreement to which it is attached remains in effect, and shall inure to the benefit of and be binding upon the parties, their successors, legal representatives and assigns.

Section 8.

Nothing herein shall change or affect each party's obligations to pay its proportionate share of all costs and liabilities incurred in lease operations in accordance with and subject to the provisions of the Operating Agreement.

SEC 189071

# TAB E

# North Mound Lake Letter (DX 1345)
## (incorrectly dated as January 17, 2008 instead of July)

# RAW Oil & Gas Inc.

*12312 Slide Road*
*Lubbock, Texas 79424*

*(806) 771-7766*

January 17, 2008

Mark P. Hardwick
P.O. Box 213
Midland, Texas 79702

Re:    N. Mound Lake Prospect
        Section 39, Block E, EL&RR Ry. Co.
        Lynn and Terry Counties, Texas

Dear Mark:

This letter is to set out our verbal agreement of your participation in RAW Energy's N. Mound Lake Prospect covering the lands captioned above.

RAW Energy, L.C. has is entering into certain Oil and Gas Leases covering the above captioned lands. RAW agrees to assign Mark P. Hardwick a 6.25% leasehold interest, delivering the same net revenue that the leases are originally burdened with retaining no additional ORRI. RAW further agrees to carry Mark P. Hardwick for the 6.25% percent leasehold working interest to the casing point in the first well drilled on the lease. This carried interest also includes all leasehold cost prior to drilling the first well. Hardwick will pay his way on the completion cost of the first well and all subsequent operations including any additional acreage purchases within the AMI area as defined in the Joint Operating agreement which is governing the prospects operations.

Additionally, RAW anticipates selling the prospect with a Geological cost of $50,000.00 charged to the buyer. Upon selling the prospect, RAW will pay Hardwick $12,500.00 of the total Geological cost.

RAW's obligations above will be proportionally reduced as to the amount of Leasehold Interest RAW acquires. If RAW acquires 50% of the leasehold, its above obligations will be reduced by one-half.

Thank you and if the above adequately stated our verbal agreement covering the Parks Prospect, please indicate by signing below and returning one copy of this letter to my office.

Very truly yours,

Agreed to and accepted:

Mark P. Hardwick

DEFENDANT'S
TRIAL EXHIBIT

1345

SECA274635

# TAB F

# Big Bump
# Participation Agreement
# & Operating Agreement
# (DX 1354)

# BIG BUMP PROSPECT
## LYNN COUNTY, TEXAS
### PARTICIPATION AGREEMENT

This Participation Agreement (the "Agreement") dated and effective as of the 19th day of October, 2009 (the "Effective Date"), is entered into by and between **RAW Oil & Gas, Inc.** ("RAW"), **JDH RAW Energy, L.C.**, formerly known as RAW Energy, L.C. ("RAW LC"), **Mark P. Hardwick** ("Hardwick"), **Steve Blaylock** ("Blaylock"), **Elger Exploration, Inc.** ("Elger"), and **Smith Energy Company** ("Smith"). Hardwick, Blaylock, and Elger are at times referred to collectively as the "RAW Participants" and, together with Smith, the "Participants". The Participants, RAW and RAW LC, are at times referred to individually as a "Party" and collectively as the "Parties."

WHEREAS, RAW LC is purchasing Leases covering the lands set out on Exhibit "A", attached hereto ("Prospect Area"); and

WHEREAS, the Parties have agreed to participate in a program to explore for and develop oil and gas within the Prospect Area in the undivided percentages set forth below, all in accordance with the terms herein; and

WHEREAS, the Parties intend that Smith shall own an undivided 75.0% interest in and to the Leases acquired covering the lands defined in Exhibit "A", and Smith shall pay 100.0% of the acreage and land costs associated with the Prospects. (Acreage cost should average between $100.00 and $300.00 per acre and the land cost will consist of brokerage, leasing, and title opinion cost). In addition, a onetime geological prospect generation fee of $50,000.00 will be payable by Smith upon the execution of this Agreement. Smith shall pay 100.0% of all expenses incurred in connection with the drilling expenses (through the casing point election) on the first well drilled on the Prospect. Smith shall pay 75.0% of all expenses incurred in connection with the equipping, completion and lease operating. The Participants shall become parties to the AAPL Form 610—1989 Joint Operating Agreement ("Operating Agreement"), dated November 1, 2009, naming RAW as Operator and covering operations with respect to the Leases. *(If RAW is unable to secure Leases and or assignments or farmouts on 100% of the mineral/leasehold interest in the initial drillsite tract, Smith's obligations above will be proportionally reduced in relation to the amount of interest RAW has acquired. This proportionate reduction includes, but is not limited to, land cost, acreage cost, drilling and completion cost. This does not include the one time geological cost of $50,000.00 which is payable upon the execution of this Agreement.)*

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants, agreements and obligations set forth herein and to be performed, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the Parties hereto, the Parties agree as follows:

1. Definitions.

(a) "Affiliate" means, with respect to any party, a person or entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the party in question. As used in the definition of "Affiliate", the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a party, whether through ownership of voting securities, by contract or otherwise.

(b) "Prospect Area" shall mean the areas defined on Exhibit "A".



DEFENDANT'S TRIAL EXHIBIT 1354

SEC 189648

(c) "Casing Point Election" means the well has been drilled to the objective depth, at which time the owners of the majority of the interests will decide whether to commit additional dollars to "setting pipe" to attempt a completion or to plug and abandon as non-commercial.

2. Representations and Warranties of RAW. RAW represents and warrants to Participants the following:

(a) Without making any warranty or representation of any kind relating to the title of any lessor to the minerals covered by the Leases (any such warranty being expressly disclaimed), RAW represents and warrants that it is the owner of such of the rights of lessee under the Leases as are to be assigned to Participants pursuant to the provisions hereof; that it has good and sufficient title to such interest and rights; and that it has the right, power and authority to sell and transfer said interests and rights to Participants.

(b) There are no proceedings, judgments or liens now pending or, to the knowledge of RAW threatened against RAW which would affect the Leases or the Prospect Area except those as have been previously disclosed to Participants in writing.

(c) The interest in the Leases to be assigned to Participants will be assigned free and clear of any liens, claims or encumbrances upon said Leases created by, through or under RAW.

3. Covenants of RAW. RAW, as Operator under the Operating Agreement, covenants and agrees to perform the terms of, and provide the documents, information and data required by, Schedule A attached hereto.

4. Acknowledgments by the Parties. The Parties acknowledge and agree to the following:

(a) The Parties shall execute and record in Lynn County, Texas a memorandum of this Agreement.

(b) The Parties represent and warrant to each other that the interests in the Leases acquired by them hereunder are being acquired for investment only and not with a view to any "distribution" (as such term is used in the Securities Act of 1993, as amended) thereof, and neither of them shall offer to sell or otherwise dispose of the Leases so acquired by it in violation of any of the registration requirements of the Securities Act of 1993, as amended, or any applicable state securities laws, and that each of the Parties qualifies as an "accredited investor" as defined in Regulation D under the Securities Act of 1993, as amended.

(c) The Parties represent and warrant to each other that each has received information regarding the interest in the Leases being acquired by it pursuant to this Agreement, each has been provided access to any and all written information, documents and materials that it has requested, has obtained to the satisfaction of itself and its counsel answers to all inquiries made by it and has been given an opportunity to obtain all answers and information that it believes necessary or appropriate to evaluate the suitability of an investment in the interests in the Leases being acquired by it; and, in evaluating the suitability of an investment therein, neither it nor its counsel has relied upon any representations or other information (whether oral or written) other than as set forth herein.

(d) The Parties represent and warrant to each other that (i) each can bear the economic risk of losing its entire investment in the interests in the Leases, and (ii) each has adequate means for providing for its current financial needs and contingencies, does not have as an investment objective the immediate receipt of income and has no need for liquidity in an investment in such interests.

2

SEC 189649

5. Interests Assigned to the Participants.

(a) RAW LC hereby agrees to assign to Smith 75.0% of 8/8ths of its rights and interests existing under each of the Leases, burdened only by the royalty payable to the Lessor of each Lease, without any other reduction. Immediately on payment of all initial acreage, geological and land costs for which Smith is obligated to RAW in this Agreement, Smith shall be entitled to an assignment of its working interest, and related net revenue interest, in the area earned by such participation.

(b) RAW LC hereby agrees to assign to each of the RAW Participants 6.25% of 8/8ths of its rights and interests existing under the Leases. When assignments of record title to the Leases are made by RAW, each of the RAW Participants shall receive an assignment of its proportionate undivided working interest and attributable net revenue interest in and to each Lease in which the Participants are entitled to receive an interest pursuant to this Participation Agreement and the Operating Agreement.

(c) Except as stated in paragraph 5(a) above, the interests assigned to each Participant pursuant to this Agreement are hereby expressly assigned subject to their proportionate part of all of the terms, covenants, reversionary interests and other production burdens referenced in the following:

(i) each Lease; and
(ii) the Operating Agreement referenced in paragraph 11 below.

6. Duties and Role of RAW. RAW has been designated the Operator in accordance with the Operating Agreement. As such, RAW, in addition to any other duties assigned to it pursuant to the Operating Agreement, shall have the overall responsibility to conduct all negotiations with landowners in the Prospect Area, conduct all title investigations required by this Agreement, conduct drilling operations, select acreage to lease, and carry out production operations.

7. Participation of the Parties in the Prospect Area 3D Seismic, and Subsequent Wells.

(a) Smith agrees to reimburse RAW for 100.0% of the acreage and land costs associated with the Prospect Area. In addition, upon execution of this agreement, Smith will pay a one-time $50,000 geological/geophysical prospect generation fee to RAW, Hardwick, Blaylock and Elger, in equal shares. For consideration for payment of the prospect fee, Smith shall have the right to view all 3D seismic data and all geophysical and all geophysical and geologic data and interpretations in the possession of any other Party, subject to any confidentiality or license items relating to the 3D data.

(b) It is understood and agreed that RAW, as Operator, will use its commercially reasonable efforts to commence operations for the drilling of the initial well as the Prospect well promptly after the relevant Leases have been acquired, but, in any event, no later than April 1, 2010 unless otherwise agreed by the holders of a majority of the Interests. Enclosed herewith is RAW's Authorization For Expenditure ("AFE") which shows the total estimated costs to drill, complete and equip such well. In no event, without the written approval of the holders of a majority of the Interests, shall a lapse of the AFE serve to extend the time within which Operator is required to commence operations for the drilling of a well.

(c) RAW and the RAW Participants shall be collectively entitled to an undivided 25.0% working interest carried to the casing point on the initial well drilled on the Prospect Area. All subsequent wells will be on a heads-up basis.

(d) As to all wells drilled within the Prospect Area, each will be subject to a casing point election at which, if any Party elects not to participate in such drilling or completion, such Party will relinquish and

3

SEC 189650

assign to the participating Parties all of its or their leasehold interests in and to the well and the Prospect Area as defined in Exhibit "A".

In the event that any Party elects not to participate in a completion attempt, the non-consenting Party will be subject to the provisions in the governing JOA.

(e) No Party shall have the right to reinstatement of an interest in a well or acreage relinquished in accordance with this Section 7, whether by payment of a cash penalty, production penalty, or otherwise.

(f) In the event of a default by RAW or RAW LC or RAW Participants, as defined and described in Article VII of the Operating Agreement, the Participants shall have the right to exercise any and all remedies available to the non-defaulting Parties specified in Article VII of the Operating Agreement, which are incorporated herein by reference.

8. Area of Mutual Interest ("AMI") and Right of First Refusal.

(a) No Party, either directly or through an Affiliate, may transfer or acquire any lease, royalty, overriding royalty or other interest of any type in the mineral estate or any petroleum exploration or seismic license (individually and collectively an "Interest"), or participate in the acquisition of any Interest from a third party holding any Interest, which Interest is located partially or entirely within the Prospect Area, other than in accordance with the provisions of this paragraph and the Operating Agreement.

(b) The parties to this Participation Agreement hereby create an Area of Mutual Interest ("AMI"), which will consist of all of the lands included within the Contract Area described in Exhibit "A" to the Operating Agreement dated November 1, 2009. The AMI shall remain in effect for so long as any Lease in which some or all of the Parties own an interest remains in effect or until January 1, 2020, whichever first occurs. The Parties hereby incorporate by reference the provisions of Article XVI,M of the Operating Agreement into this Agreement as is set out in full as the AMI terms and procedures.

(c) The Parties to this Participation Agreement hereby grant to each other a preferential right to purchase all or any part of a Party's Interest which is to be Transferred to any third party other than a Permitted Assignee, all as defined below.

(i)   If the Party desires to Transfer, as defined below, its Interests, or any portion, in this Agreement or the AMI (a "Transferor Party(ies)"), Transferor Party(ies) must first provide written notice of such intent to the other Parties. If the proposed Transfer is to a Permitted Assignee, the non-transferring Parties shall not have a Right of First Refusal as to that Transfer. If the proposed Transfer is to a Party other than a Permitted Assignee, as defined below, the non-transferring Parties shall then have the right ("Right of First Refusal"), but not the obligation, to purchase their proportionate share of the offered portion of the Interests pursuant to this paragraph. The non-Transferor Parties shall have thirty (30) days from receipt of such notice within which to determine whether it or they elect to purchase the offered Interests. If the proposed Transfer is to a Permitted Assignee, the non-Transferor will not have a Right of First Refusal but the Permitted Assignee must ratify this Agreement and the applicable Operating Agreement and the Transferor shall be jointly and severally liable for all liabilities and obligations of the Permitted Assignee under this Agreement and the Operating Agreement. "Transfer" means any sale, lease, conveyance, gift, transfer, exchange, assignment, disposition by will or inheritance or other disposition of (or any agreement or arrangement to sell, lease, convey, gift, transfer, exchange, assign, or otherwise dispose of) all or any portion of the Transferor Parties' Interests in any manner,

4

SEC 189651

directly or indirectly, whether for money, other consideration or otherwise. "Permitted Assignee" means: (w) a spouse, descendants or relative of the Transferor Party; (x) the spouse, descendants or relative of the controlling person of a Transferor Party or the spouse, descendants or relative of a manager of a Transferor Party; (y) a legal entity including but not limited to any Trust, partnership, or company controlled by the Transferor Party or by the spouse, descendants or relatives of the Transferor Party; and (z) any employee, consultant or person under contract to a Transferor Party (or any Trust, entity or partnership owned by such person).

(ii) If the Transfer contemplated by section 8(c)(i) above results from a bona fide offer to purchase from a third party, exercise of the non-Transferor Parties' Right of First Refusal shall be based on the same terms and conditions as the third party offer. If the Transfer contemplated by section 8(c)(i) above is not the result of a bona fide third party offer, the non-Transferor and the Transferor Parties shall attempt to agree upon a purchase price for the Transferred Interests. In the event the Parties fail to agree upon a purchase price for the Transferred Interests within ten (10) days after exercise by the non-Transferor Parties of their Right of First Refusal, then the Transferor Party shall not be allowed to Transfer the Transferred Interest to the third party and the Non-Transferor Party shall not be entitled to purchase the Transferred Interest. The provisions of Section 8 shall apply to any future Transfer by the Transferor Party.

9. Financing. Any party shall have the right to arrange its own financing for any wells or other projects to be conducted on the Prospect Area without any obligation to provide, or assist the other in obtaining, similar financing. No party shall encumber the rights and interests of any other party in the Prospect Area. A Party shall have the right to pledge, mortgage or encumber all or any part of its interest in the Prospect Area without triggering a Right of First Refusal under Section 8; provided that any pledge, mortgage or encumbrance will be subject to the following restrictions and conditions:

(i) the lender or secured party shall acknowledge in writing that the interest pledged is subject to this Agreement and the Operating Agreement;

(ii) the document creating the pledge or encumbrance must expressly state that upon foreclosure on the pledged interest, the lender or secured party will receive the pledged interest subject to this Agreement and the Operating Agreement; and

(iii) prior to any subsequent Transfer of the interest by the lender or secured party, the lender or secured party must comply with the procedures set forth in Section 8(c)(ii) and the other Parties shall have the Right of First Refusal set forth in Section 8(c)(ii).

10. Indemnification. **Each party shall indemnify, defend and save harmless each other party and its officers, directors, employees, agents and attorneys, and each of them (the "Indemnified Parties"), from and against any and all commenced or threatened claims, actions, suits, litigation, administrative or enforcement proceedings or investigations (including any proceeding or action under any federal or state law) and other legal proceedings, and all damages, costs, interest charges, counsel fees and other expenses and penalties related thereto (collectively "Claims" or individually a "Claim") which any of the Indemnified Parties may sustain or incur by reason of or arising from or related to (i) any breach by the indemnifying party of any representation, warranty, covenant or agreement or (ii) the transfer by or through the indemnifying party of any interests herein or in the Lease. The indemnification set forth in this Section 10 shall not cover any Claim arising from or related to any gross negligence or willful misconduct of an Indemnified Party.**

5

SEC 189652

11. Operating Agreement. Upon execution of this Agreement, Participants agree to execute the Operating Agreement substantially in the form attached hereto as Exhibit B. In the event of conflict between the provisions of this Agreement and the Operating Agreement, the provisions of this Agreement shall be controlling. In any assignment executed by any Party conveying part or all of the interests acquired by it pursuant hereto, such Party agrees to include the following provision:

> The Interests conveyed hereby are subject to the terms and provisions of that certain Participation Agreement dated effective October 19, 2009 and that certain Operating Agreement dated November 1, 2009, between RAW Oil & Gas, Inc. as Operator, and Smith Energy Company, *et al* as Non-Operators.

12. Confidentiality. Each Party agrees that the terms of this Agreement and all information obtained or derived from the drilling operations conducted on the Prospect and all geologic and engineering information, data and interpretations relating to the Prospect or the Contract Area is proprietary to the Parties and constitute valuable Trade secrets. Therefore, the Parties agree to maintain the confidentiality of all such information and no Party shall have the right to disclose or Transfer any data or information to a third party without the written consent of all Parties; provided a Party may show the information to consultants and advisors under contract to the Party who has acknowledged in writing that the data is subject to the restrictions in this Agreement.

13. Survival of Representations and Warranties. All representations and warranties contained herein or made in writing in connection herewith shall survive the execution hereof for a period of one (1) year after the date hereof except for those set forth in Section 2(a) and Section 2(c) which shall survive without limitation as to time. All covenants contained herein shall survive without limitation as to time.

14. Additional Acts. Each Party will execute and deliver all such other and additional instruments and will do such other acts and things as may be necessary to assure more fully to the other that all respective rights intended to be conveyed and granted are conveyed and granted.

15. Notices. All notices or other communications given pursuant hereto shall be deemed given when delivered, if delivered in person; one (1) day after deposit with an overnight carrier such as Federal Express for delivery on the next calendar day; the day of transmission by telecopy (if confirmed by notice sent by Federal Express or a similar overnight carrier for receipt the next day); or five (5) days after mailing if sent certified mail, return receipt requested. All notices shall be given at the following addresses, unless any party changing its notice address shall notify all other parties in writing of such change:

> RAW Oil & Gas, Inc.
> JDH RAW Energy, L.C.
> 12312 Slide Road
> Lubbock, Texas 79424
> Attn: Joe D. Hardin
> Fax: (806) 771-7766
>
> Smith Energy Company
> Attn: Lester Smith, President
> 1001 Fannin, Suite 3850,
> Houston, Texas 77002
> Fax: (713) 759-0706

6

SEC 189653

Mark P. Hardwick
P. O. Box 213
Midland, Texas 79702

Steve Blaylock
214 West Texas, Suite 306
Midland, Texas 79701

Elger Exploration, Inc.
P. O. Box 2623
Midland, Texas 79702
Attention: Jerry Elger, President

16. Governing Law. The interpretation, validity and enforceability of this Agreement shall be governed by the laws of the State of Texas other than its conflict of law principles.

17. Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.

**RAW OIL & GAS, INC.**                        **JDH RAW ENERGY, L.C.**


By: _____          By: _____
    Joe D. Hardin, President                      Joe D. Hardin, Manager



**SMITH ENERGY COMPANY**                 **ELGER EXPLORATION, INC.**

By: _____          By: _____
    Lester Smith, President                      Jerry Elger, President



_____              _____
    Mark P. Hardwick                              Steve Blaylock

7

SEC 189654

## SCHEDULE A

1.  Prior to commencing operations on a well, RAW shall furnish or cause to be furnished to Participants a location plat, an AFE detailing estimated dry hole and completion costs, the date of commencement of operations, the proposed spud date and a drilling title opinion covering the drillsite tract along with copies of any curative documents obtained in connection therewith.

2.  RAW shall provide to Participants, upon request, a seismic and/or subsurface map depicting the structure(s) to be encountered and, on request, make available the data used to make such map.

3.  RAW shall furnish or cause to be furnished to Participants the date drilling is commenced, daily drilling reports, by fax and in writing, containing customary information; and advance notice of coring, testing and running surveys so that a representative can be present and have access to all well information.

4.  With respect to all wells, RAW shall test or cause to be tested all prospective hydrocarbon bearing horizons, run appropriate electric logs and furnish to Participants a field print, copy of such log(s) and other well data.

5.  After well completion, RAW shall furnish or cause to be furnished to Participants a final print of log(s) and notices to all governmental authorities.

8

SEC 189655

Attached to and made a part of Participation Agreement
dated October 19, 2008, by and between
RAW Oil & Gas, Inc., JDH Raw Energy, L.C., Smith Energy Company,
Mark P. Hardwick, Steve Blaylock, and Elger Exploration, Inc.

**Prospect and AMI Area**

Section 55, Abstract 394, Georgetown Ry. Co. Survey, Lynn County, Texas (640.00 ac.)

South Half of Section 57, Abstract ___, Georgetown Ry. Co. Survey, Lynn County, Texas (320.00 ac.)

West 200 Acres of Section 20, Abstract 948, D&SE Ry. Co. Survey, Lynn County, Texas (200 ac.)

North 200 Acres of Section 7, Abstract 998, Block C-40, PSL Survey, Lynn County, Texas (200 ac.)

SEC 189656

EXHIBIT "B"

Attached to and made a part of
Participation Agreement dated November 1, 2009, between RAW Oil & Gas Inc., as Operator
and
Smith Energy Company, etal, as Non-Operators

A.A.P.L. FORM 610 - 1989

# MODEL FORM OPERATING AGREEMENT

## BIG BUMP PROSPECT

OPERATING AGREEMENT

DATED

<u>NOVEMBER 1</u> , <u>2009</u>
<span style="font-size:small">year</span>

OPERATOR   <u>RAW Oil & Gas, Inc.</u>

CONTRACT AREA   <u>See Exhibit "A"</u>

COUNTY OR PARISH OF  <u>LYNN</u>                    , STATE OF   <u>TEXAS</u>

COPYRIGHT 1989 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS, 76137, APPROVED FORM.

A.A.P.L NO. 610 -- 1989

SEC 189657

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS: | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION: | 2 |
| | C. SUBSEQUENTLY CREATED INTERESTS: | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION: | 2 |
| | B. LOSS OR FAILURE OF TITLE: | 3 |
| |   1. Failure of Title | 3 |
| |   2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| |   3. Other Losses | 3 |
| |   4. Curing Title | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR: | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR: | 4 |
| |   1. Resignation or Removal of Operator | 4 |
| |   2. Selection of Successor Operator | 4 |
| |   3. Effect of Bankruptcy | 4 |
| | C. EMPLOYEES AND CONTRACTORS: | 4 |
| | D. RIGHTS AND DUTIES OF OPERATOR: | 4 |
| |   1. Competitive Rates and Use of Affiliates | 4 |
| |   2. Discharge of Joint Account Obligations | 4 |
| |   3. Protection from Liens | 4 |
| |   4. Custody of Funds | 5 |
| |   5. Access to Contract Area and Records | 5 |
| |   6. Filing and Furnishing Governmental Reports | 5 |
| |   7. Drilling and Testing Operations | 5 |
| |   8. Cost Estimates | 5 |
| |   9. Insurance | 5 |
| VI. | DRILLING AND DEVELOPMENT | 5 |
| | A. INITIAL WELL: | 5 |
| | B. SUBSEQUENT OPERATIONS: | 5 |
| |   1. Proposed Operations | 5 |
| |   2. Operations by Less Than All Parties | 6 |
| |   3. Stand-By Costs | 7 |
| |   4. Deepening | 8 |
| |   5. Sidetracking | 8 |
| |   6. Order of Preference of Operations | 8 |
| |   7. Conformity to Spacing Pattern | 9 |
| |   8. Paying Wells | 9 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK: | 9 |
| |   1. Completion | 9 |
| |   2. Rework, Recomplete or Plug Back | 9 |
| | D. OTHER OPERATIONS: | 9 |
| | E. ABANDONMENT OF WELLS: | 9 |
| |   1. Abandonment of Dry Holes | 9 |
| |   2. Abandonment of Wells That Have Produced | 10 |
| |   3. Abandonment of Non-Consent Operations | 10 |
| | F. TERMINATION OF OPERATIONS: | 10 |
| | G. TAKING PRODUCTION IN KIND: | 10 |
| |   (Option 1) Gas Balancing Agreement | 10 |
| |   (Option 2) No Gas Balancing Agreement | 11 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 11 |
| | A. LIABILITY OF PARTIES: | 11 |
| | B. LIENS AND SECURITY INTERESTS: | 12 |
| | C. ADVANCES: | 12 |
| | D. DEFAULTS AND REMEDIES: | 12 |
| |   1. Suspension of Rights | 13 |
| |   2. Suit for Damages | 13 |
| |   3. Deemed Non-Consent | 13 |
| |   4. Advance Payment | 13 |
| |   5. Costs and Attorneys' Fees | 13 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES: | 13 |
| | F. TAXES: | 13 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 14 |
| | A. SURRENDER OF LEASES: | 14 |
| | B. RENEWAL OR EXTENSION OF LEASES: | 14 |
| | C. ACREAGE OR CASH CONTRIBUTIONS: | 14 |

i

SEC 189658

## TABLE OF CONTENTS

D. ASSIGNMENT; MAINTENANCE OF UNIFORM INTEREST: .................................................15
E. WAIVER OF RIGHTS TO PARTITION: ..................................................................15
F. PREFERENTIAL RIGHT TO PURCHASE: ...............................................................15
IX. INTERNAL REVENUE CODE ELECTION ................................................................15
X. CLAIMS AND LAWSUITS ............................................................................15
XI. FORCE MAJEURE ...................................................................................16
XII. NOTICES ........................................................................................16
XIII. TERM OF AGREEMENT .............................................................................16
XIV. COMPLIANCE WITH LAWS AND REGULATIONS ..........................................................16
    A. LAWS, REGULATIONS AND ORDERS: .................................................................16
    B. GOVERNING LAW: ................................................................................16
    C. REGULATORY AGENCIES: .........................................................................16
XV. MISCELLANEOUS ..................................................................................17
    A. EXECUTION: ....................................................................................17
    B. SUCCESSORS AND ASSIGNS: ......................................................................17
    C. COUNTERPARTS: .................................................................................17
    D. SEVERABILITY ..................................................................................17
XVI. OTHER PROVISIONS ...............................................................................17

SEC 189659

# A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___RAW Oil & Gas, Inc._____ ,
hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

## ARTICLE I.
## DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of estimating the costs to be incurred in conducting an operation hereunder.

B. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production testing conducted in such operation.

C. The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be developed and operated for Oil and Gas purposes under this agreement. Such lands, Oil and Gas Leases and Oil and Gas Interests are described in Exhibit "A."

D. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the lesser.

E. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

F. The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.

G. The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be located.

H. The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.

I. The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as provided in Article VI.B.2.

J. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

K. The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

L. The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts of land lying within the Contract Area which are owned by parties to this agreement.

M. The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

N. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone.

O. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned in order to attempt a Completion in a different Zone within the existing wellbore.

P. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or improve production in a Zone which is currently open to production in the wellbore. Such operations include, but are not limited to, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Recompleting, or Plugging Back of a well.

Q. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties.

R. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

## ARTICLE II.
## EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

__X__ A. Exhibit "A," shall include the following information:
    (1) Description of lands subject to this agreement,
    (2) Restrictions, if any, as to depths, formations, or substances,
    (3) Parties to agreement with addresses and telephone numbers for notice purposes,
    (4) Percentages or fractional interests of parties to this agreement,
    (5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement,
    (6) Burdens on production.

__X__ B. Exhibit "B," Form of Lease.
__X__ C. Exhibit "C," Accounting Procedure.
__X__ D. Exhibit "D," Insurance.
__X__ E. Exhibit "E," Gas Balancing Agreement.
_____ F. ~~Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.~~
__X__ G. Exhibit "G," Tax Partnership.
_____ H. Other: _____

- 1 -

SEC 189660

If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

## ARTICLE III.
## INTERESTS OF PARTIES

A. Oil and Gas Interests:

If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B," and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.

B. Interests of Parties in Costs and Production:

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area up to, but not in excess of, existing lease burdens _____ and shall indemnify, defend and hold the other parties free from any liability therefor. Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s) which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any liability therefor.

No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby, and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

C. Subsequently Created Interests:

If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production payment, net profits interest, assignment of production or other burden payable out of production attributable to its working interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interests, or other burden payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's Lease or Interest to exceed the amount stipulated in Article III.B. above.

The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

## ARTICLE IV.
## TITLES

A. Title Examination:

Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and, if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in procuring abstracts, fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in royalty opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection with Leases or Oil and Gas Interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings. Costs incurred by Operator, including fees paid to outside attorneys, which are associated with hearings before governmental agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C."

- 2 -

SEC 189661

Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the Drilling Parties in such well.

B. Loss or Failure of Title:

1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas Leases and Interests; and,

(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;

(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed Lease or Interest;

(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;

(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received production for which such accounting is required based on the amount of such production received, and each such party shall severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;

(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and

(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest is reflected on Exhibit "A."

2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas Lease or interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A" shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest, calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest, it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or Interest, on an acreage basis, up to the amount of unrecovered costs;

(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination, would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties in proportion to their respective interests reflected on Exhibit "A"; and,

(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.

3. Other Losses: All losses of Leases or Interests committed to this agreement, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

4. Curing Title: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B. shall not apply to such acquisition.

- 3 -

SEC 189662

ARTICLE V.

OPERATOR

A. Designation and Responsibilities of Operator:

RAW Oil & Gas, Inc. _____ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

B. Resignation or Removal of Operator and Selection of Successor:

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. ~~Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.~~

Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

3. Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

C. Employees and Contractors:

The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined Operator, and all such employees or contractors shall be the employees or contractors of Operator.

D. Rights and Duties of Operator:

1. Competitive Rates and Use of Affiliates: All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from

- 4 -

SEC 189663

liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.

5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each Non-Operator or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C."

6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder, including but not limited to the Initial Well:

(a) Operator will promptly advise Non-Operators of the date on which the well is spudded, or the date on which drilling operations are commenced.

(b) Operator will send to Non-Operators such reports, test results and notices regarding the progress of operations on the well as the Non-Operators shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.

(c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

8. Cost Estimates: Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

## ARTICLE VI.
## DRILLING AND DEVELOPMENT

A. Initial Well:

On or before the ___1st___ day of ___April___, 2010, Operator shall commence the drilling of the Initial Well at the following location:

Mutually agreed upon location within the Contract Area to be determined at a later date by all the parties to this Agreement

and shall thereafter continue the drilling of the well with due diligence to penetrate the Fusselman Formation.

The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation in Completion operations and Article VI.F. as to termination of operations and Article XI as to occurrence of force majeure.

B. Subsequent Operations:

1. Proposed Operations: If any party hereto should desire to drill any well on the Contract Area other than the Initial Well, or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone

- 5 -

SEC 189664

under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be performed, the location, proposed depth, objective Zone and the estimated cost of the operation. The parties to whom such a notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties within the time and in the manner provided in Article VI.B.6.

If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation, reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance with Article VI.B.5. in the event of a Sidetracking operation.

2. Operations by Less Than All Parties:

(a) Determination of Participation. If any party to whom such notice is delivered as provided in Article VI.B.1. or VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties' interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10) days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period. If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the period provided in Article VI.B.1., subject to the same extension right as provided therein.

(b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense; provided, however, that those Non-Consenting Parties that participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened, Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking, Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking,

- 6 -

SEC 189665

Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non-Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes, royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

(i) _____ % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and

(ii) _____ % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening, Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C., and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions of this Article VI.B.2. (b) shall apply to such party's interest.

(c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties _____% of that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

(d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem, production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.C.

In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back, Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing, Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of Oil and Gas produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking, Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and Exhibit "C" attached hereto.

3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise terminated pursuant to Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking,

- 7 -

SEC 189666

Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.

4. Deepening: If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone of which the parties were given notice under Article VI.B.1. ("Initial Objective"). Such well shall not be Deepened beyond the Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate in the Deepening operation.

In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective, such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation, such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses.

(a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the sole account of Consenting Parties.

(b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the well for Deepening

The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article VI.F.

5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore to be utilized as follows:

(a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

(b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking operation is initiated shall be determined in accordance with the provisions of Exhibit "C."

6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required shall be deemed not to have voted. The proposal receiving the vote of parties owning the largest aggregate percentage interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the

- 8 -

SEC 189667

initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty-four (24) hours if a rig is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within such period shall be deemed an election not to participate in the prevailing proposal.

7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone.

8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except with the consent of all parties that have not relinquished interests in the well at the time of such operation.

C. Completion of Wells; Reworking and Plugging Back:

1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling, Deepening or Sidetracking shall include:

☐ Option No. 1: All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completing and equipping of the well, including necessary tankage and/or surface facilities.

☐ Option No. 2: All necessary expenditures for the drilling, Deepening or Sidetracking and testing of the well. When such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to participate in a Completion attempt whether or not Operator recommends attempting to Complete the well, together with Operator's AFE for Completion costs if not previously provided. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an accompanying AFE. Operator shall deliver any such Completion proposal, or any Completion proposal conflicting with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the procedures specified in Article VI.B.6. Election to participate in a Completion attempt shall include consent to all necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface facilities but excluding any stimulation operation not contained on the Completion AFE. Failure of any party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of conflicting Completion proposals. If one or more, but less than all of the parties, elect to attempt a Completion, the provision of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations thereafter conducted by less than all parties; provided, however, that Article VI.B.2. shall apply separately to each separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier Completions or Recompletion have recouped their costs pursuant to Article VI.B.2.; provided further, that any recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in which the Completion attempt is made. Election by a previous Non-Consenting party to participate in a subsequent Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt, insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a Completion attempt.

2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked, Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the Reworking, Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and Completing and equipping of said well, including necessary tankage and/or surface facilities.

D. Other Operations:

Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of _____ Twenty-five thousand _____ Dollars ($_25,000.00____) except in connection with the drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so requesting an information copy thereof for any single project costing in excess of __Twenty-five thousand_____ Dollars ($_25,000.00_____). Any party who has not relinquished its interest in a well shall have the right to propose that Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the amount first set forth above in this Article VI.D. (except in connection with an operation required to be performed under Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively be those Articles). Operator shall deliver such proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent of any party or parties owning at least ____50____% of the interests of the parties entitled to participate in such operation, each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms of the proposal.

E. Abandonment of Wells:

1. Abandonment of Dry Holes: Except for any well drilled or Deepened pursuant to Article VI.B.2., any well which has been drilled or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be

SEC 189668

plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and restoring the surface, for which the abandoning parties shall remain proportionately liable.

2. Abandonment of Wells That Have Produced: Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well within the required period or thereafter to conduct operations on such well shall entitle operator to retain or take possession of such well and plug and abandon the well.

Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the interest of the abandoning party is or includes and Oil and Gas Interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest in a portion of the well shall pay their proportionate shares of abandonment and surface restoration cost for such well as provided in Article VI.B.2.(b).

F. Termination of Operations:

Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing, Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without consent of parties bearing 50.0% of the costs of such operation; provided, however, that in the event granite or other practically impenetrable substance or condition in the hole is encountered which renders further operations impractical, Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1, and the provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.

G. Taking Production in Kind:

☐ Option No. 1: Gas Balancing Agreement Attached

Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment

- 10 -

SEC 189669

directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing basis to be used.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

☐ Option No. 2: No Gas Balancing Agreement:

~~Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditures incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.~~

~~Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.~~

~~If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase contract having a term extending beyond such ten (10) day period. Any purchase or sale by Operator of any other party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.~~

~~Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation fee equal to that received under any existing market or transportation arrangement. The sale or delivery by Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase of Oil and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written notice of such intended purchase or sale and the price to be paid or the pricing basis to be used. Operator shall give notice to all parties of the first sale of Gas from any well under this Agreement.~~

~~All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.~~

## ARTICLE VII.
### EXPENDITURES AND LIABILITY OF PARTIES

A. Liability of Parties:

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

- 11 -

SEC 189670

**B. Liens and Security Interests:**

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

~~If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.~~

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

**C. Advances:**

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

**D. Defaults and Remedies:**

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered

- 12 -

SEC 189671

only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator, and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator. Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified below or otherwise available to a non-defaulting party.

1. Suspension of Rights: Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement.

2. Suit for Damages: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

3. Deemed Non-Consent: The non-defaulting party may deliver a written Notice of Non-Consent Election to the defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party, notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

4. Advance Payment: If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided in the Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

5. Costs and Attorneys' Fees: In the event any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

E. Rentals, Shut-in Well Payments and Minimum Royalties:

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.3.

Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to production of a producing well, at least five (5) days (excluding Saturday, Sunday, and legal holidays) prior to taking such action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

F. Taxes:

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

- 13 -

SEC 189672

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C."

Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

## ARTICLE VIII.
## ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

A. Surrender of Leases:

The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B." Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made varies according to depth, then the interest assigned shall similarly reflect such variances.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

B. Renewal or Extension of Leases:

If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease, promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an assignment of its proportionate interest therein by the acquiring party.

If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating Agreement in the form of this agreement.

If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.

The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.

C. Acreage or Cash Contributions:

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled inside Contract Area. Contributions under the paragraph do not include proceeds from the actual sale of working interest in a well or lease

- 15 -

SEC 189673

hereunder.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

**D. Assignment; Maintenance of Uniform Interest:**

~~For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells, equipment and production unless such disposition covers either:~~

~~1. the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or~~

~~2. an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production in the Contract Area.~~

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

**E. Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

~~F. Preferential Right to Purchase:~~

~~☐ (Optional; Check if applicable.)~~

~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after the notice is delivered, to purchase for the stated consideration on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to transfer title to its interests to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests, or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock.~~

**ARTICLE IX.**

**INTERNAL REVENUE CODE ELECTION**

If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulation §1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.

**ARTICLE X.**

**CLAIMS AND LAWSUITS**

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed _five thousand_ Dollars ($ _5,000.00_ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling settling, or otherwise discharging such claim or suit shall be a the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

- 15 -

SEC 189674

## ARTICLE XI.
### FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

## ARTICLE XII.
### NOTICES

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex, telecopier or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the telecopy, facsimile or telex machine of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, telecopy or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.

## ARTICLE XIII.
### TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☐ Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

☐ ~~Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this agreement shall continue in force so long as any such well is capable of production, and for an additional period of ____ days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re-completing, Plugging Back or Reworking operations are commenced within ____ days from the date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of 180 days from the conduct of any operations on the well, whichever first occurs.~~

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

## ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

A. Laws, Regulations and Orders:

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

B. Governing Law:

This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of ___Texas___ shall govern.

C. Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or

- 16 -

SEC 189675

orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not constitute gross negligence. Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

## ARTICLE XV.
## MISCELLANEOUS

A. Execution:

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest. In the event Operator proceeds with drilling operations for the Initial Well without the execution hereof by all persons listed on Exhibit "A" as having a current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the Initial Well which would have been charged to such person under this agreement if such person had executed the same and Operator shall receive all revenues which would have been received by such person under this agreement if such person had executed the same.

B. Successors and Assigns:

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Contract Area.

C. Counterparts:

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

D. Severability:

For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

## ARTICLE XVI.
## OTHER PROVISIONS

This Joint Operating Agreement is subject to the additional terms and provisions which are contained in Article XVI attached hereto.

SEC 189676

IN WITNESS WHEREOF, this agreement shall be effective as of the 1st day of May, 2008.

**OPERATOR**

**RAW OIL & GAS, INC.**

By _____

Joe D. Hardin_____
Type or print name

Title President_____

Date _____

Tax ID or S.S. No. _____

**NON-OPERATORS**

**RAW ENERGY, LC**

By _____

Joe D. Hardin_____
Type or print name

Title Manager_____

Date _____

Tax ID or S.S. No. _____

**SMITH ENERGY COMPANY**

By _____

Lester Smith_____
Type or print name

Title President_____

Date _____

Tax ID or S.S. No. _____

**MARK P. HARDWICK**

By _____

Date _____

Tax ID or S.S. No. _____

**STEVE BLAYLOCK**

By _____

Date _____

Tax ID or S.S. No. _____

**ELGER EXPLORATION INC.**

By _____

Jerry Elger_____
Type or print name

Title President_____

Date _____

Tax ID or S.S. No. _____

- 21 -

SEC 189677

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

ACKNOWLEDGMENTS

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts.

The validity and effect of these forms in any state will depend upon the statutes of that state.

Acknowledgment in representative capacity:

State of Texas         )
                             ) ss.
County of Lubbock    )

This instrument was acknowledged before me on this _____ day of _____, 2008, by Joe D. Hardin as President of RAW OIL & GAS, INC.

(Seal, if any)

                                   Title (and Rank) _____

                                   My commission expires: _____

State of Texas         )
                             ) ss.
County of Lubbock    )

This instrument was acknowledged before me on this _____ day of _____, 2008, by Joe D. Hardin as Manager of RAW ENERGY, LC.

(Seal, if any)

                                   Title (and Rank) _____

                                   My commission expires: _____

State of Texas         )
                             ) ss.
County of _____   )

This instrument was acknowledged before me on this _____ day of _____, 2008, by Lester Smith as President of SMITH ENERGY COMPANY.

(Seal, if any)

                                   Title (and Rank) _____

                                   My commission expires: _____

Individual acknowledgment:

State of Texas         )
                             ) ss.
County of Midland    )

This instrument was acknowledged before me on this _____ day of _____, 2008, by MARK P. HARDWICK.

(Seal, if any)

                                   Title (and Rank) _____

                                   My commission expires: _____

- 21 -

SEC 189678

Individual acknowledgment:

State of Texas      )
                    ) ss.
County of Midland     )

This instrument was acknowledged before me on this _____ day of _____, 2008, by **STEVE BLAYLOCK**.

(Seal, if any)

                                    Title (and Rank) _____

                                    My commission expires: _____

State of Texas      )
                    ) ss.
County of_____   )

This instrument was acknowledged before me on this _____ day of _____, 2008, by Jerry Elger as President of **ELGER EXPLORATION INC.**

(Seal, if any)

                                    Title (and Rank) _____

                                    My commission expires: _____

SEC 189679

## JOINT OPERATING PROVISIONS

## ARTICLE XVI

To be attached to and made a part of that certain Joint
Operating Agreement dated November 1, 2009, between
Raw Oil & Gas, Inc. as Operator
and Smith Energy Company, etal, as Non-Operator

A. Royalties, Overriding Royalties and Other Payments:

1. As used herein, the term "Existing Burdens" shall apply separately to each Lease and means all royalties and overriding royalties and other payments carved out of the Leasehold estate with which each Lease covered by this Operating Agreement is burdened as of the effective date hereof.

2. Each party shall pay or deliver, or cause to be paid or delivered, its proportionate part of all Existing Burdens and shall hold the other parties free from any liability therefor.

B. Rentals, Shut-in Well Payments and Minimum Royalties:

1. All rentals, shut-in well payments and minimum royalties which may be required under the terms of any Lease shall be administered and paid by Operator and charged to the Joint Account except where otherwise expressly provided to the contrary in this Operating Agreement. Any party may request and shall be entitled to receive proper evidence of all such payments.

2. Operator shall diligently attempt to make or cause to be made proper payment of any rentals and/or shut-in well payments and/or minimum royalties under the foregoing provisions, but Operator shall not be held liable to the other parties in damages for the loss of any Lease or interest therein if, through mistake or oversight, any rental and/or shut-in well payment and/or minimum royalty is not paid or is erroneously paid. The loss of any Lease or interest therein which results from Operator's failure to pay or an erroneous payment of rental and/or a shut-in well payment and/or a minimum royalty shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

3. Each party hereto shall be obligated to bear its proportionate part of any and all rentals necessary to continue in force and effect the Oil and Gas Leases covered by this Agreement unless and until it timely gives the notice provided for in the next sentence hereof. If any party does not wish to bear its proportionate part of any rental necessary to continue in force any Lease covered by this Agreement, such party may give Operator and all other parties hereto written notice of such election, and the party giving such written notice shall be released of obligation to bear its proportionate part of any rentals which accrue under the terms of the Leases specified in such written notice at any time after thirty (30) days after the date Operator receives such party's aforesaid written notice. Unless mutually agreed, otherwise, the proportionate part of the rental attributable to any such Lease which would have been borne by the party giving the aforesaid written notice shall be borne by the parties hereto who do not exercise the aforesaid election, in the proportion that the interest of each bears to the total of their Interests, and the party giving the aforesaid written notice of election not to pay its part of such rental shall assign, without express or implied warranty of title, all of its interest in the Lease or Leases specified in said written notice to the aforesaid parties in the respective proportions that they bear the rental on any such Lease or Leases.

C. Removal of Operator-Vote of all Parties.

Operator may at any time be removed with or without cause by the affirmative vote of the owners of the majority interest in the Contract Area based upon ownership as shown in Exhibit "A".

D. Transition.

Upon the selection of the successor operator, the Operator who has been removed or has resigned shall promptly deliver to the successor operator all original records relating to operations on the Contract Area, including current accounting information with regard to the status of the joint account, information concerning all invoices not yet paid by the operator who has resigned or been removed, all logs, maps and all other information concerning operations. Duplicating expenses required by virtue of the change of operators shall be charged to the joint account.

E. Financing Statement.

The security interest granted to each Operator and Non-Operator under Paragraph VII.B. of this agreement which secures payment of each party's share of costs and expenses of operations shall extend to each such party's share of all Oil and Gas, equipment, fixtures, personal property, accounts, inventory and general intangibles and proceeds or products thereof relating or pertaining to the Leases and lands included in the Contract Area as described in Exhibit "A" attached hereto. For purposes of compliance with TEXAS BUSINESS AND COMMERCE CODE, Sec. 9.302, each party agrees that this instrument shall serve and may be filed as a financing statement to perfect the security interest mutually granted herein. In that regard, each party hereto agrees that its signature below shall be its signature as debtor of an appropriate financing statement, and that for purposes of compliance with the requirements of Sec. 9.402 of the TEXAS BUSINESS AND COMMERCE CODE each

SEC 189680

secured party and debtor's names and addresses are as follows:

| The names and addresses of secured parties are: | The names and address of debtors are: |
|---|---|
| SEE EXHIBIT "A" | SEE EXHIBIT "A" |

The collateral to which the security Interests apply are all of each debtor's interest in Oil and Gas, equipment, fixtures, personal property, accounts, inventory and general intangibles and proceeds or products thereof relating or pertaining to the Oil and Gas Leases covered by this agreement and included in the Contract Area as described in Exhibit "A".

F. Deemed Non-Consent for Defaulting Payment.

If the lien conferred in Article VII.B has been enforced, or if any party to this agreement shall fail to pay its share of costs and expenses incurred in operations of the Contract Area for a period of 90 days from the date of Operator's invoice therefor, Operator may notify the affected party of its default by certified mail, return receipt requested, and if such party fails to cure the default within 10 days from the date of receipt of Operator's notice, by payment in full of all invoices for operating costs which have been due for more than 30 days, the affected party shall be deemed in non-consent status and for so long as the affected party remains in default it shall have no further access to the Contract Area or information obtained in connection with operations hereunder and shall not be entitled to vote on any matter hereunder. As to any proposed operation in which it otherwise would have the right to participate, such party shall have the right to be a Consenting Party therein only if it pays the amount it is in default before the operation is commenced; otherwise it automatically shall be deemed a Non-Consenting Party to that operation. Nothing herein shall affect each party's right to protest any item charged to the joint account by Operator under the provisions of Article I.5. of Exhibit "C" attached hereto.

G. Trustee's Sale for Defaulting Payment.

If Operator should elect to proceed to foreclose the lien of Operator as against the interest of a Non-Operator having an interest in the Contract Area, this operating agreement does hereby include provisions for non-judicial sale under the laws of the State of Texas and David Cotton is hereby appointed as Trustee for such purpose. Upon such default, said Trustee or Operator shall at least 21 days preceding the date of nonjudicial sale serve written notice of the proposed sale by certified mail to Non-Operator according to records of Operator. Service of such notice shall be deemed completed upon deposit of a notice enclosed in a post-paid wrapper properly addressed to the Non-Operator and each other party obligated to pay such obligations at the most recent address or addresses as shown on the records of Operator in a post office or other official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service. After such notice, said Trustee shall proceed to sell all of the Interests of Non-Operator in the Contract Area at public auction to the highest bidder for cash after having given notice of the time and place of sale and in the manner and after the advertisement of such sale as now required by the statutes of the State of Texas in making sales of real estate under deeds of trust. Sale of a part of the realty would not exhaust the power of sale and sales may be made from time to time until all of the property is sold or the obligations paid in full. Said Trustee shall have authority to appoint an attorney in fact to act as Trustee in conducting the foreclosure sale and executing a deed to the purchasers; and it is further agreed that said Trustee or his successor may sell said property together or in lots and/or parcels as to him shall deem expedient and after such sale as aforesaid shall make, execute and deliver to the purchaser or purchasers thereof good and sufficient deeds, assignments or other lawful conveyances to vest in said purchaser or purchasers title to the Non-Operator's interest in the Contract Area in fee simple together with all personal property used or obtained in connection therewith and together with all of the proceeds of production attributable thereto including proceeds of production held by any party for the payment to Non-Operator. From the proceeds of said sale said Trustee shall first pay all charges, costs and expenses in executing these provisions and secondly pay any sums due by the Trustee for taxes in the preservation of the security and thereafter pay all of the remaining sums to Operator for the satisfaction of the debts of Non-Operator hereunder and the balance, if any, shall be paid to Non-Operator.

It is agreed that such sale shall be a perpetual bar against Non-Operator and its heirs, successors and assigns and legal representatives and all other persons claiming under him, them or any of them. It is further agreed that said Trustee or any holder or holders of said obligation of Operator shall have the right to become the purchaser or purchasers at such sale if they are the highest bidder or bidders in which event the bid or bids may be credited upon said indebtedness of Non-Operator. It is stipulated and agreed that in case of any sale hereunder by Trustee or his successor all prerequisites of said sale shall be presumed to have been performed and any conveyance given hereunder, all statements of fact or recitals therein made as to the non-payment of money secured or as to any default under the terms hereof or as to the request of the Trustee to enforce this trust or as to the proper and due appointment of any successor or substitute Trustee or as to the advertisement of sale or the time, place and terms of sale or as to any other preliminary act or thing shall be taken in all courts of law and equity as prima facie evidence that the facts so stated are true. Operator may appoint a substitute or successor Trustee in the event the Trustee above named is unable for any reason to serve.

H. Drill or Out

Notwithstanding any provisions to the contrary contained in Article VI.B, should any party hereto, after receiving notice from Operator of a proposal to drill a well on the Contract Area, other than the well provided for

SEC 189681

in Article VI.A fail to timely notify Operator of its election to participate in such proposal or should a party elect not to participate in the drilling proposal, it is hereby agreed that such party shall relinquish and assign to the participating parties all of its Leasehold interest in and to the well and the proration unit allocated to such well. Additionally, in such event, such non-participating party shall release, relinquish and surrender and forever forfeit proportionately to the participating parties, all of the non-participating party's interest in and to all proration units which are adjoining and/or contiguous to the proration unit allocated to such proposed well except for any thereof on which a well is situated and in which well the nonparticipating party participated in the drilling.

By way of illustration, in the event a 40 acre proration unit in the form of a square is allocated to a proposed well, then a non-participating party shall forfeit, release and relinquish all interest in such 40 acre proration unit together with the eight immediately surrounding and adjoining 40 acre proration units with the exception indicated.

Notwithstanding any provision to the contrary contained in Article VI., Non-Operator upon receiving Operator's recommendation with respect to an attempted Completion shall within the time period set forth herein, notify Operator of its election to participate in a proposed Completion attempt. Failure to so notify Operator shall be deemed an election by Non-Operator not to participate. In the event that any Non-Operator elects not to participate in the Completion attempt, the Non-Consenting Party shall relinquish and assign to the participating parties all of its Leasehold interest in and to the well and the proration unit allocated to such well, only insofar as to the interval or formation which is subject to the Completion attempt. Additionally, in such event, such non-participating party shall relinquish and surrender and forever forfeit proportionately to the participating parties, all of the non-participating party's interest in and to all proration units which are adjoining and/or contiguous to the proration unit allocated to such well, only insofar as to the interval or formation which is subject to the Completion attempt.

With regard to Deepening operations, any Non-Consenting Party shall forfeit proportionately to the participating parties all of the non-participating party's interest in depths greater than the depth drilled in an operation for which such non-participating party had previously consented. The interest of any party in such relinquished and forfeited Leasehold rights shall be assigned proportionately to the participating parties by the non-participating party without warranty of title except as to claims, by, through or under Assignor, and shall be free of burdens except those created prior to the time the non-participating party acquired his interest in the Leasehold estate so forfeited.

I. Sales Necessitating Separate Measurements.

In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area which necessitates separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

J. Internal Revenue Code Election.

This Operating Agreement shall not create any mining partnership, commercial partnership or other partnership relation or joint venture, and the liabilities of each of the parties hereto shall be several and not joint. However, solely for Federal and State income tax purposes, the parties elect to be taxed as a partnership in accordance with the Tax Partnership Agreement attached as Exhibit "G" hereto, but such relationship shall not be a partnership to any other extent or for any other purpose. Notwithstanding anything to the contrary herein, the parties hereto agree that, with respect to all operations conducted hereunder, each party hereto agrees to elect to be excluded from the application of Subchapter K of Chapter I of Subtitle A of the Code, and each party agrees to join in the execution of such additional documents and elections as may be required by the Internal Revenue Service in order to effectuate the foregoing. In addition, if the income tax laws of any state in which the parties conduct operations pursuant to the terms of this Agreement contain provisions similar to those contained in Subchapter K of Chapter I of Subtitle A of the Code, the parties hereby agree to elect to be excluded from the application of such provisions.

K. Memorandum of Operating Agreement.

Within ten (10) days from the execution of this operating Agreement, each party agrees to execute a "Memorandum of Joint Operating Agreement" to be filed of record in Lynn and Terry Counties, Texas, imparting constructive notice that the Contract Area is subject to all of the terms, conditions and provisions contained in this agreement.

L. Power of Attorney.

Each Non-Operator designates Operator as its respective attorney-in-fact for the purpose of executing on behalf of such Non-Operator all instruments of release; all oil purchase agreements, gas purchase agreements and amendments thereto; all amendments to existing Leases in the Contract Area deemed necessary by Operator and all filings required by regulatory agencies relating to operations on the Contract Area including without limitation all NGPA filings, filings required by the Federal Energy Regulatory Commission and the Railroad Commission of the State of Texas. This Power-of-Attorney may be revoked only by revocation signed and acknowledged by the revoking non-operator, and filed for record in Lynn and Terry Counties, Texas, a copy of which shall be forwarded to operator.

M. Area of Mutual Interest.

SEC 189682

(1) The parties hereto hereby create an Area of Mutual Interest (the "AMI") comprising all of the Contract Area covered by this Operating Agreement.

(2) During the term of the AMI, if any party hereto ("the Acquiring Party") acquires any Oil and Gas Lease, or any interest therein, any unleased mineral interest or any farmout, sublease or other contract with respect thereto which covers or affects any lands or minerals lying within the AMI ("the offered Mineral Interest"), the Acquiring Party shall promptly notify each of the other parties hereto ("Offeree") of such acquisition. In such event, such Offeree shall have the right to acquire his or its proportionate interest in the offered Mineral Interest in accordance with the other provisions of this Article XVI I.

(3) Promptly upon acquiring the offered Mineral Interest, the Acquiring Party shall, in writing, advise each Offeree of such acquisition. The notice shall include complete xerox copies of the instruments of acquisition including, by way of example but not of limitation, such copies of the Leases, assignments, subleases, farmouts or other contracts acquired by the Acquiring Party creating or affecting the offered Mineral Interest, together with such copies of paid drafts, plats depicting the exact location of the acreage covered or affected thereby, Lease brokers' reports and any other title data relating thereto. The Acquiring Party shall also enclose an itemized statement of the actual costs and expenses incurred by the Acquiring party in acquiring the offered Mineral Interest ("Acquiring Costs"). Each Offeree shall have a period of fifteen (15) days after receipt of the notice within which to furnish the Acquiring party written notice of his or its election to acquire his or its proportionate interest in the offered Mineral Interest. If, however, a well in search of oil or gas is being drilled on lands situated within the AMI or on lands situated outside the AMI of which the result could be expected to materially affect the value of the offered Mineral Interest, each Offeree shall have a period of forty-eight (48) hours after receipt of the notice (exclusive of Saturdays, Sundays and legal holidays) within which to elect to acquire his or its proportionate interest in the offered Mineral Interest. It is provided, however, that the forty-eight (48) hour election period shall not apply unless the Acquiring Party shall give written notice to each Offeree within two (2) days after the date on which the Acquiring party acquired the offered Mineral Interest exclusive of Saturdays, Sundays and legal holidays. In addition thereto, the Acquiring Party shall also:

(i)      furnish each Offeree with the approximate location of the well then being drilled and the name of the operator or drilling contractor drilling the well; and

(ii)      specifically advise each Offeree that each Offeree shall have a period of forty-eight (48) hours (inclusive of Saturdays, Sundays and legal holidays) within which to elect to acquire his or its proportionate interest in the offered Mineral Interest.

The above information shall be in addition to the information and copies of instruments to be furnished in connection with the acquisition of the offered Mineral Interest as provided hereinabove. If the Acquiring Party does not receive written notice of election from any Offeree to acquire his or its proportionate interest within the fifteen (15) day or forty-eight (48) hour period, as the case may be, such failure shall constitute an election by such Offeree not to acquire his or its interest in the offered Mineral Interest. Written notice from the Acquiring Party to each Offeree and written notice of election from each Offeree to the Acquiring Party shall be deemed given when delivered if delivered in person, one day after deposit with an overnight carrier such as Federal Express for delivery on the next calendar day and the day of transmission by telecopy (if confirmed by notice sent by Federal Express or a similar overnight carrier for receipt the next day). Each Offeree accepting the offered Mineral Interest shall be entitled to participate in the offered Mineral Interest in the proportion to which his or its ownership interest as set forth in Exhibit "A" bears to the total ownership Interests as set forth in Exhibit "A" of the Acquiring Party and all other Offerees who have elected to acquire their proportionate interest in the offered Mineral Interest. Promptly after the period for the election has expired, the Acquiring Party shall invoice each Offeree electing to acquire his or its Interests in the offered Mineral Interest for his or its proportionate part of the Acquisition Costs. In the event an Offeree elects not to acquire his or its proportionate interest therein, then the Acquiring Party and each of the other Offerees who elect to participate in the offered Mineral Interest shall bear the Acquisition Costs attributable to such non-acquiring Offeree's interest in the proportion to which such participating party's expense bearing interest in the AMI at such time bears to the aggregate expense-bearing interest in the AMI at such time of the Acquiring Party and such other Offerees who so elect to participate. Each Offeree shall immediately reimburse the Acquiring Party for his or its share of the Acquisition Costs as reflected by the invoice. Upon receipt of such reimbursement or, in the case of a farmout or similar agreement at the time the acquiring party receives its assignment or other instrument, the Acquiring Party shall execute and deliver an appropriate, recordable assignment to each participating Offeree. If the Acquiring Party does not receive the amount due from a participating Offeree within five (5) days after receipt by such Offeree of the invoice for its share of the Acquisition Costs, the Acquiring Party may, at his or its election and without prejudice to other existing remedies, give written notice to such delinquent party that the failure of the Acquiring Party to receive the amount due within forty-eight (48) hours (exclusive of Saturdays, Sundays and legal holidays) after receipt of such notice by the delinquent Offeree shall constitute a withdrawal by the delinquent Offeree of its former election to acquire the interest and such Offeree shall no longer have the right to acquire an interest in the offered Mineral Interest. In the event the Acquiring Party does not receive the amount due within such forty-eight (48) hour period, the delinquent Offeree shall be deemed to have elected not to participate and the Acquiring Party shall succeed to and own the entirety of the interest in the offered Mineral Interest which the delinquent Offeree would have owned and the Acquiring party shall bear the delinquent Offeree's proportionate share of the Acquisition Costs.

(4) In the event less than all of the Offerees elect to acquire their proportionate interest in the offered Mineral Interest, then the portion of the lands covered by the offered Mineral Interest shall be automatically deleted from the AMI and the Contract Area covered hereby without the necessity of Operator or any Non-Operator executing a document amending the AMI and this Operating Agreement to reduce the AMI and the Contract Area

SEC 189683

to exclude such lands therefrom. The Acquiring Party and the Offerees electing to acquire the Interests in the offered Mineral Interest shall be deemed to have agreed to operate the offered Mineral Interest in accordance with the terms and provisions of this Operating Agreement, except that the offered Mineral Interest shall constitute the Contract Area covered thereby. Exhibit "A" shall list the names and addresses of the parties owning the offered Mineral Interest and the Interests in which they own the same, and Operator shall be named Operator therein unless Operator did not participate in acquiring his interest in the offered Mineral Interest, in which event the parties agreeing to participate in the offered Mineral Interest shall select an Operator from among themselves, which Operator shall be elected by the affirmative vote of two or more such parties owning a majority interest based on their ownership of the offered Mineral Interest, and not on the number of parties electing to participate. The Acquiring Party and the Offerees electing to acquire their Interests in the offered Mineral Interest shall enter into an Operating Agreement reflecting the same immediately after agreeing to own jointly the offered Mineral Interest, but the failure to enter immediately into such an Operating Agreement shall not prevent the owners of the offered Mineral Interest from operating, developing and maintaining the same in accordance with the terms hereof, unless Operator elects not to participate and such parties are unable to agree on the election of an operator.

(5) Any assignment made by the Acquiring Party shall be made free and clear of any burdens placed thereon by the Acquiring Party but otherwise without warranty of title, except as to acts by, through and under the Acquiring Party, but not otherwise. The assignment shall be expressly made subject to and each assignee shall expressly assume his or its portion of all of the obligations imposed by the instrument creating or affecting the offered Mineral Interest.

(6) If the interest of any party hereto in the AMI should vest in three or more parties, those parties shall designate one of them to whom all notices provided for in this AMI are to be given and shall promptly furnish the other parties hereto the name and address of the designated party. If the Acquiring Party has not received the name and address of the designated party, the notice of the acquisition shall be directed to all of the parties having an interest in the AMI according to the Exhibit "A" which is then a part of this Operating Agreement.

(7) If the instrument creating or affecting the offered Mineral Interest covers lands situated both within and outside the AMI, the Acquiring Party may, at his or its option, offer either all of the offered Mineral Interest or only that portion of the offered Mineral Interest covering lands situated within the AMI. If less than the entirety is offered, the Acquisition Costs shall be prorated between the acreage covered by the offered Mineral Interest situated within the AMI and the acreage situated outside the AMI and the Acquiring Party shall bear all of the Acquisition Costs attributable to such outside acreage and the Acquiring Party and the Offerees who elect to participate shall bear their proportionate share of the Acquisition Costs attributable to the acreage within the AMI. If the entirety of the premises covered by the Mineral Interest is offered and each party hereto acquires it proportionate interest therein, the lands lying outside the AMI shall become a part of the Contract Area covered hereby and the AMI shall thereby be automatically enlarged without the necessity of operator or any Non-Operator executing a document amending the AMI and this Operating Agreement to enlarge the AMI to include such lands lying outside the AMI.

(8) If two or more of the offered Mineral Interests are included in the same notice, each Offeree shall have the separate right of election as to each offered Mineral Interest.

(9) The provisions of the AMI shall not apply to acquisitions resulting from a merger, consolidation, reorganization or an acquisition from a parent, subsidiary or affiliated corporation, or, as to individuals, from ascendants or descendants or trusts of which such parties are beneficiaries. The provisions hereof shall also not apply to sales and acquisitions between partners in a partnership which is a party hereto, or ventures in a joint venture which is a party hereto, nor to the acquisition by any party hereto of all or any part of the interest of another party hereto.

(10) Each party hereto stipulates and represents to the other parties hereto that he or it is not now and shall not become hereafter a party to any other area of mutual interest agreement involving all or any portion of the land comprising the AMI.

N. Participation Agreement

The parties to this Operating Agreement hereby acknowledge that their interest in the Contract Area described in Exhibit "A" hereto is owned subject to the terms of that certain Big Bump Prospect Lynn County, Texas Participation Agreement by and among the Parties hereto dated October 19, 2009 and pursuant to paragraph 8 (c) thereof, the Parties granted to each other a Right of First Refusal as to any proposed Transfer of any interest in the Contract Area to any person other than a Permitted Assignee (as such terms are defined in the Participation Agreement). The Parties hereby incorporate by reference the provisions of paragraph 8 (c) of the Participation Agreement into this Agreement as is set out in full in this Agreement.

SEC 189684

## EXHIBIT "A"

Attached to and made a part of
Operating Agreement dated November 1, 2009, between RAW Oil & Gas Inc. as Operator and
Smith Energy Company, etal, as Non-Operators

PART I:       CONTRACT & AMI AREA

Section 55, Abstract 394, Georgetown Ry. Co. Survey, Lynn County, Texas
(640.00 ac.)

South Half of Section 57, Abstract ___, Georgetown Ry. Co. Survey, Lynn County,
Texas (320.00 ac.)

West 200 Acres of Section 20, Abstract 948, D&SE Ry. Co. Survey, Lynn County,
Texas (200 ac.)

North 200 Acres of Section 7, Abstract 998, Block C-40, PSL Survey Lynn County,
Texas (200 ac.)

PART II:      PARTIES, INTEREST AND ADDRESSES FOR NOTICE PURPOSES

| Names and Addresses | Before Casing Point of the First Well | After Casing Point of the First Well And all Subsequent Operations |
|---|---|---|
| Raw Oil & Gas, Inc. 12312 Slide Road Lubbock, Texas 79424 | -0%- | 1.00% |
| Raw Energy, L.C. 12312 Slide Road Lubbock, Texas 79424 | -0%- | 5.25% |
| Smith Energy Company Lester Smith, President P.O. Box 52890 Houston, Texas 77052 | 100.0% | 75.0% |
| Mark P. Hardwick P.O. Box 213 Midland, Texas 79702 | -0%- | 6.25% |
| Steve Blaylock 214 W. Texas, Suite 306 Midland Texas 79701 | -0%- | 6.25% |
| Elger Exploration Inc. P.O. Box 2623 Midland, Texas 79702 | -0%- | 6.25% |

SEC 189685

Attached to and made a part of
Operating Agreement dated November 1, 2009, between RAW Oil & Gas Inc., as Operator and
Smith Energy Company, etal, as Non-Operators.

Producers 88 (7-69) Paid Up
with 640 Acres Pooling Provision

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this _____ between _____, Lessor (whether one or more), whose address is
_____, and _____, Lessee, WITNESSETH:

1. Lessor, in consideration of Ten Dollars and other valuable consideration ($10.00 and OVC), receipt of which is hereby acknowledged, and of the covenants and agreements of lessee hereinafter contained, does hereby grant, lease and let unto lessee the land covered hereby for the purposes and with the exclusive right of exploring, drilling, mining and operating for, producing and owning oil, gas, sulphur and all other minerals (whether or not similar to those mentioned), together with the right to make surveys on said land, lay pipe lines, establish and utilize facilities for surface or subsurface disposal of salt water, construct roads and bridges, dig canals, build tanks, power stations, telephone lines, employee houses and other structures on said land, necessary or useful in lessee's operations in exploring, drilling for, producing, treating, storing and transporting minerals produced from the land covered hereby or any land adjacent thereto. The land covered hereby, herein called "said land", is located in the Counties of _____, State of Texas, and is described as follows:

This lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by lessor by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by lessee for a more complete or accurate description of said land. For the purpose of determining the amount of any bonus or other payment hereunder, said land shall be deemed to contain _____ acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof. Lessor accepts the bonus as lump sum consideration for this lease and all rights and options hereunder.

2. Unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of _____ years from the date hereof, hereinafter called "primary term", and as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days.

3. As royalty, lessee covenants and agrees: (a) To deliver to the credit of lessor, in the pipe line to which lessee may connect its wells, the equal _____ part of all oil produced and saved by lessee from said land, or from time to time, at the option of lessee, to pay lessor the average posted market price of such _____ part of such oil at the wells as of the day it is run to the pipe line or storage tanks, lessor's interest, in either case, to bear _____ of the cost of treating oil to render it marketable pipe line oil; (b) To pay lessor on gas and casinghead gas produced from said land (1) when sold by lessee, _____ of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well, of _____ of such gas and casinghead gas; (c) To pay lessor on all other minerals mined and marketed or utilized by lessee from said land, one tenth either in kind or value at the well or mine at lessee's election, except that on sulphur mined and marketed the royalty shall be one dollar ($1.00) per long ton. If, at the expiration of the primary term or any time or times thereafter, there is any well on said land or on lands with which said lands or any portion thereof has been pooled, capable of producing oil or gas, and all such wells are shut-in, this lease shall, nevertheless, continue in force as though operations were being conducted on said land for so long as said wells are shut-in, and thereafter this lease may be continued in force as if no shut-in had occurred. Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the minerals capable of being produced from said wells, but in the exercise of such diligence, lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities of flow lines, separator, and lease tank, and shall not be required to settle labor trouble or to market gas upon terms unacceptable to lessee. If, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety consecutive days, and during such time there are no operations on said land, then at or before the expiration of said ninety day period, lessee shall pay or tender, by check or draft of lessee, as royalty, a sum equal to one dollar ($1.00) for each acre of land then covered hereby. Lessee shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety day period if upon such anniversary this lease is being continued in force solely by reason of the provisions of this paragraph. Each such payment or tender shall be made to the parties who at the time of payment would be entitled to receive the royalties which would be paid under this lease if the wells were producing, and may be deposited in the _____ Bank at _____, or its successors, which shall continue as the depositories, regardless of changes in the ownership of shut-in royalty. If at any time that lessee pays or tenders shut-in royalty, two or more parties are, or claim to be, entitled to receive same, lessee may, in lieu of any other method of payment herein provided, pay or tender such shut-in royalty, in the manner above specified, either jointly to such parties or separately to each in accordance with their respective ownership thereof, as lessee may elect. Any payment hereunder may be made by check or draft of lessee deposited in the mail or delivered to the party entitled to receive payment or to a depository bank provided for above on or before the last date for payment. Nothing herein shall impair lessee's right to release as provided in paragraph 5 hereof. In the event of assignment of this lease in whole or in part, liability for payment hereunder shall rest exclusively on the then owner or owners of this lease, severally as to acreage owned by each.

4. Lessee is hereby granted the right, at its option, to pool or unitize any land covered by this lease with any other land covered by this lease, and/or with any other land, lease, or leases, as to any or all minerals or horizons, so as to establish units containing not more than 80 surface acres, plus 10% acreage tolerance; provided, however, units may be established as to any one or more horizons, or existing units may be enlarged as to any one or more horizons, so as to contain not more than 640 surface acres plus 10% acreage tolerance, if limited to one or more of the following: (1) gas, other than casinghead gas, (2) liquid hydrocarbons (condensate) which are not liquids in the subsurface reservoir, (3) minerals produced from wells classified as gas wells by the conservation agency having jurisdiction. If larger units than any of those herein permitted, either at the time established, or after enlargement, are required under any governmental rule or order, for the drilling or operation of a well at a regular location, or for obtaining maximum allowable from any well to be drilled, drilling, or already drilled, any such unit may be established or enlarged to conform to the size required by such governmental order or rule. Lessee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded. Each of the said options may be exercised by the lessee at any time and from time to time while this lease is in force, and whether before or after production has been established either on said land, or on the portion of said land included in the unit, or on other land unitized therewith. A unit established hereunder shall be valid and effective for all purposes of this lease even though there may be mineral, royalty, or leasehold interests in lands within the unit which are not effectively pooled or unitized. Any operations conducted on any part of such unitized land shall be considered, for all purposes, except the payment of royalty, operations conducted upon said land under this lease. There shall be allocated to the land covered by this lease within each such unit (or to each separate tract within the unit if the lease covers separate tracts within the unit) that proportion of the total production of unitized minerals from the unit, after deducting any used in lease or unit operations, which the number of surface acres in such land (or in each such separate tract) covered by this lease within the unit bears to the total number of surface acres in the unit, and the production so allocated shall be considered for all purposes, including payment or delivery of royalty, overriding royalty and any other payments out of production, to be the entire production of unitized minerals from the land to which allocated in the same manner as though produced therefrom under the terms of this lease. The owner of the reversionary estate of any term royalty or mineral estate agrees that the accrual of royalties pursuant to this paragraph or of shut-in royalties from a well on the unit shall satisfy any limitation of term requiring production of oil or gas. The formation of any unit hereunder which includes land not covered by this lease shall not have the effect of exchanging or transferring any interest under this lease (including, without limitation any shut-in royalty which may become payable under this lease) between parties owning interests in land covered by this lease and parties owning interests in land not covered by this lease. Neither shall it impair the right of the lessee to release as provided in paragraph 5 hereof, except that lessee may not so release as to lands within a unit while there are operations thereon for unitized minerals unless all pooled leases are released as to lands within the unit. At any time while this lease is in force lessee may dissolve any unit established hereunder by filing for record in the public office where this lease is recorded a declaration to that effect, if at that time no operations are being conducted thereon for unitized minerals. Subject to the provisions of this paragraph 4, a unit once established hereunder shall remain in force so long as any lease subject thereto shall remain in force. If this lease now or hereafter covers separate tracts, no pooling or unitization of royalty interests as between any such separate tracts is intended or shall be implied or result merely from the inclusion of such separate tracts within this lease but lessee shall nevertheless have the right to pool or unitize as provided in this paragraph 4 with consequent allocation of production as herein provided. As used in this paragraph 4, the words "separate tract" mean any tract with royalty ownership differing, now or hereafter, either as to parties or amounts, from that as to any other part of the leased premises.

5. Lessee may at any time and from time to time execute and deliver to lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations, as to the released acreage or interest.

6. Whenever used in this lease the word "operations" shall mean operations for and any of the following: drilling, testing, completing, reworking, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals, excavating a mine, production of oil, gas, sulphur or other mineral, whether or not in paying quantities.

7. Lessee shall have the use, free from royalty, of water, other than from lessor's water wells, and of oil and gas produced from said land in all operations hereunder. Lessee shall have the right at any time to remove all machinery and fixtures placed on said land, including the right to draw and remove casing. No well shall be

SEC 189686

drilled nearer than 200 feet to the house or ba... now on said land without the consent of the lessor. Lessee shall pay for dam.  ..used by its operations to growing crops and timber on said land.

8. The rights and estate of any party hereto may be assigned from time to time in whole or in part as to any mineral or horizon. All of the covenants, obligations, and considerations of this lease shall extend to and be binding upon the parties hereto, their heirs, successors, assigns, and successive assigns. No change or division in the ownership of said land, royalties, or other moneys, or any part thereof, howsoever effected, shall increase the obligations or diminish the rights of lessee, including, but not limited to, the location and drilling of wells and the measurement of production. Notwithstanding any other actual or constructive knowledge or notice thereof of or to lessee, its successors or assigns, no change or division in the ownership of said land or of the royalties, or other moneys, or the right to receive the same, howsoever effected, shall be binding upon the then record owner of this lease until thirty (30) days after there has been furnished to such record owner at his or its principal place of business by lessor or lessor's heirs, successors, or assigns, notice of such change or division, supported by either originals or duly certified copies of the instruments which have been properly filed for record and which evidence such change or division, and of such court records and proceedings, transcripts, or other documents as shall be necessary in the opinion of such record owner to establish the validity of such change or division. If any such change in ownership occurs by reason of the death of the owner, lessee may, nevertheless pay or tender such royalties, or other moneys, or part thereof, to the credit of the decedent in a depository bank provided for above.

9. In the event lessor considers that lessee has not complied with all its obligations hereunder, both express and implied, lessor shall notify lessee in writing, setting out specifically in what respects lessee has breached this contract. Lessee shall then have sixty (60) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by lessor. The service of said notice shall be precedent to the bringing of any action by lessor on said lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after service of such notice on lessee. Neither the service of said notice nor the doing of any acts by lessee aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that lessee has failed to perform all its obligations hereunder. If this lease is canceled for any cause, it shall nevertheless remain in force and effect as to (1) sufficient acreage around each well as to which there are operations to constitute a drilling or maximum allowable unit under applicable governmental regulations, (but in no event less than forty acres), such acreage to be designated by lessee as nearly as practicable in the form of a square centered at the well, or in such shape as then existing spacing rules require; and (2) any part of said land included in a pooled unit on which there are operations. Lessee shall also have such easements on said land as are necessary to operations on the acreage so retained.

10. Lessor hereby warrants and agrees to defend title to said land against the claims of all persons whomsoever. Lessor's rights and interests hereunder shall be charged primarily with any mortgages, taxes or other liens, or interest and other charges on said land, but lessor agrees that lessee shall have the right at any time to pay or reduce same for lessor, either before or after maturity, and be subrogated to the rights of the holder thereof and to deduct amounts so paid from royalties or other payments payable or which may become payable to lessor and/or assigns under this lease. If this lease covers a less interest in the oil, gas, sulphur, or other minerals in all or any part of said land than the entire and undivided fee simple estate (whether lessor's interest is herein specified or not), or no interest therein, then the royalties and other moneys accruing from any part as to which this lease covers less than such full interest, shall be paid only in the proportion which the interest therein, if any, covered by this lease, bears to the whole and undivided fee simple estate therein. All royalty interest covered by this lease (whether or not owned by lessor) shall be paid out of the royalty herein provided. This lease shall be binding upon each party who executes it without regard to whether it is executed by all those named herein as lessor.

11. If while this lease is in force, at, or after the expiration of the primary term hereof, it is not being continued in force by reason of the shut-in well provisions of paragraph 3 hereof, and lessee is not conducting operations on said land by reason of (1) any law, order, rule or regulation, (whether or not subsequently determined to be invalid) or (2) any other cause, whether similar or dissimilar, (except financial) beyond the reasonable control of lessee, the primary term hereof shall be extended until the first anniversary date hereof occurring ninety (90) or more days following the removal of such delaying cause, and this lease may be extended thereafter by operations as if such delayed had not occurred.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

LESSOR:

_____

By: _____
Printed Name: _____
Title: _____

Tax ID No.: _____

## ACKNOWLEDGEMENT

STATE OF _____ §
                             CORPORATE
COUNTY OF _____ §

Before me, the undersigned Notary Public, personally appeared _____
known to me to be the person whose name is subscribed to the foregoing instrument and known to me to be _____ of
_____ a corporation, and acknowledged to me that he or she executed the same as the act of said corporation for the purposes therein set forth.

Given under my hand and seal of office this _____ day of _____, 2008.

_____
Notary Public in and for the State of _____

My commission expires: _____

SEC 189687

# EXHIBIT "C"

Attached to and made a part of __Joint Operating Agreement dated November 1, 2009, by and between RAW Oil & Gas, Inc., as Operator and Smith Energy Company, etal. as Non-Operators.__

# ACCOUNTING PROCEDURE

# JOINT OPERATIONS

## I. GENERAL PROVISIONS

1. **Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council or Petroleum Accountants Societies.

2. **Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

3. **Advances and Payments by Non-Operators**

A. Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B. Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at __Peoples Bank, Lubbock__ on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

4. **Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

**COPYRIGHT © 1985 by the Council of Petroleum Accountants Societies.**

- 1 -

SEC 189688

5. **Audits**

A. A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B. The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6. **Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. **Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2. **Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

3. **Labor**

A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

   (2) Salaries of First level Supervisors in the field.

   (3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

   (4) Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation or the Joint Property if such charges are excluded from the overhead rates.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

4. **Employee Benefits**

Operator's current costs or established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

- 2 -

SEC 189689

5. **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6. **Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C. In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

7. **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account.if directly engaged in the operation (not administration) of the joint property.

8. **Equipment and Facilities Furnished By Operator**

A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed _eighteen_ percent ( __18__ %) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9. **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10. **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

11. **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

- 3 -

SEC 189690



12. **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

13. **Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

14. **Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

15. **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

1. **Overhead - Drilling and Producing Operations**

   i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

      ( X ) Fixed Rate Basis, Paragraph 1A, or
      (    ) Percentage Basis, Paragraph 1B

      Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

   ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

      (    ) shall be covered by the overhead rates, or
      ( X ) shall not be covered by the overhead rates.

   iii. The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

      (    ) shall be covered by the overhead rates, or
      ( X ) shall not be covered by the overhead rates.

   A. Overhead - Fixed Rate Basis

      (1) Operator shall charge the Joint Account at the following rates per well per month:

          Drilling Well Rate $_____ 7,500.00 _____
              (Prorated for less than a full month)

          Producing Well Rate $___ 750.00 _____

      (2) Application of Overhead - Fixed Rate Basis shall be as follows:

          (a) Drilling Well Rate

              (1) Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever

- 4 -

SEC 189691

is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b) Producing Well Rates

(1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B. Overhead - Percentage Basis

(1) Operator shall charge the Joint Account at the following rates:

(a) Development

_____Percent (_____%) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.

(b) Operating

_____Percent (_____%) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead - Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.

2. Overhead - Major Construction

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint

- 5 -

SEC 189692



Account for overhead based on the following rates for any Major Construction project in excess of $_____:

A. ___5___ % of first $100,000 or total cost if less, plus

B. ___3___ % of costs in excess of $100,000 but less than $1,000,000, plus

C. ___2___ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3. **Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A. ___5___ % of total costs through $100,000; plus

B. ___3___ % of total costs in excess of $100,000 but less than $1,000,000; plus

C. ___2___ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4. **Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. **Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A. New Material (Condition A)

(1) Tubular Goods Other than Line Pipe

(a) Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at current new price available from area vendors effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

(b) For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000

- 6 -

SEC 189693

pound Oil Field Haulers Association interstate truck rate shall be used.

    (c)   Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

    (d)   Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

(2)   Line Pipe

    (a)   Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

    (b)   Line Pipe movements (except size 24 inch OD) and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

    (c)   Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

    (d)   Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

(3)   Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

(4)   Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(1) and (2).

B.   Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

   (1)   Material moved to the Joint Property

      At seventy-five percent (75%) of current new price, as determined by Paragraph A.

   (2)   Material used on and moved from the Joint Property

      (a)   At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

      (b)   At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material

   (3)   Material not used on and moved from the Joint Property

      At seventy-five percent (75%) of current new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C.   Other Used Material

   (1)   Condition C

      Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

SEC 189694



(2)   Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a)   Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b)   Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3)   Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D.   Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E.   Pricing Conditions

(1)   Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2)   Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3.   **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4.   **Warranty of Material Furnished By Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1.   **Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2.   **Reconciliation and Adjustment of Inventories**

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for

SEC 189695


overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3.  Special Inventories

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4.  Expense of Conducting Inventories

A.  The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.  The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

SEC 189696

Attached to and made a part of
Operating Agreement dated November 1, 2009, between RAW Oil & Gas Inc., as Operator and
Smith Energy Company, etal, as Non-Operators.

## INSURANCE

Operator shall carry and maintain at all times the following insurance with respect to all operations under this Agreement:

a) Insurance which shall comply with the Workmen's Compensation Laws of the State in which operations hereunder are conducted.

b) Employers' Liability Insurance with limits of not less than $1,000,000 for each occurrence.

c) Comprehensive General Liability Insurance with limits of not less than (i) $1,000,000 for each occurrence for bodily injury, and (ii) $1,000,000 for each occurrence for property damage. Operator shall provide an AFE insurance program with coverage as follows: Premises and operations, sudden and accidental pollution, underground resources, products and completed operations, and blowout, cratering and explosion coverage.

d) Automobile Liability Insurance, including owned, hired and non-hired vehicles, with combined single limits of $500,000.

e) Coverages in subparagraphs (c) and (d) above shall include Non-Operators as Additional Insured.

f) Excess Liability Coverage in excess of the coverage in subparagraphs (a), (b), (c), (d) and (e) above with a combined single limit for Bodily Injury and Property Damage of not less than $1,000,000 for each occurrence.

g) All premiums on the above provided for insurance shall be charged to the Joint Account. Except as may be otherwise expressly provided in the Operating Agreement to which this Exhibit is attached, the Joint Account shall be charged with all liabilities and expenditures resulting from any claims, damages, or losses against which Operator is not required to carry insurance.

h) Operator shall not be liable to Non-Operators for loss, suffered on account of the insufficiency of insurance carried, or of the insurer with whom carried, nor shall Operator be liable to Non-Operators for any loss accruing by reason of Operator's inability to provide or maintain the insurance specified above, provided, however, that if at any time Operator is unable to obtain or maintain such insurance, Operator shall promptly notify Non-Operators in writing of such fact and Non-Operators may obtain and maintain such insurance at their expense.

SEC 189697

Attached to and made a part of
Operating Agreement dated November 1, 2009, between RAW Oil & Gas Inc., as Operator and
Smith Energy Company, etal, as Non-Operators.

## GAS BALANCING AGREEMENT

The parties to the Operating Agreement to which this agreement is attached own the working interest in the gas rights underlying the Contract Area covered by such agreement in accordance with the percentages of participation as set forth in Exhibit "A" to the Operating Agreement.

Each party has made (or will make) arrangements to sell or utilize its share of the gas well gas produced from the Contract Area. However, the respective gas markets of the parties may be limited from time to time; therefore, to permit the parties as much flexibility as possible in meeting the demands of their respective markets, the parties hereto agree to the following storage arrangement:

### Section 1.

From and after the date of initial delivery of gas well gas from any proration unit within the Contract Area, during any period when the market of a party is not sufficient to take that party's full share of the gas well gas produced, the other parties shall be entitled to produce each month, in addition to their own share of production, that portion of any other party's share of production which said party is unable to market, or its purchaser does not take, of the allowable gas production assigned to such proration unit by the appropriate regulatory authority having jurisdiction in the premises or at the maximum efficient rate, if no such allowable gas production is so assigned, except, however, that no party shall be entitled to take or deliver to a purchaser gas production in excess of three hundred percent (300%) of its share of allowable gas production or maximum efficient rate unless that party has gas in storage. The parties hereto shall share in and own the lease condensate (liquid hydrocarbons recovered from such gas by lease equipment) in accordance with their respective above specified interests, upon and subject to the terms of the Operating Agreement.

### Section 2.

A party taking less than its full share of the gas well gas produced shall be credited with gas in storage on a BTU basis equal to its full share of the total gas well gas produced, less such party's share of such gas used in lease operations or vented or lost, and less that portion of such gas such party took or delivered to the purchaser. Operator will maintain a running account of the gas balance as between the parties hereto and will furnish each party monthly statements showing the total quantity of gas well gas produced, the portion thereof used in lease operations, vented or lost, the total quantity of gas well gas delivered to market, and the monthly and cumulative total over and under delivery of each party on an MCF and on a BTU basis.

### Section 3.

After notice, any party may at any time begin taking or delivering to a purchaser its full share of the gas well gas produced (less such party's share of such gas used in the lease operations, vented or lost). To allow the recovery of gas in storage and to balance the gas account of the parties in accordance with their respective interests, a party with gas well gas in storage shall be entitled to take or deliver to a purchaser its full share of the gas well gas produced (less such party's share of such gas used in lease operations, vented or lost), plus a share of gas not exceeding its gas in storage determined by multiplying (1) twenty-five percent (25%), by (2) the interest in the proration unit's current production (less such party's share of such gas used in lease operations, vented or lost) of the party or parties without gas in storage, by (3) a fraction, the numerator of which is the interest in the proration unit of such party with gas in storage and the denominator of which is the total percentage interest in the proration unit of all parties with gas in storage.

### Section 4.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to its purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser. Each party shall at all times use its best efforts to regulate its takes and deliveries from the Contract Area so that wells will not be shut in for over producing the allowable, if any, assigned thereto by the regulatory authority having jurisdiction.

### Section 5.

Each party producing or taking or delivering gas well gas to its purchaser shall pay any and all royalties and production taxes due on such gas.

### Section 6.

SEC 189698

Should production of gas well gas from a proration unit be permanently discontinued before the gas account is balanced, settlement will be made between the parties for gas which has not been recovered by any party from storage. In making such settlement, if there is any party whose gas has not been recovered from storage, or a party who has sold more than its share of gas well gas, then the amount owed (as hereinafter defined) by each of the latter shall be forwarded to the operator who shall allocate the sum of such amounts and pay the former in proration to the respective ownerships in gas not recovered from storage. The amount owed by each party who has sold more than its share of gas well gas shall be the weighted average of the amounts received by such party upon sale of such gas during the period or periods overproduction is accrued by such party, less base lease royalty and taxes paid thereon; provided, however, that as to gas sold in interstate commerce by such party, such amounts shall be based upon that portion of the rate or rates not subject to refund applicable to and collected for the volumes sold during such period or periods by such party under orders of the regulatory body having jurisdiction which are final at the time of such settlement, plus any additional collected amounts which are not ultimately required by said body to be refunded, such additional collected amounts to be accounted for at such time as final determination is made with respect thereto. For the purpose of the preceding sentence, the weighted average of the amounts received by such party shall be determined by weighting the respective amounts received for such gas on the basis of volumes of overproduction that accrue hereunder to the account of such party during the period for which such amount was received. As to any gas which any party hereto may take for its own use or sell to a third party purchaser affiliated with such selling party such sum or amount of money for the amount of such gas thereof shall be based upon the rate which would have been received by the under produced party as if such gas had been taken during the period or periods of underproduction under its contract with a nonaffiliated third party purchaser, but, if the underproduced party has no such contract, such sum or amount of money shall be based on the average rate received by other parties hereto for their share of gas during the affected period.

Section 7.

This agreement shall constitute a separate agreement as to each proration unit within the Contract Area and shall become effective in accordance with its terms and shall remain in force and effect as long as the Operating Agreement to which it is attached remains in effect, and shall inure to the benefit of and be binding upon the parties, their successors, legal representatives and assigns.

Section 8.

Nothing herein shall change or affect each party's obligations to pay its proportionate share of all costs and liabilities incurred in lease operations in accordance with and subject to the provisions of the Operating Agreement.

SEC 189699

Attached to and made a part of
Operating Agreement dated November 1, 2009, between RAW Oil & Gas Inc., as Operator and
Smith Energy Company, etal, as Non-Operators

## TAX PARTNERSHIP PROVISIONS

1.  **RELATIONSHIP OF THE PARTIES.** This agreement shall not create any mining partnership, commercial partnership or other partnership relating or joint venture, and the liabilities of each of the parties hereto shall be several and not joint. However, solely for the Unites States federal income tax purposes, this agreement shall be considered as a partnership, but such relationship shall be considered as a partnership, but such relationship shall not be a partnership to any other extent or for any other purposes.

2.  **ELECTION TO REMAIN WITHIN SUBCHAPTER K.** Notwithstanding anything to the contrary herein or in the Operating Agreement (the "Operating Agreement") to which this is also to be considered an Exhibit, the parties hereto agree with respect to all operations conducted hereunder:

    Each party, now having or hereinafter acquiring an interest under this agreement, agrees not to elect to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code of 1986, as amended (the "Code"), and each party agrees to join in the execution of such additional documents and elections as may be required by the Internal Revenue Service in order to effectuate the foregoing. In addition, if the income tax laws of any state in which the parties conduct operations pursuant to the terms of this Exhibit or the Operating Agreement, contained provisions similar to those contained in Subchapter K of Chapter 1 of Subtitle A of the Code, the parties hereby agree not to elect to be excluded from the application of such provisions.

3.  **INCOME TAX COMPLIANCE AND CAPITAL ACCOUNTS**

    The Operator shall prepare and file all required federal and state partnership income tax returns. In preparing such returns Operator shall use its best efforts and in doing so shall incur no liability to any other party with regard to such returns. Not less than two weeks prior to the due date (including extensions) Operator shall submit to each party a copy of the return as proposed for review.

    The Operator shall establish and maintain fair market ("FMV") capital accounts and tax basis capital accounts for each party. Operator shall submit to each party along with the copy of any proposed partnership income tax return an accounting of its respective capital accounts as of the end of the tax return period.

    Each party agrees to furnish to Operator not later than 30 days before the return due date (including extensions) such information relating to the operations conducted under this agreement as may be required for the proper preparation of such returns and capital accounts.

4.  **TAX MATTERS PARTNER**

    4.1 *Operator is Tax Matters Partner.* Operator is designated tax matters partner ("TMP") as defined in Internal Revenue Code (Code) Section 6231(a)(7). In the event of any change in operator, the party serving as TMP for a given taxable year shall continue as TMP with respect to all matters concerning such year. The TMP and other parties shall use their best efforts to comply with responsibilities outlined in this section and in Code Sections 6222 through 6232 and 6050K (including any Treasury *Regulations* promulgated thereunder) and in doing so shall incur no liability to any other party. Notwithstanding TMP's obligation to use its best efforts in the fulfillment of its responsibilities, TMP shall not be required to incur any expenses for the preparation for, or pursuance of administrative, or judicial proceedings, unless the parties agree on a method for sharing such expenses.

    4.2 *Information requested by TMP.* The parties shall furnish TMP within two weeks from the receipt of the request with such information (including information specified in Code Sections 6230(e) and 6050(k) as TMP may reasonably request to permit it to provide the Internal Revenue Service with sufficient information for purposes of Code Sections 6233 and 6050K.

    4.3 *TMP Agreements with IRS.* The TMP shall not agree to any extensions of the statute of limitations for making assessments on behalf of any other party without first obtaining the written consent of that party. The TMP shall not bind any other party to a settlement agreement in tax audits without obtaining the concurrence of any such party.

    Any other party who enters into a settlement agreement with the Secretary of the Treasury with respect to

SEC 189700

any partnership items, as defined by Code Section 6231(a)(3), shall notify the other parties of such settlement agreement and its terms within 90 days from the date of settlement.

4.4 Inconsistent Treatment of Partnership Item. If any party intends to file a notice of inconsistent treatment under Code Section 6222(b), such party shall, prior to the filing of such notice, notify the TMP of such intent and the manner in which the Party's intended treatment of a partnership item is (or may be) inconsistent with the treatment of that item by the partnership. Within one week of receipt the TMP shall remit copies of such notification to other parties to the partnership. If any inconsistency notice is filed solely because of the party not having received a Schedule K-1 in time for filing of its income tax return, the TMP need not be notified.

4.5 Request for Administrative Adjustment. No party shall file a request pursuant to Code Section 6227 for an administrative adjustment of partnership items for any partnership taxable year without first notifying all other parties. If all other parties agree with the request adjustment, the TMP shall file the request for administrative adjustment on behalf of the partnership. If unanimous consent is not obtained within the period required to timely file the request for administrative adjustment, if shorter, any party, including the TMP, may file a request for administrative adjustment on its own behalf.

4.6 Judicial Proceedings. Any party intending to file a petition under Code Section 6226, 6228 or any other Code Section with respect to any partnership item, or other tax matters involving the partnership, shall notify the other parties of such intention and the nature of the contemplated proceeding. In the case where the TMP is the Party intending to file such petition, such notice shall be given within a reasonable time to allow the other parties to participate in the choosing of the forum in which such petition will be filed. If the parties do not agree on the appropriate forum, then the appropriate forum shall be decided by majority vote. Each party shall have a vote in accordance with its percentage interest in the partnership for the year under audit. If a majority cannot agree, the TMP shall choose the forum. If a party intends to seek review of any court decision rendered as a result of such proceeding such party shall notify the other parties.

4.7 Windfall Profit Tax. The parties agree to take appropriate action under Code Section 6232(c) and any treasury regulations thereunder to assure that items required to compute the Windfall Profit Tax as imposed by Chapter 45 of the code not be treated as partnership items.

5. ELECTIONS

5.1 General Elections. For both income tax return and capital account purposes, the partnership shall elect (a) to deduct currently intangible drilling and development costs ("IDC"), (b) to use minimum allowable acceleration tax method and the shortest permissible tax life for depreciation purposes, (c) to use the accrual method of accounting, (d) to report income on a calendar year basis, and (e) dispositions of depreciable assets shall be accounted for under the General Asset account method to the extent permitted by Code Section 168(i)(4).

5.2 Depletion. Solely for FMV capital account purposes, depletion shall be calculated by using simulated percentage depletion within the meaning of Treasury Regulation Section 1.704-1 (b)(2)(iv)(k)(2).

5.3 Other Elections. Any other elections must be approved by the affirmative vote of two (2) or more parties owning a majority interest based on the post payout ownership as shown in Exhibit "A".

6. CAPITAL CONTRIBUTIONS AND FMV CAPITAL ACCOUNTS

6.1 Capital Contributions. The respective capital contributions of each party to the partnership shall be (a) each party's interest in the oil and gas leases committed to this partnership, and all properties associated with the leases, and (b) all amounts paid by each party in connection with acquisition, exploration, development and operation of the leases, and all other costs characterized as contributions or expenses borne by such party under this partnership. The contribution of the leases and any other properties committed to this partnership shall be made by each party's agreement to hold legal title to its interest in such leases or any other properties as nominee for this partnership.

6.2 FMV Capital Accounts. The FMV capital accounts shall be increased and decreased as follows:

(a) The FMV capital accounts shall be increased by: (i) the amount of money and the fair market value of any property contributed by each party, respectively, to the partnership (net of liabilities assumed by the partnership or to which the contributed property is subject); (ii) that party's Sec. 7.1 allocated share of Partnership income and gains, or items thereof; (iii) any basis increases required by Code Sections 48(q) and 1016(a)(22); and (iv) that party's share of Code Section 705(a)(1)(B) and (C) items.

(b) The FMV capital accounts shall be decreased by: (i) the amount of money and the fair market value of property distributed to each party (net of liabilities assumed by such party or to which the

SEC 189701

property is subject); (ii) that Party's Sec. 7.1 allocated share of partnership loss and deductions, or items thereof; (iii) any basis decreases required by Code Sections 48(9) and 1016(a)(22); and (iv) that parties share of Code Section 705(a)(2)(B) items and Code Section 709 nondeductible and nonamortizable items.

"Fair market value" when it applies to property contributed by a party to the partnership shall be assumed to equal the adjusted basis, as defined in Code Section 1011, of that property unless the parties agree otherwise in a separate written agreement.

7.    PARTNERSHIP ALLOCATIONS

7.1 FMV Capital Account Allocations. Each item of income, gain, loss or deduction shall be allocated to each party as follows:

(a) Actual or deemed income from the sale, exchange distribution or other disposition of production shall be allocated to the party entitled to such production or the proceeds from the sale of such production. In the event that deemed income arising from the in-kind distribution of production equals that fair market value of the production distributed to a party, the parties recognize that the corresponding adjustments would be net zero adjustment and accordingly, may be omitted form the FMV capital accounts;

(b) Exploration cost, IDC, operating and maintenance cost shall be allocated to each party in accordance with its respective contribution to such cost;

(c) Depreciation shall be allocated to each party in accordance with its contribution to the FMV capital account adjusted basis to the underlying asset;

(d) Simulated depletion shall be allocated to each party in accordance with its FMV capital account adjusted basis in each oil and gas property;

(e) Loss (or simulated loss) upon the sale, exchange, distribution, abandonment or the disposition of depreciable or depletable property, shall be allocated to the parties in the ratio of their respective FMV capital account adjusted basis in the depreciable or depletable property;

(f) Gain (or simulated gain) upon the sale, exchange, distribution, or other disposition of depreciable or depletable property, shall be allocated to the parties so that the FMV capital account balances of the parties with respect to such property will most closely reflect their respective percentage or fractional interest under the agreement;

(g) Costs or expenses of any other kind shall be allocated to and accounted for by each party in accordance with its respective contribution to such costs or expenses; and,

(h) Any other income item shall be allocated to the parties in accordance with the allocation of the realization.

7.2    Tax Returns and Tax Basis Capital Account Allocations

(a) Unless otherwise expressly provided herein the allocations of partnership items of income, gain, loss or deduction for tax return and tax basis capital accounts purposes shall be the same as those contained in Section 7.1;

(b) The parties recognize that under Code Section 613A(C)(7)(D) the depletion allowance is to be computed separately by each party. For this purpose, each party's share of the adjusted tax basis of each oil and gas property shall be equal to its contribution to the adjusted tax basis of such property;

(c) The parties recognize that under Code Section 613A(C)(7)(D) the computation of gain or loss on the taxable disposition of an oil or gas property is to be computed separately by each party. For this purpose the portion of the total amount realized by the partnership that represents a recovery of simulated adjusted basis in an oil and gas property will be allocated to the parties in the same ratio that simulated depletion is allocated to them under Sec. 7.1(d). Any additional amount realized will be allocated in accordance with the ratio of simulated gain allocation for such property under Sec. 7.1(f);

(d) Depreciation shall be allocated to each party in accordance with its contribution to the adjusted tax basis of the depreciable asset;

(e) Any recapture of depreciation, IDC, and other items of deduction or credit shall, to the extent possible, be allocated among the parties in accordance with their sharing of the depreciation, IDC

MKB/EXHG.WPF

SEC 189702

or other item of deduction or credit which is recaptured;

(f) The qualified investment for investment tax credit (if reinstated) purposes with respect to any property shall be allocated among the parties in accordance with their respective contributions to the qualified investment (as defined in the code) in such property;

(g) For partnership property which has a value in the FMV capital accounts which differs from the adjusted tax basis of such property, any tax items relating to such property will be allocated to the parties in a manner which takes into account the variation between the adjusted tax basis of such property and its FMV capital account value under Code Section 704(c); and,

(h) The income attributable to take-in-kind production will not be reflected on the tax return.

8.    DISTRIBUTION UPON TERMINATION

8.1 Termination. Termination shall occur on the earlier of the termination of the partnership under Code Section 708(b)(1) or the date upon which the partnership ceases to be a going concern. Upon termination the business shall be wound-up and concluded, and the assets shall be distributed to the parties as described below by the end of such calendar year (or, if later, within 90 days after the date of such termination). All assets shall be distributed to the parties as provided in Sections 8.2 through 8.4.

8.2 Reversion. First, all money representing unexpended contributions by any party and any property where no interest has been earned in that property under the agreement by any other party shall be returned to the contributor.

8.3 Balancing. Second, the FMV capital accounts of the parties shall be determined under this Section 8.3. The Operator shall take the actions specified under this Section 8.3 in order to cause the ratio of the parties FMV capital accounts to reflect as closely as possible their percentage interests under the agreement. The ratio of a party's FMV capital account is represented by a fraction, the numerator of which is the party's FMV capital account balance and the denominator of which is the sum of all parties FMV capital account balances. Such actions are hereafter referred to as "balancing the FMV capital accounts", and when completed, the FMV capital accounts of the parties shall be referred to as being "balanced". The matter in which the FMV capital accounts of the parties are to be balanced under this Section 8.3 shall be determined as follows:

(a) The fair market value of all partnership properties shall be determined and the gain or loss for each property which would have resulted if a sale thereof at such fair market value had occurred shall be allocated in accordance with Section 7.1(e) and (f). If thereafter, any party has a negative FMV capital account balance, that is, a balance less than zero, such party shall contribute an amount of money to the partnership sufficient to achieve a zero balance FMV capital account. Any party may contribute an amount of money to the partnership to facilitate the balancing of the FMV capital accounts. If FMV capital accounts are not balanced, Section 8.3(b) or (c) shall apply;

(b) If all the parties consent, any money or an undivided interest in certain selected properties shall be distributed to one or more parties as necessary for the purpose of balancing the FMV capital accounts;

(c) Unless (b) above applies, an undivided interest in each and every property shall be distributed to one or more parties in accordance with the ratios of their FMV capital accounts;

(d) If a property is to be valued under (a) above or distributed pursuant to (b) or (c) above, the fair market value of the property shall be agreed to by the parties. In the event all of the parties do not reach agreement as to the fair market value of property, the Operator shall cause a nationally recognized independent engineering firm to prepare an evaluation of fair market value of such property.

8.4 Final Distribution. Third, after the FMV capital accounts of the parties have been adjusted, pursuant to Section 8.3 above, all other remaining property and interest then held by the partnership shall be distributed to the parties in accordance with their FMV capital account balances.

9.    TRANSFERS, SURVIVORSHIP AND CORRESPONDENCE

9.1 Transfers. These partnership provisions shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns. The parties agree that if any one of them makes a sale or assignment of its interest under this agreement, such sale or assignment will be structured, if possible, so as not to cause a termination under Code Section 708(b)(1)(B).

9.2 Survivorship. Any termination of the agreement shall not effect the continuing application of the Tax

SEC 189703

Partnership Provisions as necessary for the termination and liquidation of the Tax Partnership.

9.3  Correspondence.  All correspondence relating to the preparation and filing of the partnership's income tax returns and capital accounts shall be forwarded to:

RAW Oil & Gas, Inc.
12312 Slide Road
Lubbock, Texas  79424

MKB/EXHG.WPF

SEC 189704

## MEMORANDUM OF OPERATING AGREEMENT AND FINANCING STATEMENT

1.0    This Memorandum of Operating Agreement and Financing Statement (hereinafter called "Memorandum") shall be effective when the Operating Agreement referred to in Paragraph 2.0 below becomes effective, that being **November 1, 2009.**

2.0    The parties hereto have entered into an Operating Agreement, providing for the development and production of crude oil, natural gas and associated substances from the lands described on Exhibit "A" attached hereto (hereinafter called the "Contract Area"), and designating **RAW OIL & GAS, INC.** as Operator to conduct such operations.

3.0    The Operating Agreement provides for certain liens and/or security interests to secure payment by the parties of their respective share of costs under the Operating Agreement. The Operating Agreement contains an Accounting Procedure along with other provisions which supplement the lien and/or security interest provisions, including non-consent clauses which provide that parties who elect not to participate in certain operations shall be deemed to have relinquished their interest until the consenting parties are able to recover their costs of such operations plus a specified amount. Should any person or firm desire additional information regarding the Operating Agreement or wish to inspect a copy of the Operating Agreement, said person or firm should contact the Operator.

4.0    The purpose of this Memorandum is to more fully describe and implement the liens and/or security interests provided for in the Operating Agreement, and to place third parties on notice thereof.

5.0    In consideration of the mutual rights and obligations of the parties hereunder, the parties hereto agree as follows:

5.1 The Operator shall conduct and direct and have full control of all Operations on the Contract Area as permitted and required by, and within the limits of the Operating Agreement.

5.2 The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations and shall be liable only for its proportionate share of costs.

5.3 Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share of oil and or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon at the rate provided in the Accounting Procedure referred to in Paragraph 3.0 above. To the extent that Operator has a security interest under the Uniform Commercial Code of he state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the rights or security interest for the payment thereof.

5.4 The Operator grants to Non-Operators a lien and security interest equivalent to that granted to Operator as described in Paragraph 5.3 above, to secure payment by Operator of its own share of costs when due.

6.0    For purposes of protecting said liens and security interest, the parties hereto agree that this Memorandum shall cover all right, title and interest of the debtor(s) in:

6.1 Property Subject to Security Interests

(A) All personal property located upon or used in connection with the Contract Area.

(B) All fixtures on the Contract Area.

(C) All oil, gas and associated substances of value in, on or under the Contract Area which may be extracted therefrom.

(D) All accounts resulting from the sale of the items described in subparagraph (C) at the wellhead of every well located on the Contract Area or on lands pooled therewith.

(E) All items used, useful, or purchased for the production, treatment, storage, transportation, manufacture, or sale of the items described in subparagraph (C).

(F) All accounts, contract rights, rights under any gas balancing agreement, general intangibles, equipment, inventory, farmout rights, option farmout rights, acreage and or cash contributions, and conversion rights, whether now owned or existing or hereafter acquired or arising, including but not limited to all interest in any partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Contract Area or in any property encumbered by this Memorandum.

(G) All severed and extracted oil, gas, and associated substances now or hereafter produced from or attributable to the Contract Area, including without limitation oil, gas and associated substances in tanks or pipelines or otherwise held for treatment, transportation, manufacture, processing or sale.

SEC 189705

(H) All the proceeds and products of the items described in the foregoing paragraphs now existing or hereafter arising, and all substitutions therefor, replacements thereof, or accessions thereto.

(I) All personal property and fixtures now and hereafter acquired in furtherance of the purposes of this Operating Agreement. Certain of the above-described items are or are to become fixtures on the Contract Area.

(J) The proceeds and products of collateral are also covered.

6.2 Property Subject to Liens

(A) All real property within the Contract Area, including all oil, gas and associated substances of value in, on or under the Contract Area which may be extracted therefrom.

(B) All fixtures within the Contract Area.

(C) All real property and fixtures now and hereafter acquired in furtherance of the purposes of this Operating Agreement.

7.0 The above items will be financed at the wellhead of the well or wells located on the Contract Area, and this Memorandum is to be filed for record in the real estate records of the county or counties in which the Contract Area is located, and in the Uniform Commercial Code records. All parties who have executed the Operating Agreement and all farmors and option farmors who have granted support within the Contract Area are identified on Exhibit A.

8.0 On default of any covenant or condition of the Operating Agreement, in addition to any other remedy afforded by law or the practice of this state, each party to the agreement and any successor to such party by assignment, operation of law, or otherwise, shall have, and is hereby given and vested with the power and authority to take possession of and sell any interest which the defaulting party has in the subject lands and to foreclose this lien in the manner provided by law.

9.0 Upon expiration of the subject Operating Agreement and the satisfaction of all debts, the Operator shall file of record a release and termination on behalf of all parties concerned. Upon the filing of such release and termination, all benefits and obligations under this Memorandum shall terminate as to all parties who have executed or ratified this Memorandum. In addition, the Operator shall have the right to file a continuation statement on behalf of all parties who have executed or ratified this Memorandum.

10.0 It is understood and agreed by the parties hereto that if any part, term, or provision of this Memorandum is by the courts held to be illegal or in conflict with any law of the state where made, the validity of the remaining portions or provisions shall not be affected, and the rights and obligations of the parties shall be construed and enforced as if the Memorandum did not contain the particular part, term or provision held to be invalid.

11.0 This Memorandum shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns. The failure of one or more persons owning an interest in the Contract Area to execute this Memorandum shall not in any manner affect the validity of the Memorandum as to those persons who have executed this Memorandum.

12.0 A party having an interest in the Contract Area can ratify this Memorandum by execution and delivery of an instrument of ratification, adopting and entering into this Memorandum, and such ratification shall have the same effect as if the ratifying party had executed this Memorandum or a counterpart thereof. By execution or ratification of this Memorandum, such party hereby consents to its ratification and adoption by any party who may have or may acquire any interest in the Contract Area.

13.0 This Memorandum may be executed or ratified in one or more counterparts and all of the executed or ratified counterparts shall together constitute one instrument. For purposes of recording, only one copy of this Memorandum with individual signature pages attached thereto needs to be filed of record.

Names and addresses:

RAW OIL & GAS, INC.
12312 Slide Road
Lubbock, Texas 79424

By:
Name: Joe D. Hardin
Title: President

RAW ENERGY, L.C.
12312 Slide Road
Lubbock, Texas 79424

By:
Name: Joe D. Hardin
Title: Manager

SEC 189706

**SMITH ENERGY COMPANY**
P.O. Box 52890
Houston, Texas 77052
Attn.: Judy Mills

By: _____
Name: Lester Smith
Title: President

**MARK P. HARDWICK**
P.O. Box 213
Midland, Texas 79702

**STEVE BLAYLOCK**
214 W. Texas, Suite 306
Midland, Texas 79701

**ELGER EXPLORATION INC.**
P.O. Box 2623
Midland, Texas 79702

By: _____
Name: Jerry Elger
Title: _____

STATE OF TEXAS §

COUNTY OF LUBBOCK §

    This instrument was acknowledged by me on this _____ day of _____, 2008 by Joe D. Hardin as President of **RAW OIL & GAS, INC.**

_____
Notary Public in and for the State of Texas

STATE OF TEXAS §

COUNTY OF LUBBOCK §

    This instrument was acknowledged by me on this _____ day of _____, 2008 by Joe D. Hardin as Manager of **RAW ENERGY, LC.**

_____
Notary Public in and for the State of Texas

STATE OF TEXAS §

COUNTY OF _____ §

    This instrument was acknowledged by me on this _____ day of _____, 2008 by Lester Smith, as President of **SMITH ENERGY COMPANY.**

_____
Notary Public in and for the State of Texas

SEC 189707

STATE OF TEXAS                    §

COUNTY OF MIDLAND            §

    This instrument was acknowledged by me on this _____ day of _____, 2008 by **MARK P. HARDWICK.**

                                                                                Notary Public in and for the State of Texas

STATE OF TEXAS                    §

COUNTY OF MIDLAND            §

    This instrument was acknowledged by me on this _____ day of _____, 2008 by **STEVE BLAYLOCK.**

                                                                                Notary Public in and for the State of Texas

STATE OF TEXAS                    §

COUNTY OF MIDLAND            §

    This instrument was acknowledged by me on this _____ day of _____, 2008 by Jerry Elger, as _____ of **ELGER EXPLORATION.**

                                                                                Notary Public in and for the State of Texas

SEC 189708

**EXHIBIT "A"**

Attached to and made a part of
Memorandum of Operating Agreement and Financing Statement
between RAW Oil & Gas, Inc., as Operator and
Smith Energy Company, etal, as Non-Operators dated November 1, 2009

CONTRACT AREA

Section 55, Abstract 394, Georgetown Ry. Co. Survey, Lynn County, Texas
(640.00 ac.)

South Half of Section 57, Abstract ___, Georgetown Ry. Co. Survey, Lynn County,
Texas (320.00 ac.)

West 200 Acres of Section 20, Abstract 948, D&SE Ry. Co. Survey, Lynn County,
Texas (200 ac.)

North 200 Acres of Section 7, Abstract 998, Block C-40, PSL Survey Lynn County,
Texas (200 ac.)

SEC 189709

# TAB G

# On Point GEA
# (DX 1351)

## GEOPHYSICAL EXPLORATION AGREEMENT
## ON POINT PROGRAM AREA
## LYNN AND TERRY COUNTIES, TEXAS

This Geophysical Exploration Agreement (the "**Agreement**") dated and effective as of January 2, 2010 (the "**Effective Date**"), is entered into by and between RAW Oil & Gas, Inc. ("**RAW**"), JDH RAW Energy, L.C., formerly known as RAW Energy, L.C. ("**RAW LC**"), Mark P. Hardwick ("**Hardwick**"), Steve Blaylock ("**Blaylock**"), Elger Exploration, Inc. ("**Elger**"), and Smith Energy Company ("**Smith**"). Hardwick, Blaylock, and Elger are at times referred to collectively as the "**RAW Participants**" and, together with Smith, the "**Participants**." The Participants, RAW and RAW LC, are at times referred to individually as a "**Party**" and collectively as the "**Parties**."

WHEREAS, RAW proposes to conduct a 3-D seismic survey covering approximately 45 square miles in Lynn and Terry Counties, Texas, as depicted on **Exhibit A** attached hereto (such lands, as the area may be amended from time to time as provided herein, are referred to herein as the "**Program Area**"); and

WHEREAS, RAW intends to utilize such 3-D seismic data and existing geologic data to generate Prospects within the Program Area; and

WHEREAS, Participants desire to participate with RAW in the 3-D seismic survey and to participate in Prospects generated within the Program Area; and

WHEREAS, this Agreement is to establish the Parties' respective rights and obligations with regard to participation in the shooting, processing and interpretation of the 3-D seismic survey, the generation of Prospects, the acquisition of Leases within the Program Area, and the exploration, development, and production of oil and gas from Prospects generated using the 3-D seismic data.

NOW, THEREFORE, in consideration of the mutual covenants herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I

### Geophysical Program

**1.1  Scope and Supervision of Geophysical Program.** The Parties have agreed that a three-dimensional geophysical program (the "**On Point Program**" or the "**Geophysical Program**") will be conducted across the Program Area. The scope and design of the Geophysical Program will be determined by RAW, subject to Smith's final written approval. RAW will conduct or supervise third Parties in conducting the Geophysical Program, including permitting, data acquisition, processing and interpretation of the Data Program (as defined below).

**1.2  Ownership and Confidentiality of Data.**

(a) All data resulting from the Geophysical Program ("**Program Data**") shall be owned by the Parties who pay for the costs of the Geophysical Program (the "**Program Data Owners**"), who will be represented in this Agreement by Smith Energy Company as their agent and nominee. Notwithstanding the provisions of **Article V**, Smith shall have the right to allow third parties to participate in Smith's

CJM 192236v.6

DEFENDANT'S
TRIAL EXHIBIT
1351

SEC 190185

rights and obligations under this Agreement so long as such parties ratify this Agreement and a copy of the ratification is furnished to RAW. All such ratifying Parties shall be referred to as the "**Smith WI Participants.**" Upon ratification of this Agreement, the Smith WI Participants shall be entitled to and shall bear their proportionate share of Smith's rights and obligations under this Agreement, including rights as Program Data Owners proportionate to their cost bearing interest in the 3D Survey Costs.

Upon request, all Parties shall be entitled to receive a copy of the Program Data, including all tapes and reproducibles. Each Party shall have the right to use the Program Data in connection with exploration and development of the Program Area for the benefit of the Parties during the Term, as defined in Section 2.5 below, but no Party other than Smith shall have the right to sell, trade, license or exchange ("**Transfer**") the Program Data without the prior written consent of Smith. Upon an approved Transfer of any of the Program Data, all proceeds of such sale shall be payable to and delivered to the Program Data Owners. Upon expiration of the Term, all copies of the Program Data and (if requested in writing by Smith) all interpretations derived from the Program Data will be returned to Smith on behalf of the Program Data Owners.

(b) During the Term of this Agreement or so long as any Lease or Joint Operating Agreement within the Program Area is in force and effect, each of the Parties shall maintain the confidentiality of the Program Data; provided, however, that with prior written notice to Smith and RAW identifying the proposed recipient of the Data, each Party may furnish a copy of the relevant portion of the Program Data to (i) the Parties' lessors, to the extent required under applicable Leases and/or Permits covering lands in the Program Area, (ii) such Party's bona fide consultants, and (iii) to prospective third Party purchasers of an interest in a Prospect. Any consultant or prospective purchaser to whom access to any portion of the Program Data is provided shall enter into a confidentiality and non-competition agreement, which shall inure to the benefit of all of the Parties, pursuant to which such third Party shall agree to maintain the confidentiality of the Program Data and to use the Program Data solely for the purpose of rendering consulting services or evaluating the Prospect, as the case may be. The consultant shall immediately return the Program Data upon the completion of the work for which the consultant was engaged. The consultant shall not be not permitted to retain any copies of the Program Data or any analysis of interpretations of the Program Data after completion of the work for which consultant was engaged. In connection with the disclosure of any portion of the Program Data to a potential third-Party purchaser or participant as permitted under this section, the Program Data shall at all times remain in the control of the Party disclosing the Program Data and no third party shall be allowed to copy, or to receive copies, of the Program Data including tapes and/or reproducibles. Such confidentiality and non-compete agreement shall also include an agreement and obligation that such consultant or prospective purchaser must offer to the Parties at actual cost any interest that may be acquired by such third party in lands covered by the disclosed data within a specified period, such period to be no less than 36 months after disclosure of the data.

**1.3 Costs of Geophysical Program.** Smith, along with the Smith WI Participants, will pay one hundred percent (100%) of all Seismic Survey Costs associated with the conduct of the Geophysical Program (including any additional seismic conducted within the AMI and any purchased seismic data that has been authorized in writing by Smith) including, but not limited to, the costs associated with three dimensional ("**3-D**") seismic acquisition, seismic permitting and damages, processing, interpretation, reproduction and any other costs associated with the Geophysical Program.

RAW has estimated the 3-D Seismic Survey Costs for the acquisition of new 3D seismic data to be $32,000/square mile, which amount includes, but is not limited to (i) costs and expenses of acquiring all necessary geophysical permits from third parties, including landman and brokers' fees; (ii) costs of shooting the seismic survey, including surface damages payable to third Parties; and (iii) costs and

2

SEC 190186

expenses associated with processing Program Data derived from the geophysical operations on the Program Area and/or merging such Program Data with other 3-D Data and other geologic data (collectively, "3D Survey Costs"). Smith, on its own behalf and along with the Smith WI Participants as to their share, agrees to reimburse RAW for 100% of the actual Seismic Survey Costs. An invoice for the Seismic Survey Costs will be prepared and submitted by RAW to Smith with a copy to each Program Data Owner monthly according to COPAS standards as such costs are incurred. Smith, along with the Smith WI Participants, shall pay directly to RAW the amount billed within thirty (30) days after receipt.

Subject to the prior approval of Smith, RAW shall have the right to purchase existing 3D seismic data and the acquisition cost shall be included in the 3D Survey Costs to be paid by Smith and the Smith WI Participants.

**1.4 Acquisition of Seismic Permits; Amendment of Program Area..** RAW shall be responsible for acquiring sufficient seismic permits or other rights to conduct the Geophysical Program, and shall notify Participants when it has completed the acquisition of such permits and other rights. If RAW is unable to obtain seismic permits or other rights sufficient to grant it the right to conduct the Geophysical Program over sufficient acreage within the Program Area to properly image substantially all of the Program Area, RAW may, upon written notice to Smith, amend the Program Area to remove acreage as to which such seismic permits or other rights have not been obtained. Such notice shall include a description of the acreage to be removed, a reasonably detailed description of the efforts made to acquire the permits, RAW's reasons for removing the acreage, and a description of the anticipated impact of such removal on the survey and the generation of Prospects. With the prior written approval of Smith, RAW may substitute contiguous or nearby acreage for the acreage so removed. If RAW desires to substitute acreage, it shall notify Smith and all other Participants of the proposed substitution, including a description of the acreage to be removed, a description of the substitute acreage, and the reasons for such substitution. Smith shall have 10 days after receipt of such notice to approve or disapprove the substitution. Failure to respond within such 10 day period shall be deemed to be approval of the substitution.

**1.5 Contributions of the Parties.** All Parties will participate with RAW in accomplishing the Geophysical Program as may be requested from RAW from time to time. The primary responsibilities of RAW are as follows:

(a) RAW shall be Operator of the project to be conducted pursuant to this Agreement. RAW shall coordinate all land and geological functions, conduct the Geophysical Program and operate all wells drilling or drilled on each Prospect Area.

(b) RAW will provide or supervise the land work on the Program Area, including negotiating and obtaining seismic options, lease options and leases, and settling surface damages for conducting the Geophysical Program and for subsequent exploration and production operations.

(c) RAW will promptly analyze and interpret the Program Data obtained from the Geophysical Program.

(d) RAW will provide the geological subsurface expertise to integrate the Program Data with all available geologic and well data to evaluate the Program Area including analyzing well logs in the area, and providing geological mapping and interpretation.

(e) RAW will provide to Participants copies of all maps and interpretations relating to the Geophysical Program and the Program Area currently available and as developed pursuant to this Agreement.

3

SEC 190187

RAW will not charge a consulting fee but will charge an overhead fee of $7,500 per month while third-party crews are working in the field during the Geophysical Program conducted under this Agreement. RAW also will be entitled to the Operator's overhead under each Operating Agreement.

**1.6 Reports; Meetings.** RAW shall distribute a written report on the status of all activities within the Program Area to the Parties on at least a monthly basis. During the first year of the Term, the Parties shall meet quarterly (unless waived by Smith) at a mutually agreeable time, either in Smith's offices or by teleconference to review the Program's activities ("**Quarterly Meeting**"). At least five (5) days prior to each Quarterly Meeting, RAW shall furnish to Participant (i) a written agenda listing any Prospects to be presented at the meeting and listing other items of business to be discussed at the Quarterly Meeting, and (ii) a brief written report summarizing the status of the program's activities, including the status of seismic acquisition and processing, prospect generation, lease acquisition, drilling operations, and other matters to be discussed at the Quarterly Meeting.

**1.7 Completion of the Geophysical Program.** The Geophysical Program will be completed for purposes of this Agreement when final processed, migrated seismic sections have been delivered to Participants by the third-party seismic contractors preparing such data. RAW will use all commercially reasonable efforts to commence the field work relating to the Geophysical Program no later than February 15, 2010 , to have the data acquisition portion of the Geophysical Program completed within 45 days thereafter and to have all Program Data analyzed with the initial Prospect proposed to the Parties no later than April 30, 2010.

## ARTICLE II

### Participation Terms and Area of Mutual Interest

**2.1 Interests of the Participants.**

(a) Smith and the Smith WI Participants shall be entitled to receive a collective 76.6667% of 8/8ths of all rights and interests acquired within the Program Area, burdened only by the royalty payable to the Lessor of each Lease, without any other reduction or burden. Immediately on payment of all 3D Seismic Costs, geological and land costs for which Smith is obligated to RAW in this Agreement, Smith and the Smith WI Participants shall be entitled to an assignment of their working interest, and related net revenue interest, in each of the Leases acquired.

(b) RAW LC hereby agrees to assign to each of the three other RAW Participants 5.833325% of 8/8ths of RAW LC's rights and interests existing under the Leases and RAW LC will retain an undivided 5.833325% of 8/8th interest. When assignments of record title to the Leases are made by RAW, each of the RAW Participants shall receive an assignment of its proportionate undivided working interest and attributable net revenue interest in and to each Lease in which the Participants are entitled to receive an interest pursuant to this Participation Agreement and the Operating Agreement.

(c) Except as stated in Section 2.1(a) above, the interests assigned to each Participant pursuant to this Agreement are hereby expressly assigned subject to their proportionate part of all of the terms, covenants, reversionary interests and other production burdens referenced in the following:

        (i) each Lease; and

4

SEC 190188

(ii) the Operating Agreement referenced in **Article V** below.

## 2.2 Participation of the Parties in the Prospect Area and Subsequent Wells.

(a) Upon execution of this Agreement, Smith, on its own behalf and along with the Smith WI Participants, will pay a one-time $150,000 geological/geophysical prospect generation fee to RAW, Hardwick, Blaylock and Elger, in equal 25% shares.

(b) It is understood and agreed that RAW, as Operator, will use its commercially reasonable efforts to commence operations for the drilling of the initial well on the first Prospect promptly after the relevant Leases have been acquired, but, in any event, no later than June 1, 2010 unless otherwise agreed by Smith. Enclosed herewith is RAW's Authorization For Expenditure ("**AFE**") which shows the current total estimated costs to drill, complete and equip a well to be drilled to a depth sufficient to test the Fusselman Formation, approximately 11,100 feet. RAW will submit an updated AFE for the initial well and each subsequent well in accordance with Section 3.1. In no event, without the written approval of Smith, shall a lapse of the AFE serve to extend the time within which Operator is required to commence operations for the drilling of a well.

(c) RAW and the RAW Participants shall be collectively entitled to an undivided 23.3333% working interest carried to the casing point on the initial well drilled pursuant to this Agreement within the Program Area and the next two wells drilled within the Program Area for a total of three wells carried to the casing point. All subsequent wells drilled by the Parties anywhere in the Program Area will be on a heads-up basis with each participating Party paying its working interest share of the costs of subsequent wells or being subject to the relinquishment provisions of this Agreement or the non-consent provisions in accordance with the applicable Operating Agreement.

(d) As to all wells drilled within the Program Area, the applicable Operating Agreement will provide that each well will be subject to a casing point election at which, if any Party elects not to participate in a completion, such Party will relinquish and assign to the participating Parties all of its or their leasehold interests in and to the area specified in the Operating Agreement, as defined for each well prior to commencement of drilling on that Prospect.

In the event that any Party elects not to participate in a completion attempt, the non-consenting Party will be subject to the provisions in the governing Operating Agreement.

(e) No Party shall have the right to reinstatement of an interest in a well or acreage relinquished in accordance with this Section 2.2 or in accordance with the applicable Operating Agreement, whether by payment of a cash penalty, production penalty, or otherwise.

(f) In the event of a "**Default**" by any Party, as defined and described in Article VII of the Operating Agreement, the other Parties shall have the right to exercise any and all remedies available to the non-defaulting Parties specified in Article VII of the Operating Agreement, which provisions are incorporated herein by reference.

## 2.3 Payment for and Ownership of Oil and Gas Interests. Until the first three (3) wells have been drilled to test the Fusselman Formation pursuant to this Agreement, Smith, along with the Smith WI Participants, shall pay all of the costs of acquiring Oil and Gas Interests (including any lease options or the exercise of any lease option) in the Program Area on the Prospect or Prospects approved by Smith. While Smith is paying 100% of the lease or option costs, no lease or option shall be purchased by any Party without the prior approval of Smith. After the first three (3) wells have been drilled, the costs of

5

SEC 190189

acquiring any additional Oil and Gas Interests (including bonuses, delay rentals, lease extensions or shut in payments relating to leases) in the Program Area thereafter shall be borne by the Parties who own an interest in the applicable Prospect Area in the proportions set forth on **Exhibit B**, Column D, attached hereto. If a Party does not pay its share of Lease obligations and costs when due, that Party will relinquish all of its interest in that Lease or Oil and Gas Interest.

All Oil and Gas Interests shall be owned by the Parties in the percentage interests set forth on **Exhibit B**, except as such undivided interests may be modified by the operation of Sections 2.4, 2.5, and 3.4 hereof or by non-payment of Lease cost obligations.

**2.4 Delay Rentals and Shut-In Royalties.** At any time any delay rentals, shut-in royalties, Lease extension payments or other sums ("**Rentals**") necessary to perpetuate any Oil and Gas Interests becomes due and owing, RAW shall pay such Rentals and invoice all other Parties for their proportionate share thereof. Each Party agrees to pay its proportionate share (as determined by **Exhibit B**, Column D, or the Party's participation percentage in that Prospect, if different) of such Rentals within fifteen (15) days of receipt of an invoice therefore. RAW shall have no liability to the other Parties hereto for failure to pay such Rentals when due provided RAW has acted in good faith.

**2.5 Area of Mutual Interest and Term.** The Parties have agreed to and do hereby establish an Area of Mutual Interest ("**AMI**") which shall encompass all of the Program Area as depicted on the plat attached hereto as **Exhibit A**. The AMI shall remain in force for a period of ten (10) years from the date hereof, unless sooner terminated by the Parties (the "Term"). Upon expiration of the 10-year Term, this Agreement shall terminate; provided that the obligation to return the Data and other information (if requested) under Section 1.2(a) shall survive termination of this Agreement. Should any Party own on the date hereof, or acquire at any time during the Term, an interest in (i) a lease covering lands, any part of which are located within the AMI or (ii) an option or a farm-in covering lands any part of which are within the AMI (an interest so owned or acquired insofar and only insofar as it covers lands within the AMI being herein called an "**Acquired Interest**"), such Party (the "**Acquiring Party**") shall promptly notify the other Parties, in writing, of such acquisition, the consideration paid or to be paid for the Acquired Interest, any other obligations (including, without limitation, drilling obligations) undertaken or to be undertaken as a part of such acquisition and any other terms of such acquisition. Each of the Parties shall, within thirty (30) days after the receipt of such notice, notify the Acquiring Party in writing, whether or not it wishes to participate in such acquisition; provided that failure of a Party to respond within the time and in the manner set forth above shall be deemed an election not to participate in such acquisition.

**2.6 Effect of Election to Participate.** Should a Party elect to participate in an acquisition of an Acquired Interest, such Party shall be assigned its proportionate part (being the percentage specified for such Party in the table set forth in **Exhibit B**) of the Acquired Interest by the Acquiring Party, and shall upon receipt of such assignment, pay, or to the extent not yet due, agree to pay when due) its part of the direct costs incurred by the Acquiring Party in making such acquisition and agrees to assume its proportionate part of any other obligations which are undertaken as part of such acquisition. If the costs or obligations relate to the lands outside the AMI as well as to lands inside the AMI, such costs and/or obligations shall be allocated between such areas on an acreage basis. Lease acquisition costs shall be paid in accordance with Section 2.3 above. If less than all of the Parties elect to participate in such acquisition, the proportionate parts for the Parties electing to participate shall, unless the Parties agreeing to participate agree otherwise, be the percentage determined by dividing, for each participating Party, the proportionate part otherwise applicable (if all Parties had participated) to such participating Party by the total proportionate parts for all participating Parties, provided, however, that in no event shall a Party electing to participate be required to participate for a percentage greater than that set forth for such Party

6

CJM 192236v.6

SEC 190190

on **Exhibit B** hereto.

**2.7 Exercise of Options.** Should any Party propose to exercise an option to lease with respect to some or all of the lands covered thereby, it shall notify the other Parties in the same manner provided for in Section 2.5 above with respect to acquisitions of Acquired Interests and each such other Party shall elect to participate or to not participate in the exercise of such Option in the same manner as provided in Section 2.5. The effective elections to participate in such an exercise of an Option and the payment of costs and the ownership of interests in the lease acquired pursuant to such exercise, shall be handled in the same manner provided in Sections 2.3 and 2.4.

## ARTICLE III

### Prospect Designation and Participation

**3.1 Prospect Designation.** Upon completion of the interpretation of the Program Data, RAW will delineate proposed Prospects for exploration and development within the Program Area and distribute to each Party a list and description of each proposed Prospect. The Parties will then meet and RAW will make a presentation on each Prospect, including (i) the proposed location for the initial well on the Prospect (and the date by which drilling of such initial well is anticipated to be commenced and an AFE covering the estimated costs of drilling and completing such initial well), and (ii) the acreage which RAW would include in the Prospect Area. The acreage proposed to be included in a Prospect shall not include any acreage included in any other Prospect Area. The Parties will attempt to agree on the Prospect and the Prospect Area to be included in each Prospect in accordance with Sections 3.2 and 3.3. Notwithstanding the above, in the event the Parties do not reach agreement as to the Prospect Area for any Prospect within 60 days after the initial Prospect proposal, Smith shall have the right to make the final decision as to the delineation of the Prospect and the Prospect Area. The Parties shall document their participation percentages in writing in Exhibit A to the Operating Agreement for that Prospect Area and from that point forward each Prospect Area shall be governed by a separate Operating Agreement in the form of **Exhibit C** in accordance with Article IV. The Parties acknowledge that they may acquire Leases or participation rights by farm-in or otherwise as to lands that are subject to an existing third-party operating agreement. In that event, the Parties will take the actions necessary to harmonize the operating agreements to the extent reasonably practical, but the Operating Agreement contemplated by this Agreement will govern as between the Parties in the event of conflict.

"**Prospect**" shall mean the area included in a geologic structural or stratigraphic trap or enclosure which based on available data is reasonably believed to have the potential for accumulations of hydrocarbons in commercial quantities. "**Prospect Area**" means all lands within a contiguous geographical area (not including lands within the Prospect Area for another Prospect previously designated pursuant to the terms of this Agreement) which are believed by the proposing Party to contain all of the Prospect; it being understood that a Prospect Area shall include all depths within the contiguous geographical area so identified.

**3.2 Proposals by Parties for Prospects.** After the meeting described in Section 3.1 above (or, if such meeting does not occur within thirty (30) days of the completion of the interpretation of the Program Data, then at any time more than 45 days after the completion of the interpretation of the Program Data by RAW) any Party may propose that a portion of the Program Area be designated as a Prospect by giving written notice to the other Parties containing the same information described in Section 3.1. The Prospect and Prospect Area will be determined in the same manner specified in Section 3.1.

7

CJM 192236v.6

SEC 190191

**3.3 Response to a Prospect Proposal.** Each Party desiring to participate in a Prospect proposed under Section 3.1 or Section 3.2 shall notify RAW, in writing, within thirty (30) days after receipt of such proposal of its election regarding participation in the proposed Prospect and stating whether or not such Party agrees with the acreage being proposed for inclusion in the Prospect by the proposing Parties. An election to participate in a Prospect which contains no statement as to whether the Party agrees with the acreage proposed for inclusion in the Prospect Area shall be deemed agreement to the acreage proposed for inclusion in the Prospect Area. A Party who elects not to participate in the Prospect and who disagrees with the acreage proposed to be included in the Prospect Area shall give notice of such disagreement to all Parties within the time and in the manner provided above for elections to participate. A Party failing to respond, within the time and in the manner provided above, to a proposal for a Prospect, or a Party responding and electing to not participate in a Prospect but making no statement as to whether it agrees with the acreage proposed to be included in the Prospect will be deemed to have elected not to participate in the Prospect and to have agreed to the acreage proposed to be included in the Prospect Area. If no other Party elects to join the proposing Party in creating a Prospect, then the proposing Party may develop the Prospect Area for such Prospect for its own account at its own expense and the terms of this Agreement (other than the terms relating to restrictions and ownership of the Program Data which shall apply) shall not apply to the Prospect Area for that Prospect.

**3.4 Relinquishment of Interests by Non-Participating Parties.** If a Party agrees, or elects (or is deemed to have elected) not to participate in a particular Prospect Area, then such Party shall relinquish all right, title and interest in such Prospect Area without any right of reimbursement for costs incurred up to the relinquishment date (including, without limitation, rights under leases, options or farm-ins insofar as they cover the Prospect Area, overriding royalty interests, carried interests and backin interests) to the Parties electing to participate in such Prospect Area in proportion to the percentages in which such participating Parties participate in such Prospect Area. If the initial well is not commenced on such prospect within 180 days after the date the Prospect Area is finalized, a new Prospect proposal shall be required and the non-participating Parties shall once again have the right to participate in that Prospect in accordance with the procedures in this Agreement.

## ARTICLE IV

### Operations

**4.1 Drilling Operations.** All operations on each Prospect Area, commencing with the establishment of such Prospect Area, shall be governed by a separate operating agreement ("**Operating Agreement**") in the form attached hereto as **Exhibit C** (with appropriate insertions and exhibits reflecting the agreements hereunder on the Prospect Area, participation percentages and initial well), and this Agreement shall no longer have any application to such Prospect Area, except with respect to the ownership of Program Data as provided for in Section 1.2 above and except for matters provided for in this Article IV.

**4.2 Operator.** It is agreed and understood that RAW shall be designated as Operator in the Operating Agreement executed for each Prospect Area in which it participates. As to any Prospect Area in which RAW has elected not to participate, Smith shall designate an operator of said Prospect Area.

**4.3 AMI for Prospect Area.** Commencing with the establishment of a Prospect Area, such Prospect Area shall from that time forward no longer be subject to the AMI provided for in **Article II** and shall thereafter be considered covered instead by a new Prospect Area specific AMI. The new AMI shall (i) be binding on all Parties (whether or not they participated, or had rights to participate in such Prospect Area), (ii) consist of such Prospect Area, (iii) remain in effect until the later to occur of the Term of this

8

SEC 190192

Agreement or the date the Operating Agreement for such Prospect Area terminates, and (iv) be governed by the same terms set forth in Sections 2.3 and 2.4 except that the term proportion or proportionate part (as such term is used in Section 2.3 or 2.4) shall mean the percentages in which the Parties participate in such Prospect Area. Any portion of the Program Area not included in a designated Prospect Area shall continue to be subject to the AMI provided for in **Article II**.

**4.4** **Limitation on Number of AFE's.** The Parties agree that during the first 12 months of the Term no more than three (3) active well proposals and AFE's shall be outstanding at any one time under this Agreement and the On Point Agreement, on a combined basis.

**4.5** **Exercise of Options in Prospect Area.** With respect to each Prospect Area, an option to acquire oil and gas interests to the extent it covers such Prospect Area, may be exercised by any Party owning an interest therein insofar as such option covers land within a Prospect Area. The leases acquired by such exercise shall be owned and, subject to Section 2.2 above, paid for by the Parties participating in such Prospect Area in the proportions in which they participated in that Prospect Area. It is recognized that some options may limit the number of times they may be exercised, and, in such event, several Prospect Areas may have to be combined in a single exercise of such an Option (and such exercise may have to be deferred until such a consolidated exercise is practical).

## ARTICLE V

### Restrictions on Transfers and Right of First Refusal

**5.1** **General Restriction on Transfer.** Except as otherwise provided in Section 1.2 with respect to Smith, no Party, either directly or through an Affiliate, may transfer or acquire any lease, royalty, overriding royalty or other interest of any type in the mineral estate or any petroleum exploration or seismic license (individually and collectively an "**Interest**"), or participate in the acquisition of any Interest from a third party holding any Interest, which Interest is located partially or entirely within the Program Area, other than in accordance with the provisions of this Agreement and the applicable Operating Agreement, if any.

**5.2** **Preferential Right to Purchase.** As long as Smith Energy owns an Interest in the Program Area or in a Contract Area under an Operating Agreement, the Parties hereby grant to each other a preferential right to purchase all or any part of a Party's Interest in this Agreement or in the lands subject to the applicable Operating Agreement which is to be Transferred to any third party other than a Permitted Assignee, all as defined below. This preferential right to purchase under this Agreement shall no longer apply to any Party after Smith has transferred all of its rights under this Agreement and shall no longer apply as to a Contract Area governed by an Operating Agreement after Smith has transferred or relinquished all of its rights to the lands in the Contract Area governed by that Operating Agreement.

(a) If any Party desires to Transfer, as defined below, its Interests, or any portion, in this Agreement or the AMI (a "**Transferor Party(ies)**"), Transferor Party(ies) must first provide written notice of such intent to the other Parties. If the proposed Transfer is to a Permitted Assignee, the non-transferring Parties shall not have a Right of First Refusal as to that Transfer. If the proposed Transfer is to a person other than a Permitted Assignee, as defined below, the non-transferring Parties shall then have the right ("**Right of First Refusal**"), but not the obligation, to purchase their proportionate share of the offered portion of the Interests pursuant to this paragraph. The non-Transferor Parties shall have thirty (30) days from receipt of such notice within which to determine whether it or they elect to purchase the offered Interests. If the proposed Transfer is to a Permitted Assignee, the non-Transferor will not have a Right of

9

SEC 190193

First Refusal but the Permitted Assignee must ratify this Agreement and the applicable Operating Agreement and the Transferor shall be jointly and severally liable for all liabilities and obligations of the Permitted Assignee under this Agreement and the Operating Agreement. **"Transfer"** means any sale, lease, conveyance, gift, transfer, exchange, assignment, disposition by will or inheritance or other disposition of (or any agreement or arrangement to sell, lease, convey, gift, transfer, exchange, assign, or otherwise dispose of) all or any portion of the Transferor Parties' Interests in any manner, directly or indirectly, whether for money, other consideration or otherwise. **"Permitted Assignee"** means: (w) a spouse, descendants or relative of the Transferor Party; (x) the spouse, descendants or relative of the controlling person of a Transferor Party or the spouse, descendants or relative of a manager of a Transferor Party; (y) a legal entity including but not limited to any Trust, partnership, or company controlled by the Transferor Party or by the spouse, descendants or relatives of the Transferor Party; and (z) any employee, consultant or person under contract to a Transferor Party (or any Trust, entity or partnership owned by such person).

(b) If the Transfer contemplated by section 5.2(a) above results from a bona fide offer to purchase from a third party, exercise of the non-Transferor Parties' Right of First Refusal shall be based on the same terms and conditions as the third party offer. If the Transfer contemplated by section 5.2(a) above is not the result of a bona fide third party offer, the non-Transferor and the Transferor Parties shall attempt to agree upon a purchase price for the Transferred Interests. In the event the Parties fail to agree upon a purchase price for the Transferred Interests within ten (10) days after exercise by the non-Transferor Parties of their Right of First Refusal, then the Transferor Party shall not be allowed to Transfer the Transferred Interest to the third party and the Non-Transferor Party shall not be entitled to purchase the Transferred Interest. If a bona fide offer to purchase is subsequently received or a price is established for the Transferred Interest, the provisions of this Section 5.2(b) shall be followed as to the new offer or price. The provisions of **Article V** shall apply to any future Transfer by the Transferor Party.

**5.3 Financing.** Any Party shall have the right to arrange its own financing for any wells or other projects to be conducted on one or more Prospect Areas without any obligation to provide, or assist the other in obtaining, similar financing. No Party shall encumber the rights and interests of any other Party in a Prospect Area. A Party shall have the right to pledge, mortgage or encumber all or any part of its Interest in one or more Prospect Areas without triggering a Right of First Refusal under **Article V**; provided that any pledge, mortgage or encumbrance will be subject to the following restrictions and conditions:

(a) the lender or secured party shall acknowledge in writing that the interest pledged is subject to this Agreement and the Operating Agreement;

(b) the document creating the pledge or encumbrance must expressly state that upon foreclosure on the pledged interest, the lender or secured party will receive the pledged interest subject to this Agreement and the Operating Agreement; and

(c) prior to any subsequent Transfer of the interest by the lender or secured party, the lender or secured party must comply with the procedures set forth in Section 5.2(b) and the other Parties shall have the Right of First Refusal set forth in Section 5.2(b).

**5.4 Tag Along Rights.** In the event Smith intends to sell all of its rights under this Agreement to a third party, Smith shall provide written notice to the other Parties of the intended sale. When the intended sale terms are established, Smith shall outline the intended terms to all Parties. Each Party will have the right and option for fifteen (15) days after receipt of the intended sale terms to elect to sell its interest along with the interest of Smith so long as the purchaser of Smith's interest agrees to purchase the additional Party's(ies') interest(s). Smith shall have the sole authority to negotiate the terms of the sale and the

10

CJM 192236v.6

SEC 190194

other Parties will have the election to sell or not to sell on the same terms as negotiated by Smith. The tag along rights granted in this Section shall not apply to a sale by Smith of all its interest in a Contract Area governed by an Operating Agreement.

## ARTICLE VI

### Miscellaneous

**6.1 Elections.** Each Party to this Agreement has the right to make separate and independent elections regarding all aspects of the Agreement, including but not limited to Acquired Interests and well participation.

**6.2 Notices.** All notices and other communications required or permitted under this Agreement shall be in writing and unless otherwise specifically provided, shall be delivered personally, or by mail, telecopy or delivery service to the addresses set forth below the signatures of the Parties and shall be considered delivered upon the date of receipt. Each Party may specify as its proper address, any other post office address within the continental limits of the United States by giving notice to the other Parties, in the manner provided in this section, at least ten (10) days prior to the effective date of such change of address.

**6.3 No Partnership.** The liabilities of the Parties hereunder shall be several, not joint or collective. Each Party shall be liable only for its cost bearing share of all liabilities and obligations arising under this Agreement as set forth on **Exhibit B** hereto and each Party's share of the liabilities and obligations arising under any applicable Operating Agreement, as set forth on the Exhibit A to the applicable Operating Agreement. It is not the intention of the Parties to create, nor shall this Agreement be deemed as creating a mining or other partnership or association or to render the Parties liable as partners.

**6.4 Internal Revenue Code Election.** The provisions of Article IX of the form of Operating Agreement attached hereto shall constitute the agreement between the Parties regarding applicable provisions of the Internal Revenue Code.

**6.5 Enforcement.** Should any Party hereto be forced to resort to legal action to enforce the provisions hereof, the prevailing Party shall be entitled to reasonable attorneys' fees and all court costs incurred in such legal action. The Parties agree that the exclusive venue for all disputes arising under this Agreement shall be in Harris County, Texas.

**6.6 Title.** No Party warrants title to interests it is contributing to the Program Area except by, through and under itself, and not otherwise. Each Party agrees to furnish to the other Parties any title data in its possession or available to it.

**6.7 Multiple Counterparts.** This Agreement may be executed in any number of counterparts, none of which needs to be executed by all Parties, and shall be binding upon each Party executing such a counterpart as if all Parties had executed the same instrument.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

CJM 192236v.6

SEC 190195

EXECUTED to be effective as of the Effective Date.

RAW OIL & GAS, INC.

By: _____

Name: _____

Title: _____

JDH RAW ENERGY, L.C.

By: _____

Name: _____

Title: _____

_____

MARK P. HARDWICK

_____

STEVE BLAYLOCK

ELGER EXPLORATION, INC.

By: _____

Name: _____

Title: _____

SMITH ENERGY COMPANY

By: _____

Lester H. Smith, President

12

SEC 190196

EXHIBIT A
Attached to Geophysical Exploration Agreement
Dated January 2, 2010,
Among
RAW, RAW LC, Hardwick, Blaylock, Elger and Smith

Outline and Description of On Point Program Area

**The following lands are all located in Terry County, Texas**

Section 3, Abstract 13, Blk. 4X, EL & RR Ry. Co. Survey, Terry County, Texas (640.00 ac.)

Section 4, Abstract 455, Blk. 4X, EL & RR Ry. Co. Survey, Terry County, Texas (640.00 ac.)

Section 84, Abstract 824, Blk. 4X, EL & RR Ry. Co. Survey, Terry County, Texas (640.00 ac.)

Section 87, Abstract 220, Blk. 4X, D & SE Ry. Co. Survey, Terry County, Texas (640.00 ac.)

Section 89, Abstract 219, Blk. 4X, D & SE Ry. Co. Survey, Terry County, Texas (640.00 ac.)

Section 90, Abstract 739, Blk. 4X, D & SE Ry. Co. Survey, Terry County, Texas (640.00 ac.)

Section 91, Abstract 221, Blk. 4X, D & SE Ry. Co. Survey, Terry County, Texas (640.00 ac.)

Section 92, Abstract 588, Blk. 4X, D & SE Ry. Co. Survey, Terry County, Texas (640.00 ac.)

Section 2, Abstract 740, Blk. T, Dallas & Wichita Ry. Co. Survey, Terry County, Texas (640.00 ac.)

Section 3, Abstract 152, Blk. T, Dallas & Wichita Ry. Co. Survey, Terry County, Texas (640.00 ac.)

Section 4, Abstract 737, Blk. T, Dallas & Wichita Ry. Co. Survey, Terry County, Texas (640.00 ac.)

South Half (S/2) of Section 32, Abstract 587, Blk. E, EL & RR Ry. Co. Survey, Terry County, Texas (320.00 ac.)

13

CJM 192236v.6

SEC 190197

Section 37, Abstract 783, Blk. E, EL & RR Ry. Co. Survey, Terry County, Texas (640.00 ac.)

Section 40, Abstract 589, Blk. E, EL & RR Ry. Co. Survey, Terry County, Texas (640.00 ac.)

Section 45, Abstract 789, Blk. E, EL & RR Ry. Co. Survey, Terry County, Texas (640.00 ac.)

**The following lands are all located in Terry and Lynn Counties, Texas**

South Half (S/2) of Section 38, Abstract 590, Blk. E, EL & RR Ry. Co. Survey, Terry & Lynn Counties, Texas (320.00 ac.)

{E|2 → N. MO&ND LAKE}

Section 39, Abstract 787, Blk. E, EL & RR Ry. Co. Survey, Terry & Lynn Counties, Texas (640.00 ac.)

Section 46, Abstract 1270, Blk. E, EL & RR Ry. Co. Survey, Terry & Lynn Counties, Texas (640.00 ac.)

Section 47, Abstract 786, Blk. E, EL & RR Ry. Co. Survey, Terry & Lynn Counties, Texas (640.00 ac.)

Section 8, Abstract 780, Blk. C-42, PSL Survey, Terry & Lynn Counties, Texas (640.00 ac.)

**The following lands are all located in Lynn County, Texas**

Section 43, Abstract 344, Blk. E, EL & RR Ry. Co. Survey, Lynn County, Texas (640.00 ac.)

West Half (W/2) of Section 44, Abstract 776 and 1158, Blk. E, EL & RR Ry. Co. Survey, Lynn County, Texas (320.00 ac.)

Section 49, Abstract 349, Blk. E, EL & RR Ry. Co. Survey, Lynn County, Texas (640.00 ac.)

Section 50, Abstract 892, 1180, 1229, and 1230, Blk. E, EL & RR Ry. Co. Survey, Lynn County, Texas (640.00 ac.)

14

SEC 190198

South Half (S/2) & Northwest Quarter (NW/4) of Section 16, Abstract 689, 1080, and 1081, Blk. 9, TT Ry. Co. Survey, Lynn County, Texas (480.00 ac.)

West Half (W/2) of Section 19, Abstract 397, Georgetown Ry. Co. Survey, Lynn County, Texas (320.00 ac.)

Section 3, Abstract 859 and 995, Blk. C-42, PSL Survey, Lynn County, Texas (640.00 ac.)

Section 4, Abstract 856, Blk. C-42, PSL Survey, Lynn County, Texas (640.00 ac.)

Section 5, Abstract 1092 and 1292, Blk. C-42, PSL Survey, Lynn County, Texas (640.00 ac.)

Section 6, Abstract 857, Blk. C-42, PSL Survey, Lynn County, Texas (640.00 ac.)

Section 7, Abstract 765, Blk. C-42, PSL Survey, Lynn County, Texas (640.00 ac.)

North Half (N/2) & Southeast Quarter (SE/4) of Section 10, Abstract 887, Blk. Y, EL & RR Ry. Co. Survey, Lynn County, Texas (480.00 ac.)

Section 11, Abstract 353, Blk. Y, EL & RR Ry. Co. Survey, Lynn County, Texas (640.00 ac.)

Northeast Quarter (NE/4) of Section 12, Abstract 839, Blk. Y, EL & RR Ry. Co. Survey, Lynn County, Texas (160.00 ac.)

Section 1, Abstract 364, EL & RR Ry. Co. Survey, Lynn County, Texas (640.00 ac.)

Section 2, Abstract 769, EL & RR Ry. Co. Survey, Lynn County, Texas (640.00 ac.)

Section 3, Abstract 365, EL & RR Ry. Co. Survey, Lynn County, Texas (640.00 ac.)

Section 1, Abstract 375, Blk. A-1, EL & RR Ry. Co. Survey, Lynn County, Texas (640.00 ac.)

Section 2, Abstract 890, Blk. A-1, EL & RR Ry. Co. Survey, Lynn County, Texas (640.00 ac.)

Northeast Quarter (NE/4) of Section 13, Abstract 369, Blk. A-1, EL & RR Ry. Co. Survey, Lynn County, Texas (160.00 ac.)

CJM 192236v.6

SEC 190199

Section 16, Abstract 770, Blk. A-1, EL & RR Ry. Co. Survey, Lynn County, Texas (640.00 ac.)

Section 17, Abstract 367, Blk. A-1, EL & RR Ry. Co. Survey, Lynn County, Texas (640.00 ac.)

North Two Hundred Acres (N/200 Acres) of Section 7, Abstract 998, Blk. C-40, PSL Survey, Lynn County, Texas (200.00 ac.)

West Half (W/2) of Section 234, Abstract 912, Blk. 1, L & SV Ry. Co. Survey, Lynn County, Texas (320.00 ac.)

*W/2 + N. MOUND LAKE*

Section 0 (SF 5845), Abstract 893, 1177, and 1181, No Block, No Survey, Lynn County, Texas (this Section is located just to the East of Section 39, Abstract 787, Blk. E, EL & RR Ry. Co. Survey, Terry & Lynn Counties, Texas) (640.00 ac.)

Section 19, Abstract 342, D & SE Ry. Co. Survey, Lynn County, Texas (640.00 ac.)

Section 20, Abstract 948, D & SE Ry. Co. Survey, Lynn County, Texas (640.00 ac.)

Section 51, Abstract 405, HE & WT Ry. Co. Survey, Lynn County, Texas (640.00 ac.)

Section 52, Abstract 829, HE & WT Ry. Co. Survey, Lynn County, Texas (640.00 ac.)

Section 55, Abstract 398, Georgetown Ry. Co. Survey, Lynn County, Texas (640.00 ac.)

Section 56, Abstract 828 and 1040, Georgetown Ry. Co. Survey, Lynn County, Texas (640.00 ac.)

Section 57, Abstract 399, Georgetown Ry. Co. Survey, Lynn County, Texas (640.00 ac.)

Section 58, Abstract 846, Georgetown Ry. Co. Survey, Lynn County, Texas (640.00 ac.)

*The following acreage is listed above but is excluded from the AMI and Prospect Area because it was previously included in the BIG*

16

SEC 190200

*BUMP Prospect Area and AMI. This acreage will be included in the On Point 3-D shoot however.*

Section 55, Abstract 394, Georgetown Ry. Co. Survey, Lynn County, Texas (640.00 ac.)

South Half of Section 57, Abstract 399, Georgetown Ry. Co. Survey, Lynn County, Texas (320.00 ac.)

West 200 Acres of Section 20, Abstract 948, D&SE Ry. Co. Survey, Lynn County, Texas (200 ac.)

North 200 Acres of Section 7, Abstract 998, Block C-40, PSL Survey Lynn County, Texas (200 ac.)

*The following acreage is listed above but is excluded from the AMI and Prospect Area because it was previously included in the N. MOUND LAKE Prospect Area and AMI. This acreage will be included in the On Point 3-D shoot however.*

Section 39, Block E, EL&RR Ry. Co. Survey, Lynn and Terry Counties, Texas (640.00 ac.)

Section 0, A-1181, No Block, No Survey, Lynn County, Texas (this Section is located just to the East of Section 39 described above)

17

SEC 190201

EXHIBIT B
Attached to On Point Geophysical Exploration Agreement
Dated January 2, 2010,
Among
RAW, RAW LC, Hardwick, Blaylock, Elger and Smith

## Oil and Gas Interests Schedule

| A.<br>Party | B.<br>Geophysical Program Costs Share | C.<br>§ 2.3 Oil and Gas Interest Acquisition Cost Share Until First 3 Wells Drilled | D.<br>Working Interest After Casing Point on First 3 Wells and In All Subsequent Operations |
|---|---|---|---|
| Smith Energy Company | 100% | 100%* | 76.66700% |
| RAW Oil & Gas, Inc. | | | 0 |
| JDH RAW Energy, L.C. | | | 5.833325% |
| Mark P. Hardwick | | | 5.833325% |
| Steve Blaylock | | | 5.833325% |
| Elger Exploration, Inc. | | | 5.833325% |
| | | | 100.000000% |

*Until first three wells have been drilled to casing point

18

CJM 192236v.6

SEC 190202

EXECUTED to be effective as of the Effective Date.

RAW OIL & GAS, INC.

By: _____
Name: _____
Title: _____

JDH RAW ENERGY, L.C.

By: _____
Name: _____
Title: _____

_____
MARK P. HARDWICK

_____
STEVE BLAYLOCK

ELGER EXPLORATION, INC.

By: _____
Name: _____
Title: _____

SMITH ENERGY COMPANY

By: _____
Lester H. Smith, President

12

SEC 190203

EXECUTED to be effective as of the Effective Date.

RAW OIL & GAS, INC.

By: _____
Name: _____
Title: _____

JDH RAW ENERGY, L.C.

By: _____
Name: _____
Title: _____

MARK P. HARDWICK

STEVE BLAYLOCK

ELGER EXPLORATION, INC.

By: _____
Name: _____
Title: _____

SMITH ENERGY COMPANY

By: _____
Lester H. Smith, President

12

SEC 190204

A.A.P.L. FORM 610 - 1989

# MODEL FORM OPERATING AGREEMENT

## ON POINT PROSPECT

OPERATING AGREEMENT

DATED

__January 2__ , __2010__
<sub>year</sub>

OPERATOR   __RAW Oil & Gas, Inc.__

CONTRACT AREA   __See Exhibit "A"__

COUNTY OR PARISH OF  __LYNN and TERRY__        , STATE OF   __TEXAS__

COPYRIGHT 1989 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS, 76137, APPROVED FORM.

A.A.P.L. NO. 610 – 1989

SEC 190218

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS: | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION: | 2 |
| | C. SUBSEQUENTLY CREATED INTERESTS: | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION: | 2 |
| | B. LOSS OR FAILURE OF TITLE: | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| | 4. Curing Title | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR: | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR: | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | 3. Effect of Bankruptcy | 4 |
| | C. EMPLOYEES AND CONTRACTORS: | 4 |
| | D. RIGHTS AND DUTIES OF OPERATOR: | 4 |
| | 1. Competitive Rates and Use of Affiliates | 4 |
| | 2. Discharge of Joint Account Obligations | 4 |
| | 3. Protection from Liens | 4 |
| | 4. Custody of Funds | 5 |
| | 5. Access to Contract Area and Records | 5 |
| | 6. Filing and Furnishing Governmental Reports | 5 |
| | 7. Drilling and Testing Operations | 5 |
| | 8. Cost Estimates | 5 |
| | 9. Insurance | 5 |
| VI. | DRILLING AND DEVELOPMENT | 5 |
| | A. INITIAL WELL: | 5 |
| | B. SUBSEQUENT OPERATIONS: | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less Than All Parties | 6 |
| | 3. Stand-By Costs | 7 |
| | 4. Deepening | 8 |
| | 5. Sidetracking | 8 |
| | 6. Order of Preference of Operations | 8 |
| | 7. Conformity to Spacing Pattern | 9 |
| | 8. Paying Wells | 9 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK: | 9 |
| | 1. Completion | 9 |
| | 2. Rework, Recomplete or Plug Back | 9 |
| | D. OTHER OPERATIONS: | 9 |
| | E. ABANDONMENT OF WELLS: | 9 |
| | 1. Abandonment of Dry Holes | 9 |
| | 2. Abandonment of Wells That Have Produced | 10 |
| | 3. Abandonment of Non-Consent Operations | 10 |
| | F. TERMINATION OF OPERATIONS: | 10 |
| | G. TAKING PRODUCTION IN KIND: | 10 |
| | (Option 1) Gas Balancing Agreement | 10 |
| | (Option 2) No Gas Balancing Agreement | 11 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 11 |
| | A. LIABILITY OF PARTIES: | 11 |
| | B. LIENS AND SECURITY INTERESTS: | 12 |
| | C. ADVANCES: | 12 |
| | D. DEFAULTS AND REMEDIES: | 12 |
| | 1. Suspension of Rights | 13 |
| | 2. Suit for Damages | 13 |
| | 3. Deemed Non-Consent | 13 |
| | 4. Advance Payment | 13 |
| | 5. Costs and Attorneys' Fees | 13 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES: | 13 |
| | F. TAXES: | 13 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 14 |
| | A. SURRENDER OF LEASES: | 14 |
| | B. RENEWAL OR EXTENSION OF LEASES: | 14 |
| | C. ACREAGE OR CASH CONTRIBUTIONS: | 14 |

SEC 190219

## TABLE OF CONTENTS

D. ASSIGNMENT; MAINTENANCE OF UNIFORM INTEREST: ................................................15
E. WAIVER OF RIGHTS TO PARTITION: ................................................................15
F. PREFERENTIAL RIGHT TO PURCHASE: ..............................................................15
IX. INTERNAL REVENUE CODE ELECTION ................................................................15
X. CLAIMS AND LAWSUITS ................................................................................15
XI. FORCE MAJEURE ......................................................................................16
XII. NOTICES .............................................................................................16
XIII. TERM OF AGREEMENT ...............................................................................16
XIV. COMPLIANCE WITH LAWS AND REGULATIONS ......................................................16
    A. LAWS, REGULATIONS AND ORDERS: ..........................................................16
    B. GOVERNING LAW: ..............................................................................16
    C. REGULATORY AGENCIES: ......................................................................16
XV. MISCELLANEOUS ....................................................................................17
    A. EXECUTION: ....................................................................................17
    B. SUCCESSORS AND ASSIGNS: ....................................................................17
    C. COUNTERPARTS: ................................................................................17
    D. SEVERABILITY ..................................................................................17
XVI. OTHER PROVISIONS ................................................................................17

SEC 190220

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___RAW Oil & Gas, Inc._____,

hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of estimating the costs to be incurred in conducting an operation hereunder.

B. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production testing conducted in such operation.

C. The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be developed and operated for Oil and Gas purposes under this agreement. Such lands, Oil and Gas Leases and Oil and Gas Interests are described in Exhibit "A."

D. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the lesser.

E. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

F. The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.

G. The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be located.

H. The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.

I. The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as provided in Article VI.B.2.

J. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

K. The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

L. The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts of land lying within the Contract Area which are owned by parties to this agreement.

M. The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

N. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone.

O. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned in order to attempt a Completion in a different Zone within the existing wellbore.

P. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or improve production in a Zone which is currently open to production in the wellbore. Such operations include, but are not limited to, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Recompleting, or Plugging Back of a well.

Q. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties.

R. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

### ARTICLE II.
### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

_X___ A. Exhibit "A," shall include the following information:

    (1) Description of lands subject to this agreement,

    (2) Restrictions, if any, as to depths, formations, or substances,

    (3) Parties to agreement with addresses and telephone numbers for notice purposes,

    (4) Percentages or fractional interests of parties to this agreement,

    (5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement,

    (6) Burdens on production.

_X___ B. Exhibit "B," Form of Lease.

_X___ C. Exhibit "C," Accounting Procedure.

_X___ D. Exhibit "D," Insurance.

_X___ E. Exhibit "E," Gas Balancing Agreement.

_____ F. ~~Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.~~

_X___ G. Exhibit "G," Tax Partnership.

_____ H. Other: _____

- 1 -

SEC 190221

If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

## ARTICLE III.
### INTERESTS OF PARTIES

A. Oil and Gas Interests:

If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B," and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.

B. Interests of Parties in Costs and Production:

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area up to, but not in excess of, existing lease burdens _____ and shall indemnify, defend and hold the other parties free from any liability therefor. Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s) which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any liability therefor.

No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby, and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

C. Subsequently Created Interests:

If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production payment, net profits interest, assignment of production or other burden payable out of production attributable to its working interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interests, or other burden payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's Lease or Interest to exceed the amount stipulated in Article III.B. above.

The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

## ARTICLE IV.
### TITLES

A. Title Examination:

Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and, if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in procuring abstracts, fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in royalty opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection with Leases or Oil and Gas Interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings. Costs incurred by Operator, including fees paid to outside attorneys, which are associated with hearings before governmental agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C."

- 2 -

SEC 190222

Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the Drilling Parties in such well.

B. Loss or Failure of Title:

1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas Leases and Interests; and,

(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;

(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed Lease or Interest;

(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;

(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received production for which such accounting is required based on the amount of such production received, and each such party shall severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;

(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and

(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest is reflected on Exhibit "A."

2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas Lease or interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A" shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest, calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest, it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or Interest, on an acreage basis, up to the amount of unrecovered costs;

(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination, would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties in proportion to their respective interests reflected on Exhibit "A"; and,

(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.

3. Other Losses: All losses of Leases or Interests committed to this agreement, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

4. Curing Title: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B. shall not apply to such acquisition.

- 3 -

SEC 190223

ARTICLE V.

OPERATOR

A. Designation and Responsibilities of Operator:

_____RAW Oil & Gas, Inc._____ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

B. Resignation or Removal of Operator and Selection of Successor:

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, or the provisions of Article XVI.O are applicable, Operator shall be deemed to have resigned without any action by Non-Operator except the selection of a successor. ~~Operator~~ Any successor Operator to RAW Oil & Gas Inc. may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.

Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

3. Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

C. Employees and Contractors:

The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined Operator, and all such employees or contractors shall be the employees or contractors of Operator.

D. Rights and Duties of Operator:

1. Competitive Rates and Use of Affiliates: All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from

- 4 -

SEC 190224

liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.

5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each Non-Operator or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C."

6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder, including but not limited to the Initial Well:

(a) Operator will promptly advise Non-Operators of the date on which the well is spudded, or the date on which drilling operations are commenced.

(b) Operator will send to Non-Operators such reports, test results and notices regarding the progress of operations on the well as the Non-Operators shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.

(c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

8. Cost Estimates: Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

**ARTICLE VI.**

**DRILLING AND DEVELOPMENT**

A. Initial Well:

On or before the ___1st___ day of ___June_____, 2010_. Operator shall commence the drilling of the Initial Well at the following location:

Mutually agreed upon location within the Contract Area to be determined at a later date by all the parties to this Agreement

and shall thereafter continue the drilling of the well with due diligence to penetrate the Fusselman Formation.

The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation in Completion operations and Article VI.F. as to termination of operations and Article XI as to occurrence of force majeure.

B. Subsequent Operations:

1. Proposed Operations: If any party hereto should desire to drill any well on the Contract Area other than the Initial Well, or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone

-5-

SEC 190225

under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be performed, the location, proposed depth, objective Zone and the estimated cost of the operation. The parties to whom such a notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties within the time and in the manner provided in Article VI.B.6.

If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation, reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance with Article VI.B.5. in the event of a Sidetracking operation.

2. Operations by Less Than All Parties:

(a) Determination of Participation. If any party to whom such notice is delivered as provided in Article VI.B.1. or VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties' interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10) days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period. If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the period provided in Article VI.B.1., subject to the same extension right as provided therein.

(b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense; provided, however, that those Non-Consenting Parties that participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened, Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking, Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking,

- 6 -

SEC 190226

Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non-Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes, royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

(i) _____% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and

(ii) _____% of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening, Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C., and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions of this Article VI.B.2. (b) shall apply to such party's interest.

(c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties _____% of that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

(d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem, production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.C.

In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back, Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing, Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of Oil and Gas produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking, Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and Exhibit "C" attached hereto.

3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise terminated pursuant to Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking,

- 7 -

SEC 190227

Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.

4. Deepening: If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone of which the parties were given notice under Article VI.B.1. ("Initial Objective"). Such well shall not be Deepened beyond the Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate in the Deepening operation.

In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective, such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation, such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses.

(a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the sole account of Consenting Parties.

(b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the well for Deepening

The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article VI.F.

5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore to be utilized as follows:

(a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

(b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking operation is initiated shall be determined in accordance with the provisions of Exhibit "C."

6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required shall be deemed not to have voted. The proposal receiving the vote of parties owning the largest aggregate percentage interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the

- 8 -

SEC 190228

initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty-four (24) hours if a rig is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within such period shall be deemed an election not to participate in the prevailing proposal.

7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone.

8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except with the consent of all parties that have not relinquished interests in the well at the time of such operation.

C. Completion of Wells; Reworking and Plugging Back:

1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling, Deepening or Sidetracking shall include:

☐ Option No. 1: All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completing and equipping of the well, including necessary tankage and/or surface facilities.

☐ Option No. 2: All necessary expenditures for the drilling, Deepening or Sidetracking and testing of the well. When such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to participate in a Completion attempt whether or not Operator recommends attempting to Complete the well, together with Operator's AFE for Completion costs if not previously provided. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an accompanying AFE. Operator shall deliver any such Completion proposal, or any Completion proposal conflicting with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the procedures specified in Article VI.B.6. Election to participate in a Completion attempt shall include consent to all necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface facilities but excluding any stimulation operation not contained on the Completion AFE. Failure of any party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of conflicting Completion proposals. If one or more, but less than all of the parties, elect to attempt a Completion, the provision of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations thereafter conducted by less than all parties; provided, however, that Article VI.B.2. shall apply separately to each separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier Completions or Recompletion have recouped their costs pursuant to Article VI.B.2.; provided further, that any recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in which the Completion attempt is made. Election by a previous Non-Consenting party to participate in a subsequent Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt, insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a Completion attempt.

2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked, Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the Reworking, Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and Completing and equipping of said well, including necessary tankage and/or surface facilities.

D. Other Operations:

Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of _____ Twenty-five thousand _____ Dollars ($ 25,000.00 ) except in connection with the drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so requesting an information copy thereof for any single project costing in excess of Twenty-five thousand _____ Dollars ($ 25,000.00 ). Any party who has not relinquished its interest in a well shall have the right to propose that Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively be those Articles). Operator shall deliver such proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent of any party or parties owning at least _____50_____% of the interests of the parties entitled to participate in such operation, each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms of the proposal.

E. Abandonment of Wells:

1. Abandonment of Dry Holes: Except for any well drilled or Deepened pursuant to Article VI.B.2., any well which has been drilled or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be

SEC 190229

plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and restoring the surface, for which the abandoning parties shall remain proportionately liable.

    2. Abandonment of Wells That Have Produced: Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well within the required period or thereafter to conduct operations on such well shall entitle operator to retain or take possession of such well and plug and abandon the well.

        Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the interest of the abandoning party is or includes and Oil and Gas Interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

        Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

        3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest in a portion of the well shall pay their proportionate shares of abandonment and surface restoration cost for such well as provided in Article VI.B.2.(b).

F. Termination of Operations:

        Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing, Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without consent of parties bearing 50.0% of the costs of such operation; provided, however, that in the event granite or other practically impenetrable substance or condition in the hole is encountered which renders further operations impractical, Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1, and the provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.

G. Taking Production In Kind:

    ☐ Option No. 1: Gas Balancing Agreement Attached

        Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

        Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment

SEC 190230

directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing basis to be used.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

☐ Option No. 2: No Gas Balancing Agreement:

~~Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditures incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.~~

~~Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.~~

~~If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase contract having a term extending beyond such ten (10) day period. Any purchase or sale by Operator of any other party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.~~

~~Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation fee equal to that received under any existing market or transportation arrangement. The sale or delivery by Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase of Oil and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written notice of such intended purchase or sale and the price to be paid or the pricing basis to be used. Operator shall give notice to all parties of the first sale of Gas from any well under this Agreement.~~

~~All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.~~

## ARTICLE VII.
## EXPENDITURES AND LIABILITY OF PARTIES

A. Liability of Parties:

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

- 11 -

SEC 190231

B. Liens and Security Interests:

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

~~If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.~~

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

C. Advances:

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

D. Defaults and Remedies:

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered

- 12 -

SEC 190232

only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator, and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator. Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified below or otherwise available to a non-defaulting party.

1. Suspension of Rights: Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement.

2. Suit for Damages: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

3. Deemed Non-Consent: The non-defaulting party may deliver a written Notice of Non-Consent Election to the defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party, notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

4. Advance Payment: If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided in the Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

5. Costs and Attorneys' Fees: In the event any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

E. Rentals, Shut-in Well Payments and Minimum Royalties:

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to production of a producing well, at least five (5) days (excluding Saturday, Sunday, and legal holidays) prior to taking such action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

F. Taxes:

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

- 13 -

SEC 190233

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C."

Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

## ARTICLE VIII.
## ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

A. Surrender of Leases:

The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B." Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made varies according to depth, then the interest assigned shall similarly reflect such variances.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

B. Renewal or Extension of Leases:

If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease, promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an assignment of its proportionate interest therein by the acquiring party.

If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating Agreement in the form of this agreement.

If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.

The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.

C. Acreage or Cash Contributions:

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled inside Contract Area. Contributions under the paragraph do not include proceeds from the actual sale of working interest in a well or lease

- 14 -

SEC 190234

hereunder.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

**D. Assignment; Maintenance of Uniform Interest:**

~~For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells, equipment and production unless such disposition covers either:~~

~~1. the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or~~

~~2. an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production in the Contract Area.~~

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

**E. Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

~~F. Preferential Right to Purchase:~~

~~(Optional; Check if applicable.)~~

~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after the notice is delivered, to purchase for the stated consideration on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to transfer title to its interests to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests, or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock.~~

## ARTICLE IX.
### INTERNAL REVENUE CODE ELECTION

If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulation §1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A." of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.

## ARTICLE X.
### CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed __five thousand__ Dollars ($ __5,000.00__ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

SEC 190235

## ARTICLE XI.
### FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

## ARTICLE XII.
### NOTICES

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex, telecopier or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the telecopy, facsimile or telex machine of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, telecopy or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.

## ARTICLE XIII.
### TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☐ Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

☐ ~~Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this agreement shall continue in force so long as any such well is capable of production, and for an additional period of _____ days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re-completing, Plugging Back or Reworking operations are commenced within _____ days from the date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of 180 days from the conduct of any operations on the well, whichever first occurs.~~

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

## ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

A. Laws, Regulations and Orders:

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

B. Governing Law:

This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of __Texas__ shall govern.

C. Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or

- 16 -

SEC 190236

orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not constitute gross negligence. Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

## ARTICLE XV.
## MISCELLANEOUS

A. Execution:

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest. In the event Operator proceeds with drilling operations for the Initial Well without the execution hereof by all persons listed on Exhibit "A" as having a current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the Initial Well which would have been charged to such person under this agreement if such person had executed the same and Operator shall receive all revenues which would have been received by such person under this agreement if such person had executed the same.

B. Successors and Assigns:

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Contract Area.

C. Counterparts:

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

D. Severability:

For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

## ARTICLE XVI.
## OTHER PROVISIONS

This Joint Operating Agreement is subject to the additional terms and provisions which are contained in Article XVI attached hereto.

- 17 -

SEC 190237

IN WITNESS WHEREOF, this agreement shall be effective as of the 2st day of January, 2010.

**OPERATOR**

**RAW OIL & GAS, INC.**

By _____

Joe D. Hardin
Type or print name

Title President _____

Date _____

Tax ID or S.S. No. _____

**NON-OPERATORS**

**RAW ENERGY, LC**

By _____

Joe D. Hardin
Type or print name

Title Manager _____

Date _____

Tax ID or S.S. No. _____

**SMITH ENERGY COMPANY**

By _____

Lester Smith
Type or print name

Title President _____

Date _____

Tax ID or S.S. No. _____

**MARK P. HARDWICK**

By _____

Date _____

Tax ID or S.S. No. _____

**STEVE BLAYLOCK**

By _____

Date _____

Tax ID or S.S. No. _____

**ELGER EXPLORATION INC.**

By _____

Jerry Elger
Type or print name

Title President _____

Date _____

Tax ID or S.S. No. _____

SEC 190238

ACKNOWLEDGMENTS

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.

Acknowledgment in representative capacity:

State of Texas        )
                      )  ss.
County of Lubbock     )

This instrument was acknowledged before me on this _____ day of _____, 2010, by Joe D. Hardin as President of RAW OIL & GAS, INC.

(Seal, if any)                                    _____

                                                  Title (and Rank) _____

                                                  My commission expires: _____


State of Texas        )
                      )  ss.
County of Lubbock     )

This instrument was acknowledged before me on this _____ day of _____, 2010, by Joe D. Hardin as Manager of RAW ENERGY, LC.

(Seal, if any)                                    _____

                                                  Title (and Rank) _____

                                                  My commission expires: _____


State of Texas        )
                      )  ss.
County of _____   )

This instrument was acknowledged before me on this _____ day of _____, 2010, by Lester Smith as President of SMITH ENERGY COMPANY.

(Seal, if any)                                    _____

                                                  Title (and Rank) _____

                                                  My commission expires: _____


Individual acknowledgment:

State of Texas        )
                      )  ss.
County of Midland     )

This instrument was acknowledged before me on this _____ day of _____, 2010, by MARK P. HARDWICK.

(Seal, if any)                                    _____

                                                  Title (and Rank) _____

                                                  My commission expires: _____

- 20 -

SEC 190239

Individual acknowledgment:

State of Texas )
) ss.
County of Midland )

This instrument was acknowledged before me on this _____ day of _____, 2010, by STEVE BLAYLOCK.

(Seal, if any)

_____

Title (and Rank) _____

My commission expires: _____


State of Texas )
) ss.
County of _____ )

This instrument was acknowledged before me on this _____ day of _____, 2010, by Jerry Elger as President of ELGER EXPLORATION INC.

(Seal, if any)

_____

Title (and Rank) _____

My commission expires: _____

SEC 190240

JOINT OPERATING PROVISIONS

ARTICLE XVI

To be attached to and made a part of that certain Joint
Operating Agreement dated January 2, 2010, between
Raw Oil & Gas, Inc. as Operator
and Smith Energy Company, etal, as Non-Operator

A. Royalties, Overriding Royalties and Other Payments:

1. As used herein, the term "Existing Burdens" shall apply separately to each Lease and means all royalties and overriding royalties and other payments carved out of the Leasehold estate with which each Lease covered by this Operating Agreement is burdened as of the effective date hereof.

2. Each party shall pay or deliver, or cause to be paid or delivered, its proportionate part of all Existing Burdens and shall hold the other parties free from any liability therefor.

B. Rentals, Shut-in Well Payments and Minimum Royalties:

1. All rentals, shut-in well payments and minimum royalties which may be required under the terms of any Lease shall be administered and paid by Operator and charged to the Joint Account except where otherwise expressly provided to the contrary in this Operating Agreement. Any party may request and shall be entitled to receive proper evidence of all such payments.

2. Operator shall diligently attempt to make or cause to be made proper payment of any rentals and/or shut-in well payments and/or minimum royalties under the foregoing provisions, but Operator shall not be held liable to the other parties in damages for the loss of any Lease or interest therein if, through mistake or oversight, any rental and/or shut-in well payment and/or minimum royalty is not paid or is erroneously paid. The loss of any Lease or interest therein which results from Operator's failure to pay or an erroneous payment of rental and/or a shut-in well payment and/or a minimum royalty shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

3. Each party hereto shall be obligated to bear its proportionate part of any and all rentals necessary to continue in force and effect the Oil and Gas Leases covered by this Agreement unless and until it timely gives the notice provided for in the next sentence hereof. If any party does not wish to bear its proportionate part of any rental necessary to continue in force any Lease covered by this Agreement, such party may give Operator and all other parties hereto written notice of such election, and the party giving such written notice shall be released of obligation to bear its proportionate part of any rentals which accrue under the terms of the Leases specified in such written notice at any time after thirty (30) days after the date Operator receives such party's aforesaid written notice. Unless mutually agreed, otherwise, the proportionate part of the rental attributable to any such Lease which would have been borne by the party giving the aforesaid written notice shall be borne by the parties hereto who do not exercise the aforesaid election, in the proportion that the interest of each bears to the total of their Interests, and the party giving the aforesaid written notice of election not to pay its part of such rental shall assign, without express or implied warranty of title, all of its interest in the Lease or Leases specified in said written notice to the aforesaid parties in the respective proportions that they bear the rental on any such Lease or Leases.

C. Removal of Operator-Vote of all Parties.

Operator may at any time be removed with or without cause by the affirmative vote of the owners of the majority interest in the Contract Area based upon ownership as shown in Exhibit "A".

D. Transition.

Upon the selection of the successor operator, the Operator who has been removed or has resigned shall promptly deliver to the successor operator all original records relating to operations on the Contract Area, including current accounting information with regard to the status of the joint account, information concerning all invoices not yet paid by the operator who has resigned or been removed, all logs, maps and all other information concerning operations. Duplicating expenses required by virtue of the change of operators shall be charged to the joint account.

E. Financing Statement.

The security interest granted to each Operator and Non-Operator under Paragraph VII.B. of this agreement which secures payment of each party's share of costs and expenses of operations shall extend to each such party's share of all Oil and Gas, equipment, fixtures, personal property, accounts, inventory and general intangibles and proceeds or products thereof relating or pertaining to the Leases and lands included in the Contract Area as described in Exhibit "A" attached hereto. For purposes of compliance with TEXAS BUSINESS AND COMMERCE CODE, Sec. 9.302, each party agrees that this instrument shall serve and may be filed as a financing statement to perfect the security interest mutually granted herein. In that regard, each party hereto agrees that its signature below shall be its signature as debtor of an appropriate financing statement, and that for purposes of compliance with the requirements of Sec. 9.402 of the TEXAS BUSINESS AND COMMERCE CODE each

SEC 190241

secured party and debtor's names and addresses are as follows:

The names and addresses          The names and address
of secured parties are:          of debtors are:

SEE EXHIBIT "A"                   SEE EXHIBIT "A"

The collateral to which the security Interests apply are all of each debtor's interest in Oil and Gas, equipment, fixtures, personal property, accounts, inventory and general intangibles and proceeds or products thereof relating or pertaining to the Oil and Gas Leases covered by this agreement and included in the Contract Area as described in Exhibit "A".

F. Deemed Non-Consent for Defaulting Payment.

If the lien conferred in Article VII.B has been enforced, or if any party to this agreement shall fail to pay its share of costs and expenses incurred in operations of the Contract Area for a period of 90 days from the date of Operator's invoice therefor, Operator may notify the affected party of its default by certified mail, return receipt requested, and if such party fails to cure the default within 10 days from the date of receipt of Operator's notice, by payment in full of all invoices for operating costs which have been due for more than 30 days, the affected party shall be deemed in non-consent status and for so long as the affected party remains in default it shall have no further access to the Contract Area or information obtained in connection with operations hereunder and shall not be entitled to vote on any matter hereunder. As to any proposed operation in which it otherwise would have the right to participate, such party shall have the right to be a Consenting Party therein only if it pays the amount it is in default before the operation is commenced; otherwise it automatically shall be deemed a Non-Consenting Party to that operation. Nothing herein shall affect each party's right to protest any item charged to the joint account by Operator under the provisions of Article I.5. of Exhibit "C" attached hereto.

G. Trustee's Sale for Defaulting Payment.

If Operator should elect to proceed to foreclose the lien of Operator as against the interest of a Non-Operator having an interest in the Contract Area, this operating agreement does hereby include provisions for non-judicial sale under the laws of the State of Texas and David Cotton is hereby appointed as Trustee for such purpose. Upon such default, said Trustee or Operator shall at least 21 days preceding the date of nonjudicial sale serve written notice of the proposed sale by certified mail to Non-Operator according to records of Operator. Service of such notice shall be deemed completed upon deposit of a notice enclosed in a post-paid wrapper properly addressed to the Non-Operator and each other party obligated to pay such obligations at the most recent address or addresses as shown on the records of Operator in a post office or other official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service. After such notice, said Trustee shall proceed to sell all of the Interests of Non-Operator in the Contract Area at public auction to the highest bidder for cash after having given notice of the time and place of sale and in the manner and after the advertisement of such sale as now required by the statutes of the State of Texas in making sales of real estate under deeds of trust. Sale of a part of the realty would not exhaust the power of sale and sales may be made from time to time until all of the property is sold or the obligations paid in full. Said Trustee shall have authority to appoint an attorney in fact to act as Trustee in conducting the foreclosure sale and executing a deed to the purchasers; and it is further agreed that said Trustee or his successor may sell said property together or in lots and/or parcels as to him shall deem expedient and after such sale as aforesaid shall make, execute and deliver to the purchaser or purchasers thereof good and sufficient deeds, assignments or other lawful conveyances to vest in said purchaser or purchasers title to the Non-Operator's interest in the Contract Area in fee simple together with all personal property used or obtained in connection therewith and together with all of the proceeds of production attributable thereto including proceeds of production held by any party for the payment to Non-Operator. From the proceeds of said sale said Trustee shall first pay all charges, costs and expenses in executing these provisions and secondly pay any sums due by the Trustee for taxes in the preservation of the security and thereafter pay all of the remaining sums to Operator for the satisfaction of the debts of Non-Operator hereunder and the balance, if any, shall be paid to Non-Operator.

It is agreed that such sale shall be a perpetual bar against Non-Operator and its heirs, successors and assigns and legal representatives and all other persons claiming under him, them or any of them. It is further agreed that said Trustee or any holder or holders of said obligation of Operator shall have the right to become the purchaser or purchasers at such sale if they are the highest bidder or bidders in which event the bid or bids may be credited upon said indebtedness of Non-Operator. It is stipulated and agreed that in case of any sale hereunder by Trustee or his successor all prerequisites of said sale shall be presumed to have been performed and any conveyance given hereunder, all statements of fact or recitals therein made as to the non-payment of money secured or as to any default under the terms hereof or as to the request of the Trustee to enforce this trust or as to the proper and due appointment of any successor or substitute Trustee or as to the advertisement of sale or the time, place and terms of sale or as to any other preliminary act or thing shall be taken in all courts of law and equity as prima facie evidence that the facts so stated are true. Operator may appoint a substitute or successor Trustee in the event the Trustee above named is unable for any reason to serve.

H. Drill or Out

Notwithstanding any provisions to the contrary contained in Article VI.B. should any party hereto, after receiving notice from Operator of a proposal to drill a well on the Contract Area, other than the well provided for

SEC 190242

in Article VI.A fail to timely notify Operator of its election to participate in such proposal or should a party elect not to participate in the drilling proposal, it is hereby agreed that such party shall relinquish and assign to the participating parties all of its Leasehold interest in and to the well and the proration unit allocated to such well. Additionally, in such event, such non-participating party shall release, relinquish and surrender and forever forfeit proportionately to the participating parties, all of the non-participating party's interest in and to all proration units which are adjoining and/or contiguous to the proration unit allocated to such proposed well except for any thereof on which a well is situated and in which well the nonparticipating party participated in the drilling.

By way of illustration, in the event a 40 acre proration unit in the form of a square is allocated to a proposed well, then a non-participating party shall forfeit, release and relinquish all interest in such 40 acre proration unit together with the eight immediately surrounding and adjoining 40 acre proration units with the exception indicated.

Notwithstanding any provision to the contrary contained in Article VI., Non-Operator upon receiving Operator's recommendation with respect to an attempted Completion shall within the time period set forth herein, notify Operator of its election to participate in a proposed Completion attempt. Failure to so notify Operator shall be deemed an election by Non-Operator not to participate. In the event that any Non-Operator elects not to participate in the Completion attempt, the Non-Consenting Party shall relinquish and assign to the participating parties all of its Leasehold interest in and to the well and the proration unit allocated to such well, only insofar as to the interval or formation which is subject to the Completion attempt. Additionally, in such event, such non-participating party shall relinquish and surrender and forever forfeit proportionately to the participating parties, all of the non-participating party's interest in and to all proration units which are adjoining and/or contiguous to the proration unit allocated to such well, only insofar as to the interval or formation which is subject to the Completion attempt.

With regard to Deepening operations, any Non-Consenting Party shall forfeit proportionately to the participating parties all of the non-participating party's interest in depths greater than the depth drilled in an operation for which such non-participating party had previously consented. The interest of any party in such relinquished and forfeited Leasehold rights shall be assigned proportionately to the participating parties by the non-participating party without warranty of title except as to claims, by, through or under Assignor, and shall be free of burdens except those created prior to the time the non-participating party acquired his interest in the Leasehold estate so forfeited.

I. Sales Necessitating Separate Measurements.

In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area which necessitates separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

J. Internal Revenue Code Election.

This Operating Agreement shall not create any mining partnership, commercial partnership or other partnership relation or joint venture, and the liabilities of each of the parties hereto shall be several and not joint. However, solely for Federal and State income tax purposes, the parties elect to be taxed as a partnership in accordance with the Tax Partnership Agreement attached as Exhibit "G" hereto, but such relationship shall not be a partnership to any other extent or for any other purpose. Notwithstanding anything to the contrary herein, the parties hereto agree that, with respect to all operations conducted hereunder, each party hereto agrees to elect to be excluded from the application of Subchapter K of Chapter I of Subtitle A of the Code, and each party agrees to join in the execution of such additional documents and elections as may be required by the Internal Revenue Service in order to effectuate the foregoing. In addition, if the income tax laws of any state in which the parties conduct operations pursuant to the terms of this Agreement contain provisions similar to those contained in Subchapter K of Chapter I of Subtitle A of the Code, the parties hereby agree to elect to be excluded from the application of such provisions.

K. Memorandum of Operating Agreement.

Within ten (10) days from the execution of this operating Agreement, each party agrees to execute a "Memorandum of Joint Operating Agreement" to be filed of record in Lynn and Terry Counties, Texas, imparting constructive notice that the Contract Area is subject to all of the terms, conditions and provisions contained in this agreement.

L. Power of Attorney.

Each Non-Operator designates Operator as its respective attorney-in-fact for the purpose of executing on behalf of such Non-Operator all instruments of release; all oil purchase agreements, gas purchase agreements and amendments thereto; all amendments to existing Leases in the Contract Area deemed necessary by Operator and all filings required by regulatory agencies relating to operations on the Contract Area including without limitation all NGPA filings, filings required by the Federal Energy Regulatory Commission and the Railroad Commission of the State of Texas. This Power-of-Attorney may be revoked only by revocation signed and acknowledged by the revoking non-operator, and filed for record in Lynn and Terry Counties, Texas, a copy of which shall be forwarded to operator.

M. Area of Mutual Interest.

SEC 190243

(1) The parties hereto hereby create an Area of Mutual Interest (the "AMI") comprising all of the Contract Area covered by this Operating Agreement.

(2) During the term of the AMI, if any party hereto ("the Acquiring Party") acquires any Oil and Gas Lease, or any interest therein, any unleased mineral interest or any farmout, sublease or other contract with respect thereto which covers or affects any lands or minerals lying within the AMI ("the offered Mineral Interest"), the Acquiring Party shall promptly notify each of the other parties hereto ("Offeree") of such acquisition. In such event, such Offeree shall have the right to acquire his or its proportionate interest in the offered Mineral Interest in accordance with the other provisions of this Article XVI I.

(3) Promptly upon acquiring the offered Mineral Interest, the Acquiring Party shall, in writing, advise each Offeree of such acquisition. The notice shall include complete xerox copies of the instruments of acquisition including, by way of example but not of limitation, such copies of the Leases, assignments, subleases, farmouts or other contracts acquired by the Acquiring Party creating or affecting the offered Mineral Interest, together with such copies of paid drafts, plats depicting the exact location of the acreage covered or affected thereby, Lease brokers' reports and any other title data relating thereto. The Acquiring Party shall also enclose an itemized statement of the actual costs and expenses incurred by the Acquiring party in acquiring the offered Mineral Interest ("Acquiring Costs"). Each Offeree shall have a period of fifteen (15) days after receipt of the notice within which to furnish the Acquiring party written notice of his or its election to acquire his or its proportionate interest in the offered Mineral Interest. If, however, a well in search of oil or gas is being drilled on lands situated within the AMI or on lands situated outside the AMI of which the result could be expected to materially affect the value of the offered Mineral Interest, each Offeree shall have a period of forty-eight (48) hours after receipt of the notice (exclusive of Saturdays, Sundays and legal holidays) within which to elect to acquire his or its proportionate interest in the offered Mineral Interest. It is provided, however, that the forty-eight (48) hour election period shall not apply unless the Acquiring Party shall give written notice to each Offeree within two (2) days after the date on which the Acquiring party acquired the offered Mineral Interest exclusive of Saturdays, Sundays and legal holidays. In addition thereto, the Acquiring Party shall also:

(i)     furnish each Offeree with the approximate location of the well then being drilled and the name of the operator or drilling contractor drilling the well; and

(ii)    specifically advise each Offeree that each Offeree shall have a period of forty-eight (48) hours (inclusive of Saturdays, Sundays and legal holidays) within which to elect to acquire his or its proportionate interest in the offered Mineral Interest.

The above information shall be in addition to the information and copies of instruments to be furnished in connection with the acquisition of the offered Mineral Interest as provided hereinabove. If the Acquiring Party does not receive written notice of election from any Offeree to acquire his or its proportionate interest within the fifteen (15) day or forty-eight (48) hour period, as the case may be, such failure shall constitute an election by such Offeree not to acquire his or its interest in the offered Mineral Interest. Written notice from the Acquiring Party to each Offeree and written notice of election from each Offeree to the Acquiring Party shall be deemed given when delivered if delivered in person, one day after deposit with an overnight carrier such as Federal Express for delivery on the next calendar day and the day of transmission by telecopy (if confirmed by notice sent by Federal Express or a similar overnight carrier for receipt the next day). Each Offeree accepting the offered Mineral Interest shall be entitled to participate in the offered Mineral Interest in the proportion to which his or its ownership interest as set forth in Exhibit "A" bears to the total ownership Interests as set forth in Exhibit "A" of the Acquiring Party and all other Offerees who have elected to acquire their proportionate interest in the offered Mineral Interest. Promptly after the period for the election has expired, the Acquiring Party shall invoice each Offeree electing to acquire his or its Interests in the offered Mineral Interest for his or its proportionate part of the Acquisition Costs. In the event an Offeree elects not to acquire his or its proportionate interest therein, then the Acquiring Party and each of the other Offerees who elect to participate in the offered Mineral Interest shall bear the Acquisition Costs attributable to such non-acquiring Offeree's interest in the proportion to which such participating party's expense bearing interest in the AMI at such time bears to the aggregate expense-bearing interest in the AMI at such time of the Acquiring Party and such other Offerees who so elect to participate. Each Offeree shall immediately reimburse the Acquiring Party for his or its share of the Acquisition Costs as reflected by the invoice. Upon receipt of such reimbursement or, in the case of a farmout or similar agreement at the time the acquiring party receives its assignment or other instrument, the Acquiring Party shall execute and deliver an appropriate, recordable assignment to each participating Offeree. If the Acquiring Party does not receive the amount due from a participating Offeree within five (5) days after receipt by such Offeree of the invoice for its share of the Acquisition Costs, the Acquiring Party may, at his or its election and without prejudice to other existing remedies, give written notice to such delinquent party that the failure of the Acquiring Party to receive the amount due within forty-eight (48) hours (exclusive of Saturdays, Sundays and legal holidays) after receipt of such notice by the delinquent Offeree shall constitute a withdrawal by the delinquent Offeree of its former election to acquire the interest and such Offeree shall no longer have the right to acquire an interest in the offered Mineral Interest. In the event the Acquiring Party does not receive the amount due within such forty-eight (48) hour period, the delinquent Offeree shall be deemed to have elected not to participate and the Acquiring Party shall succeed to and own the entirety of the interest in the offered Mineral Interest which the delinquent Offeree would have owned and the Acquiring party shall bear the delinquent Offeree's proportionate share of the Acquisition Costs.

(4) In the event less than all of the Offerees elect to acquire their proportionate interest in the offered Mineral Interest, then the portion of the lands covered by the offered Mineral Interest shall be automatically deleted from the AMI and the Contract Area covered hereby without the necessity of Operator or any Non-Operator executing a document amending the AMI and this Operating Agreement to reduce the AMI and the Contract Area

SEC 190244

to exclude such lands therefrom. The Acquiring Party and the Offerees electing to acquire the Interests in the offered Mineral Interest shall be deemed to have agreed to operate the offered Mineral Interest in accordance with the terms and provisions of this Operating Agreement, except that the offered Mineral Interest shall constitute the Contract Area covered thereby. Exhibit "A" shall list the names and addresses of the parties owning the offered Mineral Interest and the Interests in which they own the same, and Operator shall be named Operator therein unless Operator did not participate in acquiring his interest in the offered Mineral Interest, in which event the parties agreeing to participate in the offered Mineral Interest shall select an Operator from among themselves, which Operator shall be elected by the affirmative vote of two or more such parties owning a majority interest based on their ownership of the offered Mineral Interest, and not on the number of parties electing to participate. The Acquiring Party and the Offerees electing to acquire their Interests in the offered Mineral Interest shall enter into an Operating Agreement reflecting the same immediately after agreeing to own jointly the offered Mineral Interest, but the failure to enter immediately into such an Operating Agreement shall not prevent the owners of the offered Mineral Interest from operating, developing and maintaining the same in accordance with the terms hereof, unless Operator elects not to participate and such parties are unable to agree on the election of an operator.

(5) Any assignment made by the Acquiring Party shall be made free and clear of any burdens placed thereon by the Acquiring Party but otherwise without warranty of title, except as to acts by, through and under the Acquiring Party, but not otherwise. The assignment shall be expressly made subject to and each assignee shall expressly assume his or its portion of all of the obligations imposed by the instrument creating or affecting the offered Mineral Interest.

(6) If the interest of any party hereto in the AMI should vest in three or more parties, those parties shall designate one of them to whom all notices provided for in this AMI are to be given and shall promptly furnish the other parties hereto the name and address of the designated party. If the Acquiring Party has not received the name and address of the designated party, the notice of the acquisition shall be directed to all of the parties having an interest in the AMI according to the Exhibit "A" which is then a part of this Operating Agreement.

(7) If the instrument creating or affecting the offered Mineral Interest covers lands situated both within and outside the AMI, the Acquiring Party may, at his or its option, offer either all of the offered Mineral Interest or only that portion of the offered Mineral Interest covering lands situated within the AMI. If less than the entirety is offered, the Acquisition Costs shall be prorated between the acreage covered by the offered Mineral Interest situated within the AMI and the acreage situated outside the AMI and the Acquiring Party shall bear all of the Acquisition Costs attributable to such outside acreage and the Acquiring Party and the Offerees who elect to participate shall bear their proportionate share of the Acquisition Costs attributable to the acreage within the AMI. If the entirety of the premises covered by the Mineral Interest is offered and each party hereto acquires it proportionate interest therein, the lands lying outside the AMI shall become a part of the Contract Area covered hereby and the AMI shall thereby be automatically enlarged without the necessity of operator or any Non-Operator executing a document amending the AMI and this Operating Agreement to enlarge the AMI to include such lands lying outside the AMI.

(8) If two or more of the offered Mineral Interests are included in the same notice, each Offeree shall have the separate right of election as to each offered Mineral Interest.

(9) The provisions of the AMI shall not apply to acquisitions resulting from a merger, consolidation, reorganization or an acquisition from a parent, subsidiary or affiliated corporation, or, as to individuals, from ascendants or descendants or trusts of which such parties are beneficiaries. The provisions hereof shall also not apply to sales and acquisitions between partners in a partnership which is a party hereto, or ventures in a joint venture which is a party hereto, nor to the acquisition by any party hereto of all or any part of the interest of another party hereto.

(10) Each party hereto stipulates and represents to the other parties hereto that he or it is not now and shall not become hereafter a party to any other area of mutual interest agreement involving all or any portion of the land comprising the AMI.

N. Participation Agreement

The parties to this Operating Agreement hereby acknowledge that their interest in the Contract Area described in Exhibit "A" hereto is owned subject to the terms of that certain On Point Prospect Lynn & Terry Counties, Texas Participation Agreement by and among the Parties hereto dated December 10, 2009 and pursuant to paragraph 8 (c) thereof, the Parties granted to each other a Right of First Refusal as to any proposed Transfer of any interest in the Contract Area to any person other than a Permitted Assignee (as such terms are defined in the Participation Agreement). The Parties hereby incorporate by reference the provisions of paragraph 8 (c) of the Participation Agreement into this Agreement as is set out in full in this Agreement.

O. Successor Operations to RAW Oil & Gas, Inc.

Article V.B.1. is hereby amended to provide that in the event: (i) RAW Oil & Gas, Inc. is no longer under the management control (including day-to-day management of all operations conducted by RAW under this Operating Agreement) of Joe D. Hardin; (ii) Joe D. Hardin is no longer the majority owner of RAW Oil & Gas, Inc.; (iii) Joe D. Hardin is deceased; or (iv) Joe D. Hardin is determined to be non-compos mentis or incapacitated in a manner that will prevent him from directing the activities of RAW under this Agreement in the opinion of three licensed medical doctors located in the Lubbock, Texas area, then RAW may be removed as Operator by the affirmative vote of non-operators owning a majority in interest based on ownership as shown on Exhibit A. Any Party to this

SEC 190245

Agreement owning an interest of five (5%) percent or more shall have the right by delivering a written request to all non-operators to initiate the process to cause the three physicians to assess the competency of Joe D. Hardin. The physicians shall be selected by a majority in interest of the non-operators joining in the request for the examination. The cost of the physicians' fees shall be billed to the Joint Account for all Parties to the extent such costs are not covered by insurance.

SEC 190246

## EXHIBIT "A"

Attached to and made a part of
Operating Agreement dated January 2, 2010, between RAW Oil & Gas Inc. as Operator and
Smith Energy Company, etal, as Non-Operators

PART I:     CONTRACT & AMI AREA


*TO BE DETERMINED AT A LATER DATE*


PART II:     PARTIES, INTEREST AND ADDRESSES FOR NOTICE PURPOSES

| Names and Addresses | Before Casing Point of the First Well | After Casing Point of the First Well And all Subsequent Operations |
|---|---|---|
| Raw Oil & Gas, Inc. 12312 Slide Road Lubbock, Texas 79424 | -0%- | 1.00% |
| Raw Energy, L.C. 12312 Slide Road Lubbock, Texas 79424 | -0%- | 5.25% |
| Smith Energy Company Lester Smith, President P.O. Box 52890 Houston, Texas 77052 | 100.0% | 75.0% |
| Mark P. Hardwick P.O. Box 213 Midland, Texas 79702 | -0%- | 6.25% |
| Steve Blaylock 214 W. Texas, Suite 306 Midland Texas 79701 | -0%- | 6.25% |
| Elger Exploration Inc. P.O. Box 2623 Midland, Texas 79702 | -0%- | 6.25% |

SEC 190247

Attached to and made a part of
Operating Agreement dated January 2, 2010, between RAW Oil & Gas Inc., as Operator and
Smith Energy Company, etal, as Non-Operators.

Producers 88 (7-69) Paid Up
with 640 Acres Pooling Provision

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this _____, between _____, Lessor (whether one or more), whose address is _____, and _____, Lessee, WITNESSETH:

1. Lessor, in consideration of Ten Dollars and other valuable consideration ($10.00 and OVC), receipt of which is hereby acknowledged, and of the covenants and agreements of lessee hereinafter contained, does hereby grant, lease and let unto lessee the land covered hereby for the purposes and with the exclusive right of exploring, drilling, mining and operating for, producing and owning oil, gas, sulphur and all other minerals (whether or not similar to those mentioned), together with the right to make surveys on said land, lay pipe lines, establish and utilize facilities for surface or subsurface disposal of salt water, construct roads and bridges, dig canals, build tanks, power stations, telephone lines, employee houses and other structures on said land, necessary or useful in lessee's operations in exploring, drilling for, producing, treating, storing and transporting minerals produced from the land covered hereby or any land adjacent thereto. The land covered hereby, herein called "said land", is located in the Counties of_____, State of Texas, and is described as follows:

This lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by lessor by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by lessee for a more complete or accurate description of said land. For the purpose of determining the amount of any bonus or other payment hereunder, said land shall be deemed to contain _____acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof. Lessor accepts the bonus as lump sum consideration for this lease and all rights and options hereunder.

2. Unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of_____years from the date hereof, hereinafter called "primary term", and as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days.

3. As royalty, lessee covenants and agrees: (a) To deliver to the credit of lessor, in the pipe line to which lessee may connect its wells, the equal _____ part of all oil produced and saved by lessee from said land, or from time to time, at the option of lessee, to pay lessor the average posted market price of such _____ part of such oil at the wells as of the day it is run to the pipe line or storage tanks, lessor's interest, in either case, to bear _____ of the cost of treating oil to render it marketable pipe line oil; (b) To pay lessor on gas and casinghead gas produced from said land (1) when sold by lessee, _____)of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well, of _____ of such gas and casinghead gas; (c) To pay lessor on all other minerals mined and marketed or utilized by lessee from said land, one tenth either in kind or value at the well or mine at lessee's election, except that on sulphur mined and marketed the royalty shall be one dollar ($1.00) per long ton. If, at the expiration of the primary term or any time or times thereafter, there is any well on said land or on lands with which said lands or any portion thereof has been pooled, capable of producing oil or gas, and all such wells are shut-in, this lease shall, nevertheless, continue in force as though operations were being conducted on said land for so long as said wells are shut-in, and thereafter this lease may be continued in force as if no shut-in had occurred. Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the minerals capable of being produced from said wells, but in the exercise of such diligence, lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities of flow lines, separator, and lease tank, and shall not be required to settle labor trouble or to market gas upon terms unacceptable to lessee. If, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety consecutive days, and during such time there are no operations on said land, then at or before the expiration of said ninety day period, lessee shall pay or tender, by check or draft of lessee, as royalty, a sum equal to one dollar ($1.00) for each acre of land then covered hereby. Lessee shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety day period if upon such anniversary this lease is being continued in force solely by reason of the provisions of this paragraph. Each such payment or tender shall be made to the parties who at the time of payment would be entitled to receive the royalties which would be paid under this lease if the wells were producing, and may be deposited in the _____ Bank at _____ _____, or its successors, which shall continue as the depositories, regardless of changes in the ownership of shut-in royalty. If at any time that lessee pays or tenders shut-in royalty, two or more parties are, or claim to be, entitled to receive same, lessee may, in lieu of any other method of payment herein provided, pay or tender such shut-in royalty, in the manner above specified, either jointly to such parties or separately to each in accordance with their respective ownership thereof, as lessee may elect. Any payment hereunder may be made by check or draft of lessee deposited in the mail or delivered to the party entitled to receive payment or to a depository bank provided for above on or before the last date for payment. Nothing herein shall impair lessee's right to release as provided in paragraph 5 hereof. In the event of assignment of this lease in whole or in part, liability for payment hereunder shall rest exclusively on the then owner or owners of this lease, severally as to acreage owned by each.

4. Lessee is hereby granted the right, at its option, to pool or unitize any land covered by this lease with any other land covered by this lease, and/or with any other land, lease, or leases, as to any or all minerals or horizons, so as to establish units containing not more than 80 surface acres, plus 10% acreage tolerance; provided, however, units may be established as to any one or more horizons, or existing units may be enlarged as to any one or more horizons, so as to contain not more than 640 surface acres plus 10% acreage tolerance, if limited to one or more of the following: (1) gas, other than casinghead gas, (2) liquid hydrocarbons (condensate) which are not liquids in the subsurface reservoir, (3) minerals produced from wells classified as gas wells by the conservation agency having jurisdiction. If larger units than any of those herein permitted, either at the time established, or after enlargement, are required under any governmental rule or order, for the drilling or operation of a well at a regular location, or for obtaining maximum allowable from any well to be drilled, drilling, or already drilled, any such unit may be established or enlarged to conform to the size required by such governmental order or rule. Lessee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded. Each of the said options may be exercised by the lessee at any time and from time to time while this lease is in force, and whether before or after production has been established either on said land, or on the portion of said land included in the unit, or on other land unitized therewith. A unit established hereunder shall be valid and effective for all purposes of this lease even though there may be mineral, royalty, or leasehold interests in lands within the unit which are not effectively pooled or unitized. Any operations conducted on any part of such unitized land shall be considered, for all purposes, except the payment of royalty, operations conducted upon said land under this lease. There shall be allocated to the land covered by this lease within each such unit (or to each separate tract within the unit if the lease covers separate tracts within the unit) that proportion of the total production of unitized minerals from the unit, after deducting any used in lease or unit operations, which the number of surface acres in such land (or in each such separate tract) covered by this lease within the unit bears to the total number of surface acres in the unit, and the production so allocated shall be considered for all purposes, including payment or delivery of royalty, overriding royalty and any other payments out of production, to be the entire production of unitized minerals from the land to which allocated in the same manner as though produced therefrom under the terms of this lease. The owner of the reversionary estate of any term royalty or mineral estate agrees that the accrual of royalties pursuant to this paragraph or of shut-in royalties from a well on the unit shall satisfy any limitation of term requiring production of oil or gas. The formation of any unit hereunder which includes land not covered by this lease shall not have the effect of exchanging or transferring any interest under this lease (including, without limitation any shut-in royalty which may become payable under this lease) between parties owning interests in land covered by this lease and parties owning interests in land not covered by this lease. Neither shall it impair the right of the lessee to release as provided in paragraph 5 hereof, except that lessee may not so release as to lands within a unit while there are operations thereon for unitized minerals unless all pooled leases are released as to lands within the unit. At any time while this lease is in force lessee may dissolve any unit established hereunder by filing for record in the public office where this lease is recorded a declaration to that effect, if at that time no operations are being conducted thereon for unitized minerals. Subject to the provisions of this paragraph 4, a unit once established hereunder shall remain in force so long as any lease subject thereto shall remain in force. If this lease now or hereafter covers separate tracts, no pooling or unitization of royalty interests as between any such separate tracts is intended or shall be implied or result merely from the inclusion of such separate tracts within this lease but lessee shall nevertheless have the right to pool or unitize as provided in this paragraph 4 with consequent allocation of production as herein provided. As used in this paragraph 4, the words "separate tract" mean any tract with royalty ownership differing, now or hereafter, either as to parties or amounts, from that as to any other part of the leased premises.

5. Lessee may at any time and from time to time execute and deliver to lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations, as to the released acreage or interest.

SEC 190248

6. Whenever used in this lease the word "operations" shall mean operations for and any of the following: drilling, testing, completing, reworking, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals, excavating a mine, production of oil, gas, sulphur or other mineral, whether or not in paying quantities.

7. Lessee shall have the use, free from royalty, of water, other than from lessor's water wells, and of oil and gas produced from said land in all operations hereunder. Lessee shall have the right at any time to remove all machinery and fixtures placed on said land, including the right to draw and remove casing. No well shall be drilled nearer than 200 feet to the house or barn now on said land without the consent of the lessor. Lessee shall pay for damages caused by its operations to growing crops and timber on said land.

8. The rights and estate of any party hereto may be assigned from time to time in whole or in part as to any mineral or horizon. All of the covenants, obligations, and considerations of this lease shall extend to and be binding upon the parties hereto, their heirs, successors, assigns, and successive assigns. No change or division in the ownership of said land, royalties, or other moneys, or any part thereof, howsoever effected, shall increase the obligations or diminish the rights of lessee, including, but not limited to, the location and drilling of wells and the measurement of production. Notwithstanding any other actual or constructive knowledge or notice thereof of or to lessee, its successors or assigns, no change or division in the ownership of said land or of the royalties, or other moneys, or the right to receive the same, howsoever effected, shall be binding upon the then record owner of this lease until thirty (30) days after there has been furnished to such record owner at his or its principal place of business by lessor or lessor's heirs, successors, or assigns, notice of such change or division, supported by either originals or duly certified copies of the instruments which have been properly filed for record and which evidence such change or division, and of such court records and proceedings, transcripts, or other documents as shall be necessary in the opinion of such record owner to establish the validity of such change or division. If any such change in ownership occurs by reason of the death of the owner, lessee may, nevertheless pay or tender such royalties, or other moneys, or part thereof, to the credit of the decedent in a depository bank provided for above.

9. In the event lessor considers that lessee has not complied with all its obligations hereunder, both express and implied, lessor shall notify lessee in writing, setting out specifically in what respects lessee has breached this contract. Lessee shall then have sixty (60) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by lessor. The service of said notice shall be precedent to the bringing of any action by lessor on said lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after service of such notice on lessee. Neither the service of said notice nor the doing of any acts by lessee aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that lessee has failed to perform all its obligations hereunder. If this lease is canceled for any cause, it shall nevertheless remain in force and effect as to (1) sufficient acreage around each well as to which there are operations to constitute a drilling or maximum allowable unit under applicable governmental regulations, (but in no event less than forty acres), such acreage to be designated by lessee as nearly as practicable in the form of a square centered at the well, or in such shape as then existing spacing rules require; and (2) any part of said land included in a pooled unit on which there are operations. Lessee shall also have such easements on said land as are necessary to operations on the acreage so retained.

10. Lessor hereby warrants and agrees to defend title to said land against the claims of all persons whomsoever. Lessor's rights and interests hereunder shall be charged primarily with any mortgages, taxes or other liens, or interest and other charges on said land, but lessor agrees that lessee shall have the right at any time to pay or reduce same for lessor, either before or after maturity, and be subrogated to the rights of the holder thereof and to deduct amounts so paid from royalties or other payments payable or which may become payable to lessor and/or assigns under this lease. If this lease covers a less interest in the oil, gas, sulphur, or other minerals in all or any part of said land than the entire and undivided fee simple estate (whether lessor's interest is herein specified or not), or no interest therein, then the royalties and other moneys accruing from any part as to which this lease covers less than such full interest, shall be paid only in the proportion which the interest therein, if any, covered by this lease, bears to the whole and undivided fee simple estate therein. All royalty interest covered by this lease (whether or not owned by lessor) shall be paid out of the royalty herein provided. This lease shall be binding upon each party who executes it without regard to whether it is executed by all those named herein as lessor.

11. If while this lease is in force, at, or after the expiration of the primary term hereof, it is not being continued in force by reason of the shut-in well provisions of paragraph 3 hereof, and lessee is not conducting operations on said land by reason of (1) any law, order, rule or regulation, (whether or not subsequently determined to be invalid) or (2) any other cause, whether similar or dissimilar, (except financial) beyond the reasonable control of lessee, the primary term hereof shall be extended until the first anniversary date hereof occurring ninety (90) or more days following the removal of such delaying cause, and this lease may be extended thereafter by operations as if such delayed had not occurred.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

**LESSOR:**

_____

By: _____
Printed Name: _____
Title: _____

Tax ID No.: _____

## ACKNOWLEDGEMENT

STATE OF _____ §
                                          CORPORATE
COUNTY OF_____ §

Before me, the undersigned Notary Public, personally appeared _____
known to me to be the person whose name is subscribed to the foregoing instrument and known to me to be _____of
_____ a corporation, and acknowledged to me that he or she executed the same as the act of said corporation for the purposes therein set forth.

Given under my hand and seal of office this _____ day of _____, 2010.

_____
Notary Public in and for the State of_____

My commission expires: _____

SEC 190249

PAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

## EXHIBIT "C"

Attached to and made a part of ___Joint Operating Agreement dated January 2 , 2010, by and between RAW Oil & Gas, Inc., as Operator and Smith Energy Company, etal. as Non-Operators.

# ACCOUNTING PROCEDURE

# JOINT OPERATIONS

### I. GENERAL PROVISIONS

1. **Definitions**

   "Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

   "Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

   "Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

   "Operator" shall mean the party designated to conduct the Joint Operations.

   "Non-Operators" shall mean the Parties to this agreement other than the Operator.

   "Parties" shall mean Operator and Non-Operators.

   "First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

   "Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

   "Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

   "Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

   "Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council or Petroleum Accountants Societies.

2. **Statement and Billings**

   Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

3. **Advances and Payments by Non-Operators**

   A. Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

   B. Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at Peoples Bank, Lubbock on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

4. **Adjustments**

   Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof, provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

## COPYRIGHT © 1985 by the Council of Petroleum Accountants Societies.

- 1 -

SEC 190250

5.    Audits

A.    A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B.    The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6.    Approval By Non-Operators

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.


## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1.    Ecological and Environmental

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2.    Rentals and Royalties

Lease rentals and royalties paid by Operator for the Joint Operations.

3.    Labor

A.    (1)    Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2)    Salaries of First level Supervisors in the field.

(3)    Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

(4)    Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation or the Joint Property if such charges are excluded from the overhead rates.

B.    Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.    Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D.    Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

4.    Employee Benefits

Operator's current costs or established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

- 2 -

SEC 190251

5.   Material

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV.   Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6.   Transportation

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A.   If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B.   If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C.   In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

7.   Services

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III.   The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account if directly engaged in the operation (not administration) of the joint property.

8.   Equipment and Facilities Furnished By Operator

A.   Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed _eighteen_____ percent (_____18_____%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.   In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%.   For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9.   Damages and Losses to Joint Property

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10.   Legal Expense

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

11.   Taxes

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

- 3 -

SEC 190252



12. **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

13. **Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

14. **Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

15. **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

### III. OVERHEAD

1. **Overhead - Drilling and Producing Operations**

   i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

   ( X ) Fixed Rate Basis, Paragraph 1A, or
   (   ) Percentage Basis, Paragraph 1B

   Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

   ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

   (   ) shall be covered by the overhead rates, or
   ( X ) shall not be covered by the overhead rates.

   iii. The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

   (   ) shall be covered by the overhead rates, or
   ( X ) shall not be covered by the overhead rates.

   A. Overhead - Fixed Rate Basis

   (1) Operator shall charge the Joint Account at the following rates per well per month:

   Drilling Well Rate $____7,500.00_____
   (Prorated for less than a full month)

   Producing Well Rate $___750.00_____

   (2) Application of Overhead - Fixed Rate Basis shall be as follows:

   (a) Drilling Well Rate

   (1) Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever

- 4 -

SEC 190253

is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b) Producing Well Rates

(1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B. Overhead - Percentage Basis

(1) Operator shall charge the Joint Account at the following rates:

(a) Development

_____ Percent (_____%) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.

(b) Operating

_____ Percent (_____%) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead - Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.

2. Overhead - Major Construction

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint

- 5 -

SEC 190254


Account for overhead based on the following rates for any Major Construction project in excess of $_____:

A. ____5____ % of first $100,000 or total cost if less, plus

B. ____3____ % of costs in excess of $100,000 but less than $1,000,000, plus

C. ____2____ % of costs in excess of $1,000,000,

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3. **Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A. ____5____ % of total costs through $100,000; plus

B. ____3____ % of total costs in excess of $100,000 but less than $1,000,000; plus

C. ____2____ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4. **Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. **Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A. New Material (Condition A)

    (1) Tubular Goods Other than Line Pipe

        (a) Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at current new price available from area vendors effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

        (b) For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000

- 6 -

SEC 190255

pound Oil Field Haulers Association interstate truck rate shall be used.

(c) Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

(d) Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

(2) Line Pipe

(a) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(b) Line Pipe movements (except size 24 inch OD) and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(c) Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

(d) Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

(3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

(4) Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(1) and (2).

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

At seventy-five percent (75%) of current new price, as determined by Paragraph A.

(2) Material used on and moved from the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

(b) At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material

(3) Material not used on and moved from the Joint Property

At seventy-five percent (75%) of current new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

-7-

SEC 190256



(2) Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a) Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b) Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3) Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. Pricing Conditions

(1) Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph I.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4. **Warranty of Material Furnished By Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. **Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. **Reconciliation and Adjustment of Inventories**

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for

- 8 -

SEC 190257



overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3.  **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4.  **Expense of Conducting Inventories**

A.  The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.  The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

- 9 -

SEC 190258

**EXHIBIT "D"**

Attached to and made a part of
Operating Agreement dated January 2, 2010, between RAW Oil & Gas Inc., as Operator and
Smith Energy Company, etal, as Non-Operators.

## INSURANCE

Operator shall carry and maintain at all times the following insurance with respect to all operations under this Agreement:

a)   Insurance which shall comply with the Workmen's Compensation Laws of the State in which operations hereunder are conducted.

b)   Employers' Liability Insurance with limits of not less than $1,000,000 for each occurrence.

c)   Comprehensive General Liability Insurance with limits of not less than (i) $1,000,000 for each occurrence for bodily injury, and (ii) $1,000,000 for each occurrence for property damage. Operator shall provide an AFE insurance program with coverage as follows: Premises and operations, sudden and accidental pollution, underground resources, products and completed operations, and blowout, cratering and explosion coverage.

d)   Automobile Liability Insurance, including owned, hired and non-hired vehicles, with combined single limits of $500,000.

e)   Coverages in subparagraphs (c) and (d) above shall include Non-Operators as Additional Insured.

f)   Excess Liability Coverage in excess of the coverage in subparagraphs (a), (b), (c), (d) and (e) above with a combined single limit for Bodily Injury and Property Damage of not less than $1,000,000 for each occurrence.

g)   All premiums on the above provided for insurance shall be charged to the Joint Account. Except as may be otherwise expressly provided in the Operating Agreement to which this Exhibit is attached, the Joint Account shall be charged with all liabilities and expenditures resulting from any claims, damages, or losses against which Operator is not required to carry insurance.

h)   Operator shall not be liable to Non-Operators for loss, suffered on account of the insufficiency of insurance carried, or of the insurer with whom carried, nor shall Operator be liable to Non-Operators for any loss accruing by reason of Operator's inability to provide or maintain the insurance specified above, provided, however, that if at any time Operator is unable to obtain or maintain such insurance, Operator shall promptly notify Non-Operators in writing of such fact and Non-Operators may obtain and maintain such insurance at their expense.

SEC 190259

# EXHIBIT "E"

Attached to and made a part of
Operating Agreement dated January 2, 2010, between RAW Oil & Gas Inc., as Operator and
Smith Energy Company, etal, as Non-Operators.

## GAS BALANCING AGREEMENT

The parties to the Operating Agreement to which this agreement is attached own the working interest in the gas rights underlying the Contract Area covered by such agreement in accordance with the percentages of participation as set forth in Exhibit "A" to the Operating Agreement.

Each party has made (or will make) arrangements to sell or utilize its share of the gas well gas produced from the Contract Area. However, the respective gas markets of the parties may be limited from time to time; therefore, to permit the parties as much flexibility as possible in meeting the demands of their respective markets, the parties hereto agree to the following storage arrangement:

### Section 1.

From and after the date of initial delivery of gas well gas from any proration unit within the Contract Area, during any period when the market of a party is not sufficient to take that party's full share of the gas well gas produced, the other parties shall be entitled to produce each month, in addition to their own share of production, that portion of any other party's share of production which said party is unable to market, or its purchaser does not take, of the allowable gas production assigned to such proration unit by the appropriate regulatory authority having jurisdiction in the premises or at the maximum efficient rate, if no such allowable gas production is so assigned, except, however, that no party shall be entitled to take or deliver to a purchaser gas production in excess of three hundred percent (300%) of its share of allowable gas production or maximum efficient rate unless that party has gas in storage. The parties hereto shall share in and own the lease condensate (liquid hydrocarbons recovered from such gas by lease equipment) in accordance with their respective above specified interests, upon and subject to the terms of the Operating Agreement.

### Section 2.

A party taking less than its full share of the gas well gas produced shall be credited with gas in storage on a BTU basis equal to its full share of the total gas well gas produced, less such party's share of such gas used in lease operations or vented or lost, and less that portion of such gas such party took or delivered to the purchaser. Operator will maintain a running account of the gas balance as between the parties hereto and will furnish each party monthly statements showing the total quantity of gas well gas produced, the portion thereof used in lease operations, vented or lost, the total quantity of gas well gas delivered to market, and the monthly and cumulative total over and under delivery of each party on an MCF and on a BTU basis.

### Section 3.

After notice, any party may at any time begin taking or delivering to a purchaser its full share of the gas well gas produced (less such party's share of such gas used in the lease operations, vented or lost). To allow the recovery of gas in storage and to balance the gas account of the parties in accordance with their respective interests, a party with gas well gas in storage shall be entitled to take or deliver to a purchaser its full share of the gas well gas produced (less such party's share of such gas used in lease operations, vented or lost), plus a share of gas not exceeding its gas in storage determined by multiplying (1) twenty-five percent (25%), by (2) the interest in the proration unit's current production (less such party's share of such gas used in lease operations, vented or lost) of the party or parties without gas in storage, by (3) a fraction, the numerator of which is the interest in the proration unit of such party with gas in storage and the denominator of which is the total percentage interest in the proration unit of all parties with gas in storage.

### Section 4.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to its purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser. Each party shall at all times use its best efforts to regulate its takes and deliveries from the Contract Area so that wells will not be shut in for over producing the allowable, if any, assigned thereto by the regulatory authority having jurisdiction.

### Section 5.

Each party producing or taking or delivering gas well gas to its purchaser shall pay any and all royalties and production taxes due on such gas.

### Section 6.

Should production of gas well gas from a proration unit be permanently discontinued before the gas account is balanced, settlement will be made between the parties for gas which has not been recovered by any party from storage. In making

SEC 190260

such settlement, if there is any party whose gas has not been recovered from storage, or a party who has sold more than its share of gas well gas, then the amount owed (as hereinafter defined) by each of the latter shall be forwarded to the operator who shall allocate the sum of such amounts and pay the former in proration to the respective ownerships in gas not recovered from storage. The amount owed by each party who has sold more than its share of gas well gas shall be the weighted average of the amounts received by such party upon sale of such gas during the period or periods overproduction is accrued by such party, less base lease royalty and taxes paid thereon; provided, however, that as to gas sold in interstate commerce by such party, such amounts shall be based upon that portion of the rate or rates not subject to refund applicable to and collected for the volumes sold during such period or periods by such party under orders of the regulatory body having jurisdiction which are final at the time of such settlement, plus any additional collected amounts which are not ultimately required by said body to be refunded, such additional collected amounts to be accounted for at such time as final determination is made with respect thereto. For the purpose of the preceding sentence, the weighted average of the amounts received by such party shall be determined by weighting the respective amounts received for such gas on the basis of volumes of overproduction that accrue hereunder to the account of such party during the period for which such amount was received. As to any gas which any party hereto may take for its own use or sell to a third party purchaser affiliated with such selling party such sum or amount of money for the amount of such gas thereof shall be based upon the rate which would have been received by the under produced party as if such gas had been taken during the period or periods of underproduction under its contract with a nonaffiliated third party purchaser, but, if the underproduced party has no such contract, such sum or amount of money shall be based on the average rate received by other parties hereto for their share of gas during the affected period.

## Section 7.

This agreement shall constitute a separate agreement as to each proration unit within the Contract Area and shall become effective in accordance with its terms and shall remain in force and effect as long as the Operating Agreement to which it is attached remains in effect, and shall inure to the benefit of and be binding upon the parties, their successors, legal representatives and assigns.

## Section 8.

Nothing herein shall change or affect each party's obligations to pay its proportionate share of all costs and liabilities incurred in lease operations in accordance with and subject to the provisions of the Operating Agreement.

SEC 190261

Attached to and made a part of
Operating Agreement dated January 2, 2010, between RAW Oil & Gas Inc., as Operator and
Smith Energy Company, etal, as Non-Operators

## TAX PARTNERSHIP PROVISIONS

1.  RELATIONSHIP OF THE PARTIES. This agreement shall not create any mining partnership, commercial partnership or other partnership relating or joint venture, and the liabilities of each of the parties hereto shall be several and not joint. However, solely for the Unites States federal income tax purposes, this agreement shall be considered as a partnership, but such relationship shall be considered as a partnership, but such relationship shall not be a partnership to any other extent or for any other purposes.

2.  ELECTION TO REMAIN WITHIN SUBCHAPTER K. Notwithstanding anything to the contrary herein or in the Operating Agreement (the "Operating Agreement") to which this is also to be considered an Exhibit, the parties hereto agree with respect to all operations conducted hereunder:

    Each party, now having or hereinafter acquiring an interest under this agreement, agrees not to elect to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code of 1986, as amended (the "Code"), and each party agrees to join in the execution of such additional documents and elections as may be required by the Internal Revenue Service in order to effectuate the foregoing. In addition, if the income tax laws of any state in which the parties conduct operations pursuant to the terms of this Exhibit or the Operating Agreement, contained provisions similar to those contained in Subchapter K of Chapter 1 of Subtitle A of the Code, the parties hereby agree not to elect to be excluded from the application of such provisions.

3.  INCOME TAX COMPLIANCE AND CAPITAL ACCOUNTS

    The Operator shall prepare and file all required federal and state partnership income tax returns. In preparing such returns Operator shall use its best efforts and in doing so shall incur no liability to any other party with regard to such returns. Not less than two weeks prior to the due date (including extensions) Operator shall submit to each party a copy of the return as proposed for review.

    The Operator shall establish and maintain fair market ("FMV") capital accounts and tax basis capital accounts for each party. Operator shall submit to each party along with the copy of any proposed partnership income tax return an accounting of its respective capital accounts as of the end of the tax return period.

    Each party agrees to furnish to Operator not later than 30 days before the return due date (including extensions) such information relating to the operations conducted under this agreement as may be required for the proper preparation of such returns and capital accounts.

4.  TAX MATTERS PARTNER

    4.1 Operator is Tax Matters Partner. Operator is designated tax matters partner ("TMP") as defined in Internal Revenue Code (Code) Section 6231(a)(7). In the event of any change in operator, the party serving as TMP for a given taxable year shall continue as TMP with respect to all matters concerning such year. The TMP and other parties shall use their best efforts to comply with responsibilities outlined in this section and in Code Sections 6222 through 6232 and 6050K (including any Treasury Regulations promulgated thereunder) and in doing so shall incur no liability to any other party. Notwithstanding TMP's obligation to use its best efforts in the fulfillment of its responsibilities, TMP shall not be required to incur any expenses for the preparation for, or pursuance of administrative, or judicial proceedings, unless the parties agree on a method for sharing such expenses.

    4.2 Information requested by TMP. The parties shall furnish TMP within two weeks from the receipt of the request with such information (including information specified in Code Sections 6230(e) and 6050(k) as TMP may reasonably request to permit it to provide the Internal Revenue Service with sufficient information for purposes of Code Sections 6233 and 6050K.

    4.3 TMP Agreements with IRS. The TMP shall not agree to any extensions of the statute of limitations for making assessments on behalf of any other party without first obtaining the written consent of that party. The TMP shall not bind any other party to a settlement agreement in tax audits without obtaining the concurrence of any such party.

    Any other party who enters into a settlement agreement with the Secretary of the Treasury with respect to any partnership items, as defined by Code Section 6231(a)(3), shall notify the other parties of such settlement agreement and its terms within 90 days from the date of settlement.

MKB/EXHG.WPF

SEC 190262

4.4 Inconsistent Treatment of Partnership Item. If any party intends to file a notice of inconsistent treatment under Code Section 6222(b), such party shall, prior to the filing of such notice, notify the TMP of such intent and the manner in which the Party's intended treatment of a partnership item is (or may be) inconsistent with the treatment of that item by the partnership. Within one week of receipt the TMP shall remit copies of such notification to other parties to the partnership. If any inconsistency notice is filed solely because of the party not having received a Schedule K-1 in time for filing of its income tax return, the TMP need not be notified.

4.5 Request for Administrative Adjustment. No party shall file a request pursuant to Code Section 6227 for an administrative adjustment of partnership items for any partnership taxable year without first notifying all other parties. If all other parties agree with the request adjustment, the TMP shall file the request for administrative adjustment on behalf of the partnership. If unanimous consent is not obtained within the period required to timely file the request for administrative adjustment, if shorter, any party, including the TMP, may file a request for administrative adjustment on its own behalf.

4.6 Judicial Proceedings. Any party intending to file a petition under Code Section 6226, 6228 or any other Code Section with respect to any partnership item, or other tax matters involving the partnership, shall notify the other parties of such intention and the nature of the contemplated proceeding. In the case where the TMP is the Party intending to file such petition, such notice shall be given within a reasonable time to allow the other parties to participate in the choosing of the forum in which such petition will be filed. If the parties do not agree on the appropriate forum, then the appropriate forum shall be decided by majority vote. Each party shall have a vote in accordance with its percentage interest in the partnership for the year under audit. If a majority cannot agree, the TMP shall choose the forum. If a party intends to seek review of any court decision rendered as a result of such proceeding such party shall notify the other parties.

4.7 Windfall Profit Tax. The parties agree to take appropriate action under Code Section 6232(c) and any treasury regulations thereunder to assure that items required to compute the Windfall Profit Tax as imposed by Chapter 45 of the code not be treated as partnership items.

5.    ELECTIONS

5.1 General Elections. For both income tax return and capital account purposes, the partnership shall elect (a) to deduct currently intangible drilling and development costs ("IDC"), (b) to use minimum allowable acceleration tax method and the shortest permissible tax life for depreciation purposes, (c) to use the accrual method of accounting, (d) to report income on a calendar year basis, and (e) dispositions of depreciable assets shall be accounted for under the General Asset account method to the extent permitted by Code Section 168(i)(4).

5.2 Depletion. Solely for FMV capital account purposes, depletion shall be calculated by using simulated percentage depletion within the meaning of Treasury Regulation Section 1.704-1 (b)(2)(iv)(k)(2).

5.3 Other Elections. Any other elections must be approved by the affirmative vote of two (2) or more parties owning a majority interest based on the post payout ownership as shown in Exhibit "A".

6.    CAPITAL CONTRIBUTIONS AND FMV CAPITAL ACCOUNTS

6.1 Capital Contributions. The respective capital contributions of each party to the partnership shall be (a) each party's interest in the oil and gas leases committed to this partnership, and all properties associated with the leases, and (b) all amounts paid by each party in connection with acquisition, exploration, development and operation of the leases, and all other costs characterized as contributions or expenses borne by such party under this partnership. The contribution of the leases and any other properties committed to this partnership shall be made by each party's agreement to hold legal title to its interest in such leases or any other properties as nominee for this partnership.

6.2 FMV Capital Accounts. The FMV capital accounts shall be increased and decreased as follows:

(a) The FMV capital accounts shall be increased by: (i) the amount of money and the fair market value of any property contributed by each party, respectively, to the partnership (net of liabilities assumed by the partnership or to which the contributed property is subject); (ii) that party's Sec. 7.1 allocated share of Partnership income and gains, or items thereof; (iii) any basis increases required by Code Sections 48(q) and 1016(a)(22); and (iv) that party's share of Code Section 705(a)(1)(B) and (C) items.

(b) The FMV capital accounts shall be decreased by: (i) the amount of money and the fair market value of property distributed to each party (net of liabilities assumed by such party or to which the property is subject); (ii) that Party's Sec. 7.1 allocated share of partnership loss and deductions, or items thereof; (iii) any basis decreases required by Code Sections 48(9) and 1016(a)(22); and (iv) that parties share of Code Section 705(a)(2)(B) items and Code Section 709 nondeductible and nonamortizable items.

MKB/EXHG.WPF

SEC 190263

"Fair market value" when it applies to property contributed by a party to the partnership shall be assumed to equal the adjusted basis, as defined in Code Section 1011, of that property unless the parties agree otherwise in a separate written agreement.

7.  PARTNERSHIP ALLOCATIONS

7.1 FMV Capital Account Allocations. Each item of income, gain, loss or deduction shall be allocated to each party as follows:

(a) Actual or deemed income from the sale, exchange distribution or other disposition of production shall be allocated to the party entitled to such production or the proceeds from the sale of such production. In the event that deemed income arising from the in-kind distribution of production equals that fair market value of the production distributed to a party, the parties recognize that the corresponding adjustments would be net zero adjustment and accordingly, may be omitted form the FMV capital accounts;

(b) Exploration cost, IDC, operating and maintenance cost shall be allocated to each party in accordance with its respective contribution to such cost;

(c) Depreciation shall be allocated to each party in accordance with its contribution to the FMV capital account adjusted basis to the underlying asset;

(d) Simulated depletion shall be allocated to each party in accordance with its FMV capital account adjusted basis in each oil and gas property;

(e) Loss (or simulated loss) upon the sale, exchange, distribution, abandonment or the disposition of depreciable or depletable property, shall be allocated to the parties in the ratio of their respective FMV capital account adjusted basis in the depreciable or depletable property;

(f) Gain (or simulated gain) upon the sale, exchange, distribution, or other disposition of depreciable or depletable property, shall be allocated to the parties so that the FMV capital account balances of the parties with respect to such property will most closely reflect their respective percentage or fractional interest under the agreement;

(g) Costs or expenses of any other kind shall be allocated to and accounted for by each party in accordance with its respective contribution to such costs or expenses; and,

(h) Any other income item shall be allocated to the parties in accordance with the allocation of the realization.

7.2 Tax Returns and Tax Basis Capital Account Allocations

(a) Unless otherwise expressly provided herein the allocations of partnership items of income, gain, loss or deduction for tax return and tax basis capital accounts purposes shall be the same as those contained in Section 7.1;

(b) The parties recognize that under Code Section 613A(C)(7)(D) the depletion allowance is to be computed separately by each party. For this purpose, each party's share of the adjusted tax basis of each oil and gas property shall be equal to its contribution to the adjusted tax basis of such property;

(c) The parties recognize that under Code Section 613A(C)(7)(D) the computation of gain or loss on the taxable disposition of an oil or gas property is to be computed separately by each party. For this purpose the portion of the total amount realized by the partnership that represents a recovery of simulated adjusted basis in an oil and gas property will be allocated to the parties in the same ratio that simulated depletion is allocated to them under Sec. 7.1(d). Any additional amount realized will be allocated in accordance with the ratio of simulated gain allocation for such property under Sec. 7.1(f);

(d) Depreciation shall be allocated to each party in accordance with its contribution to the adjusted tax basis of the depreciable asset;

(e) Any recapture of depreciation, IDC, and other items of deduction or credit shall, to the extent possible, be allocated among the parties in accordance with their sharing of the depreciation, IDC or other item of deduction or credit which is recaptured;

(f) The qualified investment for investment tax credit (if reinstated) purposes with respect to any property shall be allocated among the parties in accordance with their respective contributions to the qualified investment (as defined in the code) in such property;

SEC 190264

(g) For partnership property which has a value in the FMV capital accounts which differs from the adjusted tax basis of such property, any tax items relating to such property will be allocated to the parties in a manner which takes into account the variation between the adjusted tax basis of such property and its FMV capital account value under Code Section 704(c); and,

(h) The income attributable to take-in-kind production will not be reflected on the tax return.

8.      DISTRIBUTION UPON TERMINATION

8.1 Termination. Termination shall occur on the earlier of the termination of the partnership under Code Section 708(b)(1) or the date upon which the partnership ceases to be a going concern. Upon termination the business shall be wound-up and concluded, and the assets shall be distributed to the parties as described below by the end of such calendar year (or, if later, within 90 days after the date of such termination). All assets shall be distributed to the parties as provided in Sections 8.2 through 8.4.

8.2 Reversion. First, all money representing unexpended contributions by any party and any property where no interest has been earned in that property under the agreement by any other party shall be returned to the contributor.

8.3 Balancing. Second, the FMV capital accounts of the parties shall be determined under this Section 8.3. The Operator shall take the actions specified under this Section 8.3 in order to cause the ratio of the parties FMV capital accounts to reflect as closely as possible their percentage interests under the agreement. The ratio of a party's FMV capital account is represented by a fraction, the numerator of which is the party's FMV capital account balance and the denominator of which is the sum of all parties FMV capital account balances. Such actions are hereafter referred to as "balancing the FMV capital accounts", and when completed, the FMV capital accounts of the parties shall be referred to as being "balanced". The matter in which the FMV capital accounts of the parties are to be balanced under this Section 8.3 shall be determined as follows:

(a) The fair market value of all partnership properties shall be determined and the gain or loss for each property which would have resulted if a sale thereof at such fair market value had occurred shall be allocated in accordance with Section 7.1(e) and (f). If thereafter, any party has a negative FMV capital account balance, that is, a balance less than zero, such party shall contribute an amount of money to the partnership sufficient to achieve a zero balance FMV capital account. Any party may contribute an amount of money to the partnership to facilitate the balancing of the FMV capital accounts. If FMV capital accounts are not balanced, Section 8.3(b) or (c) shall apply;

(b) If all the parties consent, any money or an undivided interest in certain selected properties shall be distributed to one or more parties as necessary for the purpose of balancing the FMV capital accounts;

(c) Unless (b) above applies, an undivided interest in each and every property shall be distributed to one or more parties in accordance with the ratios of their FMV capital accounts;

(d) If a property is to be valued under (a) above or distributed pursuant to (b) or (c) above, the fair market value of the property shall be agreed to by the parties. In the event all of the parties do not reach agreement as to the fair market value of property, the Operator shall cause a nationally recognized independent engineering firm to prepare an evaluation of fair market value of such property.

8.4 Final Distribution. Third, after the FMV capital accounts of the parties have been adjusted, pursuant to Section 8.3 above, all other remaining property and interest then held by the partnership shall be distributed to the parties in accordance with their FMV capital account balances.

9.      TRANSFERS, SURVIVORSHIP AND CORRESPONDENCE

9.1 Transfers. These partnership provisions shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns. The parties agree that if any one of them makes a sale or assignment of its interest under this agreement, such sale or assignment will be structured, if possible, so as not to cause a termination under Code Section 708(b)(1)(B).

9.2 Survivorship. Any termination of the agreement shall not effect the continuing application of the Tax Partnership Provisions as necessary for the termination and liquidation of the Tax Partnership.

9.3 Correspondence. All correspondence relating to the preparation and filing of the partnership's income tax returns and capital accounts shall be forwarded to:

RAW Oil & Gas, Inc.
12312 Slide Road
Lubbock, Texas  79424


MKB/EXHG.WPF

SEC 190265

# TAB H

# Muy Caliente GEA
# (DX 1356)

## GEOPHYSICAL EXPLORATION AGREEMENT
## MUY CALIENTE PROGRAM AREA
## LYNN, TERRY, HOCKLEY AND BORDEN COUNTIES, TEXAS

This Geophysical Exploration Agreement (the "**Agreement**") dated and effective as of January 15, 2010 (the "**Effective Date**"), is entered into by and between RAW Oil & Gas, Inc. ("**RAW**"), JDH RAW Energy, L.C., formerly known as RAW Energy, L.C. ("**RAW LC**"), Mark P. Hardwick ("**Hardwick**"), Steve Blaylock ("**Blaylock**"), Elger Exploration, Inc. ("**Elger**"),  and Smith Energy Company ("**Smith**").  RAW LC, Hardwick, Blaylock, and Elger are at times referred to collectively as the "**RAW Participants**" and, together with Smith, the "**Participants.**"  The Participants, RAW and RAW LC, are at times referred to individually as a "**Party**" and collectively as the "**Parties.**"

WHEREAS, RAW proposes to conduct a 3-D seismic survey covering approximately 123 square miles in Lynn, Terry and Borden Counties, Texas, as depicted on **Exhibit A** attached hereto (such lands, as the area may be amended from time to time as provided herein, are referred to herein as the "**Program Area**"); and

WHEREAS, RAW intends to utilize such 3-D seismic data and existing geologic data to generate Prospects within the Program Area; and

WHEREAS, Participants desire to participate with RAW in the 3-D seismic survey and to participate in Prospects generated within the Program Area; and

WHEREAS, this Agreement is to establish the Parties' respective rights and obligations with regard to participation in the shooting, processing and interpretation of the 3-D seismic survey, the generation of Prospects, the acquisition of Leases within the Program Area, and the exploration, development, and production of oil and gas from Prospects generated using the 3-D seismic data.

NOW, THEREFORE, in consideration of the mutual covenants herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I

### Geophysical Program

**1.1  Scope and Supervision of Geophysical Program.**  The Parties have agreed that a three-dimensional geophysical program (the "**Muy Caliente Program**" or the "**Geophysical Program**") will be conducted across the Program Area.  The scope and design of the Geophysical Program will be determined by RAW, subject to Smith's final written approval.  RAW will conduct or supervise third Parties in conducting the Geophysical Program, including permitting, data acquisition, processing and interpretation of the Data Program (as defined below).

CJM 192243v.6

DEFENDANT'S
TRIAL EXHIBIT
1356

SEC 188310

**1.2 Ownership and Confidentiality of Data.**

(a) All data resulting from the Geophysical Program ("**Program Data**") shall be owned by the Parties who pay for the costs of the Geophysical Program (the "**Program Data Owners**"), who will be represented in this Agreement by Smith Energy Company as their agent and nominee. Notwithstanding the provisions of **Article V**, Smith shall have the right to allow third parties to participate in Smith's rights and obligations under this Agreement so long as such parties ratify this Agreement and a copy of the ratification is furnished to RAW. All such ratifying Parties shall be referred to as the "**Smith WI Participants**." Upon ratification of this Agreement, the Smith WI Participants shall be entitled to and shall bear their proportionate share of Smith's rights and obligations under this Agreement, including rights as Program Data Owners proportionate to their cost bearing interest in the 3D Survey Costs.

Upon request, all Parties shall be entitled to receive a copy of the Program Data, including all tapes and reproducibles. Each Party shall have the right to use the Program Data in connection with exploration and development of the Program Area for the benefit of the Parties during the Term, as defined in Section 2.5 below, but no Party other than Smith shall have the right to sell, trade, license or exchange ("**Transfer**") the Program Data without the prior written consent of Smith. Upon an approved Transfer of any of the Program Data, all proceeds of such sale shall be payable to and delivered to the Program Data Owners. Upon expiration of the Term, all copies of the Program Data and (if requested in writing by Smith) all interpretations derived from the Program Data will be returned to Smith on behalf of the Program Data Owners.

(b) During the Term of this Agreement or so long as any Lease or Joint Operating Agreement within the Program Area is in force and effect, each of the Parties shall maintain the confidentiality of the Program Data; provided, however, that with prior written notice to Smith and RAW identifying the proposed recipient of the Data, each Party may furnish a copy of the relevant portion of the Program Data to (i) the Parties' lessors, to the extent required under applicable Leases and/or Permits covering lands in the Program Area, (ii) such Party's bona fide consultants, and (iii) to prospective third Party purchasers of an interest in a Prospect. Any consultant or prospective purchaser to whom access to any portion of the Program Data is provided shall enter into a confidentiality and non-competition agreement, which shall inure to the benefit of all of the Parties, pursuant to which such third Party shall agree to maintain the confidentiality of the Program Data and to use the Program Data solely for the purpose of rendering consulting services or evaluating the Prospect, as the case may be. The consultant shall immediately return the Program Data upon the completion of the work for which the consultant was engaged. The consultant shall not be permitted to retain any copies of the Program Data or any analysis of interpretations of the Program Data after completion of the work for which consultant was engaged. In connection with the disclosure of any portion of the Program Data to a potential third-Party purchaser or participant as permitted under this section, the Program Data shall at all times remain in the control of the Party disclosing the Program Data and no third party shall be allowed to copy, or to receive copies, of the Program Data including tapes and/or reproducibles. Such confidentiality and non-compete agreement shall also include an agreement and obligation that such consultant or prospective purchaser must offer to the Parties at actual cost any interest that may be acquired by such third party in lands covered by the disclosed data within a specified period, such period to be no less than 36 months after disclosure of the data.

**1.3 Costs of Geophysical Program.** Smith, along with the Smith WI Participants, will pay one hundred percent (100%) of all 3D Survey Costs associated with the conduct of the Geophysical Program (including any additional seismic conducted within the AMI and any purchased seismic data that has been authorized in writing by Smith) including, but not limited to, the costs associated with three dimensional ("**3-D**") seismic acquisition, seismic permitting and damages, processing, interpretation,

2

SEC 188311

reproduction and any other costs associated with the Geophysical Program.

RAW has estimated the 3D Survey Costs for the acquisition of new 3D seismic data to be $32,000 per square mile, which amount includes, but is not limited to (i) costs and expenses of acquiring all necessary geophysical permits from third parties, including landman and brokers' fees; (ii) costs of shooting the seismic survey, including surface damages payable to third Parties; and (iii) costs and expenses associated with processing Program Data derived from the geophysical operations on the Program Area and/or merging such Program Data with other 3-D Data and other geologic data (collectively, "**3D Survey Costs**"). Smith, on its own behalf and along with the Smith WI Participants as to their share, agrees to reimburse RAW for 100% of the 3D Survey Costs. An invoice for the actual 3D Survey Costs will be prepared and submitted by RAW to Smith with a copy to each Program Data Owner monthly according to COPAS standards as such costs are incurred. Smith, along with the Smith WI Participants, shall pay directly to RAW the amount billed within thirty (30) days after receipt.

Subject to the prior approval of Smith, RAW shall have the right to purchase existing 3D seismic data and the acquisition cost shall be included in the 3D Survey Costs to be paid by Smith and the Smith WI Participants. The lands imaged by any purchased 3D seismic data shall be considered as included in the Geophysical Program.

**1.4     Acquisition of Seismic Permits; Amendment of Program Area..** RAW shall be responsible for acquiring sufficient seismic permits or other rights to conduct the Geophysical Program, and shall notify Participants when it has completed the acquisition of such permits and other rights. If RAW is unable to obtain seismic permits or other rights sufficient to grant it the right to conduct the Geophysical Program over sufficient acreage within the Program Area to properly image substantially all of the Program Area, RAW may, upon written notice to Smith, amend the Program Area to remove acreage as to which such seismic permits or other rights have not been obtained. Such notice shall include a description of the acreage to be removed, a reasonably detailed description of the efforts made to acquire the permits, RAW's reasons for removing the acreage, and a description of the anticipated impact of such removal on the survey and the generation of Prospects. With the prior written approval of Smith, RAW may substitute contiguous or nearby acreage for the acreage so removed. If RAW desires to substitute acreage, it shall notify Smith and all other Participants of the proposed substitution, including a description of the acreage to be removed, a description of the substitute acreage, and the reasons for such substitution. Smith shall have 10 days after receipt of such notice to approve or disapprove the substitution. Failure to respond within such 10 day period shall be deemed to be approval of the substitution.

**1.5 Contributions of the Parties.** All Parties will participate with RAW in accomplishing the Geophysical Program as may be requested from RAW from time to time. The primary responsibilities of RAW are as follows:

(a) RAW shall be Operator of the project to be conducted pursuant to this Agreement. RAW shall coordinate all land and geological functions, conduct the Geophysical Program and operate all wells drilling or drilled on each Prospect Area.

(b) RAW will provide or supervise the land work on the Program Area, including negotiating and obtaining seismic options, lease options and leases, and settling surface damages for conducting the Geophysical Program and for subsequent exploration and production operations.

(c) RAW will promptly analyze and interpret the Program Data obtained from the Geophysical Program.

3

SEC 188312

(d) RAW will provide the geological subsurface expertise to integrate the Program Data with all available geologic and well data to evaluate the Program Area including analyzing well logs in the area, and providing geological mapping and interpretation.

(e) RAW will provide to Participants copies of all maps and interpretations relating to the Geophysical Program and the Program Area currently available and as developed pursuant to this Agreement.

RAW will not charge a consulting fee but will charge an overhead fee of $7,500 per month while third-party crews are working in the field during the Geophysical Program conducted under this Agreement. RAW also will be entitled to the Operator's overhead under each Operating Agreement.

**1.6 Reports; Meetings.** RAW shall distribute a written report on the status of all activities within the Program Area to the Parties on at least a monthly basis. During the first year of the Term and thereafter upon request by Smith, the Parties shall meet quarterly (unless waived by Smith) at a mutually agreeable time, either in Smith's offices or by teleconference to review the Program's activities ("**Quarterly Meeting**"). At least five (5) days prior to each Quarterly Meeting, RAW shall furnish to Participant (i) a written agenda listing any Prospects to be presented at the meeting and listing other items of business to be discussed at the Quarterly Meeting, and (ii) a brief written report summarizing the status of the program's activities, including the status of seismic acquisition and processing, prospect generation, lease acquisition, drilling operations, and other matters to be discussed at the Quarterly Meeting.

**1.7 Completion of the Geophysical Program.** The Geophysical Program will be completed for purposes of this Agreement when final processed, migrated seismic sections have been delivered to Participants by the third-party seismic contractors preparing such data. RAW will use all commercially reasonable efforts to commence the field work relating to the Geophysical Program no later than February 15, 2010, to have the data acquisition portion of the Geophysical Program completed by May 15, 2010 and to have all Program Data analyzed with the initial Prospect proposed to the Parties no later than August 31, 2010.

## ARTICLE II

### Participation Terms and Area of Mutual Interest

**2.1 Interests of the Participants.**

(a) RAW will acquire permits, options and Leases in its name as nominee on behalf of all Parties. RAW will then assign to each Party its undivided interest in each Lease in accordance with the terms of this Agreement. Smith and the Smith WI Participants shall be entitled to receive a collective 75% of 8/8ths of all rights and interests acquired within the Program Area, burdened only by the royalty payable to the Lessor of each Lease and any other third-party burdens in existence as of the time the Lease was acquired by RAW, but without any other reduction or burden created by, through or under RAW or the RAW Participants. Immediately on payment of all 3D Seismic Costs, geological and land costs for which Smith is obligated to RAW in this Agreement, Smith and the Smith WI Participants shall be entitled to an assignment of their working interest, and related net revenue interest, in each of the Leases acquired.

(b) RAW LC hereby agrees to assign to each of the three other RAW Participants 6.25% of 8/8ths of RAW LC's rights and interests existing under the Leases and RAW LC will retain an undivided 6.25% of 8/8ths interest. When assignments of record title to the Leases are made by RAW, each of the RAW

4

SEC 188313

Participants shall receive an assignment of its proportionate undivided working interest and attributable net revenue interest in and to each Lease in which the Participants are entitled to receive an interest pursuant to this Participation Agreement and the Operating Agreement.

(c) Except as stated in Section 2.1(a) above, the interests assigned to each Participant pursuant to this Agreement are hereby expressly assigned subject to their proportionate part of all of the terms, covenants, reversionary interests and other production burdens referenced in the following:

        (i)      each Lease;

        (ii)     the Operating Agreement referenced in **Article V** below; and

        (iii)    any other third-party burdens in existence as of the time the Lease was acquired by RAW.

## 2.2 Participation of the Parties in the Prospect Area and Subsequent Wells.

(a) As to each well on which RAW and the RAW Participants will receive a carried working interest pursuant to Section 2.2(c) below, RAW will submit an invoice to Smith for a $50,000 geological/geophysical prospect generation fee thirty (30) days prior to the proposed spud date for the applicable well. Smith (on its own behalf and along with the Smith WI Participants) will pay the fee on or before fifteen (15) days from the proposed spud date. If actual drilling operations have not commenced within 15 days after the proposed spud date for any well on which a fee has been paid by Smith, RAW shall, upon written request by Smith, immediately refund the entire fee to Smith for that well. When actual drilling operations do commence on that well, Smith, along with the Smith WI Participants, shall pay the $50,000 fee to RAW within 15 days after the spud date. The maximum number of wells on which Smith will be obligated to pay a prospect fee is nine (9) regardless of the number of square miles actually imaged with 3D data pursuant to the Muy Caliente Program.

(b) It is understood and agreed that RAW, as Operator, will use its commercially reasonable efforts to commence operations for the drilling of the initial well on the first Prospect promptly after the relevant Leases have been acquired, but, in any event, no later than October 1, 2010 unless otherwise agreed by Smith. Enclosed herewith is RAW's Authorization For Expenditure ("**AFE**") which shows the current total estimated costs to drill, complete and equip a well to be drilled to a depth sufficient to test the Fusselman Formation of approximately 11,100 feet. RAW will submit an updated AFE for the initial well and each subsequent well in accordance with Section 3.1. In no event, without the written approval of Smith, shall a lapse of the AFE serve to extend the time within which Operator is required to commence operations for the drilling of a well.

(c) RAW and the RAW Participants shall be collectively entitled to an undivided 25% working interest carried to the casing point on the first nine (9) wells drilled under this Agreement. The carried interest will apply to the first nine (9) wells drilled anywhere on the Program Area (or in the On Point Program Area pursuant to Section 2.2(d) below) even if more than one well is drilled within a single Prospect Area. All subsequent wells drilled by the Parties anywhere in the Program Area will be on a heads-up basis with each participating Party paying its working interest share of the costs of subsequent wells or being subject to the relinquishment provisions of this Agreement or the non-consent provisions in accordance with the applicable Operating Agreement.

(d) The Parties acknowledge that they have entered into a Geophysical Exploration Agreement for the "**On Point Program Area**" located in Lynn and Terry Counties, Texas dated effective January 2, 2010 that relates to a proposed 3D Seismic Survey Program on approximately 45 square miles (the "**On Point Agreement**"). The On Point Agreement provides that RAW and the RAW Participants will be entitled

CJM 192243v.6

SEC 188314

to a 23.3333% carried working interest to casing point on the first three wells drilled within the On Point Program Area. The Parties to this Agreement hereby agree that after the first three wells have been drilled within the On Point Program Area in accordance with the On Point Agreement, Smith shall have the right to specify in writing that any well or wells drilled thereafter within the On Point Program Area shall be counted as wells drilled to satisfy the carried working interest obligation set forth in Section 2.2(c) above of this Agreement. As to each well Smith exercises this designation, RAW and the RAW Participants will be entitled to the $50,000 prospect fee in accordance with Section 2.2(a) if the well is one of the first nine (9) wells drilled pursuant to this Agreement. If RAW and the RAW Participants are entitled to a carried working interest in accordance with Section 2.2(c) of this Agreement, then the carried interest will be 25%, notwithstanding the fact that the well is drilled within the On Point Program Area. Each such well drilled within the On Point Program Area that is designated by Smith as being drilled pursuant to this Agreement will count toward Smith's obligations under this Section 2.2 of this Agreement.

(e) As to all wells drilled within the Program Area, the applicable Operating Agreement will provide that each well will be subject to a casing point election at which, if any Party elects not to participate in a completion, such Party will relinquish and assign to the participating Parties all of its or their leasehold interests in and to the well and the area specified in the Operating Agreement, as defined for each well prior to commencement of drilling on that Prospect.

In the event that any Party elects not to participate in a completion attempt, the non-consenting Party will be subject to the provisions in the governing Operating Agreement.

(f) No Party shall have the right to reinstatement of an interest in a well or acreage relinquished in accordance with this Section 2.2 or in accordance with the applicable Operating Agreement, whether by payment of a cash penalty, production penalty, or otherwise.

(g) In the event of a "**Default**" by any Party, as defined and described in Article VII of the Operating Agreement, the other Parties shall have the right to exercise any and all remedies available to the non-defaulting Parties specified in Article VII of the Operating Agreement, which provisions are incorporated herein by reference.

**2.3 Payment for and Ownership of Oil and Gas Interests.** Until the first nine (9) wells have been drilled to test the Fusselman Formation pursuant to this Agreement, Smith, along with the Smith WI Participants, shall pay all of the costs of acquiring Oil and Gas Interests (including any lease options or the exercise of any lease option) in the Program Area on the Prospect or Prospects approved by Smith. While Smith is paying 100% of the lease or option costs, no lease or option shall be purchased by any Party without the prior approval of Smith. After the first nine (9) wells have been drilled, the costs of acquiring any additional Oil and Gas Interests (including bonuses, delay rentals, lease extensions or shut in payments relating to leases) in the Program Area thereafter shall be borne by the Parties who own an interest in the applicable Prospect Area in the proportions set forth on **Exhibit B**, Column D, attached hereto. If a Party does not pay its share of Lease obligations and costs when due, that Party will relinquish all of its interest in that Lease or Oil and Gas Interest.

All Oil and Gas Interests shall be owned by the Parties in the percentage interests set forth on **Exhibit B**, Column D, except as such undivided interests may be modified by the operation of Sections 2.4, 2.5, and 3.4 hereof or by non-payment of Lease cost obligations.

**2.4 Delay Rentals and Shut-In Royalties.** At any time any delay rentals, shut-in royalties, Lease extension payments or other sums ("**Rentals**") necessary to perpetuate any Oil and Gas Interests becomes

CJM 192243v.6

SEC 188315

due and owing (whether or not prior to nine (9) wells having been drilled), RAW shall pay such Rentals and invoice all other Parties for their proportionate share thereof. Each Party agrees to pay its proportionate share (as determined by **Exhibit B**, Column D, or the Party's participation percentage in that Prospect, if different) of such Rentals within fifteen (15) days of receipt of an invoice therefore. RAW shall have no liability to the other Parties hereto for failure to pay such Rentals when due provided RAW has acted in good faith.

**2.5  Area of Mutual Interest and Term.** The Parties have agreed to and do hereby establish an Area of Mutual Interest ("**AMI**") which shall encompass all lands located within the Program Area as depicted on the plat attached hereto as **Exhibit A** together with all lands located within one-half mile of the exterior boundaries of the Program Area. The AMI shall remain in force for a period of ten (10) years from the date hereof, unless sooner terminated by the Parties (the "**Term**"). Upon expiration of the 10-year Term, this Agreement shall terminate; provided that the obligation to return the Data and other information (if requested) under Section 1.2(a) shall survive termination of this Agreement. Should any Party own on the date hereof, or acquire at any time during the Term, an interest in (i) a lease covering lands, any part of which are located within the AMI or (ii) an option or a farm-in covering lands any part of which are within the AMI (an interest so owned or acquired insofar and only insofar as it covers lands within the AMI being herein called an "**Acquired Interest**"), such Party (the "**Acquiring Party**") shall promptly notify the other Parties, in writing, of such acquisition, the consideration paid or to be paid for the Acquired Interest, any other obligations (including, without limitation, drilling obligations) undertaken or to be undertaken as a part of such acquisition and any other terms of such acquisition. Each of the Parties shall, within thirty (30) days after the receipt of such notice, notify the Acquiring Party in writing, whether or not it wishes to participate in such acquisition; provided that failure of a Party to respond within the time and in the manner set forth above shall be deemed an election <u>not</u> to participate in such acquisition.

**2.6  Effect of Election to Participate.** Should a Party elect to participate in an acquisition of an Acquired Interest, such Party shall be assigned its proportionate part (being the percentage specified for such Party in the table set forth in **Exhibit B**) of the Acquired Interest by the Acquiring Party, and shall upon receipt of such assignment, pay, or to the extent not yet due, agree to pay when due) its part of the direct costs incurred by the Acquiring Party in making such acquisition and agrees to assume its proportionate part of any other obligations which are undertaken as part of such acquisition. If the costs or obligations relate to the lands outside the AMI as well as to lands inside the AMI, such costs and/or obligations shall be allocated between such areas on an acreage basis. Lease acquisition costs shall be paid in accordance with Section 2.3 above. If less than all of the Parties elect to participate in such acquisition, the proportionate parts for the Parties electing to participate shall, unless the Parties agreeing to participate agree otherwise, be the percentage determined by dividing, for each participating Party, the proportionate part otherwise applicable (if all Parties had participated) to such participating Party by the total proportionate parts for all participating Parties, provided, however, that in no event shall a Party electing to participate be required to participate for a percentage greater than that set forth for such Party on **Exhibit B** hereto.

**2.7  Exercise of Options.** Should any Party propose to exercise an option to lease with respect to some or all of the lands covered thereby, it shall notify the other Parties in the same manner provided for in Section 2.5 above with respect to acquisitions of Acquired Interests and each such other Party shall elect to participate or to not participate in the exercise of such Option in the same manner as provided in Section 2.5. The effective elections to participate in such an exercise of an Option and the payment of costs and the ownership of interests in the lease acquired pursuant to such exercise, shall be handled in the same manner provided in Sections 2.3 and 2.4.

7

CJM 192243v.6

SEC 188316

## ARTICLE III

### Prospect Designation and Participation

**3.1 Prospect Designation.** Upon completion of the interpretation of the Program Data, RAW will delineate proposed Prospects for exploration and development within the Program Area and distribute to each Party a list and description of each proposed Prospect. The Parties will then meet and RAW will make a presentation on each Prospect, including (i) the proposed location for the initial well on the Prospect (and the date by which drilling of such initial well is anticipated to be commenced and an AFE covering the estimated costs of drilling and completing such initial well), and (ii) the acreage which RAW would include in the Prospect Area. The acreage proposed to be included in a Prospect shall <u>not</u> include any acreage included in any other Prospect Area. The Parties will attempt to agree on the Prospect and the Prospect Area to be included in each Prospect in accordance with Sections 3.2 and 3.3. Notwithstanding the above, in the event the Parties do not reach agreement as to the Prospect Area for any Prospect within 60 days after the initial Prospect proposal, Smith shall have the right to make the final decision as to the delineation of the Prospect and the Prospect Area. The Parties shall document their participation percentages in writing in Exhibit A to the Operating Agreement for that Prospect Area and from that point forward each Prospect Area shall be governed by a separate Operating Agreement in the form of **Exhibit C** in accordance with Article IV. The Parties acknowledge that they may acquire Leases or participation rights by farm-in or otherwise as to lands that are subject to an existing third-party operating agreement. In that event, the Parties will take the actions necessary to harmonize the operating agreements to the extent reasonably practical, but the Operating Agreement contemplated by this Agreement will govern as between the Parties in the event of conflict.

"**Prospect**" shall mean the area included in a geologic structural or stratigraphic trap or enclosure which based on available data is reasonably believed to have the potential for accumulations of hydrocarbons in commercial quantities. "**Prospect Area**" means all lands within a contiguous geographical area (not including lands within the Prospect Area for another Prospect previously designated pursuant to the terms of this Agreement) which are believed by the proposing Party to contain all of the Prospect; it being understood that a Prospect Area shall include all depths within the contiguous geographical area so identified.

**3.2 Proposals by Parties for Prospects.** After the meeting described in Section 3.1 above (or, if such meeting does not occur within thirty (30) days of the completion of the interpretation of the Program Data, then at any time more than 45 days after the completion of the interpretation of the Program Data by RAW) any Party may propose that a portion of the Program Area be designated as a Prospect by giving written notice to the other Parties containing the same information described in Section 3.1. The Prospect and Prospect Area will be determined in the same manner specified in Section 3.1.

**3.3 Response to a Prospect Proposal.** Each Party desiring to participate in a Prospect proposed under Section 3.1 or Section 3.2 shall notify RAW, in writing, within thirty (30) days after receipt of such proposal of its election regarding participation in the proposed Prospect and stating whether or not such Party agrees with the acreage being proposed for inclusion in the Prospect by the proposing Parties. An election to participate in a Prospect which contains no statement as to whether the Party agrees with the acreage proposed for inclusion in the Prospect Area shall be deemed agreement to the acreage proposed for inclusion in the Prospect Area. A Party who elects not to participate in the Prospect and who disagrees with the acreage proposed to be included in the Prospect Area shall give notice of such

8

SEC 188317

disagreement to all Parties within the time and in the manner provided above for elections to participate. A Party failing to respond, within the time and in the manner provided above, to a proposal for a Prospect, or a Party responding and electing to not participate in a Prospect but making no statement as to whether it agrees with the acreage proposed to be included in the Prospect will be deemed to have elected not to participate in the Prospect and to have agreed to the acreage proposed to be included in the Prospect Area. If no other Party elects to join the proposing Party in creating a Prospect, then the proposing Party may develop the Prospect Area for such Prospect for its own account at its own expense and the terms of this Agreement (other than the terms relating to restrictions and ownership of the Program Data which shall apply) shall not apply to the Prospect Area for that Prospect.

**3.4 Relinquishment of Interests by Non-Participating Parties.** If a Party agrees, or elects (or is deemed to have elected) not to participate in a particular Prospect Area, then such Party shall relinquish all right, title and interest in such Prospect Area without any right of reimbursement for costs incurred up to the relinquishment date (including, without limitation, rights under leases, options or farm-ins insofar as they cover the Prospect Area, overriding royalty interests, carried interests and backin interests) to the Parties electing to participate in such Prospect Area in proportion to the percentages in which such participating Parties participate in such Prospect Area. If the initial well is not commenced on such prospect within 180 days after the date the Prospect Area is finalized, a new Prospect proposal shall be required and the non-participating Parties shall once again have the right to participate in that Prospect in accordance with the procedures in this Agreement.

## ARTICLE IV

### Operations

**4.1 Drilling Operations.** All operations on each Prospect Area, commencing with the establishment of such Prospect Area, shall be governed by a separate operating agreement ("**Operating Agreement**") in the form attached hereto as **Exhibit C** (with appropriate insertions and exhibits reflecting the agreements hereunder on the Prospect Area, participation percentages and initial well), and this Agreement shall no longer have any application to such Prospect Area, except with respect to the ownership of Program Data as provided for in Section 1.2 above and except for matters provided for in this **Article IV**.

**4.2 Operator.** It is agreed and understood that RAW shall be designated as Operator in the Operating Agreement executed for each Prospect Area in which it participates. As to any Prospect Area in which RAW has elected not to participate, Smith shall designate an operator of said Prospect Area.

**4.3 AMI for Prospect Area.** Commencing with the establishment of a Prospect Area, such Prospect Area shall from that time forward no longer be subject to the AMI provided for in **Article II** and shall thereafter be considered covered instead by a new Prospect Area specific AMI. The new AMI shall (i) be binding on all Parties (whether or not they participated, or had rights to participate in such Prospect Area), (ii) consist of such Prospect Area, (iii) remain in effect until the later to occur of the Term of this Agreement or the date the Operating Agreement for such Prospect Area terminates, and (iv) be governed by the same terms set forth in Sections 2.3 and 2.4 except that the term proportion or proportionate part (as such term is used in Section 2.3 or 2.4) shall mean the percentages in which the Parties participate in such Prospect Area. Any portion of the Program Area not included in a designated Prospect Area shall continue to be subject to the AMI provided for in **Article II**.

**4.4 Limitation on Number of AFE's.** The Parties agree that during the first 12 months of the Term no more than three (3) active well proposals and AFE's shall be outstanding at any one time under this Agreement and the On Point Agreement, on a combined basis.

9

SEC 188318

**4.5 Exercise of Options in Prospect Area.** With respect to each Prospect Area, an option to acquire oil and gas interests to the extent it covers such Prospect Area, may be exercised by any Party owning an interest therein insofar as such option covers land within a Prospect Area. The leases acquired by such exercise shall be owned and, subject to Section 2.2 above, paid for by the Parties participating in such Prospect Area in the proportions in which they participated in that Prospect Area. It is recognized that some options may limit the number of times they may be exercised, and, in such event, several Prospect Areas may have to be combined in a single exercise of such an Option (and such exercise may have to be deferred until such a consolidated exercise is practical).

**ARTICLE V**

**Restrictions on Transfers and Right of First Refusal**

**5.1 General Restriction on Transfer.** Except as otherwise provided in Section 1.2 with respect to Smith, no Party, either directly or through an Affiliate, may transfer or acquire any lease, royalty, overriding royalty or other interest of any type in the mineral estate or any petroleum exploration or seismic license (individually and collectively an **"Interest"**), or participate in the acquisition of any Interest from a third party holding any Interest, which Interest is located partially or entirely within the Program Area, other than in accordance with the provisions of this Agreement and the applicable Operating Agreement, if any.

**5.2 Preferential Right to Purchase.** As long as Smith Energy owns an Interest in the Program Area or in a Contract Area under an Operating Agreement, the Parties hereby grant to each other a preferential right to purchase all or any part of a Party's Interest in this Agreement or in the lands subject to the applicable Operating Agreement which is to be Transferred to any third party other than a Permitted Assignee, all as defined below. This preferential right to purchase under this Agreement shall no longer apply to any Party after Smith has transferred all of its rights under this Agreement and shall no longer apply as to a Contract Area governed by an Operating Agreement after Smith has transferred or relinquished all of its rights to the lands in the Contract Area governed by that Operating Agreement.

(a) If any Party desires to Transfer, as defined below, its Interests, or any portion, in this Agreement or the AMI (a **"Transferor Party(ies)"**), Transferor Party(ies) must first provide written notice of such intent to the other Parties. If the proposed Transfer is to a Permitted Assignee, the non-transferring Parties shall not have a Right of First Refusal as to that Transfer. If the proposed Transfer is to a person other than a Permitted Assignee, as defined below, the non-transferring Parties shall then have the right (**"Right of First Refusal"**), but not the obligation, to purchase their proportionate share of the offered portion of the Interests pursuant to this paragraph. The non-Transferor Parties shall have thirty (30) days from receipt of such notice within which to determine whether it or they elect to purchase the offered Interests. If the proposed Transfer is to a Permitted Assignee, the non-Transferor will not have a Right of First Refusal but the Permitted Assignee must ratify this Agreement and the applicable Operating Agreement and the Transferor shall be jointly and severally liable for all liabilities and obligations of the Permitted Assignee under this Agreement and the Operating Agreement. **"Transfer"** means any sale, lease, conveyance, gift, transfer, exchange, assignment, disposition by will or inheritance or other disposition of (or any agreement or arrangement to sell, lease, convey, gift, transfer, exchange, assign, or otherwise dispose of) all or any portion of the Transferor Parties' Interests in any manner, directly or indirectly, whether for money, other consideration or otherwise. **"Permitted Assignee"** means: (w) a spouse, descendants or relative of the Transferor Party; (x) the spouse, descendants or relative of the controlling person of a Transferor Party or the spouse, descendants or relative of a manager of a Transferor Party; (y) a legal entity including but not limited to any Trust, partnership, or company controlled by the Transferor Party or by the spouse, descendants or relatives of the Transferor Party; and

10

SEC 188319

(z) any employee, consultant or person under contract to a Transferor Party (or any Trust, entity or partnership owned by such person).

(b) If the Transfer contemplated by section 5.2(a) above results from a bona fide offer to purchase from a third party, exercise of the non-Transferor Parties' Right of First Refusal shall be based on the same terms and conditions as the third party offer. If the Transfer contemplated by section 5.2(a) above is not the result of a bona fide third party offer, the non-Transferor and the Transferor Parties shall attempt to agree upon a purchase price for the Transferred Interests. In the event the Parties fail to agree upon a purchase price for the Transferred Interests within ten (10) days after exercise by the non-Transferor Parties of their Right of First Refusal, then the Transferor Party shall not be allowed to Transfer the Transferred Interest to the third party and the Non-Transferor Party shall not be entitled to purchase the Transferred Interest. If a bona fide offer to purchase is subsequently received or a price is established for the Transferred Interest, the provisions of this Section 5.2(b) shall be followed as to the new offer or price. The provisions of **Article V** shall apply to any future Transfer by the Transferor Party and to any successor to the Transferor Party.

**5.3 Financing**. Any Party shall have the right to arrange its own financing for any wells or other projects to be conducted on one or more Prospect Areas without any obligation to provide, or assist the other in obtaining, similar financing. No Party shall encumber the rights and interests of any other Party in a Prospect Area. A Party shall have the right to pledge, mortgage or encumber all or any part of its Interest in one or more Prospect Areas without triggering a Right of First Refusal under **Article V**; provided that any pledge, mortgage or encumbrance will be subject to the following restrictions and conditions:

(a) the lender or secured party shall acknowledge in writing that the interest pledged is subject to this Agreement and the Operating Agreement;

(b) the document creating the pledge or encumbrance must expressly state that upon foreclosure on the pledged interest, the lender or secured party will receive the pledged interest subject to this Agreement and the Operating Agreement; and

(c) prior to any subsequent Transfer of the interest by the lender or secured party, the lender or secured party must comply with the procedures set forth in Section 5.2(b) and the other Parties shall have the Right of First Refusal set forth in Section 5.2(b).

**5.4 Tag Along Rights**. In the event Smith intends to sell all of its rights under this Agreement to a third party, Smith shall provide written notice to the other Parties of the intended sale. When the intended sale terms are established, Smith shall outline the intended terms to all Parties. Each Party will have the right and option for fifteen (15) days after receipt of the intended sale terms to elect to sell its interest along with the interest of Smith so long as the purchaser of Smith's interest agrees to purchase the additional Party's(ies') interest(s). Smith shall have the sole authority to negotiate the terms of the sale and the other Parties will have the election to sell or not to sell on the same terms as negotiated by Smith. The tag along rights granted in this Section shall not apply to a sale by Smith of all its interest in a Contract Area governed by an Operating Agreement.

## ARTICLE VI

### Miscellaneous

**6.1 Elections.** Each Party to this Agreement has the right to make separate and independent elections regarding all aspects of the Agreement, including but not limited to Acquired Interests and well

11

SEC 188320

participation.

**6.2 Notices.** All notices and other communications required or permitted under this Agreement shall be in writing and unless otherwise specifically provided, shall be delivered personally, or by mail, telecopy or delivery service to the addresses set forth below the signatures of the Parties and shall be considered delivered upon the date of receipt. Each Party may specify as its proper address, any other post office address within the continental limits of the United States by giving notice to the other Parties, in the manner provided in this section, at least ten (10) days prior to the effective date of such change of address.

**6.3 No Partnership.** The liabilities of the Parties hereunder shall be several, not joint or collective. Each Party shall be liable only for its cost bearing share of all liabilities and obligations arising under this Agreement as set forth on **Exhibit B** hereto AND EACH Party's share of the liabilities and obligations arising under any applicable Operating Agreement as set forth on the Exhibit A to the applicable Operating Agreement. It is not the intention of the Parties to create, nor shall this Agreement be deemed as creating a mining or other partnership or association or to render the Parties liable as partners.

**6.4 Internal Revenue Code Election.** The provisions of Article IX of the form of Operating Agreement attached hereto shall constitute the agreement between the Parties regarding applicable provisions of the Internal Revenue Code.

**6.5 Enforcement.** Should any Party hereto be forced to resort to legal action to enforce the provisions hereof, the prevailing Party shall be entitled to reasonable attorneys' fees and all court costs incurred in such legal action. The Parties agree that the exclusive venue for all disputes arising under this Agreement shall be in Harris County, Texas.

**6.6 Title.** No Party warrants title to interests it is contributing to the Program Area except by, through and under itself, and not otherwise. Each Party agrees to furnish to the other Parties any title data in its possession or available to it.

**6.7 Multiple Counterparts.** This Agreement may be executed in any number of counterparts, none of which needs to be executed by all Parties, and shall be binding upon each Party executing such a counterpart as if all Parties had executed the same instrument.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

CJM 192243v.6

SEC 188321

EXECUTED to be effective as of the Effective Date.

RAW OIL & GAS, INC.

By: _____
Name: _____
Title: _____

JDH RAW ENERGY, L.C.

By: _____
Name: _____
Title: _____

_____
MARK P. HARDWICK

_____
STEVE BLAYLOCK

ELGER EXPLORATION, INC.

By: _____
Name: _____
Title: _____

SMITH ENERGY COMPANY

By: _____
Lester H. Smith, President

13

SEC 188322

EXHIBIT A
Attached to Geophysical Exploration Agreement
Dated January 15, 2010,
Among
RAW, RAW LC, Hardwick, Blaylock, Elger and Smith

Outline and Description of Muy Caliente Program Area

*(The following lands are in the Mid Point Area)*

**The following lands are located in Lynn County, Texas:**

East 481.5 acres of Section 1, Abstract 976, Blk. C-40, PSL Survey (481.5 ac.)

Section 2, Abstract 975, Blk. C-40, PSL Survey (640 ac.)

Section 3, Abstract 943, Blk. C-40, PSL Survey (640 ac.)

East Half (E/2) of Section 55, Abstract 173, Blk. 1, EL & RR Ry. Co. Survey (320 ac.)

Section 54, Abstract 1065 and 958, Blk. 1, EL & RR Ry. Co. Survey (640 ac.)

Section 53, Abstract 174, Blk. 1, EL & RR Ry. Co. Survey (640 ac.)

Section 52, Abstract 712, Blk. 1, EL & RR Ry. Co. Survey (640 ac.)

East Half (E/2) of Section 48, Abstract 957, Blk. H, EL & RR Ry. Co. Survey (320 ac.)

Section 47, Abstract 256, Blk. H, EL & RR Ry. Co. Survey (640 ac.)

Section 46, Abstract 1125 and 799, Blk. H, EL & RR Ry. Co. Survey (640 ac.)

Section 45, Abstract 257, Blk. H, EL & RR Ry. Co. Survey (640 ac.)

East Half (E/2) of Section 35, Abstract 262, Blk. H, EL & RR Ry. Co. Survey (320 ac.)

Section 36, Abstract 1429, 1534, and 926, Blk. H, EL & RR Ry. Co. Survey (640 ac.)

14

SEC 188323

Section 37, Abstract 261, Blk. H, EL & RR Ry. Co. Survey (640 ac.)

Section 38, Abstract 1252 and 728, Blk. H, EL & RR Ry. Co. Survey (640 ac.)

West Half (W/2) of Section 39, Abstract 260, Blk. H, EL & RR Ry. Co. Survey (320 ac.)

East Half (E/2) of Section 34, Abstract 1444, Blk. H, EL & RR Ry. Co. Survey (320 ac.)

Section 33, Abstract 263, Blk. H, EL & RR Ry. Co. Survey (640 ac.)

Section 32, Abstract 1421 and 1430, Blk. H, EL & RR Ry. Co. Survey (640 ac.)

Section 31, Abstract 264, Blk. H, EL & RR Ry. Co. Survey (640 ac.)

Section 30, Abstract 1223, 1224, 1253 and 656, Blk. H, EL & RR Ry. Co. Survey (640 ac.)

West Half (W/2) of Section 29, Abstract 265, Blk. H, EL & RR Ry. Co. Survey (320 ac.)

South Half Section 28, Abstract 1126, Blk. H, EL & RR Ry. Co. Survey (320 ac.)

East Half (E/2) of Section 22, Abstract 1252 and 728, Blk. H, EL & RR Ry. Co. Survey (320 ac.)

Section 23, Abstract 179, Blk. H, EL & RR Ry. Co. Survey (640 ac.)

Section 24, Abstract 824, Blk. H, EL & RR Ry. Co. Survey (640 ac.)

Section 25, Abstract 178, Blk. H, EL & RR Ry. Co. Survey (640 ac.)

Section 26, Abstract 1348, 1423, 1424, and 951, Blk. H, EL & RR Ry. Co. Survey (640 ac.)

Section 27, Abstract 177, Blk. H, EL & RR Ry. Co. Survey (640 ac.)

Section 38, Abstract 928, Blk. 8, EL & RR Ry. Co. Survey (640 ac.)

15

CJM 192243v.6

SEC 188324

Southwest Quarter Section 37, Abstract 223, Blk. 8, EL & RR Ry. Co. Survey (160 ac.)

Section 39, Abstract 212, Blk. 8, EL & RR Ry. Co. Survey (640 ac.)

Section 49, Abstract 211, Blk. 8, EL & RR Ry. Co. Survey (640 ac.)

West Half Section 52, Abstract 1132, Blk. 8, EL & RR Ry. Co. Survey (320 ac.)

East Half (E/2) of Section 19, Abstract 181, Blk. H, EL & RR Ry. Co. Survey (320 ac.)

Section 18, Abstract 810, Blk. H, EL & RR Ry. Co. Survey (640 ac.)

Section 17, Abstract 182, Blk. H, EL & RR Ry. Co. Survey (640 ac.)

Section 16, Abstract 822, 1538, 1464 and 1458, Blk. H, EL & RR Ry. Co. Survey (640 ac.)

Section 15, Abstract 183, Blk. H, EL & RR Ry. Co. Survey (640 ac.)

Section 14, Abstract 950, 1422, and 1495, Blk. H, EL & RR Ry. Co. Survey (640 ac.)

Section 50, Abstract 929, 1463, and 1378, Blk. 8, EL & RR Ry. Co. Survey (640 ac.)

East Half (E/2) of Section 11, Abstract 185, Blk. H, EL & RR Ry. Co. Survey (320 ac.)

Section 12, Abstract 868, Blk. H, EL & RR Ry. Co. Survey (640 ac.)

Section 13, Abstract 184, Blk. H, EL & RR Ry. Co. Survey (640 ac.)

Section 51, Abstract 215, Blk. 8, EL & RR Ry. Co. Survey (640 ac.)

**The following lands are located in Lynn and Dawson Counties, Texas:**

East Half (E/2) of Section 1, Abstract 169, Blk. H, EL & RR Ry. Co. Survey (320 ac.)

16

CJM 192243v.6

SEC 188325

Section 70, Abstract 1209 and 1434, Blk. 8, EL & RR Ry. Co. Survey (640 ac.)

Section 69, Abstract 217, Blk. 8, EL & RR Ry. Co. Survey (640 ac.)

West 400 Acres Section 68, Abstract 1200, Blk. 8, EL &RR Ry. Co. Survey (400.0 ac.)

**The following lands are located in Dawson County, Texas:**

Section 7, Abstract 333, Blk. 34, T-4-N, Georgetown RR Co. Survey (230.0 ac.)

Section 8, Abstract 669, Blk. 34, T-4-N, Georgetown RR Co. Survey (230.0 ac.)

Section 9, Abstract 335, Blk. 34, T-4-N, Georgetown RR Co. Survey (230.0 ac.)

E/200Ac. Sec. 34, Abstract 741, Blk. C-41, PSL Survey (640.0ac.)

Section 36, Abstract 742, Blk. C-41, PSL Survey (640.0ac.)

Section 37, Abstract 136, 1334, 899, & 1326, Blk. C-41, PSL Survey (600.0ac.)

Section 35 ½ , Abstract 911, Blk. C-41, PSL Survey (300.0ac.)

*(The following lands are in the North Point Area)*

**The following lands are located in Hockley and Terry Counties, Texas:**

Section 12, Abstract 482, Blk. 1, PSL Survey (676.2 ac.)

Section 13, Abstract 1503, Blk. 1, PSL Survey (687.3 ac.)

Section 14, Abstract 1466, Blk. 1, PSL Survey (657.7 ac.)

Section 15, Abstract 415, Blk. 1, PSL Survey (685.3 ac.)

17

SEC 188326

Section 16, Abstract 1006, Blk. L, PSL Survey (644.9 ac.)

Section 17, Abstract 1607, Blk. 1, PSL Survey (657.4 ac.)

**The following lands are located in Terry County, Texas:**

Section 7, Abstract 17, Blk. E, EL & RR Ry. Co. Survey (640 ac.)

Section 6, Abstract 1485, 1575, and 690, Blk. E, EL & RR Ry. Co. Survey (640 ac.)

Section 5, Abstract 15, Blk. E, EL & RR Ry. Co. Survey (640 ac.)

Section 10, Abstract 689 and 891, Blk. E, EL & RR Ry. Co. Survey (640 ac.)

Section 11, Abstract 9, Blk. E, EL & RR Ry. Co. Survey (640 ac.)

Section 12, Abstract 594, Blk. E, EL & RR Ry. Co. Survey (640 ac.)

Section 13, Abstract 10, Blk. E, EL & RR Ry. Co. Survey (640 ac.)

South Half (S/2) of Section 14, Abstract 592, Blk. E, EL & RR Ry. Co. Survey (320 ac.)

Southwest Quarter (SW/4) of Section 15, Abstract 8, Blk. E, EL & RR Ry. Co. Survey (160 ac.)

Section 28, Abstract 472, Blk. 4X, EL & RR Ry. Co. Survey (640 ac.)

Section 27, Abstract 26, Blk. 4X, EL & RR Ry. Co. Survey (640 ac.)

Section 18, Abstract 477, Blk. 4X, EL & RR Ry. Co. Survey (640 ac.)

Section 15, Abstract 21 and 45, Blk. 4X, TW & NG Ry. Co. Survey and EL & RR Ry. Co. Survey (640 ac.)

18

CJM 192243v.6

SEC 188327

Section 12, Abstract 473, Blk. 4X, EL & RR Ry. Co. Survey (640 ac.)

West Half (W/2) of Section 51, Abstract 262, Blk. E, EL & RR Ry. Co. Survey (320 ac.)

North Half (N/2) of Section 25, Abstract 28, Blk. 4X, EL & RR Ry. Co. Survey (320 ac.)

North Half (N/2) and Southeast Quarter (SE/4) of Section 26, Abstract 1325, 1444, and 476, Blk. 4X, EL & RR Ry. Co. Survey (480 ac.)

Section 17, Abstract 20, Blk. 4X, EL & RR Ry. Co. Survey (640 ac.)

Section 16, Abstract 474, Blk. 4X, TW & NG Ry. Co. Survey (640 ac.)

Section 11, Abstract 18, Blk. 4X, EL & RR Ry. Co. Survey (640 ac.)

West Half (W/2) of Section 10, Abstract 901, 1097, and 1401, Blk. 4X, TT Ry. Co. Survey (320 ac.)

Section 20, Abstract 478, 1810, 1469, and 1397, Blk. 4X, C & M Ry. Co. Survey (640 ac.)

Section 13, Abstract 44, Blk. 4X, H & OB Ry. Co. Survey (640 ac.)

Section 14, Abstract 471 and 1322, Blk. 4X, H & OB Ry. Co. Survey (640 ac.)

Section 9, Abstract 293, Blk. 4X, TT Ry. Co. Survey (640 ac.)

Section 8, Abstract 418, Blk. 4X, C & M Ry. Co. Survey (640 ac.)

Section 7, Abstract 4, Blk. 4X, C & M Ry. Co. Survey (640 ac.)

Section 19, Abstract 5, Blk. 4X, C & M Ry. Co. Survey (640 ac.)

Section 54, Abstract 823, 1412, and 1462, Blk. 4X, EL & RR Ry. Co. Survey (640 ac.)

19

SEC 188328

Section 53, Abstract 248, Blk. 4X, EL & RR Ry. Co. Survey (640 ac.)

Section 60, Abstract 470, 1520, 1398, and 1375, Blk. 4X, C & M Ry. Co. Survey (640 ac.)

Section 1, Abstract 30, Blk. 4X, EL & RR Ry. Co. Survey (640 ac.)

Section 6, Abstract 456, Blk. 4X, EL & RR Ry. Co. Survey (640 ac.)

North Half (N/2) of Section 57, Abstract 247, Blk. E, EL & RR Ry. Co. Survey (320 ac.)

North Half (N/2) and Southeast Quarter (SE/4) of Section 58, Abstract 822, Blk. E, EL & RR Ry. Co. Survey (480 ac.)

Section 59, Abstract 98, Blk. 4X, C & M Ry. Co. Survey (640 ac.)

Section 2, Abstract 448, Blk. 4X, EL & RR Ry. Co. Survey (640 ac.)

Section 5, Abstract 25, Blk. 4X, EL & RR Ry. Co. Survey (640 ac.)

### *(The following lands are in the South Point Area)*
**The following lands are located in Borden County, Texas:**

Section 36, Abstract 1548, Blk. 33, T-5-N, T & P Ry. Co. Survey (640 ac.)

Section 31, Abstract 334, Blk. 32, T-5-N, T & P Ry. Co. Survey (640 ac.)

Section 32, Abstract 1322, Blk. 32, T-5-N, T & P Ry. Co. Survey(640 ac.)

Section 33, Abstract 335, Blk. 32, T-5-N, T & P Ry. Co. Survey (640 ac.)
Section 34, Abstract 1310, Blk. 32, T-5-N, T & P Ry. Co. Survey (640 ac.)

West Half (W/2) of Section 35, Abstract 336, Blk. 32, T-5-N, T & P Ry. Co. Survey (320 ac.)

CJM 192243v.6

SEC 188329

Section 37, Abstract 376, Blk. 33, T-5-N, T & P Ry. Co. Survey (640 ac.)

Section 42, Abstract 1323, Blk. 32, T-5-N, T & P Ry. Co. Survey (640 ac.)

Section 41, Abstract 339, Blk. 32, T-5-N, T & P Ry. Co. Survey (640 ac.)

Section 40, Abstract 1309, Blk. 32, T-5-N, T & P Ry. Co. Survey (640 ac.)

Section 39, Abstract 338, Blk. 32, T-5-N, T & P Ry. Co. Survey (640 ac.)

Section 38, Abstract 1306, Blk. 32, T-5-N, T & P Ry. Co. Survey (640 ac.)

Section 48, Abstract 1300, Blk. 33, T-5-N, T & P Ry. Co. Survey (640 ac.)

Section 43, Abstract 340, Blk. 32, T-5-N, T & P Ry. Co. Survey (640 ac.)

Section 44, Abstract 1318, Blk. 32, T-5-N, T & P Ry. Co. Survey (640 ac.)

Section 45, Abstract 341, Blk. 32, T-5-N, T & P Ry. Co. Survey (640 ac.)

Section 46, Abstract 1200, Blk. 32, T-5-N, T & P Ry. Co. Survey(640 ac.)

Section 47, Abstract 342, Blk. 32, T-5-N, T & P Ry. Co. Survey(640 ac.)

Section 1, Abstract 352, Blk. 33, T-4-N, T & P Ry. Co. Survey (640 ac.)

Section 6, Abstract 940, Blk. 32, T-4-N, T & P Ry. Co. Survey (640 ac.)

Section 5, Abstract 297, Blk. 32, T-4-N, T & P Ry. Co. Survey (640 ac.)

Section 4, Abstract 938, Blk. 32, T-4-N, T & P Ry. Co. Survey (640 ac.)

Section3, Abstract 296, Blk. 32, T-4-N, T & P Ry. Co. Survey (640 ac.)

CJM 192243v.6

SEC 188330

Section 2, Abstract 1030, Blk. 32, T-4-N, T & P Ry. Co. Survey (640 ac.)

Section 8, Abstract 939, Blk. 32, T-4-N, T & P Ry. Co. Survey(640 ac.)

Section 9, Abstract 299, Blk. 32, T-4-N, T & P Ry. Co. Survey (640 ac.)

Section 10, Abstract 1031, Blk. 32, T-4-N, T & P Ry. Co. Survey(640 ac.)

Section 17, Abstract 303, Blk. 32, T-4-N, T & P Ry. Co. Survey (640 ac.)

Section 16, Abstract 919, Blk. 32, T-4-N, T & P Ry. Co. Survey (640 ac.)

Section 15, Abstract 302, Blk. 32, T-4-N, T & P Ry. Co. Survey (640 ac.)

Section 20, Abstract 921, Blk. 32, T-4-N, T & P Ry. Co. Survey (640 ac.)

Section 21, Abstract 305, Blk. 32, T-4-N, T & P Ry. Co. Survey (640 ac.)

Section 22, Abstract 932, Blk. 32, T-4-N, T & P Ry. Co. Survey (640 ac.)

Section 29, Abstract 309, Blk. 32, T-4-N, T & P Ry. Co. Survey (640 ac.)

Section 28, Abstract 1108, Blk. 32, T-4-N, T & P Ry. Co. Survey (640 ac.)

Section 27, Abstract 308, Blk. 32, T-4-N, T & P Ry. Co. Survey (640 ac.)

North Half (N/2) of Section 32, Abstract 923, Blk. 32, T-4-N, T & P Ry. Co. Survey (320 ac.)

North Half (N/2) of Section 33, Abstract 311, Blk. 32, T-4-N, T & P Ry. Co. Survey (320 ac.)

North Half (N/2) of Section 34, Abstract 974, Blk. 32, T-4-N, T & P Ry. Co. Survey (320 ac.)

CJM 192243v.6

SEC 188331

EXHIBIT B
Attached to Muy Caliente Geophysical Exploration Agreement
Dated January 15, 2010,
Among
RAW, RAW LC, Hardwick, Blaylock, Elger and Smith

## Oil and Gas Interests Schedule

| A.<br>Party | B.<br>Geophysical Program Costs Share | C.<br>Oil and Gas Interest Acquisition Cost Share Until First 9 Wells Drilled | D.<br>Working Interest After Casing Point on First 9 Wells and In All Subsequent Operations |
|---|---|---|---|
| Smith Energy Company | 100% | 100%* | 75.00% |
| RAW Oil & Gas, Inc. | | | 0 |
| JDH RAW Energy, L.C. | | | 6.25% |
| Mark P. Hardwick | | | 6.25% |
| Steve Blaylock | | | 6.25% |
| Elger Exploration, Inc. | | | 6.25% |
| | | | 100.00% |

*Until first nine (9) wells have been drilled to casing point

23

SEC 188332

EXECUTED to be effective as of the Effective Date.

RAW OIL & GAS, INC.

By: _____
Name: _____
Title: _____

JDH RAW ENERGY, L.C.

By: _____
Name: _____
Title: _____

_____
MARK P. HARDWICK

_____
STEVE BLAYLOCK

ELGER EXPLORATION, INC.

By: _____
Name: _____
Title: _____

SMITH ENERGY COMPANY

By: _____
Lester H. Smith, President

13

SEC 188334

EXECUTED to be effective as of the Effective Date.

RAW OIL & GAS, INC.

By: _____
Name: _____
Title: _____

JDH RAW ENERGY, L.C.

By: _____
Name: _____
Title: _____

_____
MARK P. HARDWICK

_____
STEVE BLAYLOCK

ELGER EXPLORATION, INC.

By: _____
Name: _____
Title: _____

SMITH ENERGY COMPANY

By: _____
    Lester H. Smith, President

13

SEC 188335

A.A.P.L. FORM 610 - 1989

# MODEL FORM OPERATING AGREEMENT

## MUE CALIENTE PROSPECT

OPERATING AGREEMENT

DATED

**January 15** , **2010**
_year_

OPERATOR   **RAW Oil & Gas, Inc.**

CONTRACT AREA   **See Exhibit "A"**

COUNTY OR PARISH OF   **LYNN , TERRY, BORDEN AND HOCKLEY**   , STATE OF   **TEXAS**

COPYRIGHT 1989 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS, 76137, APPROVED FORM.

A.A.P.L. NO. 610 – 1989

SEC 188336

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS: | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION: | 2 |
| | C. SUBSEQUENTLY CREATED INTERESTS: | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION: | 2 |
| | B. LOSS OR FAILURE OF TITLE: | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| | 4. Curing Title | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR: | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR: | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | 3. Effect of Bankruptcy | 4 |
| | C. EMPLOYEES AND CONTRACTORS: | 4 |
| | D. RIGHTS AND DUTIES OF OPERATOR: | 4 |
| | 1. Competitive Rates and Use of Affiliates | 4 |
| | 2. Discharge of Joint Account Obligations | 4 |
| | 3. Protection from Liens | 4 |
| | 4. Custody of Funds | 5 |
| | 5. Access to Contract Area and Records | 5 |
| | 6. Filing and Furnishing Governmental Reports | 5 |
| | 7. Drilling and Testing Operations | 5 |
| | 8. Cost Estimates | 5 |
| | 9. Insurance | 5 |
| VI. | DRILLING AND DEVELOPMENT | 5 |
| | A. INITIAL WELL: | 5 |
| | B. SUBSEQUENT OPERATIONS: | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less Than All Parties | 6 |
| | 3. Stand-By Costs | 7 |
| | 4. Deepening | 8 |
| | 5. Sidetracking | 8 |
| | 6. Order of Preference of Operations | 8 |
| | 7. Conformity to Spacing Pattern | 9 |
| | 8. Paying Wells | 9 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK: | 9 |
| | 1. Completion | 9 |
| | 2. Rework, Recomplete or Plug Back | 9 |
| | D. OTHER OPERATIONS: | 9 |
| | E. ABANDONMENT OF WELLS: | 9 |
| | 1. Abandonment of Dry Holes | 9 |
| | 2. Abandonment of Wells That Have Produced | 10 |
| | 3. Abandonment of Non-Consent Operations | 10 |
| | F. TERMINATION OF OPERATIONS: | 10 |
| | G. TAKING PRODUCTION IN KIND: | 10 |
| | (Option 1) Gas Balancing Agreement | 10 |
| | (Option 2) No Gas Balancing Agreement | 11 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 11 |
| | A. LIABILITY OF PARTIES: | 11 |
| | B. LIENS AND SECURITY INTERESTS: | 12 |
| | C. ADVANCES: | 12 |
| | D. DEFAULTS AND REMEDIES: | 12 |
| | 1. Suspension of Rights | 13 |
| | 2. Suit for Damages | 13 |
| | 3. Deemed Non-Consent | 13 |
| | 4. Advance Payment | 13 |
| | 5. Costs and Attorneys' Fees | 13 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES: | 13 |
| | F. TAXES: | 13 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 14 |
| | A. SURRENDER OF LEASES: | 14 |
| | B. RENEWAL OR EXTENSION OF LEASES: | 14 |
| | C. ACREAGE OR CASH CONTRIBUTIONS: | 14 |

i

SEC 188337

## TABLE OF CONTENTS

|  |  |  |
|---|---|---|
|  | D. ASSIGNMENT; MAINTENANCE OF UNIFORM INTEREST: | 15 |
|  | E. WAIVER OF RIGHTS TO PARTITION: | 15 |
|  | F. PREFERENTIAL RIGHT TO PURCHASE: | 15 |
| IX. | INTERNAL REVENUE CODE ELECTION | 15 |
| X. | CLAIMS AND LAWSUITS | 15 |
| XI. | FORCE MAJEURE | 16 |
| XII. | NOTICES | 16 |
| XIII. | TERM OF AGREEMENT | 16 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 16 |
|  | A. LAWS, REGULATIONS AND ORDERS: | 16 |
|  | B. GOVERNING LAW: | 16 |
|  | C. REGULATORY AGENCIES: | 16 |
| XV. | MISCELLANEOUS | 17 |
|  | A. EXECUTION: | 17 |
|  | B. SUCCESSORS AND ASSIGNS: | 17 |
|  | C. COUNTERPARTS: | 17 |
|  | D. SEVERABILITY | 17 |
| XVI. | OTHER PROVISIONS | 17 |

SEC 188338

OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___RAW Oil & Gas, Inc._____ hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

WITNESSETH:

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

ARTICLE I.

DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of estimating the costs to be incurred in conducting an operation hereunder.

B. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production testing conducted in such operation.

C. The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be developed and operated for Oil and Gas purposes under this agreement. Such lands, Oil and Gas Leases and Oil and Gas Interests are described in Exhibit "A."

D. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the lesser.

E. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

F. The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.

G. The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be located.

H. The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.

I. The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as provided in Article VI.B.2.

J. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

K. The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

L. The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts of land lying within the Contract Area which are owned by parties to this agreement.

M. The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

N. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone.

O. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned in order to attempt a Completion in a different Zone within the existing wellbore.

P. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or improve production in a Zone which is currently open to production in the wellbore. Such operations include, but are not limited to, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Recompleting, or Plugging Back of a well.

Q. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties.

R. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

ARTICLE II.

EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

__X___ A. Exhibit "A," shall include the following information:

(1) Description of lands subject to this agreement,

(2) Restrictions, if any, as to depths, formations, or substances,

(3) Parties to agreement with addresses and telephone numbers for notice purposes,

(4) Percentages or fractional interests of parties to this agreement,

(5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement,

(6) Burdens on production.

__X___ B. Exhibit "B," Form of Lease.

__X___ C. Exhibit "C," Accounting Procedure.

__X___ D. Exhibit "D," Insurance.

__X___ E. Exhibit "E," Gas Balancing Agreement.

_____ F. ~~Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.~~

__X___ G. Exhibit "G," Tax Partnership.

_____ H. Other: _____

- 1 -

SEC 188339

If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

## ARTICLE III.
### INTERESTS OF PARTIES

A. Oil and Gas Interests:

If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B," and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.

B. Interests of Parties in Costs and Production:

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area up to, but not in excess of, existing lease burdens _____ and shall indemnify, defend and hold the other parties free from any liability therefor. Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s) which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any liability therefor.

No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby, and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

C. Subsequently Created Interests:

If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production payment, net profits interest, assignment of production or other burden payable out of production attributable to its working interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interests, or other burden payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's Lease or Interest to exceed the amount stipulated in Article III.B. above.

The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

## ARTICLE IV.
### TITLES

A. Title Examination:

Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and, if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in procuring abstracts, fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in royalty opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection with Leases or Oil and Gas Interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings. Costs incurred by Operator, including fees paid to outside attorneys, which are associated with hearings before governmental agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C."

- 2 -

SEC 188340

Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the Drilling Parties in such well.

**B. Loss or Failure of Title:**

1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas Leases and Interests; and,

(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;

(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed Lease or Interest;

(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;

(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received production for which such accounting is required based on the amount of such production received, and each such party shall severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;

(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and

(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest is reflected on Exhibit "A."

2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas Lease or interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A" shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest, calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest, it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or Interest, on an acreage basis, up to the amount of unrecovered costs;

(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination, would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties in proportion to their respective interests reflected on Exhibit "A"; and,

(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.

3. Other Losses: All losses of Leases or Interests committed to this agreement, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

4. Curing Title: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B. shall not apply to such acquisition.

- 3 -

SEC 188341

ARTICLE V.

OPERATOR

A. Designation and Responsibilities of Operator:

    RAW Oil & Gas, Inc. shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

B. Resignation or Removal of Operator and Selection of Successor:

    1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. ~~Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.~~

    Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

    2. Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

    3. Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

C. Employees and Contractors:

    The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined Operator, and all such employees or contractors shall be the employees or contractors of Operator.

D. Rights and Duties of Operator:

    1. Competitive Rates and Use of Affiliates: All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

    2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

    3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from

- 4 -

SEC 188342

liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.

5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each Non-Operator or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C."

6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder, including but not limited to the Initial Well:

(a) Operator will promptly advise Non-Operators of the date on which the well is spudded, or the date on which drilling operations are commenced.

(b) Operator will send to Non-Operators such reports, test results and notices regarding the progress of operations on the well as the Non-Operators shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.

(c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

8. Cost Estimates: Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

ARTICLE VI.

DRILLING AND DEVELOPMENT

A. Initial Well:

On or before the __1st__ day of __September__, 2010, Operator shall commence the drilling of the Initial Well at the following location:

Mutually agreed upon location within the Contract Area to be determined at a later date by all the parties to this Agreement

and shall thereafter continue the drilling of the well with due diligence to penetrate the Fusselman Formation.

The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation in Completion operations and Article VI.F. as to termination of operations and Article XI as to occurrence of force majeure.

B. Subsequent Operations:

1. Proposed Operations: If any party hereto should desire to drill any well on the Contract Area other than the Initial Well, or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone

- 5 -

SEC 188343

under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be performed, the location, proposed depth, objective Zone and the estimated cost of the operation. The parties to whom such a notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties within the time and in the manner provided in Article VI.B.6.

If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation, reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance with Article VI.B.5. in the event of a Sidetracking operation.

2. Operations by Less Than All Parties:

(a) Determination of Participation. If any party to whom such notice is delivered as provided in Article VI.B.1. or VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties' interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10) days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period. If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the period provided in Article VI.B.1., subject to the same extension right as provided therein.

(b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense; provided, however, that those Non-Consenting Parties that participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened, Recompleted or Plugged Back under the provisions of this Article results·in a well capable of producing Oil and/or Gas in paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking, Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking,

- 6 -

SEC 188344

Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non-Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes, royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

(i) _____ % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and

(ii) _____ % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening, Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C., and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions of this Article VI.B.2. (b) shall apply to such party's interest.

(c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties _____ % of that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

(d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem, production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.C.

In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back, Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing, Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of Oil and Gas produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking, Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and Exhibit "C" attached hereto.

3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise terminated pursuant to Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking,

- 7 -

SEC 188345

Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.

4. **Deepening:** If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone of which the parties were given notice under Article VI.B.1. ("Initial Objective"). Such well shall not be Deepened beyond the Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate in the Deepening operation.

In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective, such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation, such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses.

(a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the sole account of Consenting Parties.

(b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the well for Deepening.

The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article VI.F.

5. **Sidetracking:** Any party having the right to participate in a proposed Sidetracking operation that does not own an interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore to be utilized as follows:

(a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

(b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking operation is initiated shall be determined in accordance with the provisions of Exhibit "C."

6. **Order of Preference of Operations.** Except as otherwise specifically provided in this agreement, if any party desires to propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required shall be deemed not to have voted. The proposal receiving the vote of parties owning the largest aggregate percentage interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the

- 8 -

SEC 188346

initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty-four (24) hours if a rig is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within such period shall be deemed an election not to participate in the prevailing proposal.

7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone.

8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except with the consent of all parties that have not relinquished interests in the well at the time of such operation.

C. Completion of Wells; Reworking and Plugging Back:

1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling, Deepening or Sidetracking shall include:

☐ ~~Option No. 1: All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completing and equipping of the well, including necessary tankage and/or surface facilities.~~

☐ Option No. 2: All necessary expenditures for the drilling, Deepening or Sidetracking and testing of the well. When such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to participate in a Completion attempt whether or not Operator recommends attempting to Complete the well, together with Operator's AFE for Completion costs if not previously provided. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an accompanying AFE. Operator shall deliver any such Completion proposal, or any Completion proposal conflicting with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the procedures specified in Article VI.B.6. Election to participate in a Completion attempt shall include consent to all necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface facilities but excluding any stimulation operation not contained on the Completion AFE. Failure of any party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of conflicting Completion proposals. If one or more, but less than all of the parties, elect to attempt a Completion, the provision of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations thereafter conducted by less than all parties; provided, however, that Article VI.B.2. shall apply separately to each separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier Completions or Recompletion have recouped their costs pursuant to Article VI.B.2.; provided further, that any recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in which the Completion attempt is made. Election by a previous Non-Consenting party to participate in a subsequent Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt, insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a Completion attempt.

2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked, Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the Reworking, Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and Completing and equipping of said well, including necessary tankage and/or surface facilities.

D. Other Operations:

Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of _____ Twenty-five thousand _____ Dollars ($ 25,000.00 ) except in connection with the drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so requesting an information copy thereof for any single project costing in excess of Twenty-five thousand Dollars ($ 25,000.00 ). Any party who has not relinquished its interest in a well shall have the right to propose that Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively be those Articles). Operator shall deliver such proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent of any party or parties owning at least 50 % of the interests of the parties entitled to participate in such operation, each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms of the proposal.

E. Abandonment of Wells:

1. Abandonment of Dry Holes: Except for any well drilled or Deepened pursuant to Article VI.B.2., any well which has been drilled or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be

- 9 -

SEC 188347

plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and restoring the surface, for which the abandoning parties shall remain proportionately liable.

2. Abandonment of Wells That Have Produced: Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well within the required period or thereafter to conduct operations on such well shall entitle operator to retain or take possession of such well and plug and abandon the well.

Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the interest of the abandoning party is or includes and Oil and Gas Interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest in a portion of the well shall pay their proportionate shares of abandonment and surface restoration cost for such well as provided in Article VI.B.2.(b).

F. Termination of Operations:

Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing, Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without consent of parties bearing 50.0% of the costs of such operation; provided, however, that in the event granite or other practically impenetrable substance or condition in the hole is encountered which renders further operations impractical, Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1, and the provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.

G. Taking Production in Kind:

☐ Option No. 1: Gas Balancing Agreement Attached

Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment

- 10 -

SEC 188348

directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing basis to be used.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

☐ Option No. 2: No Gas Balancing Agreement:

Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditures incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase contract having a term extending beyond such ten (10) day period. Any purchase or sale by Operator of any other party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation fee equal to that received under any existing market or transportation arrangement. The sale or delivery by Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase of Oil and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written notice of such intended purchase or sale and the price to be paid or the pricing basis to be used. Operator shall give notice to all parties of the first sale of Gas from any well under this Agreement.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

## ARTICLE VII.
### EXPENDITURES AND LIABILITY OF PARTIES

A. Liability of Parties:

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

- 11 -

SEC 188349

**B. Liens and Security Interests:**

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

~~If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.~~

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

**C. Advances:**

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

**D. Defaults and Remedies:**

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered

- 12 -

SEC 188350

only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator, and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator. Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified below or otherwise available to a non-defaulting party.

1. Suspension of Rights: Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement.

2. Suit for Damages: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

3. Deemed Non-Consent: The non-defaulting party may deliver a written Notice of Non-Consent Election to the defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party, notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3, shall be offered to the non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

4. Advance Payment: If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided in the Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

5. Costs and Attorneys' Fees: In the event any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

E. Rentals, Shut-in Well Payments and Minimum Royalties:

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to production of a producing well, at least five (5) days (excluding Saturday, Sunday, and legal holidays) prior to taking such action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

F. Taxes:

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

- 13 -

SEC 188351

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C."

Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

### ARTICLE VIII.
### ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

A. Surrender of Leases:

The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B." Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made varies according to depth, then the interest assigned shall similarly reflect such variances.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

B. Renewal or Extension of Leases:

If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease, promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an assignment of its proportionate interest therein by the acquiring party.

If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating Agreement in the form of this agreement.

If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.

The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.

C. Acreage or Cash Contributions:

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled inside Contract Area. Contributions under the paragraph do not include proceeds from the actual sale of working interest in a well or lease

- 14 -

SEC 188352

hereunder.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

**D. Assignment; Maintenance of Uniform Interest:**

~~For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells, equipment and production unless such disposition covers either:~~

~~1. the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or~~

~~2. an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production in the Contract Area.~~

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

**E. Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

~~F. Preferential Right to Purchase:~~

~~☐ (Optional; Check if applicable.)~~

~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after the notice is delivered, to purchase for the stated consideration on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to transfer title to its interests to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests, or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock.~~

**ARTICLE IX.**

**INTERNAL REVENUE CODE ELECTION**

If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulation §1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.

**ARTICLE X.**

**CLAIMS AND LAWSUITS**

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed __five thousand__ Dollars ($ __5,000.00__ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling settling, or otherwise discharging such claim or suit shall be a the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

- 14 -

SEC 188353

## ARTICLE XI.
### FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

## ARTICLE XII.
### NOTICES

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex, telecopier or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the telecopy, facsimile or telex machine of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, telecopy or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.

## ARTICLE XIII.
### TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☐ Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

☒ ~~Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this agreement shall continue in force so long as any such well is capable of production, and for an additional period of _____ days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re-completing, Plugging Back or Reworking operations are commenced within _____ days from the date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of 180 days from the conduct of any operations on the well, whichever first occurs.~~

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

## ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

**A. Laws, Regulations and Orders:**

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

**B. Governing Law:**

This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of ___Texas___ shall govern.

**C. Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or

- 16 -

SEC 188354

orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not constitute gross negligence. Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

## ARTICLE XV.
## MISCELLANEOUS

A. Execution:

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest. In the event Operator proceeds with drilling operations for the Initial Well without the execution hereof by all persons listed on Exhibit "A" as having a current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the Initial Well which would have been charged to such person under this agreement if such person had executed the same and Operator shall receive all revenues which would have been received by such person under this agreement if such person had executed the same.

B. Successors and Assigns:

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Contract Area.

C. Counterparts:

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

D. Severability:

For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

## ARTICLE XVI.
## OTHER PROVISIONS

This Joint Operating Agreement is subject to the additional terms and provisions which are contained in Article XVI attached hereto.

- 17 -

SEC 188355

IN WITNESS WHEREOF, this agreement shall be effective as of the 15th day of January, 2010.

**OPERATOR**

**RAW OIL & GAS, INC.**

By _____

Joe D. Hardin
Type or print name

Title President_____

Date _____

Tax ID or S.S. No. _____

**NON-OPERATORS**

**RAW ENERGY, LC**

By _____

Joe D. Hardin
Type or print name

Title Manager_____

Date _____

Tax ID or S.S. No. _____

**SMITH ENERGY COMPANY**

By _____

Lester Smith
Type or print name

Title President_____

Date _____

Tax ID or S.S. No. _____

**MARK P. HARDWICK**

By _____

Date _____

Tax ID or S.S. No. _____

**STEVE BLAYLOCK**

By _____

Date _____

Tax ID or S.S. No. _____

**ELGER EXPLORATION INC.**

By _____

Jerry Elger
Type or print name

Title President_____

Date _____

Tax ID or S.S. No. _____

- 20 -

SEC 188356

ACKNOWLEDGMENTS

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts.

The validity and effect of these forms in any state will depend upon the statutes of that state.

Acknowledgment in representative capacity:

State of Texas           )
                         )  ss.
County of Lubbock        )

This instrument was acknowledged before me on this _____ day of _____, 2010, by Joe D. Hardin as President of **RAW OIL & GAS, INC.**

(Seal, if any)                                   _____

                                                 Title (and Rank) _____

                                                 My commission expires: _____


State of Texas           )
                         )  ss.
County of Lubbock        )

This instrument was acknowledged before me on this _____ day of _____, 2010, by Joe D. Hardin as Manager of **RAW ENERGY, LC.**

(Seal, if any)                                   _____

                                                 Title (and Rank) _____

                                                 My commission expires: _____


State of Texas           )
                         )  ss.
County of_____    )

This instrument was acknowledged before me on this _____ day of _____, 2010, by Lester Smith as President of **SMITH ENERGY COMPANY.**

(Seal, if any)                                   _____

                                                 Title (and Rank) _____

                                                 My commission expires: _____


Individual acknowledgment:

State of Texas           )
                         )  ss.
County of Midland        )

This instrument was acknowledged before me on this _____ day of _____, 2010, by **MARK P. HARDWICK.**

(Seal, if any)                                   _____

                                                 Title (and Rank) _____

                                                 My commission expires: _____

- 20 -

SEC 188357

Individual acknowledgment:

State of Texas )
) ss.
County of Midland )

This instrument was acknowledged before me on this _____ day of _____, 2010, by **STEVE BLAYLOCK.**

(Seal, if any)

_____

Title (and Rank) _____

My commission expires: _____

State of Texas )
) ss.
County of _____ )

This instrument was acknowledged before me on this _____ day of _____, 2010, by Jerry Elger as President of **ELGER EXPLORATION INC.**

(Seal, if any)

_____

Title (and Rank) _____

My commission expires: _____

- 20 -

SEC 188358

# JOINT OPERATING PROVISIONS
## ARTICLE XVI

To be attached to and made a part of that certain Joint
Operating Agreement dated January 15, 2010, between
Raw Oil & Gas, Inc. as Operator
and Smith Energy Company, etal, as Non-Operator

A. Royalties, Overriding Royalties and Other Payments:

1. As used herein, the term "Existing Burdens" shall apply separately to each Lease and means all royalties and overriding royalties and other payments carved out of the Leasehold estate with which each Lease covered by this Operating Agreement is burdened as of the effective date hereof.

2. Each party shall pay or deliver, or cause to be paid or delivered, its proportionate part of all Existing Burdens and shall hold the other parties free from any liability therefor.

B. Rentals, Shut-in Well Payments and Minimum Royalties:

1. All rentals, shut-in well payments and minimum royalties which may be required under the terms of any Lease shall be administered and paid by Operator and charged to the Joint Account except where otherwise expressly provided to the contrary in this Operating Agreement. Any party may request and shall be entitled to receive proper evidence of all such payments.

2. Operator shall diligently attempt to make or cause to be made proper payment of any rentals and/or shut-in well payments and/or minimum royalties under the foregoing provisions, but Operator shall not be held liable to the other parties in damages for the loss of any Lease or interest therein if, through mistake or oversight, any rental and/or shut-in well payment and/or minimum royalty is not paid or is erroneously paid. The loss of any Lease or interest therein which results from Operator's failure to pay or an erroneous payment of rental and/or a shut-in well payment and/or a minimum royalty shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

3. Each party hereto shall be obligated to bear its proportionate part of any and all rentals necessary to continue in force and effect the Oil and Gas Leases covered by this Agreement unless and until it timely gives the notice provided for in the next sentence hereof. If any party does not wish to bear its proportionate part of any rental necessary to continue in force any Lease covered by this Agreement, such party may give Operator and all other parties hereto written notice of such election, and the party giving such written notice shall be released of obligation to bear its proportionate part of any rentals which accrue under the terms of the Leases specified in such written notice at any time after thirty (30) days after the date Operator receives such party's aforesaid written notice. Unless mutually agreed, otherwise, the proportionate part of the rental attributable to any such Lease which would have been borne by the party giving the aforesaid written notice shall be borne by the parties hereto who do not exercise the aforesaid election, in the proportion that the interest of each bears to the total of their Interests, and the party giving the aforesaid written notice of election not to pay its part of such rental shall assign, without express or implied warranty of title, all of its interest in the Lease or Leases specified in said written notice to the aforesaid parties in the respective proportions that they bear the rental on any such Lease or Leases.

C. Removal of Operator-Vote of all Parties.

Operator may at any time be removed with or without cause by the affirmative vote of the owners of the majority interest in the Contract Area based upon ownership as shown in Exhibit "A".

D. Transition.

Upon the selection of the successor operator, the Operator who has been removed or has resigned shall promptly deliver to the successor operator all original records relating to operations on the Contract Area, including current accounting information with regard to the status of the joint account, information concerning all invoices not yet paid by the operator who has resigned or been removed, all logs, maps and all other information concerning operations. Duplicating expenses required by virtue of the change of operators shall be charged to the joint account.

E. Financing Statement.

The security interest granted to each Operator and Non-Operator under Paragraph VII.B. of this agreement which secures payment of each party's share of costs and expenses of operations shall extend to each such party's share of all Oil and Gas, equipment, fixtures, personal property, accounts, inventory and general intangibles and proceeds or products thereof relating or pertaining to the Leases and lands included in the Contract Area as described in Exhibit "A" attached hereto. For purposes of compliance with TEXAS BUSINESS AND COMMERCE CODE, Sec. 9.302, each party agrees that this instrument shall serve and may be filed as a financing statement to perfect the security interest mutually granted herein. In that regard, each party hereto agrees that its signature below shall be its signature as debtor of an appropriate financing statement, and that for purposes of compliance with the requirements of Sec. 9.402 of the TEXAS BUSINESS AND COMMERCE CODE each secured party and debtor's names and addresses are as follows:

SEC 188359

| The names and addresses of secured parties are: | The names and address of debtors are: |
|---|---|
| SEE EXHIBIT "A" | SEE EXHIBIT "A" |

The collateral to which the security Interests apply are all of each debtor's interest in Oil and Gas, equipment, fixtures, personal property, accounts, inventory and general intangibles and proceeds or products thereof relating or pertaining to the Oil and Gas Leases covered by this agreement and included in the Contract Area as described in Exhibit "A".

F. Deemed Non-Consent for Defaulting Payment.

If the lien conferred in Article VII.B has been enforced, or if any party to this agreement shall fail to pay its share of costs and expenses incurred in operations of the Contract Area for a period of 90 days from the date of Operator's invoice therefor, Operator may notify the affected party of its default by certified mail, return receipt requested, and if such party fails to cure the default within 10 days from the date of receipt of Operator's notice, by payment in full of all invoices for operating costs which have been due for more than 30 days, the affected party shall be deemed in non-consent status and for so long as the affected party remains in default it shall have no further access to the Contract Area or information obtained in connection with operations hereunder and shall not be entitled to vote on any matter hereunder. As to any proposed operation in which it otherwise would have the right to participate, such party shall have the right to be a Consenting Party therein only if it pays the amount it is in default before the operation is commenced; otherwise it automatically shall be deemed a Non-Consenting Party to that operation. Nothing herein shall affect each party's right to protest any item charged to the joint account by Operator under the provisions of Article I.5. of Exhibit "C" attached hereto.

G. Trustee's Sale for Defaulting Payment.

If Operator should elect to proceed to foreclose the lien of Operator as against the interest of a Non-Operator having an interest in the Contract Area, this operating agreement does hereby include provisions for non-judicial sale under the laws of the State of Texas and David Cotton is hereby appointed as Trustee for such purpose. Upon such default, said Trustee or Operator shall at least 21 days preceding the date of nonjudicial sale serve written notice of the proposed sale by certified mail to Non-Operator according to records of Operator. Service of such notice shall be deemed completed upon deposit of a notice enclosed in a post-paid wrapper properly addressed to the Non-Operator and each other party obligated to pay such obligations at the most recent address or addresses as shown on the records of Operator in a post office or other official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service. After such notice, said Trustee shall proceed to sell all of the Interests of Non-Operator in the Contract Area at public auction to the highest bidder for cash after having given notice of the time and place of sale and in the manner and after the advertisement of such sale as now required by the statutes of the State of Texas in making sales of real estate under deeds of trust. Sale of a part of the realty would not exhaust the power of sale and sales may be made from time to time until all of the property is sold or the obligations paid in full. Said Trustee shall have authority to appoint an attorney in fact to act as Trustee in conducting the foreclosure sale and executing a deed to the purchasers; and it is further agreed that said Trustee or his successor may sell said property together or in lots and/or parcels as to him shall deem expedient and after such sale as aforesaid shall make, execute and deliver to the purchaser or purchasers thereof good and sufficient deeds, assignments or other lawful conveyances to vest in said purchaser or purchasers title to the Non-Operator's interest in the Contract Area in fee simple together with all personal property used or obtained in connection therewith and together with all of the proceeds of production attributable thereto including proceeds of production held by any party for the payment to Non-Operator. From the proceeds of said sale said Trustee shall first pay all charges, costs and expenses in executing these provisions and secondly pay any sums due by the Trustee for taxes in the preservation of the security and thereafter pay all of the remaining sums to Operator for the satisfaction of the debts of Non-Operator hereunder and the balance, if any, shall be paid to Non-Operator.

It is agreed that such sale shall be a perpetual bar against Non-Operator and its heirs, successors and assigns and legal representatives and all other persons claiming under him, them or any of them. It is further agreed that said Trustee or any holder or holders of said obligation of Operator shall have the right to become the purchaser or purchasers at such sale if they are the highest bidder or bidders in which event the bid or bids may be credited upon said indebtedness of Non-Operator. It is stipulated and agreed that in case of any sale hereunder by Trustee or his successor all prerequisites of said sale shall be presumed to have been performed and any conveyance given hereunder, all statements of fact or recitals therein made as to the non-payment of money secured or as to any default under the terms hereof or as to the request of the Trustee to enforce this trust or as to the proper and due appointment of any successor or substitute Trustee or as to the advertisement of sale or the time, place and terms of sale or as to any other preliminary act or thing shall be taken in all courts of law and equity as prima facie evidence that the facts so stated are true. Operator may appoint a substitute or successor Trustee in the event the Trustee above named is unable for any reason to serve.

H. Drill or Out

Notwithstanding any provisions to the contrary contained in Article VI.B. should any party hereto, after receiving notice from Operator of a proposal to drill a well on the Contract Area, other than the well provided for in Article VI.A fail to timely notify Operator of its election to participate in such proposal or should a party elect

SEC 188360

not to participate in the drilling proposal, it is hereby agreed that such party shall relinquish and assign to the participating parties all of its Leasehold interest in and to the well and the proration unit allocated to such well. Additionally, in such event, such non-participating party shall release, relinquish and surrender and forever forfeit proportionately to the participating parties, all of the non-participating party's interest in and to all proration units which are adjoining and/or contiguous to the proration unit allocated to such proposed well except for any thereof on which a well is situated and in which well the nonparticipating party participated in the drilling.

By way of illustration, in the event a 40 acre proration unit in the form of a square is allocated to a proposed well, then a non-participating party shall forfeit, release and relinquish all interest in such 40 acre proration unit together with the eight immediately surrounding and adjoining 40 acre proration units with the exception indicated.

Notwithstanding any provision to the contrary contained in Article VI., Non-Operator upon receiving Operator's recommendation with respect to an attempted Completion shall within the time period set forth herein, notify Operator of its election to participate in a proposed Completion attempt. Failure to so notify Operator shall be deemed an election by Non-Operator not to participate. In the event that any Non-Operator elects not to participate in the Completion attempt, the Non-Consenting Party shall relinquish and assign to the participating parties all of its Leasehold interest in and to the well and the proration unit allocated to such well, only insofar as to the interval or formation which is subject to the Completion attempt. Additionally, in such event, such non-participating party shall relinquish and surrender and forever forfeit proportionately to the participating parties, all of the non-participating party's interest in and to all proration units which are adjoining and/or contiguous to the proration unit allocated to such well, only insofar as to the interval or formation which is subject to the Completion attempt.

With regard to Deepening operations, any Non-Consenting Party shall forfeit proportionately to the participating parties all of the non-participating party's interest in depths greater than the depth drilled in an operation for which such non-participating party had previously consented. The interest of any party in such relinquished and forfeited Leasehold rights shall be assigned proportionately to the participating parties by the non-participating party without warranty of title except as to claims, by, through or under Assignor, and shall be free of burdens except those created prior to the time the non-participating party acquired his interest in the Leasehold estate so forfeited.

I. Sales Necessitating Separate Measurements.

In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area which necessitates separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

J. Internal Revenue Code Election.

This Operating Agreement shall not create any mining partnership, commercial partnership or other partnership relation or joint venture, and the liabilities of each of the parties hereto shall be several and not joint. However, solely for Federal and State income tax purposes, the parties elect to be taxed as a partnership in accordance with the Tax Partnership Agreement attached as Exhibit "G" hereto, but such relationship shall not be a partnership to any other extent or for any other purpose. Notwithstanding anything to the contrary herein, the parties hereto agree that, with respect to all operations conducted hereunder, each party hereto agrees to elect to be excluded from the application of Subchapter K of Chapter I of Subtitle A of the Code, and each party agrees to join in the execution of such additional documents and elections as may be required by the Internal Revenue Service in order to effectuate the foregoing. In addition, if the income tax laws of any state in which the parties conduct operations pursuant to the terms of this Agreement contain provisions similar to those contained in Subchapter K of Chapter I of Subtitle A of the Code, the parties hereby agree to elect to be excluded from the application of such provisions.

K. Memorandum of Operating Agreement.

Within ten (10) days from the execution of this operating Agreement, each party agrees to execute a "Memorandum of Joint Operating Agreement" to be filed of record in Lynn and Terry Counties, Texas, imparting constructive notice that the Contract Area is subject to all of the terms, conditions and provisions contained in this agreement.

L. Power of Attorney.

Each Non-Operator designates Operator as its respective attorney-in-fact for the purpose of executing on behalf of such Non-Operator all instruments of release; all oil purchase agreements, gas purchase agreements and amendments thereto; all amendments to existing Leases in the Contract Area deemed necessary by Operator and all filings required by regulatory agencies relating to operations on the Contract Area including without limitation all NGPA filings, filings required by the Federal Energy Regulatory Commission and the Railroad Commission of the State of Texas. This Power-of-Attorney may be revoked only by revocation signed and acknowledged by the revoking non-operator, and filed for record in Lynn and Terry Counties, Texas, a copy of which shall be forwarded to operator.

M. Area of Mutual Interest.

SEC 188361

(1) The parties hereto hereby create an Area of Mutual Interest (the "AMI") comprising all of the Contract Area covered by this Operating Agreement.

(2) During the term of the AMI, if any party hereto ("the Acquiring Party") acquires any Oil and Gas Lease, or any interest therein, any unleased mineral interest or any farmout, sublease or other contract with respect thereto which covers or affects any lands or minerals lying within the AMI ("the offered Mineral Interest"), the Acquiring Party shall promptly notify each of the other parties hereto ("Offeree") of such acquisition. In such event, such Offeree shall have the right to acquire his or its proportionate interest in the offered Mineral Interest in accordance with the other provisions of this Article XVI I.

(3) Promptly upon acquiring the offered Mineral Interest, the Acquiring Party shall, in writing, advise each Offeree of such acquisition. The notice shall include complete xerox copies of the instruments of acquisition including, by way of example but not of limitation, such copies of the Leases, assignments, subleases, farmouts or other contracts acquired by the Acquiring Party creating or affecting the offered Mineral Interest, together with such copies of paid drafts, plats depicting the exact location of the acreage covered or affected thereby, Lease brokers' reports and any other title data relating thereto. The Acquiring Party shall also enclose an itemized statement of the actual costs and expenses incurred by the Acquiring party in acquiring the offered Mineral Interest ("Acquiring Costs"). Each Offeree shall have a period of fifteen (15) days after receipt of the notice within which to furnish the Acquiring party written notice of his or its election to acquire his or its proportionate interest in the offered Mineral Interest. If, however, a well in search of oil or gas is being drilled on lands situated within the AMI or on lands situated outside the AMI of which the result could be expected to materially affect the value of the offered Mineral Interest, each Offeree shall have a period of forty-eight (48) hours after receipt of the notice (exclusive of Saturdays, Sundays and legal holidays) within which to elect to acquire his or its proportionate interest in the offered Mineral Interest. It is provided, however, that the forty-eight (48) hour election period shall not apply unless the Acquiring Party shall give written notice to each Offeree within two (2) days after the date on which the Acquiring party acquired the offered Mineral Interest exclusive of Saturdays, Sundays and legal holidays. In addition thereto, the Acquiring Party shall also:

(i) furnish each Offeree with the approximate location of the well then being drilled and the name of the operator or drilling contractor drilling the well; and

(ii) specifically advise each Offeree that each Offeree shall have a period of forty-eight (48) hours (inclusive of Saturdays, Sundays and legal holidays) within which to elect to acquire his or its proportionate interest in the offered Mineral Interest.

The above information shall be in addition to the information and copies of instruments to be furnished in connection with the acquisition of the offered Mineral Interest as provided hereinabove. If the Acquiring Party does not receive written notice of election from any Offeree to acquire his or its proportionate interest within the fifteen (15) day or forty-eight (48) hour period, as the case may be, such failure shall constitute an election by such Offeree not to acquire his or its interest in the offered Mineral Interest. Written notice from the Acquiring Party to each Offeree and written notice of election from each Offeree to the Acquiring Party shall be deemed given when delivered if delivered in person, one day after deposit with an overnight carrier such as Federal Express for delivery on the next calendar day and the day of transmission by telecopy (if confirmed by notice sent by Federal Express or a similar overnight carrier for receipt the next day). Each Offeree accepting the offered Mineral Interest shall be entitled to participate in the offered Mineral Interest in the proportion to which his or its ownership interest as set forth in Exhibit "A" bears to the total ownership Interests as set forth in Exhibit "A" of the Acquiring Party and all other Offerees who have elected to acquire their proportionate interest in the offered Mineral Interest. Promptly after the period for the election has expired, the Acquiring Party shall invoice each Offeree electing to acquire his or its Interests in the offered Mineral Interest for his or its proportionate part of the Acquisition Costs. In the event an Offeree elects not to acquire his or its proportionate interest therein, then the Acquiring Party and each of the other Offerees who elect to participate in the offered Mineral Interest shall bear the Acquisition Costs attributable to such non-acquiring Offeree's interest in the proportion to which such participating party's expense bearing interest in the AMI at such time bears to the aggregate expense-bearing interest in the AMI at such time of the Acquiring Party and such other Offerees who so elect to participate. Each Offeree shall immediately reimburse the Acquiring Party for his or its share of the Acquisition Costs as reflected by the invoice. Upon receipt of such reimbursement or, in the case of a farmout or similar agreement at the time the acquiring party receives its assignment or other instrument, the Acquiring Party shall execute and deliver an appropriate, recordable assignment to each participating Offeree. If the Acquiring Party does not receive the amount due from a participating Offeree within five (5) days after receipt by such Offeree of the invoice for its share of the Acquisition Costs, the Acquiring Party may, at his or its election and without prejudice to other existing remedies, give written notice to such delinquent party that the failure of the Acquiring Party to receive the amount due within forty-eight (48) hours (exclusive of Saturdays, Sundays and legal holidays) after receipt of such notice by the delinquent Offeree shall constitute a withdrawal by the delinquent Offeree of its former election to acquire the interest and such Offeree shall no longer have the right to acquire an interest in the offered Mineral Interest. In the event the Acquiring Party does not receive the amount due within such forty-eight (48) hour period, the delinquent Offeree shall be deemed to have elected not to participate and the Acquiring Party shall succeed to and own the entirety of the interest in the offered Mineral Interest which the delinquent Offeree would have owned and the Acquiring party shall bear the delinquent Offeree's proportionate share of the Acquisition Costs.

(4) In the event less than all of the Offerees elect to acquire their proportionate interest in the offered Mineral Interest, then the portion of the lands covered by the offered Mineral Interest shall be automatically deleted from the AMI and the Contract Area covered hereby without the necessity of Operator or any Non-Operator

SEC 188362

executing a document amending the AMI and this Operating Agreement to reduce the AMI and the Contract Area to exclude such lands therefrom. The Acquiring Party and the Offerees electing to acquire the Interests in the offered Mineral Interest shall be deemed to have agreed to operate the offered Mineral Interest in accordance with the terms and provisions of this Operating Agreement, except that the offered Mineral Interest shall constitute the Contract Area covered thereby. Exhibit "A" shall list the names and addresses of the parties owning the offered Mineral Interest and the Interests in which they own the same, and Operator shall be named Operator therein unless Operator did not participate in acquiring his interest in the offered Mineral Interest, in which event the parties agreeing to participate in the offered Mineral Interest shall select an Operator from among themselves, which Operator shall be elected by the affirmative vote of two or more such parties owning a majority interest based on their ownership of the offered Mineral Interest, and not on the number of parties electing to participate. The Acquiring Party and the Offerees electing to acquire their Interests in the offered Mineral Interest shall enter into an Operating Agreement reflecting the same immediately after agreeing to own jointly the offered Mineral Interest, but the failure to enter immediately into such an Operating Agreement shall not prevent the owners of the offered Mineral Interest from operating, developing and maintaining the same in accordance with the terms hereof, unless Operator elects not to participate and such parties are unable to agree on the election of an operator.

(5) Any assignment made by the Acquiring Party shall be made free and clear of any burdens placed thereon by the Acquiring Party but otherwise without warranty of title, except as to acts by, through and under the Acquiring Party, but not otherwise. The assignment shall be expressly made subject to and each assignee shall expressly assume his or its portion of all of the obligations imposed by the instrument creating or affecting the offered Mineral Interest.

(6) If the interest of any party hereto in the AMI should vest in three or more parties, those parties shall designate one of them to whom all notices provided for in this AMI are to be given and shall promptly furnish the other parties hereto the name and address of the designated party. If the Acquiring Party has not received the name and address of the designated party, the notice of the acquisition shall be directed to all of the parties having an interest in the AMI according to the Exhibit "A" which is then a part of this Operating Agreement.

(7) If the instrument creating or affecting the offered Mineral Interest covers lands situated both within and outside the AMI, the Acquiring Party may, at his or its option, offer either all of the offered Mineral Interest or only that portion of the offered Mineral Interest covering lands situated within the AMI. If less than the entirety is offered, the Acquisition Costs shall be prorated between the acreage covered by the offered Mineral Interest situated within the AMI and the acreage situated outside the AMI and the Acquiring Party shall bear all of the Acquisition Costs attributable to such outside acreage and the Acquiring Party and the Offerees who elect to participate shall bear their proportionate share of the Acquisition Costs attributable to the acreage within the AMI. If the entirety of the premises covered by the Mineral Interest is offered and each party hereto acquires it proportionate interest therein, the lands lying outside the AMI shall become a part of the Contract Area covered hereby and the AMI shall thereby be automatically enlarged without the necessity of operator or any Non-Operator executing a document amending the AMI and this Operating Agreement to enlarge the AMI to include such lands lying outside the AMI.

(8) If two or more of the offered Mineral Interests are included in the same notice, each Offeree shall have the separate right of election as to each offered Mineral Interest.

(9) The provisions of the AMI shall not apply to acquisitions resulting from a merger, consolidation, reorganization or an acquisition from a parent, subsidiary or affiliated corporation, or, as to individuals, from ascendants or descendants or trusts of which such parties are beneficiaries. The provisions hereof shall also not apply to sales and acquisitions between partners in a partnership which is a party hereto, or ventures in a joint venture which is a party hereto, nor to the acquisition by any party hereto of all or any part of the interest of another party hereto.

(10) Each party hereto stipulates and represents to the other parties hereto that he or it is not now and shall not become hereafter a party to any other area of mutual interest agreement involving all or any portion of the land comprising the AMI.

N. Participation Agreement

The parties to this Operating Agreement hereby acknowledge that their interest in the Contract Area described in Exhibit "A" hereto is owned subject to the terms of that certain Mue Caliente Prospect Lynn, Terry, Hockley & Borden Counties, Texas Participation Agreement by and among the Parties hereto dated January 15, 2010 and pursuant to paragraph 8 (c) thereof, the Parties granted to each other a Right of First Refusal as to any proposed Transfer of any interest in the Contract Area to any person other than a Permitted Assignee (as such terms are defined in the Participation Agreement). The Parties hereby incorporate by reference the provisions of paragraph 8 (c) of the Participation Agreement into this Agreement as is set out in full in this Agreement.

O. Successor Operations to RAW Oil & Gas, Inc.

Article V.B.1. is hereby amended to provide that in the event: (i) RAW Oil & Gas, Inc. is no longer under the management control (including day-to-day management of all operations conducted by RAW under this Operating Agreement) of Joe D. Hardin; (ii) Joe D. Hardin is no longer the majority owner of RAW Oil & Gas, Inc.; (iii) Joe D. Hardin is deceased; or (iv) Joe D. Hardin is determined to be non-compos mentis or incapacitated in a manner that will prevent him from directing the activities of RAW under this Agreement in the opinion of three licensed

SEC 188363

medical doctors located in the Lubbock, Texas area, then RAW may be removed as Operator by the affirmative vote of non-operators owning a majority in interest based on ownership as shown on Exhibit A. Any Party to this Agreement owning an interest of five (5%) percent or more shall have the right by delivering a written request to all non-operators to initiate the process to cause the three physicians to assess the competency of Joe D. Hardin. The physicians shall be selected by a majority in interest of the non-operators joining in the request for the examination. The cost of the physicians' fees shall be billed to the Joint Account for all Parties to the extent such costs are not covered by insurance.

SEC 188364

Attached to and made a part of
Operating Agreement dated January 15, 2010, between RAW Oil & Gas Inc. as Operator and
Smith Energy Company, etal, as Non-Operators


PART I:      CONTRACT & AMI AREA


· *TO BE DETERMINED AT A LATER DATE*


PART II:      PARTIES, INTEREST AND ADDRESSES FOR NOTICE PURPOSES

| Names and Addresses | Before Casing Point of the First Well | After Casing Point of the First Well And all Subsequent Operations |
|---|---|---|
| Raw Oil & Gas, Inc.<br>12312 Slide Road<br>Lubbock, Texas 79424 | -0%- | 1.00% |
| Raw Energy, L.C.<br>12312 Slide Road<br>Lubbock, Texas 79424 | -0%- | 5.25% |
| Smith Energy Company<br>Lester Smith, President<br>P.O. Box 52890<br>Houston, Texas 77052 | 100.0% | 75.0% |
| Mark P. Hardwick<br>P.O. Box 213<br>Midland, Texas 79702 | -0%- | 6.25% |
| Steve Blaylock<br>214 W. Texas, Suite 306<br>Midland Texas 79701 | -0%- | 6.25% |
| Elger Exploration Inc.<br>P.O. Box 2623<br>Midland, Texas 79702 | -0%- | 6.25% |

SEC 188365

Attached to and made a part of
Operating Agreement dated January 15, 2010, between RAW Oil & Gas Inc., as Operator and
Smith Energy Company, etal, as Non-Operators.

Producers 88 (7-69) Paid Up
with 640 Acres Pooling Provision

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this _____, between _____, Lessor (whether one or more), whose address is
_____, and _____, Lessee, **WITNESSETH:**

1. Lessor, in consideration of Ten Dollars and other valuable consideration ($10.00 and OVC), receipt of which is hereby acknowledged, and of the covenants and agreements of lessee hereinafter contained, does hereby grant, lease and let unto lessee the land covered hereby for the purposes and with the exclusive right of exploring, drilling, mining and operating for, producing and owning oil, gas, sulphur and all other minerals (whether or not similar to those mentioned), together with the right to make surveys on said land, lay pipe lines, establish and utilize facilities for surface or subsurface disposal of salt water, construct roads and bridges, dig canals, build tanks, power stations, telephone lines, employee houses and other structures on said land, necessary or useful in lessee's operations in exploring, drilling for, producing, treating, storing and transporting minerals produced from the land covered hereby or any land adjacent thereto. The land covered hereby, herein called "said land", is located in the Counties of_____, State of Texas, and is described as follows:

This lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by lessor by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by lessee for a more complete or accurate description of said land. For the purpose of determining the amount of any bonus or other payment hereunder, said land shall be deemed to contain _____acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof. Lessor accepts the bonus as lump sum consideration for this lease and all rights and options hereunder.

2. Unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of_____years from the date hereof, hereinafter called "primary term", and as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days.

3. As royalty, lessee covenants and agrees: (a) To deliver to the credit of lessor, in the pipe line to which lessee may connect its wells, the equal _____ part of all oil produced and saved by lessee from said land, or from time to time, at the option of lessee, to pay lessor the average posted market price of such _____ part of such oil at the wells as of the day it is run to the pipe line or storage tanks, lessor's interest, in either case, to bear _____ of the cost of treating oil to render it marketable pipe line oil; (b) To pay lessor on gas and casinghead gas produced from said land (1) when sold by lessee, _____)of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well, of_____ of such gas and casinghead gas; (c) To pay lessor on all other minerals mined and marketed or utilized by lessee from said land, one tenth either in kind or value at the well or mine at lessee's election, except that on sulphur mined and marketed the royalty shall be one dollar ($1.00) per long ton. If, at the expiration of the primary term or any time or times thereafter, there is any well on said land or on lands with which said lands or any portion thereof has been pooled, capable of producing oil or gas, and all such wells are shut-in, this lease shall, nevertheless, continue in force as though operations were being conducted on said land for so long as said wells are shut-in, and thereafter this lease may be continued in force as if no shut-in had occurred. Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the minerals capable of being produced from said wells, but in the exercise of such diligence, lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities of flow lines, separator, and lease tank, and shall not be required to settle labor trouble or to market gas upon terms unacceptable to lessee. If, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety consecutive days, and during such time there are no operations on said land, then at or before the expiration of said ninety day period, lessee shall pay or tender, by check or draft of lessee, as royalty, a sum equal to one dollar ($1.00) for each acre of land then covered hereby. Lessee shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety day period if upon such anniversary this lease is being continued in force solely by reason of the provisions of this paragraph. Each such payment or tender shall be made to the parties who at the time of payment would be entitled to receive the royalties which would be paid under this lease if the wells were producing, and may be deposited in the _____ Bank at __ _____, or its successors, which shall continue as the depositories, regardless of changes in the ownership of shut-in royalty. If at any time that lessee pays or tenders shut-in royalty, two or more parties are, or claim to be, entitled to receive same, lessee may, in lieu of any other method of payment herein provided, pay or tender such shut-in royalty, in the manner above specified, either jointly to such parties or separately to each in accordance with their respective ownership thereof, as lessee may elect. Any payment hereunder may be made by check or draft of lessee deposited in the mail or delivered to the party entitled to receive payment or to a depository bank provided for above on or before the last date for payment. Nothing herein shall impair lessee's right to release as provided in paragraph 5 hereof. In the event of assignment of this lease in whole or in part, liability for payment hereunder shall rest exclusively on the then owner or owners of this lease, severally as to acreage owned by each.

4. Lessee is hereby granted the right, at its option, to pool or unitize any land covered by this lease with any other land covered by this lease, and/or with any other land, lease, or leases, as to any or all minerals or horizons, so as to establish units containing not more than 80 surface acres, plus 10% acreage tolerance; provided, however, units may be established as to any one or more horizons, or existing units may be enlarged as to any one or more horizons, so as to contain not more than 640 surface acres plus 10% acreage tolerance, if limited to one or more of the following: (1) gas, other than casinghead gas, (2) liquid hydrocarbons (condensate) which are not liquids in the subsurface reservoir, (3) minerals produced from wells classified as gas wells by the conservation agency having jurisdiction. If larger units than any of those herein permitted, either at the time established, or after enlargement, are required under any governmental rule or order, for the drilling or operation of a well at a regular location, or for obtaining maximum allowable from any well to be drilled, drilling, or already drilled, any such unit may be established or enlarged to conform to the size required by such governmental order or rule. Lessee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded. Each of the said options may be exercised by the lessee at any time and from time to time while this lease is in force, and whether before or after production has been established either on said land, or on the portion of said land included in the unit, or on other land unitized therewith. A unit established hereunder shall be valid and effective for all purposes of this lease even though there may be mineral, royalty, or leasehold interests in lands within the unit which are not effectively pooled or unitized. Any operations conducted on any part of such unitized land shall be considered, for all purposes, except the payment of royalty, operations conducted upon said land under this lease. There shall be allocated to the land covered by this lease within each such unit (or to each separate tract within the unit if the lease covers separate tracts within the unit) that proportion of the total production of unitized minerals from the unit, after deducting any used in lease or unit operations, which the number of surface acres in such land (or in each such separate tract) covered by this lease within the unit bears to the total number of surface acres in the unit, and the production so allocated shall be considered for all purposes, including payment or delivery of royalty, overriding royalty and any other payments out of production, to be the entire production of unitized minerals from the land to which allocated in the same manner as though produced therefrom under the terms of this lease. The owner of the reversionary estate of any term royalty or mineral estate agrees that the accrual of royalties pursuant to this paragraph or of shut-in royalties from a well on the unit shall satisfy any limitation of term requiring production of oil or gas. The formation of any unit hereunder which includes land not covered by this lease shall not have the effect of exchanging or transferring any interest under this lease (including, without limitation any shut-in royalty which may become payable under this lease) between parties owning interests in land covered by this lease and parties owning interests in land not covered by this lease. Neither shall it impair the right of the lessee to release as provided in paragraph 5 hereof, except that lessee may not so release as to lands within a unit while there are operations thereon for unitized minerals unless all pooled leases are released as to lands within the unit. At any time while this lease is in force lessee may dissolve any unit established hereunder by filing for record in the public office where this lease is recorded a declaration to that effect, if at that time no operations are being conducted thereon for unitized minerals. Subject to the provisions of this paragraph 4, a unit once established hereunder shall remain in force so long as any lease subject thereto shall remain in force. If this lease now or hereafter covers separate tracts, no pooling or unitization of royalty interests as between any such separate tracts is intended or shall be implied or result merely from the inclusion of such separate tracts within this lease but lessee shall nevertheless have the right to pool or unitize as provided in this paragraph 4 with consequent allocation of production as herein provided. As used in this paragraph 4, the words "separate tract" mean any tract with royalty ownership differing, now or hereafter, either as to parties or amounts, from that as to any other part of the leased premises.

5. Lessee may at any time and from time to time execute and deliver to lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations, as to the released acreage or interest.

6. Whenever used in this lease the word "operations" shall mean operations for and any of the following: drilling, testing, completing, reworking, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals, excavating a mine, production of oil, gas, sulphur or other mineral, whether or not in paying quantities.

7. Lessee shall have the use, free from royalty, of water, other than from lessor's water wells, and of oil and gas produced from said land in all operations hereunder. Lessee shall have the right at any time to remove all machinery and fixtures placed on said land, including the right to draw and remove casing. No well shall be

SEC 188366

drilled nearer than 200 feet to the house or ba... ...ow on said land without the consent of the lessor. Lessee shall pay for dama... ...sed by its operations to growing crops and timber on said land.

8. The rights and estate of any party hereto may be assigned from time to time in whole or in part as to any mineral or horizon. All of the covenants, obligations, and considerations of this lease shall extend to and be binding upon the parties hereto, their heirs, successors, assigns, and successive assigns. No change or division in the ownership of said land, royalties, or other moneys, or any part thereof, howsoever effected, shall increase the obligations or diminish the rights of lessee, including, but not limited to, the location and drilling of wells and the measurement of production. Notwithstanding any other actual or constructive knowledge or notice thereof of or to lessee, its successors or assigns, no change or division in the ownership of said land or of the royalties, or other moneys, or the right to receive the same, howsoever effected, shall be binding upon the then record owner of this lease until thirty (30) days after there has been furnished to such record owner at his or its principal place of business by lessor or lessor's heirs, successors, or assigns, notice of such change or division, supported by either originals or duly certified copies of the instruments which have been properly filed for record and which evidence such change or division, and of such court records and proceedings, transcripts, or other documents as shall be necessary in the opinion of such record owner to establish the validity of such change or division. If any such change in ownership occurs by reason of the death of the owner, lessee may, nevertheless pay or tender such royalties, or other moneys, or part thereof, to the credit of the decedent in a depository bank provided for above.

9. In the event lessor considers that lessee has not complied with all its obligations hereunder, both express and implied, lessor shall notify lessee in writing, setting out specifically in what respects lessee has breached this contract. Lessee shall then have sixty (60) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by lessor. The service of said notice shall be precedent to the bringing of any action by lessor on said lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after service of such notice on lessee. Neither the service of said notice nor the doing of any acts by lessee aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that lessee has failed to perform all its obligations hereunder. If this lease is canceled for any cause, it shall nevertheless remain in force and effect as to (1) sufficient acreage around each well as to which there are operations to constitute a drilling or maximum allowable unit under applicable governmental regulations, (but in no event less than forty acres), such acreage to be designated by lessee as nearly as practicable in the form of a square centered at the well, or in such shape as then existing spacing rules require; and (2) any part of said land included in a pooled unit on which there are operations. Lessee shall also have such easements on said land as are necessary to operations on the acreage so retained.

10. Lessor hereby warrants and agrees to defend title to said land against the claims of all persons whomsoever. Lessor's rights and interests hereunder shall be charged primarily with any mortgages, taxes or other liens, or interest and other charges on said land, but lessor agrees that lessee shall have the right at any time to pay or reduce same for lessor, either before or after maturity, and be subrogated to the rights of the holder thereof and to deduct amounts so paid from royalties or other payments payable or which may become payable to lessor and/or assigns under this lease. If this lease covers a less interest in the oil, gas, sulphur, or other minerals in all or any part of said land than the entire and undivided fee simple estate (whether lessor's interest is herein specified or not), or no interest therein, then the royalties and other moneys accruing from any part as to which this lease covers less than such full interest, shall be paid only in the proportion which the interest therein, if any, covered by this lease, bears to the whole and undivided fee simple estate therein. All royalty interest covered by this lease (whether or not owned by lessor) shall be paid out of the royalty herein provided. This lease shall be binding upon each party who executes it without regard to whether it is executed by all those named herein as lessor.

11. If while this lease is in force, at, or after the expiration of the primary term hereof, it is not being continued in force by reason of the shut-in well provisions of paragraph 3 hereof, and lessee is not conducting operations on said land by reason of (1) any law, order, rule or regulation, (whether or not subsequently determined to be invalid) or (2) any other cause, whether similar or dissimilar, (except financial) beyond the reasonable control of lessee, the primary term hereof shall be extended until the first anniversary date hereof occurring ninety (90) or more days following the removal of such delaying cause, and this lease may be extended thereafter by operations as if such delayed had not occurred.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

**LESSOR:**

_____

By: _____
Printed Name: _____
Title: _____

Tax ID No.: _____

## ACKNOWLEDGEMENT

STATE OF _____     §
                                          CORPORATE
COUNTY OF _____     §

Before me, the undersigned Notary Public, personally appeared _____
known to me to be the person whose name is subscribed to the foregoing instrument and known to me to be _____ of _____ a corporation, and acknowledged to me that he or she executed the same as the act of said corporation for the purposes therein set forth.

Given under my hand and seal of office this _____ day of _____, 2008.

_____
Notary Public in and for the State of _____

My commission expires: _____

SEC 188367

'S 1984 ONSHORE
Amended by the Council
oi  etroleum Accountants
Societies

**COPAS**

## EXHIBIT "C"

Attached to and made a part of __Joint Operating Agreement dated January 15 , 2010, by and between RAW Oil & Gas, Inc.,__ __as Operator and Smith Energy Company, etal, as Non-Operators.__

# ACCOUNTING PROCEDURE

# JOINT OPERATIONS

### I. GENERAL PROVISIONS

1. **Definitions**

   "Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

   "Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

   "Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

   "Operator" shall mean the party designated to conduct the Joint Operations.

   "Non-Operators" shall mean the Parties to this agreement other than the Operator.

   "Parties" shall mean Operator and Non-Operators.

   "First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

   "Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

   "Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

   "Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

   "Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council or Petroleum Accountants Societies.

2. **Statement and Billings**

   Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

3. **Advances and Payments by Non-Operators**

   A. Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

   B. Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at __Peoples Bank, Lubbock__ on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

4. **Adjustments**

   Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

## COPYRIGHT © 1985 by the Council of Petroleum Accountants Societies.

- 1 -

SEC 188368

5. **Audits**

A. A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B. The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6. **Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. **Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2. **Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

3. **Labor**

A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2) Salaries of First level Supervisors in the field.

(3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

(4) Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation or the Joint Property if such charges are excluded from the overhead rates.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

4. **Employee Benefits**

Operator's · current costs or established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

- 2 -

SEC 188369


5. **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6. **Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C. In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

7. **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account.if directly engaged in the operation (not administration) of the joint property.

8. **Equipment and Facilities Furnished By Operator**

A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed _eighteen_ percent (___18___%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9. **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10. **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

11. **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

- 3 -

SEC 188370



**12.** **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

**13.** **Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

**14.** **Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

**15.** **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

# III. OVERHEAD

**1.** **Overhead – Drilling and Producing Operations**

 i.   As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

  ( X ) Fixed Rate Basis, Paragraph 1A, or
  (   ) Percentage Basis, Paragraph 1B

  Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

 ii.   The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

  (   ) shall be covered by the overhead rates, or
  ( X ) shall not be covered by the overhead rates.

 iii.   The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

  (   ) shall be covered by the overhead rates, or
  ( X ) shall not be covered by the overhead rates.

 A.   Overhead – Fixed Rate Basis

  (1)   Operator shall charge the Joint Account at the following rates per well per month:

    Drilling Well Rate $_____7,500.00_____
     (Prorated for less than a full month)

    Producing Well Rate $____750.00_____

  (2)   Application of Overhead – Fixed Rate Basis shall be as follows:

   (a)   Drilling Well Rate

    (1)   Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever

- 4 -

SEC 188371


is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b) Producing Well Rates

(1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B. Overhead - Percentage Basis

(1) Operator shall charge the Joint Account at the following rates:

(a) Development

_____ Percent (_____%) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.

(b) Operating

_____ Percent (_____%) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead - Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.

2. Overhead - Major Construction

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint

- 5 -

SEC 188372


Account for overhead based on the following rates for any Major Construction project in excess of $_____:

A. ____5____ % of first $100,000 or total cost if less, plus

B. ____3____ % of costs in excess of $100,000 but less than $1,000,000, plus

C. ____2____ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3. **Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A. ____5____ % of total costs through $100,000; plus

B. ____3____ % of total costs in excess of $100,000 but less than $1,000,000; plus

C. ____2____ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4. **Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

### IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. **Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A. New Material (Condition A)

    (1) Tubular Goods Other than Line Pipe

        (a) Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at current new price available from area vendors effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

        (b) For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000

SEC 188373

pound Oil Field Haulers Association interstate truck rate shall be used.

(c) Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

(d) Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

(2) Line Pipe

(a) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(I)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(b) Line Pipe movements (except size 24 inch OD) and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(I)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(c) Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

(d) Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

(3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

(4) Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(I) and (2).

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

At seventy-five percent (75%) of current new price, as determined by Paragraph A.

(2) Material used on and moved from the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

(b) At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material

(3) Material not used on and moved from the Joint Property

At seventy-five percent (75%) of current new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

- 7 -

SEC 188374



(2) Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a) Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b) Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3) Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. Pricing Conditions

(1) Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. Premium Prices

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4. Warranty of Material Furnished By Operator

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. Periodic Inventories, Notice and Representation

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. Reconciliation and Adjustment of Inventories

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for

- 8 -

SEC 188375



overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4. **Expense of Conducting Inventories**

A. The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B. The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

SEC 188376

**EXHIBIT "D"**

Attached to and made a part of
Operating Agreement dated January 15, 2010, between RAW Oil & Gas Inc., as Operator and
Smith Energy Company, etal, as Non-Operators.

## INSURANCE

Operator shall carry and maintain at all times the following insurance with respect to all operations under this Agreement:

a) Insurance which shall comply with the Workmen's Compensation Laws of the State in which operations hereunder are conducted.

b) Employers' Liability Insurance with limits of not less than $1,000,000 for each occurrence.

c) Comprehensive General Liability Insurance with limits of not less than (i) $1,000,000 for each occurrence for bodily injury, and (ii) $1,000,000 for each occurrence for property damage. Operator shall provide an AFE insurance program with coverage as follows: Premises and operations, sudden and accidental pollution, underground resources, products and completed operations, and blowout, cratering and explosion coverage.

d) Automobile Liability Insurance, including owned, hired and non-hired vehicles, with combined single limits of $500,000.

e) Coverages in subparagraphs (c) and (d) above shall include Non-Operators as Additional Insured.

f) Excess Liability Coverage in excess of the coverage in subparagraphs (a), (b), (c), (d) and (e) above with a combined single limit for Bodily Injury and Property Damage of not less than $1,000,000 for each occurrence.

g) All premiums on the above provided for insurance shall be charged to the Joint Account. Except as may be otherwise expressly provided in the Operating Agreement to which this Exhibit is attached, the Joint Account shall be charged with all liabilities and expenditures resulting from any claims, damages, or losses against which Operator is not required to carry insurance.

h) Operator shall not be liable to Non-Operators for loss, suffered on account of the insufficiency of insurance carried, or of the insurer with whom carried, nor shall Operator be liable to Non-Operators for any loss accruing by reason of Operator's inability to provide or maintain the insurance specified above, provided, however, that if at any time Operator is unable to obtain or maintain such insurance, Operator shall promptly notify Non-Operators in writing of such fact and Non-Operators may obtain and maintain such insurance at their expense.

SEC 188377

Attached to and made a part of
Operating Agreement dated January 15, 2010, between RAW Oil & Gas Inc., as Operator and
Smith Energy Company, etal, as Non-Operators.

## GAS BALANCING AGREEMENT

The parties to the Operating Agreement to which this agreement is attached own the working interest in the gas rights underlying the Contract Area covered by such agreement in accordance with the percentages of participation as set forth in Exhibit "A" to the Operating Agreement.

Each party has made (or will make) arrangements to sell or utilize its share of the gas well gas produced from the Contract Area. However, the respective gas markets of the parties may be limited from time to time; therefore, to permit the parties as much flexibility as possible in meeting the demands of their respective markets, the parties hereto agree to the following storage arrangement:

### Section 1.

From and after the date of initial delivery of gas well gas from any proration unit within the Contract Area, during any period when the market of a party is not sufficient to take that party's full share of the gas well gas produced, the other parties shall be entitled to produce each month, in addition to their own share of production, that portion of any other party's share of production which said party is unable to market, or its purchaser does not take, of the allowable gas production assigned to such proration unit by the appropriate regulatory authority having jurisdiction in the premises or at the maximum efficient rate, if no such allowable gas production is so assigned, except, however, that no party shall be entitled to take or deliver to a purchaser gas production in excess of three hundred percent (300%) of its share of allowable gas production or maximum efficient rate unless that party has gas in storage. The parties hereto shall share in and own the lease condensate (liquid hydrocarbons recovered from such gas by lease equipment) in accordance with their respective above specified interests, upon and subject to the terms of the Operating Agreement.

### Section 2.

A party taking less than its full share of the gas well gas produced shall be credited with gas in storage on a BTU basis equal to its full share of the total gas well gas produced, less such party's share of such gas used in lease operations or vented or lost, and less that portion of such gas such party took or delivered to the purchaser. Operator will maintain a running account of the gas balance as between the parties hereto and will furnish each party monthly statements showing the total quantity of gas well gas produced, the portion thereof used in lease operations, vented or lost, the total quantity of gas well gas delivered to market, and the monthly and cumulative total over and under delivery of each party on an MCF and on a BTU basis.

### Section 3.

After notice, any party may at any time begin taking or delivering to a purchaser its full share of the gas well gas produced (less such party's share of such gas used in the lease operations, vented or lost). To allow the recovery of gas in storage and to balance the gas account of the parties in accordance with their respective interests, a party with gas well gas in storage shall be entitled to take or deliver to a purchaser its full share of the gas well gas produced (less such party's share of such gas used in lease operations, vented or lost), plus a share of gas not exceeding its gas in storage determined by multiplying (1) twenty-five percent (25%), by (2) the interest in the proration unit's current production (less such party's share of such gas used in lease operations, vented or lost) of the party or parties without gas in storage, by (3) a fraction, the numerator of which is the interest in the proration unit of such party with gas in storage and the denominator of which is the total percentage interest in the proration unit of all parties with gas in storage.

### Section 4.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to its purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser. Each party shall at all times use its best efforts to regulate its takes and deliveries from the Contract Area so that wells will not be shut in for over producing the allowable, if any, assigned thereto by the regulatory authority having jurisdiction.

### Section 5.

Each party producing or taking or delivering gas well gas to its purchaser shall pay any and all royalties and production taxes due on such gas.

### Section 6.

Should production of gas well gas from a proration unit be permanently discontinued before the gas account is balanced, settlement will be made between the parties for gas which has not been recovered by any party from storage. In making such settlement, if there is any party whose gas has not been recovered from storage, or a party who has sold more than its share of gas well gas, then the amount owed (as hereinafter defined) by each of the latter shall be forwarded to the operator who shall allocate the sum of such amounts and pay the former in proration to the respective ownerships in gas not recovered from storage. The amount owed by each party who has sold more than its share of gas well gas shall be the weighted average of the amounts received by such party upon sale of such gas during the period or periods overproduction is accrued by such party, less base lease royalty and taxes paid thereon; provided, however, that as to gas sold in interstate commerce by such party, such amounts shall be based upon that portion of the rate or rates not subject to refund applicable to and collected for the volumes sold during such period or periods by such party under orders of the regulatory body having jurisdiction which are final at the time of such settlement, plus any additional collected amounts which are not ultimately required by said body to be refunded, such additional collected amounts to be accounted for at such time as final determination is made with respect thereto. For the purpose of the preceding sentence, the weighted average of the amounts received by such party shall be determined by weighting the respective amounts received for such gas on the basis of volumes of overproduction that accrue hereunder to the account of such party during the period for which such amount was received. As to any gas which any party hereto may take for its own use or sell to a third party purchaser affiliated with such selling party such sum or amount of money for the amount of such gas thereof shall be based upon the rate which would have been received by the under produced party as if such gas had been taken during the period or periods of underproduction under its contract with a nonaffiliated third party purchaser, but, if the underproduced party has no such contract, such sum or amount of money shall be based on the average rate received by other parties hereto for their share of gas during the affected period.

## Section 7.

This agreement shall constitute a separate agreement as to each proration unit within the Contract Area and shall become effective in accordance with its terms and shall remain in force and effect as long as the Operating Agreement to which it is attached remains in effect, and shall inure to the benefit of and be binding upon the parties, their successors, legal representatives and assigns.

## Section 8.

Nothing herein shall change or affect each party's obligations to pay its proportionate share of all costs and liabilities incurred in lease operations in accordance with and subject to the provisions of the Operating Agreement.

SEC 188379

Attached to and made a part of
Operating Agreement dated January 15, 2010, between RAW Oil & Gas Inc., as Operator and
Smith Energy Company, etal, as Non-Operators

## TAX PARTNERSHIP PROVISIONS

1.  RELATIONSHIP OF THE PARTIES.  This agreement shall not create any mining partnership, commercial partnership or other partnership relating or joint venture, and the liabilities of each of the parties hereto shall be several and not joint.  However, solely for the Unites States federal income tax purposes, this agreement shall be considered as a partnership, but such relationship shall be considered as a partnership, but such relationship shall not be a partnership to any other extent or for any other purposes.

2.  ELECTION TO REMAIN WITHIN SUBCHAPTER K.  Notwithstanding anything to the contrary herein or in the Operating Agreement (the "Operating Agreement") to which this is also to be considered an Exhibit, the parties hereto agree with respect to all operations conducted hereunder:

    Each party, now having or hereinafter acquiring an interest under this agreement, agrees not to elect to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code of 1986, as amended (the "Code"), and each party agrees to join in the execution of such additional documents and elections as may be required by the Internal Revenue Service in order to effectuate the foregoing.  In addition, if the income tax laws of any state in which the parties conduct operations pursuant to the terms of this Exhibit or the Operating Agreement, contained provisions similar to those contained in Subchapter K of Chapter 1 of Subtitle A of the Code, the parties hereby agree not to elect to be excluded from the application of such provisions.

3.  INCOME TAX COMPLIANCE AND CAPITAL ACCOUNTS

    The Operator shall prepare and file all required federal and state partnership income tax returns.  In preparing such returns Operator shall use its best efforts and in doing so shall incur no liability to any other party with regard to such returns.  Not less than two weeks prior to the due date (including extensions) Operator shall submit to each party a copy of the return as proposed for review.

    The Operator shall establish and maintain fair market ("FMV") capital accounts and tax basis capital accounts for each party.  Operator shall submit to each party along with the copy of any proposed partnership income tax return an accounting of its respective capital accounts as of the end of the tax return period.

    Each party agrees to furnish to Operator not later than 30 days before the return due date (including extensions) such information relating to the operations conducted under this agreement as may be required for the proper preparation of such returns and capital accounts.

4.  TAX MATTERS PARTNER

    4.1  Operator is Tax Matters Partner.  Operator is designated tax matters partner ("TMP") as defined in Internal Revenue Code (Code) Section 6231(a)(7).  In the event of any change in operator, the party serving as TMP for a given taxable year shall continue as TMP with respect to all matters concerning such year.  The TMP and other parties shall use their best efforts to comply with responsibilities outlined in this section and in Code Sections 6222 through 6232 and 6050K (including any Treasury Regulations promulgated thereunder) and in doing so shall incur no liability to any other party. Notwithstanding TMP's obligation to use its best efforts in the fulfillment of its responsibilities, TMP shall not be required to incur any expenses for the preparation for, or pursuance of administrative, or judicial proceedings, unless the parties agree on a method for sharing such expenses.

    4.2  Information requested by TMP.  The parties shall furnish TMP within two weeks from the receipt of the request with such information (including information specified in Code Sections 6230(e) and 6050(k) as TMP may reasonably request to permit it to provide the Internal Revenue Service with sufficient information for purposes of Code Sections 6233 and 6050K.

    4.3  TMP Agreements with IRS.  The TMP shall not agree to any extensions of the statute of limitations for making assessments on behalf of any other party without first obtaining the written consent of that party.  The TMP shall not bind any other party to a settlement agreement in tax audits without obtaining the concurrence of any such party.

    Any other party who enters into a settlement agreement with the Secretary of the Treasury with respect to

SEC 188380

any partnership items, as defined by Code Section 6231(a)(3), shall notify the other parties of such settlement agreement and its terms within 90 days from the date of settlement.

4.4 Inconsistent Treatment of Partnership Item. If any party intends to file a notice of inconsistent treatment under Code Section 6222(b), such party shall, prior to the filing of such notice, notify the TMP of such intent and the manner in which the Party's intended treatment of a partnership item is (or may be) inconsistent with the treatment of that item by the partnership. Within one week of receipt the TMP shall remit copies of such notification to other parties to the partnership. If any inconsistency notice is filed solely because of the party not having received a Schedule K-1 in time for filing of its income tax return, the TMP need not be notified.

4.5 Request for Administrative Adjustment. No party shall file a request pursuant to Code Section 6227 for an administrative adjustment of partnership items for any partnership taxable year without first notifying all other parties. If all other parties agree with the request adjustment, the TMP shall file the request for administrative adjustment on behalf of the partnership. If unanimous consent is not obtained within the period required to timely file the request for administrative adjustment, if shorter, any party, including the TMP, may file a request for administrative adjustment on its own behalf.

4.6 Judicial Proceedings. Any party intending to file a petition under Code Section 6226, 6228 or any other Code Section with respect to any partnership item, or other tax matters involving the partnership, shall notify the other parties of such intention and the nature of the contemplated proceeding. In the case where the TMP is the Party intending to file such petition, such notice shall be given within a reasonable time to allow the other parties to participate in the choosing of the forum in which such petition will be filed. If the parties do not agree on the appropriate forum, then the appropriate forum shall be decided by majority vote. Each party shall have a vote in accordance with its percentage interest in the partnership for the year under audit. If a majority cannot agree, the TMP shall choose the forum. If a party intends to seek review of any court decision rendered as a result of such proceeding such party shall notify the other parties.

4.7 Windfall Profit Tax. The parties agree to take appropriate action under Code Section 6232(c) and any treasury regulations thereunder to assure that items required to compute the Windfall Profit Tax as imposed by Chapter 45 of the code not be treated as partnership items.

5.   ELECTIONS

5.1 General Elections. For both income tax return and capital account purposes, the partnership shall elect (a) to deduct currently intangible drilling and development costs ("IDC"), (b) to use minimum allowable acceleration tax method and the shortest permissible tax life for depreciation purposes, (c) to use the accrual method of accounting, (d) to report income on a calendar year basis, and (e) dispositions of depreciable assets shall be accounted for under the General Asset account method to the extent permitted by Code Section 168(i)(4).

5.2 Depletion. Solely for FMV capital account purposes, depletion shall be calculated by using simulated percentage depletion within the meaning of Treasury Regulation Section 1.704-1 (b)(2)(iv)(k)(2).

5.3 Other Elections. Any other elections must be approved by the affirmative vote of two (2) or more parties owning a majority interest based on the post payout ownership as shown in Exhibit "A".

6.   CAPITAL CONTRIBUTIONS AND FMV CAPITAL ACCOUNTS

6.1 Capital Contributions. The respective capital contributions of each party to the partnership shall be (a) each party's interest in the oil and gas leases committed to this partnership, and all properties associated with the leases, and (b) all amounts paid by each party in connection with acquisition, exploration, development and operation of the leases, and all other costs characterized as contributions or expenses borne by such party under this partnership. The contribution of the leases and any other properties committed to this partnership shall be made by each party's agreement to hold legal title to its interest in such leases or any other properties as nominee for this partnership.

6.2 FMV Capital Accounts. The FMV capital accounts shall be increased and decreased as follows:

(a) The FMV capital accounts shall be increased by: (i) the amount of money and the fair market value of any property contributed by each party, respectively, to the partnership (net of liabilities assumed by the partnership or to which the contributed property is subject); (ii) that party's Sec. 7.1 allocated share of Partnership income and gains, or items thereof; (iii) any basis increases required by Code Sections 48(q) and 1016(a)(22); and (iv) that party's share of Code Section 705(a)(1)(B) and (C) items.

(b) The FMV capital accounts shall be decreased by: (i) the amount of money and the fair market value of property distributed to each party (net of liabilities assumed by such party or to which the

SEC 188381

property is subject); (ii) that Party's Sec. 7.1 allocated share of partnership loss and deductions, or items thereof; (iii) any basis decreases required by Code Sections 48(9) and 1016(a)(22); and (iv) that parties share of Code Section 705(a)(2)(B) items and Code Section 709 nondeductible and nonamortizable items.

"Fair market value" when it applies to property contributed by a party to the partnership shall be assumed to equal the adjusted basis, as defined in Code Section 1011, of that property unless the parties agree otherwise in a separate written agreement.

7.    PARTNERSHIP ALLOCATIONS

7.1 FMV Capital Account Allocations. Each item of income, gain, loss or deduction shall be allocated to each party as follows:

(a) Actual or deemed income from the sale, exchange distribution or other disposition of production shall be allocated to the party entitled to such production or the proceeds from the sale of such production. In the event that deemed income arising from the in-kind distribution of production equals that fair market value of the production distributed to a party, the parties recognize that the corresponding adjustments would be net zero adjustment and accordingly, may be omitted form the FMV capital accounts;

(b) Exploration cost, IDC, operating and maintenance cost shall be allocated to each party in accordance with its respective contribution to such cost;

(c) Depreciation shall be allocated to each party in accordance with its contribution to the FMV capital account adjusted basis to the underlying asset;

(d) Simulated depletion shall be allocated to each party in accordance with its FMV capital account adjusted basis in each oil and gas property;

(e) Loss (or simulated loss) upon the sale, exchange, distribution, abandonment or the disposition of depreciable or depletable property, shall be allocated to the parties in the ratio of their respective FMV capital account adjusted basis in the depreciable or depletable property;

(f) Gain (or simulated gain) upon the sale, exchange, distribution, or other disposition of depreciable or depletable property, shall be allocated to the parties so that the FMV capital account balances of the parties with respect to such property will most closely reflect their respective percentage or fractional interest under the agreement;

(g) Costs or expenses of any other kind shall be allocated to and accounted for by each party in accordance with its respective contribution to such costs or expenses; and,

(h) Any other income item shall be allocated to the parties in accordance with the allocation of the realization.

7.2    Tax Returns and Tax Basis Capital Account Allocations

(a) Unless otherwise expressly provided herein the allocations of partnership items of income, gain, loss or deduction for tax return and tax basis capital accounts purposes shall be the same as those contained in Section 7.1;

(b) The parties recognize that under Code Section 613A(C)(7)(D) the depletion allowance is to be computed separately by each party. For this purpose, each party's share of the adjusted tax basis of each oil and gas property shall be equal to its contribution to the adjusted tax basis of such property;

(c) The parties recognize that under Code Section 613A(C)(7)(D) the computation of gain or loss on the taxable disposition of an oil or gas property is to be computed separately by each party. For this purpose the portion of the total amount realized by the partnership that represents a recovery of simulated adjusted basis in an oil and gas property will be allocated to the parties in the same ratio that simulated depletion is allocated to them under Sec. 7.1(d). Any additional amount realized will be allocated in accordance with the ratio of simulated gain allocation for such property under Sec. 7.1(f);

(d) Depreciation shall be allocated to each party in accordance with its contribution to the adjusted tax basis of the depreciable asset;

(e) Any recapture of depreciation, IDC, and other items of deduction or credit shall, to the extent possible, be allocated among the parties in accordance with their sharing of the depreciation, IDC

MKB/EXHG.WPF

SEC 188382

or other item of deduction or credit which is recaptured;

(f) The qualified investment for investment tax credit (if reinstated) purposes with respect to any property shall be allocated among the parties in accordance with their respective contributions to the qualified investment (as defined in the code) in such property;

(g) For partnership property which has a value in the FMV capital accounts which differs from the adjusted tax basis of such property, any tax items relating to such property will be allocated to the parties in a manner which takes into account the variation between the adjusted tax basis of such property and its FMV capital account value under Code Section 704(c); and,

(h) The income attributable to take-in-kind production will not be reflected on the tax return.

8.    DISTRIBUTION UPON TERMINATION

8.1 Termination. Termination shall occur on the earlier of the termination of the partnership under Code Section 708(b)(1) or the date upon which the partnership ceases to be a going concern. Upon termination the business shall be wound-up and concluded, and the assets shall be distributed to the parties as described below by the end of such calendar year (or, if later, within 90 days after the date of such termination). All assets shall be distributed to the parties as provided in Sections 8.2 through 8.4.

8.2 Reversion. First, all money representing unexpended contributions by any party and any property where no interest has been earned in that property under the agreement by any other party shall be returned to the contributor.

8.3 Balancing. Second, the FMV capital accounts of the parties shall be determined under this Section 8.3. The Operator shall take the actions specified under this Section 8.3 in order to cause the ratio of the parties FMV capital accounts to reflect as closely as possible their percentage interests under the agreement. The ratio of a party's FMV capital account is represented by a fraction, the numerator of which is the party's FMV capital account balance and the denominator of which is the sum of all parties FMV capital account balances. Such actions are hereafter referred to as "balancing the FMV capital accounts", and when completed, the FMV capital accounts of the parties shall be referred to as being "balanced". The matter in which the FMV capital accounts of the parties are to be balanced under this Section 8.3 shall be determined as follows:

(a) The fair market value of all partnership properties shall be determined and the gain or loss for each property which would have resulted if a sale thereof at such fair market value had occurred shall be allocated in accordance with Section 7.1(e) and (f). If thereafter, any party has a negative FMV capital account balance, that is, a balance less than zero, such party shall contribute an amount of money to the partnership sufficient to achieve a zero balance FMV capital account. Any party may contribute an amount of money to the partnership to facilitate the balancing of the FMV capital accounts. If FMV capital accounts are not balanced, Section 8.3(b) or (c) shall apply;

(b) If all the parties consent, any money or an undivided interest in certain selected properties shall be distributed to one or more parties as necessary for the purpose of balancing the FMV capital accounts;

(c) Unless (b) above applies, an undivided interest in each and every property shall be distributed to one or more parties in accordance with the ratios of their FMV capital accounts;

(d) If a property is to be valued under (a) above or distributed pursuant to (b) or (c) above, the fair market value of the property shall be agreed to by the parties. In the event all of the parties do not reach agreement as to the fair market value of property, the Operator shall cause a nationally recognized independent engineering firm to prepare an evaluation of fair market value of such property.

8.4 Final Distribution. Third, after the FMV capital accounts of the parties have been adjusted, pursuant to Section 8.3 above, all other remaining property and interest then held by the partnership shall be distributed to the parties in accordance with their FMV capital account balances.

9,    TRANSFERS, SURVIVORSHIP AND CORRESPONDENCE

9.1 Transfers. These partnership provisions shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns. The parties agree that if any one of them makes a sale or assignment of its interest under this agreement, such sale or assignment will be structured, if possible, so as not to cause a termination under Code Section 708(b)(1)(B).

9.2 Survivorship. Any termination of the agreement shall not effect the continuing application of the Tax

MKB/EXHG.WPF

Partnership Provisions as necessary for the termination and liquidation of the Tax Partnership.

9.3  Correspondence.  All correspondence relating to the preparation and filing of the partnership's income tax returns and capital accounts shall be forwarded to:

RAW Oil & Gas, Inc.
12312 Slide Road
Lubbock, Texas  79424

MKB/EXHG.WPF

SEC 188384

## MEMORANDUM OF OPERATING AGREEMENT AND FINANCING STATEMENT

1.0 This Memorandum of Operating Agreement and Financing Statement (hereinafter called "Memorandum") shall be effective when the Operating Agreement referred to in Paragraph 2.0 below becomes effective, that being **January 15, 2010.**

2.0 The parties hereto have entered into an Operating Agreement, providing for the development and production of crude oil, natural gas and associated substances from the lands described on Exhibit "A" attached hereto (hereinafter called the "Contract Area"), and designating **RAW OIL & GAS, INC.** as Operator to conduct such operations.

3.0 The Operating Agreement provides for certain liens and/or security interests to secure payment by the parties of their respective share of costs under the Operating Agreement. The Operating Agreement contains an Accounting Procedure along with other provisions which supplement the lien and/or security interest provisions, including non-consent clauses which provide that parties who elect not to participate in certain operations shall be deemed to have relinquished their interest until the consenting parties are able to recover their costs of such operations plus a specified amount. Should any person or firm desire additional information regarding the Operating Agreement or wish to inspect a copy of the Operating Agreement, said person or firm should contact the Operator.

4.0 The purpose of this Memorandum is to more fully describe and implement the liens and/or security interests provided for in the Operating Agreement, and to place third parties on notice thereof.

5.0 In consideration of the mutual rights and obligations of the parties hereunder, the parties hereto agree as follows:

5.1 The Operator shall conduct and direct and have full control of all Operations on the Contract Area as permitted and required by, and within the limits of the Operating Agreement.

5.2 The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations and shall be liable only for its proportionate share of costs.

5.3 Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share of oil and or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon at the rate provided in the Accounting Procedure referred to in Paragraph 3.0 above. To the extent that Operator has a security interest under the Uniform Commercial Code of he state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the rights or security interest for the payment thereof.

5.4 The Operator grants to Non-Operators a lien and security interest equivalent to that granted to Operator as described in Paragraph 5.3 above, to secure payment by Operator of its own share of costs when due.

6.0 For purposes of protecting said liens and security interest, the parties hereto agree that this Memorandum shall cover all right, title and interest of the debtor(s) in:

6.1 Property Subject to Security Interests

(A) All personal property located upon or used in connection with the Contract Area.

(B) All fixtures on the Contract Area.

(C) All oil, gas and associated substances of value in, on or under the Contract Area which may be extracted therefrom.

(D) All accounts resulting from the sale of the items described in subparagraph (C) at the wellhead of every well located on the Contract Area or on lands pooled therewith.

(E) All items used, useful, or purchased for the production, treatment, storage, transportation, manufacture, or sale of the items described in subparagraph (C).

(F) All accounts, contract rights, rights under any gas balancing agreement, general intangibles, equipment, inventory, farmout rights, option farmout rights, acreage and or cash contributions, and conversion rights, whether now owned or existing or hereafter acquired or arising, including but not limited to all interest in any partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Contract Area or in any property encumbered by this Memorandum.

(G) All severed and extracted oil, gas, and associated substances now or hereafter produced from or attributable to the Contract Area, including without limitation oil, gas and associated substances in tanks or pipelines or otherwise held for treatment, transportation, manufacture, processing or sale.

SEC 188385

(H) All the proceeds and products of the items described in the foregoing paragraphs now existing or hereafter arising, and all substitutions therefor, replacements thereof, or accessions thereto.

(I) All personal property and fixtures now and hereafter acquired in furtherance of the purposes of this Operating Agreement. Certain of the above-described items are or are to become fixtures on the Contract Area.

(J) The proceeds and products of collateral are also covered.

6.2 Property Subject to Liens

(A) All real property within the Contract Area, including all oil, gas and associated substances of value in, on or under the Contract Area which may be extracted therefrom.

(B) All fixtures within the Contract Area.

(C) All real property and fixtures now and hereafter acquired in furtherance of the purposes of this Operating Agreement.

7.0 The above items will be financed at the wellhead of the well or wells located on the Contract Area, and this Memorandum is to be filed for record in the real estate records of the county or counties in which the Contract Area is located, and in the Uniform Commercial Code records. All parties who have executed the Operating Agreement and all farmors and option farmors who have granted support within the Contract Area are identified on Exhibit A.

8.0 On default of any covenant or condition of the Operating Agreement, in addition to any other remedy afforded by law or the practice of this state, each party to the agreement and any successor to such party by assignment, operation of law, or otherwise, shall have, and is hereby given and vested with the power and authority to take possession of and sell any interest which the defaulting party has in the subject lands and to foreclose this lien in the manner provided by law.

9.0 Upon expiration of the subject Operating Agreement and the satisfaction of all debts, the Operator shall file of record a release and termination on behalf of all parties concerned. Upon the filing of such release and termination, all benefits and obligations under this Memorandum shall terminate as to all parties who have executed or ratified this Memorandum. In addition, the Operator shall have the right to file a continuation statement on behalf of all parties who have executed or ratified this Memorandum.

10.0 It is understood and agreed by the parties hereto that if any part, term, or provision of this Memorandum is by the courts held to be illegal or in conflict with any law of the state where made, the validity of the remaining portions or provisions shall not be affected, and the rights and obligations of the parties shall be construed and enforced as if the Memorandum did not contain the particular part, term or provision held to be invalid.

11.0 This Memorandum shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns. The failure of one or more persons owning an interest in the Contract Area to execute this Memorandum shall not in any manner affect the validity of the Memorandum as to those persons who have executed this Memorandum.

12.0 A party having an interest in the Contract Area can ratify this Memorandum by execution and delivery of an instrument of ratification, adopting and entering into this Memorandum, and such ratification shall have the same effect as if the ratifying party had executed this Memorandum or a counterpart thereof. By execution or ratification of this Memorandum, such party hereby consents to its ratification and adoption by any party who may have or may acquire any interest in the Contract Area.

13.0 This Memorandum may be executed or ratified in one or more counterparts and all of the executed or ratified counterparts shall together constitute one instrument. For purposes of recording, only one copy of this Memorandum with individual signature pages attached thereto needs to be filed of record.

Names and addresses:

RAW OIL & GAS, INC.
12312 Slide Road
Lubbock, Texas 79424

By: _____
Name:  Joe D. Hardin
Title:  President

RAW ENERGY, L.C.
12312 Slide Road
Lubbock, Texas 79424

By: _____
Name:  Joe D. Hardin
Title:  Manager

SEC 188386

SMITH ENERGY COMPANY
P.O. Box 52890
Houston, Texas 77052
Attn.: Judy Mills

By: _____
Name: Lester Smith _____
Title: President _____


MARK P. HARDWICK                    STEVE BLAYLOCK
P.O. Box 213                        214 W. Texas, Suite 306
Midland, Texas 79702                Midland, Texas 79701


ELGER EXPLORATION INC.
P.O. Box 2623
Midland, Texas 79702

By: _____
Name: Jerry Elger _____
Title: _____


STATE OF TEXAS              §

COUNTY OF LUBBOCK           §

        This instrument was acknowledged by me on this _____ day of _____, 2010 by Joe D. Hardin as President of **RAW OIL & GAS, INC.**

                                        _____
                                        Notary Public in and for the State of Texas


STATE OF TEXAS              §

COUNTY OF LUBBOCK           §

        This instrument was acknowledged by me on this _____ day of _____, 2010 by Joe D. Hardin as Manager of **RAW ENERGY, LC.**

                                        _____
                                        Notary Public in and for the State of Texas


STATE OF TEXAS              §

COUNTY OF _____    §

        This instrument was acknowledged by me on this _____ day of _____, 2010 by Lester Smith, as President of **SMITH ENERGY COMPANY.**

                                        _____
                                        Notary Public in and for the State of Texas

SEC 188387

STATE OF TEXAS §

COUNTY OF MIDLAND §

    This instrument was acknowledged by me on this _____ day of _____, 2010 by **MARK P. HARDWICK.**

                                    _____
                                    Notary Public in and for the State of Texas

STATE OF TEXAS §

COUNTY OF MIDLAND §

    This instrument was acknowledged by me on this _____ day of _____, 2010 by **STEVE BLAYLOCK.**

                                      _____
                                    Notary Public in and for the State of Texas

STATE OF TEXAS §

COUNTY OF MIDLAND §

    This instrument was acknowledged by me on this _____ day of _____, 2010 by Jerry Elger, as _____ of **ELGER EXPLORATION.**

                                      _____
                                    Notary Public in and for the State of Texas

SEC 188388

**EXHIBIT "A"**

Attached to and made a part of
Memorandum of Operating Agreement and Financing Statement
between RAW Oil & Gas, Inc., as Operator and
Smith Energy Company, etal, as Non-Operators dated January 15, 2010

CONTRACT AREA

*TO BE DETERMINED AT A LATER DATE*

SEC 188389

# TAB I

# Amended North On Point Extension & O'Donnell GEA (DX 1350)

### GEOPHYSICAL EXPLORATION AGREEMENT
### N. ON POINT EXTENTION & ODONNELL PROGRAM AREA
### LYNN AND DAWSON COUNTIES, TEXAS

*This is an Amendment dated June 15th, 2011 of the Original Agreement for the purpose of adding an additional 9.75 square miles to the survey area. This addition will make the total survey area 39.75 square miles as shown below in the Exhibit A. The addition to the survey area will also move the carried well number to 1.6 wells.*

This Geophysical Exploration Agreement (the "Agreement") dated and effective as of December 1, 2010 (the "Effective Date"), is entered into by and between RAW Oil & Gas, Inc. ("RAW"), JDH RAW Energy, L.C., formerly known as RAW Energy, L.C. ("RAW LC"), Mark P. Hardwick ("Hardwick"), Steve Blaylock ("Blaylock"), Elger Exploration, Inc. ("Elger"), and Smith Energy Company ("Smith"). RAW LC, Hardwick, Blaylock, and Elger are at times referred to collectively as the "RAW Participants" and, together with Smith, the "Participants." The Participants, RAW and RAW LC, are at times referred to individually as a "Party" and collectively as the "Parties."

WHEREAS, RAW proposes to conduct or purchasing 3-D seismic survey covering approximately 39.75 square miles in Lynn and Dawson Counties, Texas, as depicted on Exhibit A attached hereto (such lands, as the area may be amended from time to time as provided herein, are referred to herein as the "Program Area"); and

WHEREAS, RAW intends to utilize such 3-D seismic data and existing geologic data to generate Prospects within the Program Area; and

WHEREAS, Participants desire to participate with RAW in the 3-D seismic survey and to participate in Prospects generated within the Program Area; and

WHEREAS, this Agreement is to establish the Parties' respective rights and obligations with regard to participation in the shooting, processing and interpretation of the 3-D seismic survey, the generation of Prospects, the acquisition of Leases within the Program Area, and the exploration, development, and production of oil and gas from Prospects generated using the 3-D seismic data.

NOW, THEREFORE, in consideration of the mutual covenants herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

### ARTICLE I

### Geophysical Program

**1.1 Scope and Supervision of Geophysical Program.** The Parties have agreed that a three-dimensional geophysical program (the "N On Point & O Donnell" or the "Geophysical Program") will be conducted across the Program Area. The scope and design of the Geophysical Program will be determined by RAW, subject to Smith's final written approval. RAW will conduct or supervise third Parties in conducting the Geophysical Program, including permitting, data acquisition, processing and interpretation of the Data Program (as defined below).

CJM 192243v.6

DEFENDANT'S
TRIAL EXHIBIT

1350

SEC 195503
CONFIDENTIAL

**1.2 Ownership and Confidentiality of Data.**

(a) All data resulting from the Geophysical Program ("Program Data") shall be owned by the Parties who pay for the costs of the Geophysical Program (the "Program Data Owners"), who will be represented in this Agreement by Smith Energy Company as their agent and nominee. Notwithstanding the provisions of Article V, Smith shall have the right to allow third parties to participate in Smith's rights and obligations under this Agreement so long as such parties ratify this Agreement and a copy of the ratification is furnished to RAW. All such ratifying Parties shall be referred to as the "Smith WI Participants." Upon ratification of this Agreement, the Smith WI Participants shall be entitled to and shall bear their proportionate share of Smith's rights and obligations under this Agreement, including rights as Program Data Owners proportionate to their cost bearing interest in the 3D Survey Costs.

Upon request, all Parties shall be entitled to receive a copy of the Program Data, including all tapes and reproducibles. Each Party shall have the right to use the Program Data in connection with exploration and development of the Program Area for the benefit of the Parties during the Term, as defined in Section 2.5 below, but no Party other than Smith shall have the right to sell, trade, license or exchange ("Transfer") the Program Data without the prior written consent of Smith. Upon an approved Transfer of any of the Program Data, all proceeds of such sale shall be payable to and delivered to the Program Data Owners. Upon expiration of the Term, all copies of the Program Data and (if requested in writing by Smith) all interpretations derived from the Program Data will be returned to Smith on behalf of the Program Data Owners.

(b) During the Term of this Agreement or so long as any Lease or Joint Operating Agreement within the Program Area is in force and effect, each of the Parties shall maintain the confidentiality of the Program Data; provided, however, that with prior written notice to Smith and RAW identifying the proposed recipient of the Data, each Party may furnish a copy of the relevant portion of the Program Data to (i) the Parties' lessors, to the extent required under applicable Leases and/or Permits covering lands in the Program Area, (ii) such Party's bona fide consultants, and (iii) to prospective third Party purchasers of an interest in a Prospect. Any consultant or prospective purchaser to whom access to any portion of the Program Data is provided shall enter into a confidentiality and non-competition agreement, which shall inure to the benefit of all of the Parties, pursuant to which such third Party shall agree to maintain the confidentiality of the Program Data and to use the Program Data solely for the purpose of rendering consulting services or evaluating the Prospect, as the case may be. The consultant shall immediately return the Program Data upon the completion of the work for which the consultant was engaged. The consultant shall not be permitted to retain any copies of the Program Data or any analysis or interpretations of the Program Data after completion of the work for which consultant was engaged. In connection with the disclosure of any portion of the Program Data to a potential third-Party purchaser or participant as permitted under this section, the Program Data shall at all times remain in the control of the Party disclosing the Program Data and no third party shall be allowed to copy, or to receive copies, of the Program Data including tapes and/or reproducibles. Such confidentiality and non-compete agreement shall also include an agreement and obligation that such consultant or prospective purchaser must offer to the Parties at actual cost any interest that may be acquired by such third party in lands covered by the disclosed data within a specified period, such period to be no less than 36 months after disclosure of the data.

**1.3 Costs of Geophysical Program.** Smith, along with the Smith WI Participants, will pay one hundred percent (100%) of all 3D Survey Costs associated with the conduct of the Geophysical Program (including any additional seismic conducted within the AMI and any purchased seismic data that has been authorized in writing by Smith) including, but not limited to, the costs associated with three dimensional ("3-D") seismic acquisition, seismic permitting and damages, processing, interpretation, reproduction and any other costs associated with the Geophysical Program.

RAW has estimated the 3D Survey Costs for the acquisition of new 3D seismic data to be $32,000 per square mile, which amount includes, but is not limited to (i) costs and expenses of acquiring all necessary geophysical permits from third parties, including landman and brokers' fees; (ii) costs of shooting the seismic survey, including surface damages payable to third Parties; and (iii) costs and expenses associated with processing Program Data derived from the geophysical operations on the Program Area and/or merging such Program Data with other 3-D Data and other geologic data (collectively, "3D Survey Costs"). Smith, on its own behalf and along with the Smith WI Participants as to their share, agrees to reimburse RAW for 100% of the 3D Survey Costs. An invoice for the actual 3D Survey Costs will be prepared and submitted by RAW to Smith with a copy to each Program Data Owner monthly according to COPAS standards as such costs are incurred. Smith, along with the Smith WI Participants, shall pay directly to RAW the amount billed within thirty (30) days after receipt.

2

SEC 195504
CONFIDENTIAL

Subject to the prior approval of Smith, RAW shall have the right to purchase existing 3D seismic data and the acquisition cost shall be included in the 3D Survey Costs to be paid by Smith and the Smith WI Participants. The lands imaged by any purchased 3D seismic data shall be considered as included in the Geophysical Program.

1.4   Acquisition of Seismic Permits: Amendment of Program Area.. RAW shall be responsible for acquiring sufficient seismic permits or other rights to conduct the Geophysical Program, and shall notify Participants when it has completed the acquisition of such permits and other rights. If RAW is unable to obtain seismic permits or other rights sufficient to grant it the right to conduct the Geophysical Program over sufficient acreage within the Program Area to properly image substantially all of the Program Area, RAW may, upon written notice to Smith, amend the Program Area to remove acreage as to which such seismic permits or other rights have not been obtained. Such notice shall include a description of the acreage to be removed, a reasonably detailed description of the efforts made to acquire the permits, RAW's reasons for removing the acreage, and a description of the anticipated impact of such removal on the survey and the generation of Prospects. With the prior written approval of Smith, RAW may substitute contiguous or nearby acreage for the acreage so removed. If RAW desires to substitute acreage, it shall notify Smith and all other Participants of the proposed substitution, including a description of the acreage to be removed, a description of the substitute acreage, and the reasons for such substitution. Smith shall have 10 days after receipt of such notice to approve or disapprove the substitution. Failure to respond within such 10 day period shall be deemed to be approval of the substitution.

1.5   Contributions of the Parties. All Parties will participate with RAW in accomplishing the Geophysical Program as may be requested from RAW from time to time. The primary responsibilities of RAW are as follows:

> (a) RAW shall be Operator of the project to be conducted pursuant to this Agreement. RAW shall coordinate all land and geological functions, conduct the Geophysical Program and operate all wells drilling or drilled on each Prospect Area.
>
> (b) RAW will provide or supervise the land work on the Program Area, including negotiating and obtaining seismic options, lease options and leases, and settling surface damages for conducting the Geophysical Program and for subsequent exploration and production operations.
>
> (c) RAW will promptly analyze and interpret the Program Data obtained from the Geophysical Program.
>
> (d) RAW will provide the geological subsurface expertise to integrate the Program Data with all available geologic and well data to evaluate the Program Area including analyzing well logs in the area, and providing geological mapping and interpretation.
>
> (e) RAW will provide to Participants copies of all maps and interpretations relating to the Geophysical Program and the Program Area currently available and as developed pursuant to this Agreement.

RAW will not charge a consulting fee but will charge an overhead fee of $7,500 per month while third-party crews are working in the field during the Geophysical Program conducted under this Agreement. RAW also will be entitled to the Operator's overhead under each Operating Agreement.

1.6   Reports: Meetings. RAW shall distribute a written report on the status of all activities within the Program Area to the Parties on at least a monthly basis. During the first year of the Term and thereafter upon request by Smith, the Parties shall meet quarterly (unless waived by Smith) at a mutually agreeable time, either in Smith's offices or by teleconference to review the Program's activities ("Quarterly Meeting"). At least five (5) days prior to each Quarterly Meeting, RAW shall furnish to Participant (i) a written agenda listing any Prospects to be presented at the meeting and listing other items of business to be discussed at the Quarterly Meeting, and (ii) a brief written report summarizing the status of the program's activities, including the status of seismic acquisition and processing, prospect generation, lease acquisition, drilling operations, and other matters to be discussed at the Quarterly Meeting.

1.7   Completion of the Geophysical Program. The Geophysical Program will be completed for purposes of this Agreement when final processed, migrated seismic sections have been delivered to Participants by the third-party seismic contractors preparing such data. RAW will use all commercially reasonable efforts to commence the field work relating to the Geophysical Program no later than February 15, 2011, to have the data acquisition portion of the Geophysical Program completed by May

3

CJM 192243v.6

SEC 195505
CONFIDENTIAL

15, 2011 and to have all Program Data analyzed with the initial Prospect proposed to the Parties no later than August 31, 2011.

## ARTICLE II

### Participation Terms and Area of Mutual Interest

**2.1 Interests of the Participants.**

(a) RAW will acquire permits, options and Leases in its name as nominee on behalf of all Parties. RAW will then assign to each Party its undivided interest in each Lease in accordance with the terms of this Agreement. Smith and the Smith WI Participants shall be entitled to receive a collective 75% of 8/8ths of all rights and interests acquired within the Program Area, burdened only by the royalty payable to the Lessor of each Lease and any other third-party burdens in existence as of the time the Lease was acquired by RAW, but without any other reduction or burden created by, through or under RAW or the RAW Participants. Immediately on payment of all 3D Seismic Costs, geological and land costs for which Smith is obligated to RAW in this Agreement, Smith and the Smith WI Participants shall be entitled to an assignment of their working interest, and related net revenue interest, in each of the Leases acquired.

(b) RAW LC hereby agrees to assign to each of the three other RAW Participants 6.25% of 8/8ths of RAW LC's rights and interests existing under the Leases and RAW LC will retain an undivided 6.25% of 8/8ths interest. When assignments of record title to the Leases are made by RAW, each of the RAW Participants shall receive an assignment of its proportionate undivided working interest and attributable net revenue interest in and to each Lease in which the Participants are entitled to receive an interest pursuant to this Participation Agreement and the Operating Agreement.

(c) Except as stated in Section 2.1(a) above, the interests assigned to each Participant pursuant to this Agreement are hereby expressly assigned subject to their proportionate part of all of the terms, covenants, reversionary interests and other production burdens referenced in the following:

(i)     each Lease;
(ii)    the Operating Agreement referenced in Article V below; and
(iii)   any other third-party burdens in existence as of the time the Lease was acquired by RAW.

CJM 192243v.6

SEC 195506
CONFIDENTIAL

## 2.2 Participation of the Parties in the Prospect Area and Subsequent Wells.

(a) As to each well on which RAW and the RAW Participants will receive a carried working interest pursuant to Section 2.2(c) below, RAW will submit an invoice to Smith for a $50,000 geological/geophysical prospect generation fee thirty (30) days prior to the proposed spud date for the applicable well. Smith (on its own behalf and along with the Smith WI Participants) will pay the fee on or before fifteen (15) days from the proposed spud date. If actual drilling operations have not commenced within 15 days after the proposed spud date for any well on which a fee has been paid by Smith, RAW shall, upon written request by Smith, immediately refund the entire fee to Smith for that well. When actual drilling operations do commence on that well, Smith, along with the Smith WI Participants, shall pay the $50,000 fee to RAW within 15 days after the spud date. The maximum number of wells on which Smith will be obligated to pay a prospect fee is one and 6/10th (1.6) regardless of the number of square miles actually imaged with 3D data pursuant to the Muy Caliente Program.

(b) It is understood and agreed that RAW, as Operator, will use its commercially reasonable efforts to commence operations for the drilling of the initial well on the first Prospect promptly after the relevant Leases have been acquired, but, in any event, no later than October 1, 2011 unless otherwise agreed by Smith. Enclosed herewith is RAW's Authorization For Expenditure ("AFE") which shows the current total estimated costs to drill, complete and equip a well to be drilled to a depth sufficient to test the Fusselman Formation of approximately 11,100 feet. RAW will submit an updated AFE for the initial well and each subsequent well in accordance with Section 3.1. In no event, without the written approval of Smith, shall a lapse of the AFE serve to extend the time within which Operator is required to commence operations for the drilling of a well.

(c) RAW and the RAW Participants shall be collectively entitled to an undivided 25% working interest carried to the casing point on the first one and 6/10th (1.6) wells drilled under this Agreement. The carried interest will apply to the first one and 6/10th (1.6) wells drilled anywhere on the Program Area (or in the On Point Program Area pursuant to Section 2.2(d) below) even if more than one well is drilled within a single Prospect Area. All subsequent wells drilled by the Parties anywhere in the Program Area will be on a heads-up basis with each participating Party paying its working interest share of the costs of subsequent wells or being subject to the relinquishment provisions of this Agreement or the non-consent provisions in accordance with the applicable Operating Agreement.

(d) The Parties acknowledge that they have entered into a Geophysical Exploration Agreement for the "On Point Program Area" located in Lynn and Terry Counties, Texas dated effective January 2, 2010 that relates to a proposed 3D Seismic Survey Program on approximately 45 square miles (the "On Point Agreement"). The Parties also acknowledge that they have entered into a Geophysical Exploration Agreement for the "Muy Caliente Program Area" located in Lynn, Terry, Hockley and Borden Counties, Texas dated effective January 15, 2010 that relates to a proposed 3D Seismic Survey Program on approximately 45 square miles (the "Muy Caliente Agreement").

(e) As to all wells drilled within the Program Area, the applicable Operating Agreement will provide that each well will be subject to a casing point election at which, if any Party elects not to participate in a completion, such Party will relinquish and assign to the participating Parties all of its or their leasehold interests in and to the well and the area specified in the Operating Agreement, as defined for each well prior to commencement of drilling on that Prospect.

In the event that any Party elects not to participate in a completion attempt, the non-consenting Party will be subject to the provisions in the governing Operating Agreement.

CJM 192243v.6

SEC 195507
CONFIDENTIAL

(f) No Party shall have the right to reinstatement of an interest in a well or acreage relinquished in accordance with this Section 2.2 or in accordance with the applicable Operating Agreement, whether by payment of a cash penalty, production penalty, or otherwise.

(g) In the event of a "Default" by any Party, as defined and described in Article VII of the Operating Agreement, the other Parties shall have the right to exercise any and all remedies available to the non-defaulting Parties specified in Article VII of the Operating Agreement, which provisions are incorporated herein by reference.

2.3 **Payment for and Ownership of Oil and Gas Interests.** Until the first one and $6/10^{th}$ (1.6) wells have been drilled to test the Fusselman Formation pursuant to this Agreement, Smith, along with the Smith WI Participants, shall pay all of the costs of acquiring Oil and Gas Interests (including any lease options or the exercise of any lease option) in the Program Area on the Prospect or Prospects approved by Smith. While Smith is paying 100% of the lease or option costs, no lease or option shall be purchased by any Party without the prior approval of Smith. After the first one and $6/10^{th}$ (1.6) wells have been drilled, the costs of acquiring any additional Oil and Gas Interests (including bonuses, delay rentals, lease extensions or shut in payments relating to leases) in the Program Area thereafter shall be borne by the Parties who own an interest in the applicable Prospect Area in the proportions set forth on **Exhibit B,** Column D, attached hereto. If a Party does not pay its share of Lease obligations and costs when due, that Party will relinquish all of its interest in that Lease or Oil and Gas Interest.

All Oil and Gas Interests shall be owned by the Parties in the percentage interests set forth on **Exhibit B,** Column D, except as such undivided interests may be modified by the operation of Sections 2.4, 2.5, and 3.4 hereof or by non-payment of Lease cost obligations.

2.4 **Delay Rentals and Shut-In Royalties.** At any time any delay rentals, shut-in royalties, Lease extension payments or other sums ("Rentals") necessary to perpetuate any Oil and Gas Interests becomes due and owing (whether or not prior to one and $6/10^{th}$ (1.6) wells having been drilled), RAW shall pay such Rentals and invoice all other Parties for their proportionate share thereof. Each Party agrees to pay its proportionate share (as determined by Exhibit B, Column D, or the Party's participation percentage in that Prospect, if different) of such Rentals within fifteen (15) days of receipt of an invoice therefore. RAW shall have no liability to the other Parties hereto for failure to pay such Rentals when due provided RAW has acted in good faith.

2.5 **Area of Mutual Interest and Term.** The Parties have agreed to and do hereby establish an Area of Mutual Interest ("AMI") which shall encompass all lands located within the Program Area as depicted on the plat attached hereto as **Exhibit A** together with all lands located within one-half mile of the exterior boundaries of the Program Area. The AMI shall remain in force for a period of ten (10) years from the date hereof, unless sooner terminated by the Parties (the "Term"). Upon expiration of the 10-year Term, this Agreement shall terminate; provided that the obligation to return the Data and other information (if requested) under Section 1.2(a) shall survive termination of this Agreement. Should any Party own on the date hereof, or acquire at any time during the Term, an interest in (i) a lease covering lands, any part of which are located within the AMI or (ii) an option or a farm-in covering lands any part of which are within the AMI (an interest so owned or acquired insofar and only insofar as it covers lands within the AMI being herein called an "Acquired Interest"), such Party (the "Acquiring Party") shall promptly notify the other Parties, in writing, of such acquisition, the consideration paid or to be paid for the Acquired Interest, any other obligations (including, without limitation, drilling obligations) undertaken or to be undertaken as a part of such acquisition and any other terms of such acquisition. Each of the Parties shall, within thirty (30) days after the receipt of such notice, notify the Acquiring Party in writing, whether or not it wishes to participate in such acquisition; provided that failure of a Party to respond within the time and in the manner set forth above shall be deemed an election <u>not</u> to participate in such acquisition.

2.6 **Effect of Election to Participate.** Should a Party elect to participate in an acquisition of an Acquired Interest, such Party shall be assigned its proportionate part (being the percentage specified for such Party in the table set forth in **Exhibit B**) of the Acquired Interest by the Acquiring Party, and shall upon receipt of such assignment, pay, or to the extent not yet due, agree to pay when due) its part of the direct costs incurred by the Acquiring Party in making such acquisition and agrees to assume its proportionate part of any other obligations which are undertaken as part of such acquisition. If the costs or obligations relate to the lands outside the AMI as well as to lands inside the AMI, such costs and/or obligations shall be allocated between such areas on an acreage basis. Lease acquisition costs shall be paid in accordance with Section 2.3 above. If less than all of the Parties elect to participate in such acquisition, the proportionate parts for the Parties electing to participate shall, unless the Parties agreeing to participate agree otherwise, be the percentage determined by dividing, for each participating Party, the proportionate part otherwise applicable (if all Parties had participated) to such participating Party by the

6

CJM 192243v.6

SEC 195508
CONFIDENTIAL

total proportionate parts for all participating Parties, provided, however, that in no event shall a Party electing to participate be required to participate for a percentage greater than that set forth for such Party on Exhibit B hereto.

2.7 **Exercise of Options.** Should any Party propose to exercise an option to lease with respect to some or all of the lands covered thereby, it shall notify the other Parties in the same manner provided for in Section 2.5 above with respect to acquisitions of Acquired Interests and each such other Party shall elect to participate or to not participate in the exercise of such Option in the same manner as provided in Section 2.5. The effective elections to participate in such an exercise of an Option and the payment of costs and the ownership of interests in the lease acquired pursuant to such exercise, shall be handled in the same manner provided in Sections 2.3 and 2.4.

## ARTICLE III

### Prospect Designation and Participation

3.1 **Prospect Designation.** Upon completion of the interpretation of the Program Data, RAW will delineate proposed Prospects for exploration and development within the Program Area and distribute to each Party a list and description of each proposed Prospect. The Parties will then meet and RAW will make a presentation on each Prospect, including (i) the proposed location for the initial well on the Prospect (and the date by which drilling of such initial well is anticipated to be commenced and an AFE covering the estimated costs of drilling and completing such initial well), and (ii) the acreage which RAW would include in the Prospect Area. The acreage proposed to be included in a Prospect shall not include any acreage included in any other Prospect Area. The Parties will attempt to agree on the Prospect and the Prospect Area to be included in each Prospect in accordance with Sections 3.2 and 3.3. Notwithstanding the above, in the event the Parties do not reach agreement as to the Prospect Area for any Prospect within 60 days after the initial Prospect proposal, Smith shall have the right to make the final decision as to the delineation of the Prospect and the Prospect Area. The Parties shall document their participation percentages in writing in Exhibit A to the Operating Agreement for that Prospect Area and from that point forward each Prospect Area shall be governed by a separate Operating Agreement in the form of Exhibit C in accordance with Article IV. The Parties acknowledge that they may acquire Leases or participation rights by farm-in or otherwise as to lands that are subject to an existing third-party operating agreement. In that event, the Parties will take the actions necessary to harmonize the operating agreements to the extent reasonably practical, but the Operating Agreement contemplated by this Agreement will govern as between the Parties in the event of conflict.

"Prospect" shall mean the area included in a geologic structural or stratigraphic trap or enclosure which based on available data is reasonably believed to have the potential for accumulations of hydrocarbons in commercial quantities. "Prospect Area" means all lands within a contiguous geographical area (not including lands within the Prospect Area for another Prospect previously designated pursuant to the terms of this Agreement) which are believed by the proposing Party to contain all of the Prospect; it being understood that a Prospect Area shall include all depths within the contiguous geographical area so identified.

3.2 **Proposals by Parties for Prospects.** After the meeting described in Section 3.1 above (or, if such meeting does not occur within thirty (30) days of the completion of the interpretation of the Program Data, then at any time more than 45 days after the completion of the interpretation of the Program Data by RAW) any Party may propose that a portion of the Program Area be designated as a Prospect by giving written notice to the other Parties containing the same information described in Section 3.1. The Prospect and Prospect Area will be determined in the same manner specified in Section 3.1.

3.3 **Response to a Prospect Proposal.** Each Party desiring to participate in a Prospect proposed under Section 3.1 or Section 3.2 shall notify RAW, in writing, within thirty (30) days after receipt of such proposal of its election regarding participation in the proposed Prospect and stating whether or not such Party agrees with the acreage being proposed for inclusion in the Prospect by the proposing Parties. An election to participate in a Prospect which contains no statement as to whether the Party agrees with the acreage proposed for inclusion in the Prospect Area shall be deemed agreement to the acreage proposed for inclusion in the Prospect Area. A Party who elects not to participate in the Prospect and who disagrees with the acreage proposed to be included in the Prospect Area shall give notice of such disagreement to all Parties within the time and in the manner provided above for elections to participate. A Party failing to respond, within the time and in the manner provided above, to a proposal for a Prospect, or a Party responding and electing to not participate in a Prospect but making no statement as to whether it agrees with the acreage proposed to be included in the Prospect will be deemed to have elected not to participate in the Prospect and to have agreed to the acreage proposed to be included in the

7

SEC 195509
CONFIDENTIAL

Prospect Area. If no other Party elects to join the proposing Party in creating a Prospect, then the proposing Party may develop the Prospect Area for such Prospect for its own account at its own expense and the terms of this Agreement (other than the terms relating to restrictions and ownership of the Program Data which shall apply) shall not apply to the Prospect Area for that Prospect.

3.4 **Relinquishment of Interests by Non-Participating Parties.** If a Party agrees, or elects (or is deemed to have elected) not to participate in a particular Prospect Area, then such Party shall relinquish all right, title and interest in such Prospect Area without any right of reimbursement for costs incurred up to the relinquishment date (including, without limitation, rights under leases, options or farm-ins insofar as they cover the Prospect Area, overriding royalty interests, carried interests and backin interests) to the Parties electing to participate in such Prospect Area in proportion to the percentages in which such participating Parties participate in such Prospect Area. If the initial well is not commenced on such prospect within 180 days after the date the Prospect Area is finalized, a new Prospect proposal shall be required and the non-participating Parties shall once again have the right to participate in that Prospect in accordance with the procedures in this Agreement.

## ARTICLE IV

### Operations

4.1 **Drilling Operations.** All operations on each Prospect Area, commencing with the establishment of such Prospect Area, shall be governed by a separate operating agreement ("Operating Agreement") in the form attached hereto as Exhibit C (with appropriate insertions and exhibits reflecting the agreements hereunder on the Prospect Area, participation percentages and initial well), and this Agreement shall no longer have any application to such Prospect Area, except with respect to the ownership of Program Data as provided for in Section 1.2 above and except for matters provided for in this Article IV.

4.2 **Operator.** It is agreed and understood that RAW shall be designated as Operator in the Operating Agreement executed for each Prospect Area in which it participates. As to any Prospect Area in which RAW has elected not to participate, Smith shall designate an operator of said Prospect Area.

4.3 **AMI for Prospect Area.** Commencing with the establishment of a Prospect Area, such Prospect Area shall from that time forward no longer be subject to the AMI provided for in Article II and shall thereafter be considered covered instead by a new Prospect Area specific AMI. The new AMI shall (i) be binding on all Parties (whether or not they participated, or had rights to participate in such Prospect Area), (ii) consist of such Prospect Area, (iii) remain in effect until the later to occur of the Term of this Agreement or the date the Operating Agreement for such Prospect Area terminates, and (iv) be governed by the same terms set forth in Sections 2.3 and 2.4 except that the term proportion or proportionate part (as such term is used in Section 2.3 or 2.4) shall mean the percentages in which the Parties participate in such Prospect Area. Any portion of the Program Area not included in a designated Prospect Area shall continue to be subject to the AMI provided for in Article II.

4.4 **Limitation on Number of AFE's.** The Parties agree that during the first 12 months of the Term no more than three (3) active well proposals and AFE's shall be outstanding at any one time under this Agreement and the On Point Agreement, on a combined basis.

4.5 **Exercise of Options in Prospect Area.** With respect to each Prospect Area, an option to acquire oil and gas interests to the extent it covers such Prospect Area, may be exercised by any Party owning an interest therein insofar as such option covers land within a Prospect Area. The leases acquired by such exercise shall be owned and, subject to Section 2.2 above, paid for by the Parties participating in such Prospect Area in the proportions in which they participated in that Prospect Area. It is recognized that some options may limit the number of times they may be exercised, and, in such event, several Prospect Areas may have to be combined in a single exercise of such an Option (and such exercise may have to be deferred until such a consolidated exercise is practical).

## ARTICLE V

### Restrictions on Transfers and Right of First Refusal

5.1 **General Restriction on Transfer.** Except as otherwise provided in Section 1.2 with respect to Smith, no Party, either directly or through an Affiliate, may transfer or acquire any lease, royalty, overriding royalty or other interest of any type in the mineral estate or any petroleum exploration or seismic license (individually and collectively an "**Interest**"), or participate in the acquisition of any Interest from a third party holding any Interest, which Interest is located partially or entirely within the Program Area, other than in accordance with the provisions of this Agreement and the applicable Operating Agreement,

8

CJM 192243v.6

SEC 195510
CONFIDENTIAL

if any.

**5.2 Preferential Right to Purchase.** As long as Smith Energy owns an Interest in the Program Area or in a Contract Area under an Operating Agreement, the Parties hereby grant to each other a preferential right to purchase all or any part of a Party's Interest in this Agreement or in the lands subject to the applicable Operating Agreement which is to be Transferred to any third party other than a Permitted Assignee, all as defined below. This preferential right to purchase under this Agreement shall no longer apply to any Party after Smith has transferred all of its rights under this Agreement and shall no longer apply as to a Contract Area governed by an Operating Agreement after Smith has transferred or relinquished all of its rights to the lands in the Contract Area governed by that Operating Agreement.

(a) If any Party desires to Transfer, as defined below, its Interests, or any portion, in this Agreement or the AMI (a "Transferor Party(ies)"), Transferor Party(ies) must first provide written notice of such intent to the other Parties. If the proposed Transfer is to a Permitted Assignee, the non-transferring Parties shall not have a Right of First Refusal as to that Transfer. If the proposed Transfer is to a person other than a Permitted Assignee, as defined below, the non-transferring Parties shall then have the right ("Right of First Refusal"), but not the obligation, to purchase their proportionate share of the offered portion of the Interests pursuant to this paragraph. The non-Transferor Parties shall have thirty (30) days from receipt of such notice within which to determine whether it or they elect to purchase the offered Interests. If the proposed Transfer is to a Permitted Assignee, the non-Transferor will not have a Right of First Refusal but the Permitted Assignee must ratify this Agreement and the applicable Operating Agreement and the Transferor shall be jointly and severally liable for all liabilities and obligations of the Permitted Assignee under this Agreement and the Operating Agreement. "Transfer" means any sale, lease, conveyance, gift, transfer, exchange, assignment, disposition by will or inheritance or other disposition of (or any agreement or arrangement to sell, lease, convey, gift, transfer, exchange, assign, or otherwise dispose of) all or any portion of the Transferor Parties' Interests in any manner, directly or indirectly, whether for money, other consideration or otherwise. "Permitted Assignee" means: (w) a spouse, descendants or relative of the Transferor Party; (x) the spouse, descendants or relative of the controlling person of a Transferor Party or the spouse, descendants or relative of a manager of a Transferor Party; (y) a legal entity including but not limited to any Trust, partnership, or company controlled by the Transferor Party or by the spouse, descendants or relatives of the Transferor Party; and (z) any employee, consultant or person under contract to a Transferor Party (or any Trust, entity or partnership owned by such person).

(b) If the Transfer contemplated by section 5.2(a) above results from a bona fide offer to purchase from a third party, exercise of the non-Transferor Parties' Right of First Refusal shall be based on the same terms and conditions as the third party offer. If the Transfer contemplated by section 5.2(a) above is not the result of a bona fide third party offer, the non-Transferor and the Transferor Parties shall attempt to agree upon a purchase price for the Transferred Interests. In the event the Parties fail to agree upon a purchase price for the Transferred Interests within ten (10) days after exercise by the non-Transferor Parties of their Right of First Refusal, then the Transferor Party shall not be allowed to Transfer the Transferred Interest to the third party and the Non-Transferor Party shall not be entitled to purchase the Transferred Interest. If a bona fide offer to purchase is subsequently received or a price is established for the Transferred Interest, the provisions of this Section 5.2(b) shall be followed as to the new offer or price. The provisions of Article V shall apply to any future Transfer by the Transferor Party and to any successor to the Transferor Party.

**5.3 Financing.** Any Party shall have the right to arrange its own financing for any wells or other projects to be conducted on one or more Prospect Areas without any obligation to provide, or assist the other in obtaining, similar financing. No Party shall encumber the rights and interests of any other Party in a Prospect Area. A Party shall have the right to pledge, mortgage or encumber all or any part of its Interest in one or more Prospect Areas without triggering a Right of First Refusal under Article V; provided that any pledge, mortgage or encumbrance will be subject to the following restrictions and conditions:

(a) the lender or secured party shall acknowledge in writing that the interest pledged is subject to this Agreement and the Operating Agreement;

(b) the document creating the pledge or encumbrance must expressly state that upon foreclosure on the pledged interest, the lender or secured party will receive the pledged interest subject to this Agreement and the Operating Agreement; and

9

CJM 192243v.6

SEC 195511
CONFIDENTIAL

(c) prior to any subsequent Transfer of the interest by the lender or secured party, the lender or secured party must comply with the procedures set forth in Section 5.2(b) and the other Parties shall have the Right of First Refusal set forth in Section 5.2(b).

**5.4 Tag Along Rights.** In the event Smith intends to sell all of its rights under this Agreement to a third party, Smith shall provide written notice to the other Parties of the intended sale. When the intended sale terms are established, Smith shall outline the intended terms to all Parties. Each Party will have the right and option for fifteen (15) days after receipt of the intended sale terms to elect to sell its interest along with the interest of Smith so long as the purchaser of Smith's interest agrees to purchase the additional Party's(ies') interest(s). Smith shall have the sole authority to negotiate the terms of the sale and the other Parties will have the election to sell or not to sell on the same terms as negotiated by Smith. The tag along rights granted in this Section shall not apply to a sale by Smith of all its interest in a Contract Area governed by an Operating Agreement.

## ARTICLE VI

### Miscellaneous

**6.1 Elections.** Each Party to this Agreement has the right to make separate and independent elections regarding all aspects of the Agreement, including but not limited to Acquired Interests and well participation.

**6.2 Notices.** All notices and other communications required or permitted under this Agreement shall be in writing and unless otherwise specifically provided, shall be delivered personally, or by mail, telecopy or delivery service to the addresses set forth below the signatures of the Parties and shall be considered delivered upon the date of receipt. Each Party may specify as its proper address, any other post office address within the continental limits of the United States by giving notice to the other Parties, in the manner provided in this section, at least ten (10) days prior to the effective date of such change of address.

**6.3 No Partnership.** The liabilities of the Parties hereunder shall be several, not joint or collective. Each Party shall be liable only for its cost bearing share of all liabilities and obligations arising under this Agreement as set forth on **Exhibit B** hereto AND EACH Party's share of the liabilities and obligations arising under any applicable Operating Agreement as set forth on the Exhibit A to the applicable Operating Agreement. It is not the intention of the Parties to create, nor shall this Agreement be deemed as creating a mining or other partnership or association or to render the Parties liable as partners.

**6.4 Internal Revenue Code Election.** The provisions of Article IX of the form of Operating Agreement attached hereto shall constitute the agreement between the Parties regarding applicable provisions of the Internal Revenue Code.

**6.5 Enforcement.** Should any Party hereto be forced to resort to legal action to enforce the provisions hereof, the prevailing Party shall be entitled to reasonable attorneys' fees and all court costs incurred in such legal action. The Parties agree that the exclusive venue for all disputes arising under this Agreement shall be in Harris County, Texas.

**6.6 Title.** No Party warrants title to interests it is contributing to the Program Area except by, through and under itself, and not otherwise. Each Party agrees to furnish to the other Parties any title data in its possession or available to it.

**6.7 Multiple Counterparts.** This Agreement may be executed in any number of counterparts, none of which needs to be executed by all Parties, and shall be binding upon each Party executing such a counterpart as if all Parties had executed the same instrument.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

10

CJM 192243v.6

SEC 195512
CONFIDENTIAL

EXECUTED to be effective as of the Effective Date,
As Amended as of June 15th, 2011

RAW OIL & GAS, INC.

By: _____
Name: _____
Title: _____

JDH RAW ENERGY, L.C.

By: _____
Name: _____
Title: _____

_____
MARK P. HARDWICK

_____
STEVE BLAYLOCK

ELGER EXPLORATION, INC.

By: _____
Name: _____
Title: _____

SMITH ENERGY COMPANY

By: _____
Lester H. Smith, President

11

SEC 195513
CONFIDENTIAL

EXECUTED to be effective as of the Effective Date,
As Amended as of June 15th, 2011

RAW OIL & GAS, INC.

By: _____
Name: _____
Title: _____

JDH RAW ENERGY, L.C.

By: _____
Name: _____
Title: _____

_____
MARK P. HARDWICK

_____
STEVE BLAYLOCK

ELGER EXPLORATION, INC.

By: _____
Name: _____
Title: _____

SMITH ENERGY COMPANY

By: _____
        Lester H. Smith, President

11

CJM 192243v.6

SEC 195514
CONFIDENTIAL

Outline and Description of the N. On Point Extension & O'Donnell Program Area
*As Amended on June 15th, 2011*

*(The following lands are in the N. On Point Extension Area)*

**The following lands are in Lynn County:**

Section 230, EL & RR Ry. Co. Survey (640.0 ac.)

Section 229, EL & RR Ry. Co. Survey (640.0 ac.)

E/2 of Section 234, Blk. 1, L & SV Ry. Co. Survey (320.0 ac.)

Section 233, Blk. 1, L & SV Ry. Co. Survey (640.0 ac.)

Section 227, Blk. 1, L & SV Ry. Co. Survey (640.0 ac.)

Section 228, Blk. 1, L & SV Ry. Co. Survey (640.0 ac.)

Section 225, EL & RR Ry. Co. Survey (640.0 ac.)

Section 226, EL & RR Ry. Co. Survey (640.0 ac.)

Section 4, EL & RR Ry. Co. Survey (640.0 ac.)

Section 318, Blk. 3, BS & F Ry. Co. Survey (640.0 ac.)

Section 319, B. S. & F. Ry. Co. Survey (647.5 acres)

Section 320, A-525, B. S. & F. Ry. Co. Survey (640 acres)

E/2 of Sec. 44, Blk. E, A-726 & A-1158, E. L. & R. R. Ry. Co. Survey (320 acres)

Section 15, A-322, T. T. R. R. Co. Survey (640 acres)

NE/4 Section 16, A-689 & A-1080 & A-1081, T. T. R. R. Co. Survey (160 acres)

Section 2, Blk. C-42, A-1062 & A-858 & A-1542, PSL Survey (640 acres)

Section 1, Blk. C-42, A-1541 & A-1044, PSL Survey (640 acres)

Section 232, A-960, E. L. & R. R. Ry. Co. Survey (640 acres)

Section 231, A-138, E. L. & R. R. Ry. Co. Survey (640 acres)

Section 322, A-558, B. S. & F. Ry. Co. Survey (640 acres)

Section 14, A-1137 & A-806, H. E. & W. T. Ry. Co. Survey (640 acres)

CJM 192243v.6

SEC 195515
CONFIDENTIAL

*(The following lands are in the O'Donnell Area)*

**The following lands are in the Dawson & Lynn Counties:**

Section 65, Blk. 8, El & RR Ry. Co. Survey (640.0 ac.)

Section 66, Blk. 8, El & RR Ry. Co. Survey (640.0 ac.)

E/240 ac. Section 68, Blk. 8, El & RR Ry. Co. Survey (240.0 ac.)

Section 67, Blk. 8, El & RR Ry. Co. Survey (640.0 ac.)

**The following lands are in the Lynn County:**

Section 54, Blk. 8, El & RR Ry. Co. Survey (640.0 ac.)

Section 55, Blk. 8, El & RR Ry. Co. Survey (640.0 ac.)

Section 53, Blk. 8, El & RR Ry. Co. Survey (640.0 ac.)

E/2 of Section 52, Blk. 8, El & RR Ry. Co. Survey (320.0 ac.)

Section 35, Blk. 8, El & RR Ry. Co. Survey (640.0 ac.)

Section 34, Blk. 8, El & RR Ry. Co. Survey (640.0 ac.)

Section 41, Blk. 8, El & RR Ry. Co. Survey (640.0 ac.)

Section 42, Blk. 8, El & RR Ry. Co. Survey (640.0 ac.)

Section 40, Blk. 8, El & RR Ry. Co. Survey (640.0 ac.)

Section 46, Blk. 8, El & RR Ry. Co. Survey (640.0 ac.)

Section 48, Blk. 8, El & RR Ry. Co. Survey (640.0 ac.)

Section 47, Blk. 8, El & RR Ry. Co. Survey (640.0 ac.)

Section 36, Blk. 8, El & RR Ry. Co. Survey (640.0 ac.)

E/2 of Section 37, Blk. 8, El & RR Ry. Co. Survey (320.0 ac.)


**The following lands are located in Dawson County, Texas:**

Section 38, Blk. C-41, PSL Survey (640 ac.)

Section 39, Blk. C-41, PSL Survey (640 ac.)

Section 40, Blk. C-41, PSL Survey (640 ac.)

Section 17, Blk. 33, TWP 7-N, HE & WT Ry. Co. Survey (640 ac.)

13

CJM 192243v.6

SEC 195516
CONFIDENTIAL

EXHIBIT B

Attached to Geophysical Exploration Agreement
Dated December 1, 2010, as Amended June 15th, 2011,
Among
RAW, RAW LC, Hardwick, Blaylock, Elger and Smith

Oil and Gas Interests Schedule

| A.<br>Party | B.<br>Geophysical Program Costs Share | C.<br>Oil and Gas Interest<br>Acquisition Cost<br>Share Until<br>First 1.2 Wells Drilled | D.<br>Working Interest After<br>Casing Point on First<br>1.2 Wells and In All<br>Subsequent Operations |
|---|---|---|---|
| Smith Energy Company | 100% | 100%* | 75.00% |
| RAW Oil & Gas, Inc. | | | 0 |
| JDH RAW Energy, L.C. | | | 6.25% |
| Mark P. Hardwick | | | 6.25% |
| Steve Blaylock | | | 6.25% |
| Elger Exploration, Inc. | | | 6.25% |
| | | | 100.00% |

*Until first one and 6/10th (1.6) wells have been drilled to casing point

14

CJM 192243v.6

SEC 195517
CONFIDENTIAL

# TAB J

# Bad Billy Agreement (Amended) (PX 85)

**Mark P. Hardwick**
*Oil & Gas Properties*

P. O. Box 213
Midland, TX 79702-0213

E-mail: mark@mphardwick.com

(432) 683-3322
Fax (432) 683-3325

December 17, 2010

Smith Energy Company
P.O. Box 52890
Houston, TX 77052
Attn: Mr. Lester Smith

Mr. Paul A. Hardwick
1025 Martin
Houston, TX 77018

RE: Terry, Yoakum, Hockley, Lubbock & Lynn Counties Lease Acquisition Program-Bad Billy Project Area

Dear Mr. Smith and Mr. Hardwick:

The purpose of this Letter Agreement is to change and replace the Letter Agreement dated November 1, 2010 between Mark P. Hardwick and Smith Energy Company.

This letter, when accepted by each of you, will be our agreement ("Agreement") concerning the acquisition of oil and gas leases in Terry, Yoakum, Hockley, Lubbock & Lynn Counties, Texas, within the area known as the "Bad Billy Area" by Smith Energy Company ("Smith") for a period commencing the date of this letter, and ending three (3) years from such date (the "Agreement Term"). The Bad Billy Area is depicted on the Exhibit "A" attached to this Agreement, being a Plat of portions of Terry, Yoakum, Hockley, Lubbock & Lynn Counties, Texas, with the outline of the Bad Billy Area being enclosed in the outlined and *shaded area* and marked "AM1 Outline". The area in *yellow* on the Exhibit "A" is subject to previous Agreements (N. Mound Lake, Muy Caliente, On Point & N. On Point Extention/O'Donnell/S. Fasken) and excluded from this Letter Agreement.

Smith is desirous of acquiring oil and gas leases within the Bad Billy Area, and has agreed that as consideration for the geologic lead, is willing to compensate Paul A. Hardwick ("Paul") by the assignment of an overriding royalty interest in any such acquired leases, and, in consideration of Mark P. Hardwick ("Mark") overseeing the acquisition of leases, is willing to assign to Mark an overriding royalty interest in all leases acquired within the Bad Billy Area in accordance with, and subject to the terms and provisions herein.

During the Agreement Term, Mark will engage lease brokers, and other necessary field title research and land support persons, and attempt to acquire oil and gas leases within the Bad Billy Area, all such leases being owned by Smith, and with Smith paying the bonus consideration therefore, and Smith shall pay all expenses incurred by Mark in connection with such lease acquisition, plus a day-work brokerage fee, all such expenses and fees to be paid and reimbursed to Mark as incurred, but in any event within thirty (30) days of the date such expenses, or fees are incurred.



**PLAINTIFF'S EXHIBIT**
**85**

Hardwick 000214

For any leases acquired by Smith in the Bad Billy Area within the Agreement Term, Mark and Paul shall be entitled to an assignment of an overriding royalty interest equal to one percent (1%) of eight-eighths (8/8) for Mark, and one and one-half percent (1.5%) of eight-eighths (8/8) for Paul, proportionately reduced, and further reduced to the extent such overrides would cause the combined lease royalty and the overriding royalty interest burdens to exceed twenty-seven and a half percent (27.5%).

Leases will be acquired in the broker's names, on economic terms and parameters as approved by Smith and the brokers shall, upon recording and payment for each such oil and gas lease, deliver to Mark and Paul an assignment of overriding interest in the form as attached to this Agreement as Exhibit "B". Simultaneously, the Brokers will be instructed to deliver to Smith an assignment of each such oil and gas lease on the form attached to this Agreement as Exhibit "C".

If this letter correctly sets forth the terms of our agreement concerning the subject matter thereof, please so indicate by executing one (1) original of this letter and returning it to the undersigned at your earliest convenience.

Yours very truly,

By: _____
Mark P. Hardwick

AGREED TO AND ACCEPTED THIS
_____ DAY OF ~~DECEMBER, 2010~~ January, 2011

SMITH ENERGY COMPANY

By: _____
Name: Lester Smith
Title: Chairman

AGREED TO AND ACCEPTED THIS
__7__ DAY OF ~~DECEMBER, 2010~~ Jan 2011
By: _____
PAUL A. HARDWICK



Exhibit A

AMI Outline

AMI Outline

Hockley Co.

Lubbock Co.

Yoakum Co.

Terry Co.

Lynn Co.

Muy Caliente/On Point/ Mound Lake/ N. On Point Extension/O'Donnald/ South Faskin-Excluded Area





## ASSIGNMENT OF OVERRIDING ROYALTY INTEREST

This Assignment of Overriding Royalty Interest (this "Assignment"), dated as of _____ 2010, is made by [Broker], whose address is ____  _____  _____  ____ ("Assignor") to Mark P. Hardwick, whose address is P.O. Box 213, Midland, Texas, 79702 and Paul A. Hardwick, whose address is 1025 Martin, Houston, Texas, 77018, (collectively herein "Assignee").

For and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby **GRANT, BARGAIN, SELL, CONVEY, ASSIGN, TRANSFER, SET OVER AND DELIVER** unto Assignee, an overriding royalty interest ("ORI") in and to the leases as described on Exhibit "A" hereto, reference to which is here made for all purposes ("Leases"), insofar as the Leases cover the lands described therein (the "Lands") equal to two and one-half percent (2.5%), of eight-eighths (8/8) of all oil, gas and other minerals produced and saved from the Lands, free of the costs of drilling and producing the same, to Assignee, as follows:

| | |
|---|---|
| Mark P. Hardwick | 40% |
| Paul A. Hardwick | 60% |

The ORI shall bear its proportionate part of all ad valorem, or other property value taxes, and its proportionate part of any production and severance taxes, but shall otherwise be cost free. In the event that any of the Leases cover less than the full, undivided interest in the oil, gas and other mineral estate in any portion of the Lands, the ORI pursuant to such of the Leases shall be proportionately reduced. Further, to the extent that the ORI is, when taken in consideration with the percentage lease royalty obligation as to any Lease, in excess of twenty-seven and a half percent (27.5%), such ORI, as to such Lease, shall be reduced such that the total lease royalty and ORI equal twenty-seven and a half percent (27.5%). Any such proportionate reduction in the ORI, or reduction in the quantum of ORI provided for herein, shall be borne in the proportion that each Assignee is assigned the ORI herein. The resulting percentage ORI created by this Assignment as to each of the Leases, shall extend to, and burden any amendment of such Leases, as well as any renewal lease or extension thereof. Any new lease acquired by Assignee, or any affiliated entity thereof, within one (1) year of the expiration of any of the Leases, covering the same ownership interest as any of the Leases, shall be deemed a "renewal lease", as that term is used herein. The ORI assigned as to any of the Leases may be pooled in accordance with, and on the same basis as provided for in such Leases, without the necessity for written consent by Assignee.

This Assignment is made subject to the following matters:

(1)     The terms, provisions and conditions of the Leases; and

(2)     All matters affecting title to the Leases and Lands as reflected of record in the official public records of the County where the Lands are situated.

Assignee hereby assumes and shall be responsible for and comply with all duties and obligations, express or implied, arising with respect to the Leases.

This Assignment shall bind and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

Assignor warrants title to each Lease, by, through and under Assignor, but not otherwise.

IN WITNESS WHEREOF, the undersigned has executed this instrument on the date of the acknowledgment annexed hereto.

Assignor
[Broker]

By:_____
Name:_____
Title:_____

## ACKNOWLEDGMENT

STATE OF TEXAS          )
                        )     $
COUNTY OF _____  )

This instrument was acknowledged before me on this ___ day of _____, 2010. by _____, as Broker, a _____  _____ on behalf of said _____  _____.

My Commission Expires:___  _____          Notary Public
Commission Number:_____  _____

## ASSIGNMENT OF OIL AND GAS LEASES

This Assignment of Oil and Gas Leases (this "Assignment"), dated as of _____ 2010, is made by [Broker], whose address is _____ _____. _____ ("Assignor") to Smith Energy Company, whose address is P.O. Box 52890, Houston, Texas, 77052 ("Assignee").

For and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby **GRANT, BARGAIN, SELL, CONVEY, ASSIGN, TRANSFER, SET OVER AND DELIVER** unto Assignee, subject to the terms hereof, all of Assignor's right, title and interest in and to the following (the "Leases"):

All of the Leases described in Exhibit "A" attached hereto and made a part hereof, as to all of the lands covered thereby (the "Lands").

It is the intent of Assignor to convey and this Assignment hereby conveys to Assignee, subject to the conditions herein contained, all of Assignor's right, title, and interest, in and to the Leases, as to the Lands, regardless of any errors in description, any incorrect or misspelled names or any transcribed or incorrect recording references. Assignor agrees to execute such further assurances as may be necessary to effect such intent.

This Assignment is made subject to the following matters:

(1)     The terms, provisions and conditions of the Leases;

(2)     All matters affecting title to the Leases and Lands as reflected of record in the official public records of the County where the Lands are situated; and

(3)     That certain Assignment of Overriding Royalty Interest dated _____, by Assignor, in favor of Mark P. Hardwick and Paul A. Hardwick, covering the Leases and Lands.

Assignee hereby assumes and shall be responsible for and comply with all duties and obligations express or implied, arising with respect to the Leases.

This Assignment shall bind and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

Assignor warrants title to each Lease, by, through and under Assignor, but not otherwise.

IN WITNESS WHEREOF, the undersigned has executed this instrument on the date of the acknowledgment annexed hereto.

Assignor

[Broker]

By:_____

Name:_____

Title:_____

### ACKNOWLEDGMENT

STATE OF TEXAS                    )
                                  )          §
COUNTY OF _____ )

This instrument was acknowledged before me on this ____ day of _____, 2010, by _____, as Broker, a _____. _____ on behalf of said _____ _____.

My Commission Expires: _____        Notary Public
Commission Number:__  _____